Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
        kwyant@shea.law

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br><br>**PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP; ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE<br><br>Counter-Defendants. | Hearing Date:  May 12, 2022<br>Hearing Time:  9:30 a.m. |

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

ROBERT E. ATKINSON, CHAPTER 7
TRUSTEE,

                    Counter-Claimant

v.

TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

                    Counter-Defendant

**MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED
RECEIVABLES**

HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by and through counsel, respectfully submits this Motion for Partial Summary Judgment (the "Motion") to determine the superior priority of HASelect's perfected security interest in certain of the accounts receivable that Tecumseh-Infinity Medical Receivables Fund, LP ("Tecumseh") claims to have acquired from Debtor Infinity Capital Management, Inc. ("Infinity" or "Debtor").

This Motion is made pursuant to Fed. R. Civ. P. 56 and Federal Rules of Bankruptcy Procedure 7056 and Rule 7056 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada,[1] and is made and based upon the following memorandum of points and authorities as well as statement of undisputed facts submitted herewith and referenced herein:

**PRELIMINARY STATEMENT**

Since approximately February 19, 2019, HASelect has held a perfected security interest in substantially all of Infinity's personal property, including all accounts receivable, as collateral for a loan on which HASelect is presently owed in excess of $14 million.  In or around June 2020, Infinity began selling existing and newly acquired accounts receivable that were subject to HASelect's prior perfected security interest to Tecumseh in violation of Infinity's contractual obligations to HASelect

---

[1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

and without HASelect's knowledge or consent.  As a result, Tecumseh now contends that it owns a substantial number of accounts receivable for which it paid Infinity in excess of $6 million (the "Disputed Accounts")[2] free and clear of HASelect's prior perfected security interest.  Tecumseh, however, is plainly mistaken.  All such accounts receivable were and remain subject to HASelect's superior security interest.

Moreover, as to a significant portion of the Disputed Accounts (identified herein as the "Sold Accounts"), the undisputed facts and evidence presented herewith unequivocally establish that any interest Tecumseh might have acquired in such Disputed Accounts is plainly subordinate and subject to HASelect's prior perfected security interest.  Accordingly, for the reasons set forth below, HASelect respectfully requests that this Court enter an order granting partial summary judgment in its favor and determining that HASelect holds the superior interest in and is entitled to immediate ownership and possession of the Sold Accounts and all proceeds thereof.

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are FRCP 56, Bankruptcy Rule 7056, and Local Rule 7056.

## STATEMENT OF FACTS

**A.    HASelect's Relationship with Infinity and the Loan Transaction**

1.    Beginning in February 2019, HASelect made a series of loans to Infinity that were documented through various written loan agreements and promissory notes through which Infinity pledged substantially all of its personal property, including accounts receivable, to HASelect as collateral for such loans.[3]

2.    HASelect perfected its security interest in all of Infinity's personal property through

---

[2] A list of the Disputed Accounts (also referred to in other filings as the "Tecumseh Receivables") is on file in Infinity's chapter 7 case at ECF Nos. 201-1 and 201-2.

[3] *See* Declaration of Michael Griffin (the "Griffin Declaration"), ¶ 5.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.[4]

3.       On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all prior and related loan documents, the "MLA"), which amended and superseded all prior written loan agreements and promissory notes entered into between HASelect and Infinity.[5]

4.       Accordingly, HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral").  Specifically, Section 4.1 of the MLA describes the Collateral as follows:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").[6]

5.       Pursuant to the MLA, Infinity agreed to use the loan proceeds it received from HASelect to purchase accounts receivable from medical providers.[7]

6.       Such accounts receivable generally arose from medical treatment or prescription medication provided to individuals who were injured in accidents and had asserted personal injury claims against third parties.  These accounts receivable are secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.[8]

7.       Infinity purchased these accounts receivable pursuant to contracts it entered into

---

[4] *Id.* at ¶ 6.  A copy of this UCC-1 filing is submitted herewith as Exhibit 2.

[5] *See* Griffin Declaration, ¶ 7.  A copy of the MLA is submitted herewith as Exhibit 1.

[6] *See* MLA (Exhibit 1), § 4.1.

[7] *See* MLA (Exhibit 1), § 3.2.

[8] *See* Griffin Declaration at ¶ 11.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

directly with various medical providers.[9]  In addition to the contracts Infinity entered into with the sellers of these accounts receivable, Infinity also received direct assignments of the individual personal injury claimants' rights to recovery.[10]

8.      To ensure that HASelect received a perfected, first-priority security interest in all accounts receivable purchased by Infinity (as well as all other Collateral), HASelect required that Infinity use part of loan proceeds advanced by HASelect to repay and retire a prior secured debt owed to Law Finance Group, LLC, which had similarly advanced funds to Infinity for the purchase of accounts receivable.[11]

9.      HASelect also required that Infinity apply an electronic stamp to certain documents associated with its accounts receivable to identify the accounts receivable as HASelect's Collateral.[12]

10.      From February 2019 through April 2020, HASelect advanced loan proceeds totaling approximately $13.7 million to Infinity, which was obligated under the MLA to use such proceeds to purchase accounts receivable.[13]

**B.      Infinity's Sale of HASelect's Collateral to Tecumseh**

11.      On or about June 18, 2020, Infinity and Tecumseh entered into a Sub-Advisory Agreement[14] (the "Sub-Advisory Agreement") under which Infinity agreed, among other things, to "assist [Tecumseh] in acquiring an interest in medical receivables in connection with personal injury cases" in exchange for which Tecumseh agreed to pay Infinity a 20% fee at the time of acquisition as well as 15% of the net profit earned on each such account receivable at the time of collection.[15]

12.      Upon signing the Sub-Advisory Agreement, Infinity began preparing to transfer

---

[9] See Infinity's Amended Schedule G filed in the chapter 7 case at ECF No. 91.

[10] See Excerpts from Transcript of November 9, 2021 Rule 2004 Examination of Anne Pantelas (the "Pantelas Transcript") submitted herewith as Exhibit 4, pp. 66-67 ("Q: Was there any version of this form that you're aware of that was used in the last two years by Infinity in which, you know, Infinity was not identified as the party receiving the assignment?   A: No, no."); Exhibit 7 to Pantelas Transcript (Assignment of Benefits/Medical Lien and Security Agreement).

[11] See Pantelas Transcript (Exhibit 4), pp. 82-83.

[12] See Hemmers Transcript, pp. 108-110; Exhibit 18 to Hemmers Transcript (Exhibit 3) (February 26, 2019 email chain discussing electronic stamping of documents as HASelect collateral).

[13] See Griffin Declaration, ¶ 13.

[14] The Sub-Advisory Agreement was filed in Infinity's chapter 7 case at ECF No. 201-3.  A copy of the Sub-Advisory Agreement is submitted herewith as Exhibit 5.

[15] See Sub-Advisory Agreement, Exhibit A, § 1 (a) and Exhibit B §§ (a) and (b).

accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh by, among other things, removing the electronic stamps that identified such accounts receivable as HASelect's Collateral.[16]

13.    Infinity then began selling accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh without HASelect's knowledge or consent and in violation of Infinity's contractual obligations under the MLA.[17]

### a.    The June 26, 2020 Sale of the 1-A Accounts

14.    On June 19, 2020, Tecumseh issued a Receivables Purchase Order to Infinity (the "1-A Purchase Order") identifying approximately 258 separate accounts receivable (the "1-A Accounts") it intended to purchase from Infinity for a total price of $294,465.70.[18]

15.    On June 26, 2020, Tecumseh wired the $294,465.70 purchase price for the 1-A Accounts to Infinity's Nevada State Bank account ending in 8480.[19]  That same day, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-A Accounts to Tecumseh.[20]

### b.    The July 23, 2020 Sale of the 1-B Accounts

16.    On July 13, 2020, Tecumseh issued a second Receivables Purchase Order to Infinity (the "1-B Purchase Order") identifying approximately 59 separate accounts receivable (the "1-B Accounts") it intended to purchase from Infinity for a total price of $90,008.34.[21]

17.    On July 23, 2020, Infinity executed an Assignment and Bill of Sale by which it sold

---

[16] *See* Hemmers Transcript (Exhibit 3), pp. 61, 110-112; Exhibit 25 to Hemmers Transcript (June 23, 2020 emails from Oliver Hemmers to Endre Debozy confirming removal of electronic stamps).

[17] *Id.* at pp. 110-114 ("Q: And it may have not been clear earlier, but I believe I asked you if any accounts in which HASelect held a security interest were sold to any other party, and I thought you had told me no.  So just -- A: Under the blanket UCC[?]  Q: Yes, under the blanket UCC.  A: Yeah.  In that case the Tecumseh receivables were the only ones that fall in that category."); *see also* Griffin Declaration, ¶ 15.

[18] The 1-A Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-4 and designated as "Exhibit D-1".  A copy of the 1-A Purchase Order is submitted herewith as Exhibit 6.

[19] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated June 30, 2020 is submitted herewith as Exhibit 7.

[20] A copy of the June 26, 2020 Assignment and Bill of Sale for the 1-A Accounts is submitted herewith as Exhibit 8.

[21] The 1-B Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-5 and designated as "Exhibit D-2".  A copy of the 1-B Purchase Order is submitted herewith as Exhibit 9.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

and assigned the 1-B Accounts to Tecumseh.[22]  The following day, Tecumseh wired the $90,008.34 purchase price for the 1-B Accounts to Infinity's Nevada State Bank account ending in 8480.[23]

### c.  The August 12, 2020 Sale of the 1-C Accounts

18.    On August 11, 2020, Tecumseh issued a third Receivables Purchase Order to Infinity (the "1-C Purchase Order") identifying approximately 120 separate accounts receivable (the "1-C Accounts") it intended to purchase from Infinity for a total price of $178,056.19.[24]

19.    On August 12, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-C Accounts to Tecumseh.[25]  On August 12, 2020, August 13, 2020, and August 27, 2020, Tecumseh sent three wire transfers totaling the $178,056.19 purchase price for the 1-C Accounts to Infinity's Nevada State Bank account ending in 8480.[26]

### d.  The September 10, 2020 Sale of the 1-D Accounts

20.    On August 28, 2020, Tecumseh issued a fourth Receivables Purchase Order to Infinity (the "1-D Purchase Order") identifying approximately 1,465 separate accounts receivable (the "1-D Accounts") it intended to purchase from Infinity for a total price of $114,323.03.[27]

21.    On September 10, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-D Accounts to Tecumseh.[28]  On August 31, 2020 and September 11, 2020, Tecumseh sent two wire transfers totaling the $114,323.33 purchase price for the 1-D Accounts to Infinity's Nevada State Bank account ending in 8480.[29]

### e.  The September 16, 2020 Sale of the 1-E Accounts

[22] A copy of the July 23, 2020 Assignment and Bill of Sale for the 1-B Accounts is submitted herewith as Exhibit 10.

[23] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated July 31, 2020 is submitted herewith as Exhibit 11.

[24] The 1-C Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-6 and designated as "Exhibit D-3".  A copy of the 1-C Purchase Order is submitted herewith as Exhibit 12.

[25] A copy of the August 12, 2020 Assignment and Bill of Sale for the 1-C Accounts is submitted herewith as Exhibit 13.

[26] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated August 31, 2020 is submitted herewith as Exhibit 14.

[27] The 1-D Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-7 and designated as "Exhibit D-4".  A copy of the 1-D Purchase Order is submitted herewith as Exhibit 15.

[28] A copy of the September 10, 2020 Assignment and Bill of Sale for the 1-D Accounts is submitted herewith as Exhibit 16.

[29] A copy of the monthly account statements for Infinity's Nevada State Bank account ending in 8420 dated September 30, 2020 are submitted herewith as Exhibit 17.

22.     On September 15, 2020, Tecumseh issued a fifth Receivables Purchase Order to Infinity (the "1-E Purchase Order") identifying approximately 196 separate accounts receivable (the "1-E Accounts") it intended to purchase from Infinity for a total price of $203,469.67.[30]

23.     On September 16, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-E Accounts to Tecumseh.[31]  On September 16, 2020, Tecumseh wired the $203,467.67 purchase price for the 1-E Accounts to Infinity's Nevada State Bank account ending in 8480.[32]

### f.     The September 25, 2020 Sale of the 1-F Accounts

24.     On September 22, 2020, Tecumseh issued a sixth Receivables Purchase Order to Infinity (the "1-F Purchase Order") identifying approximately 332 separate accounts receivable (the "1-F Accounts") it intended to purchase from Infinity for a total price of $481,023.10.[33]

25.     On September 25, 2020, Tecumseh wired the $481,023.10 purchase price for the 1-F Accounts to Infinity's Nevada State Bank account ending in 8480.[34]  Unlike previous sales, Infinity did not execute any assignment or bill of sale transferring ownership of the 1-F Accounts to Tecumseh.

### g.     The September 30, 2020 Sale of the 1-G Accounts

26.     On September 30, 2020, Tecumseh issued a seventh Receivables Purchase Order to Infinity (the "1-G Purchase Order") identifying 13 separate accounts receivable (the "1-G Accounts") it intended to purchase from Infinity for a total price of $55,459.80.[35]

27.     The purchase price for the 1-G Accounts was paid using proceeds that Infinity had

---

[30] The 1-E Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-8 and designated as "Exhibit D-5".  A copy of the 1-E Purchase Order is submitted herewith as Exhibit 18.

[31] A copy of the September 16, 2020 Assignment and Bill of Sale for the 1-E Accounts is submitted herewith as Exhibit 19.

[32] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated September 30, 2020 is submitted herewith as Exhibit 17.

[33] The 1-F Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-9 and designated as "Exhibit D-6".  A copy of the 1-F Purchase Order is submitted herewith as Exhibit 20.

[34] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated September 30, 2020 is submitted herewith as Exhibit 17.

[35] The 1-G Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-10 and designated as "Exhibit D-7".  A copy of the 1-G Purchase Order is submitted herewith as Exhibit 21.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**

1731 Village Center Circle, Suite 150

Las Vegas, Nevada 89134

(702) 471-7432

collected on certain of the Sold Accounts receivable Infinity had previously sold to Tecumseh. On September 30, 2020, Infinity paid itself the $55,459.80 purchase price for the 1-G Accounts through a check drawn on a Bank of America account established by Infinity and Tecumseh for the purpose of collecting proceeds of the Sold Accounts (the "<u>BOA Account</u>")[36], which was deposited to Infinity's Nevada State Bank account ending in 6375.[37] That same day, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-G Accounts to Tecumseh.[38]

**h.    The October 4, 2020 Sale of the 1-H Accounts**

28.    On October 4, 2020, Tecumseh issued an eighth Receivables Purchase Order to Infinity (the "<u>1-H Purchase Order</u>") identifying approximately 310 separate accounts receivable (the "<u>1-H Accounts</u>") it intended to purchase from Infinity for a total price of $149,802.81.[39]

29.    On October 4, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-H Accounts to Tecumseh.[40] On October 7, 2020, Tecumseh wired the $149,802.81 purchase price for the 1-H Accounts to Infinity's Nevada State Bank account ending in 8420.[41]

**i.    The October 14, 2020 Sale of the 1-I Accounts**

30.    On October 12, 2020, Tecumseh issued a ninth Receivables Purchase Order to Infinity (the "<u>1-I Purchase Order</u>") identifying approximately 718 separate accounts receivable (the "<u>1-I Accounts</u>") it intended to purchase from Infinity for a total price of $209,320.99.[42]

31.    On October 14, 2020, Tecumseh wired the $209,320.99 purchase price for the 1-I

---

[36] The BOA Account was established under Infinity's trade name, Infinity Health Connections. *See* Hemmers Transcript (<u>Exhibit 3</u>), p. 119, ll. 1-25; *see also* account statements from the BOA Account on file in Infinity's chapter 7 case at ECF No. 156-1.

[37] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 6375 dated September 30, 2020 is submitted herewith as <u>Exhibit 22</u>.

[38] A copy of the September 30, 2020 Assignment and Bill of Sale for the 1-G Accounts is submitted herewith as <u>Exhibit 23</u>.

[39] The 1-H Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-11 and designated as "Exhibit D-8". A copy of the 1-H Purchase Order is submitted herewith as <u>Exhibit 24</u>.

[40] A copy of the October 4, 2020 Assignment and Bill of Sale for the 1-H Accounts is submitted herewith as <u>Exhibit 25</u>.

[41] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 is submitted herewith as <u>Exhibit 26</u>.

[42] The 1-I Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-12 and designated as "Exhibit D-9". A copy of the 1-I Purchase Order is submitted herewith as <u>Exhibit 27</u>.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Accounts to Infinity's Nevada State Bank account ending in 8420.[43]  Infinity did not execute any assignment or bill of sale transferring ownership of the 1-I Accounts to Tecumseh.

### j.     The October 26, 2020 Sale of the 1-J Accounts

32.     On October 23, 2020, Tecumseh issued a tenth Receivables Purchase Order to Infinity (the "1-J Purchase Order") identifying approximately 125 separate accounts receivable (the "1-J Accounts" and together with the 1-A Accounts, 1-B Accounts, 1-C Accounts, 1-D Accounts, 1-E Accounts, 1-F Accounts, 1-G Accounts, 1-H Accounts, and 1-I Accounts, the "Sold Accounts") it intended to purchase from Infinity for a total price of $136,063.26.[44]

33.     On October 26, 2020, Tecumseh wired the $136,063.26 purchase price for the 1-J Accounts to Infinity's Nevada State Bank account ending in 8420.[45]  Infinity did not execute any assignment or bill of sale transferring ownership of the 1-J Accounts to Tecumseh.

### k.     Summary of the Sold Accounts

34.     Accordingly, the Sold Accounts that are the subject of this Motion include the Disputed Accounts purportedly sold and assigned to Tecumseh through the following sale transactions.  The individual Sold Accounts are identified separately in the Tecumseh Receivables Purchase Orders that are attached as exhibits hereto.

| Sale | PO Date | Assignment Date | Payment Date | Purchase Price | Face Value |
|---|---|---|---|---|---|
| 1-A Accounts | 6/19/2020 | 6/26/2020 | 6/26/2020 | $294,465.70 | $982,518.86 |
| 1-B Accounts | 7/13/2020 | 7/23/2020 | 7/23/2020 | $90,008.34 | $296,078.35 |
| 1-C Accounts | 8/11/2020 | 8/12/2020 | Various | $178,056.19 | $645,886.88 |
| 1-D Accounts | 8/28/2020 | 9/10/2020 | Various | $114,323.33 | $268,557.23 |
| 1-E Accounts | 9/15/2020 | 9/16/2020 | 9/16/2020 | $203,469.67 | $811,767.32 |
| 1-F Accounts | 9/22/2020 | N/A | 9/25/2020 | $481,023.10 | $1,671,274.81 |
| 1-G Accounts | 9/30/2020 | 9/30/2020 | 9/30/2020 | $55,549.80 | $212,638.27 |
| 1-H Accounts | 10/4/2020 | 10/4/2020 | 10/7/2020 | $149,802.81 | $516,950.34 |

[43] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 is submitted herewith as Exhibit 26.

[44] The 1-J Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-13 and designated as "Exhibit D-10". A copy of the 1-J Purchase Order is submitted herewith as Exhibit 28.

[45] A copy of the monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 is submitted herewith as Exhibit 26.

| Sale | PO Date | Assignment Date | Payment Date | Purchase Price | Face Value |
|------|---------|-----------------|--------------|----------------|------------|
| 1-I Accounts | 10/12/2020 | N/A | 10/14/2020 | $209,320.99 | $1,024,171.82 |
| 1-J Accounts | 10/23/2020 | N/A | 10/26/2020 | $136,063.26 | $362,674.98 |
| | | | | **$1,912,083.19** | **$6,792,518.86** |

35.     Each of the Sold Accounts was purchased by Infinity using funds paid from its operating account at Nevada State Bank prior to the sale or assignment of any interest in such Sold Account to Tecumseh and prior to the receipt of payment from Tecumseh.[46]

36.     Tecumseh does not dispute that it purchased the Sold Accounts from Infinity pursuant to the above-described Purchase Orders.[47]

37.     Tecumseh did not file any UCC-1 financing statement to perfect any interest it purchased in any of the Sold Accounts.[48]

**C.    Infinity's Continuing Sales of Accounts to Tecumseh**

38.     On or about October 22, 2020, Infinity and Tecumseh exchanged emails discussing an additional purchase of approximately $1.1 million of accounts receivable in which HASelect held a perfected security interest.[49]  In the course of doing so, it appears Infinity and Tecumseh realized that the Sold Accounts remained subject to HASelect's perfected security interest.[50]  Thereafter, it appears Tecumseh generally ceased issuing purchase orders for new transactions and that Infinity began using the BOA Account instead of Infinity's operating account at Nevada State Bank to pay for new purchases of accounts receivable in a futile attempt to circumvent HASelect's perfected security interest under the MLA.  Nevertheless, the substances of the transactions between Infinity and Tecumseh remained the same.  Infinity continued to purchase and receive direct assignments of

---

[46] A list of the Disputed Accounts is on file in Infinity's chapter 7 case at ECF No. 179-1.  That list includes a column labeled "PaidDate", which denotes the date on which each Disputed Account was acquired by Infinity.  *See* Hemmers Transcript (Exhibit 3), pp. 38-39 (Q: "… the Paid Date shown here in column DV, does that represent the date on which Infinity acquired the receivable?"  A: "Yeah, that's the date, yeah.")

[47] *See Declaration of Chad Myer in Support of Motion of Party in Interest Tecumseh-Infinity Medical Receivables Fund, LP to (1) Abandon Property and (2) Lift Automatic Stay* filed in Infinity's chapter 7 case at ECF No. 54, ¶ 11 ("[Tecumseh] purchased the remaining Tecumseh Receivables from the Debtor.  Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of [the] Tecumseh Receivables from the Debtor.").

[48] A UCC Search Report from the Office of the Secretary of State of the State of Nevada is submitted herewith as Exhibit 29.

[49] *See* Hemmers Transcript (Exhibit 3), Exhibit 24.

[50] *Id*.

SHEA LARSEN

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

accounts receivable from various medical providers, to obtain direct assignments of the individual personal injury claimants' rights to recover, and to allocate collections realized on the accounts it purchased according to the Sub-Advisory Agreement. Although, it is unclear what interest, if any, in such accounts receivable was assigned to Tecumseh as Tecumseh is unable to produce any document evidencing its receipt of any assignment of any account receivable after the October 4, 2020 Assignment and Bill of Sale.

39.     It is HASelect's position that all of the Disputed Accounts are included within the Collateral and remain subject to HASelect's prior perfected security interest notwithstanding any interest Tecumseh may claim. However, because HASelect's investigation into the facts surrounding the continuing purchases occurring after October 26, 2020 remains ongoing, the instant Motion pertains only to the Sold Accounts described above.

**D.     HASelect's Purchase of Estate's Interests in Disputed Accounts**

40.     On or about December 3, 2021, Chapter 7 Trustee Robert E. Atkinson, through his counsel, filed a *Motion to: (I) Approve Sale of Certain Assets; (II) Set Sale/Auction Procedures; and (III) Set Auction Hearing Date*[51] (the "Sale Motion") seeking to sell whatever interest the bankruptcy estate may have in the Tecumseh Receivables (as defined therein) (i.e., the Disputed Accounts, including the Sold Accounts that are the subject of this Motion)[52] as well as all claims and causes of action that the Trustee or bankruptcy may have relating thereto.

41.     On January 21, 2022, the Court entered an order granting Sale Motion, approving the sale of the estate's rights and interests in the Disputed Receivables to HASelect free and clear of all liens and encumbrances except for the respective interests of HASelect and Tecumseh and finding HASelect to be a good faith purchaser pursuant to 11 U.S.C. § 363(m).[53]

42.     HASelect subsequently purchased all of the estate's rights and interests in the

---

[51] *See* ECF No. 145 on file in Infinity's chapter 7 case.

[52] The Disputed Accounts referenced herein are the same as the accounts described as the Tecumseh Receivables the Sale Motion. Likewise, the Sold Accounts that are the subject of this Motion are a subset of the accounts described as the Tecumseh Receivables the Sale Motion.

[53] *See* ECF No. 175 on file in Infinity's chapter 7 case.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Disputed Receivables and all causes of action relating thereto for $100,000.[54]

## ARGUMENT

### A.    Partial Summary Judgment Confirming HASelect's Superior Interest in the Sold Accounts Is Appropriate and Warranted.

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Id.* As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id*.

### B.    HASelect's Perfected Security Interest in the Sold Accounts Is Superior to Any Interest Tecumseh May Hold.

As this Court has already confirmed through its orders granting HASelect's *Motion for Relief from Automatic Stay*[55] as well as HASelect and Chapter 7 Trustee Robert Atkinson's *Joint Motion*

---

[54] *See* ECF Nos. 190 and 191 on file in Infinity's chapter 7 case.

[55] *See* ECF No. 96 in Infinity's chapter 7 case.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

*for Abandonment of Collateral*[56] filed in Infinity's chapter 7 case, HASelect holds a perfected, first-priority security interest in all Collateral, including all existing and after acquired accounts receivable in which Infinity held any interest, pursuant to the MLA.   Moreover, the priority, perfection, and enforceability of HASelect's security interest in the Sold Accounts can be quickly confirmed through a simple review of the MLA and applicable law.[57]

      **1.**      **HASelect Holds a Perfected Security Interest in the Sold Accounts.**

The validity and enforceability of a security interest in personal property, including accounts, is determined under Article 9 of the Uniform Commercial Code ("UCC").  *In re Schwalb*, 347 B.R. 726, 738 (Bankr. D. Nev. 2006) ("The initial consequence of Article 9's applicability is that the creation and status of [lender's] interest is governed by a combination of the common law of contract law and the statutory provisions of Article 9.").  Article 9 is intentionally broad; it applies to all security interests in personal property "regardless of the form of the transaction or the name that the parties have given to it."  *Id*. (citing cmt. 2 to UCC § 9-109).

      **a.**      **The Sold Accounts are "Accounts" under the UCC.**

Because different rules apply to different types of personal property pledged as collateral under the UCC, the first step in determining the priority of HASelect's security interest is to identify the type of collateral at issue.  The term "account" is defined broadly under the UCC to include a right to payment for property sold, leased, or licensed, or services rendered.[58]  The Sold Accounts that are the subject of this Motion arose from professional medical services, and in some limited instances prescription medication, provided to personal injury claimants by the medical providers from whom Infinity purchased the Sold Accounts.  Accordingly, the Sold Accounts are plainly "accounts" within the meaning of the UCC.

      **b.**      **HASelect's Security Interest Attached to the Sold Accounts.**

Next, for an Article 9 security interest to be enforceable, it must "attach."  *Id*.  Attachment

---

[56] *See* ECF No. 97 in Infinity's chapter 7 case.

[57] The MLA is governed by Illinois law.  *See* MLA (Exhibit 1), § 9.10.  There appears to be no material difference between the relevant provisions of the Uniform Commercial Code as adopted in Illinois as compared to Nevada.

[58] NRS 104.9102(1)(b); 810 ILCS 5/9-102 (a)(2).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

of security interests is governed by UCC § 9-203, which provides that a security interest "attaches to collateral when it becomes enforceable against the debtor with respect to the collateral."[59]  "A security interest is enforceable against the debtor and third parties with respect to the collateral only if: (a) Value has been given; (b) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (c) … The debtor has authenticated[60] a security agreement[61] that provides a description of the collateral …"[62]  *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F.Supp.2d 1013, 1020 (D. Nev. 2009) (citing *In re Schwalb*, 347 B.R. at 741; NRS 104.9203(2)(a)-(c)).

All three requirements for attachment are easily satisfied in this case.  There is no dispute that HASelect loaned in excess of $13 million to Infinity.  As such, value was clearly given.  Likewise, there is no dispute that Infinity held a personal property interest in the Sold Accounts. Otherwise, Infinity's acceptance of payment from Tecumseh and Infinity's assignment and transfer of the Sold Accounts through the various Assignment and Bill of Sale agreements would be entirely meaningless.  In fact, through their execution of those Assignment and Bill of Sale agreements, Infinity and Tecumseh expressly agreed, among other things, that Infinity had purchased and was in possession of the Sold Accounts referenced therein that it intended to sell and assign those Sold Accounts to Tecumseh.[63]  Moreover, both Infinity and Tecumseh admit and acknowledge that Tecumseh purchased the Sold Accounts from Infinity.[64]  Finally, there is no dispute that Infinity

---

[59] NRS 104.9203(1); 810 ILCS 5/9-203(a).

[60] Under NRS 104.9102(1)(g) and 810 ILCS 5/9-102(a)(7), "authenticate" means "(1) to sign; or (2) with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol or process."

[61] NRS 104.9102(1)(uuu) and 810 ILCS 5/9-102(a)(74) define "security agreement" as "an agreement that creates or provides for a security interest."  NRS 104.1201(1)(ii) and 810 ILCS 5/9-1201(b)(35) define "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation."

[62] NRS 104.9203; 810 ILCS 5/9-203.

[63] *See* Exhibits 8, 10, 13, 16, 19, 25, and 27 submitted herewith at Recitals A and B.

[64] *See* Hemmers Transcript (Exhibit 3), pp. 110-114 ("Q: And it may have not been clear earlier, but I believe I asked you if any accounts in which HASelect held a security interest were sold to any other party, and I thought you had told me no.  So just -- A: Under the blanket UCC[?]  Q: Yes, under the blanket UCC.  A: Yeah.  In that case the Tecumseh receivables were the only ones that fall in that category."); *see also Amended Declaration of Chad Myer in Support of Motion of Party in Interest Tecumseh-Infinity Medical Receivables Fund, LP to (1) Abandon Property and (2) Lift Automatic Stay* filed in Infinity's chapter 7 case at ECF No. 201, ¶ 11 ("[Tecumseh] purchased the remaining Tecumseh Receivables from the Debtor.  Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of [the] Tecumseh Receivables from the Debtor.").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

signed the MLA, and it is abundantly clear from the plain language of the MLA that the Collateral pledged thereunder includes all of Infinity's interests in both existing and after acquired accounts, which are plainly identified within the description of the Collateral set forth at § 4.1 of the MLA.[65] Accordingly, it is clear the MLA constitutes an authenticated security agreement. Having satisfied the requirements of UCC § 9-203, there should be no doubt that HASelect's security interest under the MLA attached to the Sold Accounts.

### c. HASelect Perfected Its Security Interest in the Sold Accounts.

Perfection of a security interest in accounts is governed by UCC § 9-310, which provides that "a financing statement must be filed to perfect all security interests" unless the transaction falls into one of the specific exceptions set forth therein – none of which apply to the facts of at issue in this Adversary Proceeding.[66] Again, it is undisputed that HASelect perfected its security interest in the Collateral with the filing of its UCC-1 financing statement at the outset of its lending relationship with Infinity in February 2019 – more than a year before Tecumseh began purchasing the Disputed Accounts from Infinity. Tecumseh, on the other hand, made no effort to perfect any security interest in the Sold Accounts and, therefore, remains an unsecured creditor.

### 2. Tecumseh's Purchase of the Sold Accounts Remains Subject to the UCC.

The term "security interest" includes the interest of a buyer of accounts.[67] *See Dellamargio v. B-Line, LLC (In re Barker)*, 306 B.R. 339, 349 (Bankr. E.D. Cal. 2004) ("The scope of Revised Article 9 extends to: 'A sale of accounts....'"). Dovetailing with the UCC's inclusive definition of "security interest," UCC § 9-102 defines "debtor" to include "[a] seller of accounts,"[68] while UCC § 9-102 defines "secured party" to include "[a] person to which accounts ... have been sold."[69] Likewise, "collateral" is defined in UCC § 9-102 to include "[a]ccounts ... that have been sold,"[70]

---

[65] The sufficiency of descriptions of collateral in security agreements is addressed at UCC § 9-108, which provides in part, "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." NRS 104.9108(1); 810 ILCS 5/9-108(a).

[66] NRS 104.9310(1); 810 ILCS 5/9-310(a).

[67] NRS 104.1201(2)(ii); 810 ILCS 5/1-201(b)(35).

[68] NRS 104.9102(1)(bb); 810 ILCS 5/9-102(a)(28).

[69] NRS 104.9102(1)(ttt); 810 ILCS 5/9-102(a)(73).

[70] NRS 104.9102(1)(l); 810 ILCS 5/9-102(a)(12)

while UCC § 9-109, which sets forth the scope of Article 9, provides that "this Article applies to ...(3) [a] sale of accounts..."[71]  *See Netbank, FSB v. Kipperman (In re Commercial Money Center, Inc.)*, 350 B.R. 465, 475 (9th Cir. BAP 2006) ("[T]he UCC uses lending terminology in provisions that are applicable to sales.").  Thus, under the UCC, it makes no difference that Tecumseh purchased the Sold Accounts.  The same rules of perfection and priority apply regardless of Tecumseh's purchase of the Sold Accounts.  And those rules clearly provide that HASelect's prior perfected security interest is superior to any unperfected interest Tecumseh can claim as a result of its purchase of the Sold Accounts.

### 3.    Tecumseh Did Not Perfect Any Security Interest in the Sold Accounts.

As discussed above, UCC § 9-310 requires that a financing statement must be filed to perfect a security interest in accounts regardless of whether the accounts are purchased or pledged as collateral.[72]  Tecumseh did not file any UCC-1 financing statement in connection with its purchase of the Sold Accounts from Infinity.[73]  As a result, Tecumseh holds only an unperfected security interest in the Sold Accounts.  *See In re De-Pen Line*, 215 B.R. 947 (Bankr. E.D. Penn. 1997) ("[account buyer's] failure to file a financing statement makes its interest that of an unsecured creditor …").

### 4.    Tecumseh's Unperfected Interest in the Sold Accounts Is Subordinate to HASelect's Prior Perfected Security Interest.

Priority among competing security interests is determined under UCC § 9-322, which provides that "priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules:  (1)  Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. … (2)  A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."[74]  *See NetBank, FSB v. Kipperman (IN re Commer. Money Ctr., Inc.)*, 350 B.R. 465, 479 (9th Cir. BAP 2006) ("[I]f the hypothetical financier is the first to perfect, then generally

---

[71] NRS 104.9109 (1); 810 ILCS 5/9-109 (a).

[72] NRS 104.9310(1); 810 ILCS 5/9-310(a).

[73] *See* <u>Exhibit 29</u> submitted herewith.

[74] NRS 104.9322 (1); 810 ILCS 5/9-322 (a).

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

it will be the first in priority."); *Hendrickson v. HW Partners, LLC (In re HW Partners, LLC)*, No. 11-03366-JAR11; 2013 Bankr. LEXIS 3820, *39-41 (E.D. Wash. Bankr. Sept. 12, 2013) (finding that the party who filed their UCC-1 first was first to perfect its rights in an instrument and thus prevailed over another creditor claiming priority in a debtor's assets). As HASelect indisputably perfected its security interest in the Sold Accounts in 2019 prior to Tecumseh acquiring any interest in the Sold Accounts in 2020, HASelect's security interest clearly holds priority over any interest Tecumseh may claim.

Furthermore, the superiority of HASelect's security interest in the Sold Accounts remains intact notwithstanding Infinity's sale of the Sold Accounts to Tecumseh. Specifically, UCC § 9-315 provides, "A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien …"[75] *See In re Neatex, Inc.* 77 B.R. 808 (D. Nev. Bankr. 1987) (citing to former NRS 104.9306, subsequently replaced by NRS 104.9315, and finding that the nonconsensual sale of a creditor's collateral did not alter or change the creditor's perfected security interest in the collateral that existed pre-sale and the same security interest continued in the sold collateral post-sale); *Hall v. Hopkins (In re Jacobs)*, No. 04-42387, 2006 Bankr. LEXIS 2264, *17-19 (Idaho Bankr. Feb. 10, 2006) (stating that, without the express intent to release a security interest, a creditor's security interest remains attached to sold collateral post-sale). As such, Infinity's sale of the Sold Accounts to Tecumseh had no effect on the validity or priority of HASelect's perfected security interest.

## C.    Any Interest Tecumseh Acquired in the Sold Accounts Is Avoidable for HASelect's Benefit.

As explained above, the purchase of an interest in accounts is a "security interest" that is subject to the priority and perfection requirements of Article 9 of the UCC. This fact is easily confirmed by Assembly Committee Comments 4 and 5 to UCC § 9-109, which explain as follows:

> Under subsection (a)(3), as under former Section 9-102, this Article applies to sales of accounts and chattel paper. … *A "sale" of an account, chattel paper, a promissory note, or a payment intangible includes a sale of a right in the*

---

[75] NRS 104.9315 (1)(a); 810 ILCS 5/9-322 (a)(1).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

***receivable, such as a sale of a participation interest.*** The term also includes the sale of an enforcement right. … [N]either this Division nor the definition of "security interest" in Section 1201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation. ***This Division applies to both types of transactions. The principal effect of this coverage is to apply this Division's perfection and priority rules to these sales transactions.*** Use of terminology such as "security interest," "debtor," and "collateral" is merely a drafting convention adopted to reach this end, and its use has no relevance to distinguishing sales from other transactions.

UCC § 9-109, cmts. 4 and 5 (emphasis added).

Accordingly, any interest Tecumseh could have acquired through its purchase of the Sold Accounts from Infinity would undoubtedly be a "security interest" subject to the UCC. *See Valley Bank of Nevada v. City of Henderson*, 528 F.Supp. 907 (D. Nev. 1981) (noting that sales of accounts fall within the scope of the Article 9 of the UCC). Tecumseh, however, did not file any UCC-1 financing statement to perfect any security interest in the Sold Accounts as required pursuant to UCC § 9-310(a).[76] Consequently, any interest that Tecumseh may hold in the Sold Accounts is unperfected and avoidable as a matter of law pursuant to 11 U.S.C. § 544(a), which provides:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by – (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

11 U.S.C. § 544(a)(1).

The trustee's "strong arm" powers under 11 U.S.C. § 544(a) now belong to HASelect as a result of the Trustee's sale of the estate's interests in the Sold Accounts.[77] Indeed, the Order Approving Sale expressly confirmed that all causes of action that could be brought by the Trustee pursuant to Section 544, among others, were sold and transferred to HASelect.[78] As a result, HASelect now holds the power to avoid Tecumseh's unperfected security interest in the Sold Accounts.

As the Ninth Circuit Court of Appeals has explained, "[s]ection 544 of the Bankruptcy Code,

---

[76] NRS 104.9310 (1); 810 ILCS 5/9-310 (a).

[77] *See* ECF No. 184 on file in Infinity's chapter 7 case.

[78] *Id.* at p. 2.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the 'strong-arm clause,' grants a trustee in bankruptcy 'the rights and powers of a hypothetical creditor who obtained a judicial lien on all of the property in the estate at the date the petition in bankruptcy was filed.'" *Neilson v. Chang (In re First T.D. & Investment, Inc.)*, 253 F.3d 520, 526 (9th Cir. 2001) (citation omitted).  In particular, "[o]ne of those powers it the ability to take priority over or 'avoid' security interests that are unperfected under applicable state law…." *Id.* (internal quotations and citations omitted).

Likewise, UCC § 9-317(a)(2)[79] confirms that estate's rights in the Sold Accounts, which were purchased by HASelect, take priority over Tecumseh's unperfected security interest: "[a] security interest…is subordinate to the rights of…a person that becomes a lien creditor before…the time the security interest…is perfected…."  The term "lien creditor" is defined in UCC § 9-102(a)(52)[80] to include "[a] trustee in bankruptcy from the date of the filing of the petition."  By operation of the Trustee's sale of the estate's interests in the Sold Accounts to HASelect, HASelect now qualifies as a "lien creditor" under this subsection.

Tecumseh's claimed purchase of the Sold Accounts is again irrelevant.  Specifically, UCC § 9-318(b)[81] provides, "[f]or purposes of determining the rights of creditors of…a debtor that has sold an account…, while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account…identical to those the debtor sold."  In other words, because Tecumseh failed to perfect, whatever interest it could have acquired in the Sold Accounts from Infinity became property of Infinity's bankruptcy estate upon the filing of Infinity's chapter 7 petition and now remains subject to HASelect's superior position as a "lien creditor" under 11 U.S.C. § 544(a).  *See, e.g., Octagon Gas Sys. v. Rimmer*, 995 F.2d 948 (10th Cir. 1993) ("… because, under Article 9, a sale of accounts is treated as if it creates a security interest in the accounts, accounts sold by a debtor prior to filing for bankruptcy remain property of the debtor's bankruptcy estate."); *In re Vigil Bros. Construction, Inc.*, 193 B.R. 513 (9th Cir. B.A.P. 1996) (holding that position of unperfected buyer of accounts was subordinate to subsequent chapter 7 trustee's position as lien creditor); *In re Cripps*,

---

[79] NRS 104.9317(1)(b); 810 ILCS 5/9-317(a)(2).
[80] NRS 104.9102(1)(yy); 810 ILCS 5/9-102(a)(52).
[81] NRS 104.9318(2); 810 ILCS 5/9-318(b).

31 B.R. 541 (Bankr. W.D. Okla. 1983) (same holding).

As a matter of law, Tecumseh's unperfected interest in the Sold Accounts is plainly subordinate to both HASelect's position as a perfected secured creditor under the MLA and HASelect's position as a "lien creditor" under § 544(a) according to the rights HASelect acquired from Infinity's bankruptcy estate.

<u>CONCLUSION</u>

Based on the foregoing, HASelect respectfully requests that this Court enter an order (i) granting partial summary judgment in its favor, (ii) determining that HASelect's perfected security interest in the Sold Accounts under the MLA is superior to any interest held by Tecumseh in the Sold Accounts, (iii) determining that HASelect's position as a "lien creditor" under 11 U.S.C. § 544(a) is superior to any interest held by Tecumseh in the Sold Accounts, (iv) determining that any interest held by Tecumseh in the Sold Accounts is avoided pursuant to 11 U.S.C. § 544(a), (v) determining that HASelect is entitled to immediate ownership and possession of the Sold Accounts as well as all proceeds thereof, and (vi) compelling Tecumseh to immediately surrender and turn over to HASelect all of the Sold Accounts as well as all proceeds thereof pursuant to 11 U.S.C. § 550(a).

Dated this <u>22nd</u> day of March 2022.

SHEA LARSEN

/s/ *Bart K. Larsen, Esq.*
BART K. LARSEN, ESQ.
Nevada Bar No. 8538
KYLE M. WYANT, ESQ.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivable Litigation Finance Fund International SP*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1. On March 22, 2022, I served the following document(s): **MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES**

2. I served the above document(s) by the following means to the persons as listed below:

☒    a.    ECF System:

CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ggordon@gtg.legal, bknotices@gtg.legal

GABRIELLE A. HAMM on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ghamm@Gtg.legal, bknotices@gtg.legal

MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

transmission is attached.

☐    f.    By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 22, 2022.

By: /s/ *Bart K. Larsen, Esq,*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432