GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
GABRIELLE A. HAMM
Nevada Bar No. 11588
E-mail: ghamm@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116
Email: michael.napoli@akerman.com

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC. *dba* INFINITY HEALTH CONNECTIONS,<br><br>    Debtor. | Case No. 21-14486-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>    Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>    Defendant. | Adversary Case No. 21-01167-abl<br><br><br>**OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>    Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP; ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE,<br><br>    Counter-Defendants. | Date: May 26, 2022<br>Time: 9:30 a.m. |

63241790;1

|     |     |
| --- | --- |
| 1   | ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE, |
| 2   |     |
| 3   | Counter-Claimant, |
|     | v.  |
| 4   | TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, |
| 5   |     |
| 6   | Counter-Defendant. |

Defendant and Counter-claimant Tecumseh–Infinity Medical Receivable Fund, LP ("**Tecumseh**") respectfully submits this opposition (the "**Opposition**") to the *Motion for Partial Summary Judgment as to Certain Disputed Receivables* [ECF No. 53] (the "**Motion**") filed by Plaintiff *HASelect-Medical Receivables Litigation Finance Fund International LP* ("**HASelect**").

This Opposition is made and based on the following memorandum of points and authorities, the declarations of Michael Belotz (the "**Belotz Declaration**") and Gabrielle A. Hamm (the "**Hamm Declaration**") and the *Statement of Disputed Facts in Support of Opposition to Motion for Partial Summary Judgment as to Certain Disputed Receivables* (the "**Disputed Facts**"), filed contemporaneously herewith, the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearing on the Motion.

## I. INTRODUCTION

HASelect moves for summary judgment arguing that a subset of the receivables claimed by Tecumseh (the "**Disputed Receivables**")[1] were previously owned by the Debtor before being sold to Tecumseh. Accordingly, argues HASelect, Tecumseh acquired the Disputed Receivables subject to HASelect's prior lien. HASelect's Motion turns on a material and disputed question of fact: Did the Debtor purchase and then resell the Disputed Receivables, or did the Debtor acquire the Disputed Receivables on Tecumseh's behalf and for its benefit? If the former, HASelect's lien attached to the Disputed Receivables. If the latter, the Debtor held the Disputed Receivables in a purchase money resulting trust precluding the attachment of HASelect's lien.

---

[1] The "Disputed Receivables" are identified in Exhibits B through K and M to the Belotz Declaration. Belotz Decl. at ¶¶ 12, 13, 19.

63241790;1

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

HASelect's evidence fails to resolve this issue as a matter of law. The requirements of the Sub-Advisory Agreement, the testimony of Oliver Hemmers, the testimony of Michael Belotz, and the contemporaneous records of the acquisition of the Disputed Receivables create a fact issue at the very least. In addition, there is some evidence that HASelect consented to the sale of some of the Disputed Receivables.

Moreover, HASelect's motion is premature. Discovery has barely begun. Tecumseh only recently responded to HASelect's written discovery and HASelect has not responded to Tecumseh's written discovery. The parties have yet to obtain all of the Debtor's records – particularly the e-mail correspondence of the Debtor's principals. No depositions have been taken.[2] Due to the lack of discovery to date, the parties have not and cannot present sufficient evidence for the Court to determine the exact dates of transactions or whether HASelect acquiesced in sales of the Disputed Receivables to Tecumseh.

The Court should therefore deny HASelect's motion.

## II. RELEVANT FACTS

1. In June 2020, Tecumseh retained the Debtor as a sub-advisor to assist it in acquiring and managing a portfolio of medical litigation receivables. The Debtor was to act as finder, broker and manager of Tecumseh's receivables. It was not to acquire and did not acquire an ownership interest in the receivables it located and managed for Tecumseh. As such, Tecumseh's receivables are not subject to HASelect's lien.

2. Prior to the bankruptcy, Tecumseh acquired about 8,670 receivables with a face value of $28,045,874. *See* Belotz Decl. at ¶ 9. The receivables that Tecumseh acquired represent a three-way transaction between Tecumseh, a medical provider and a personal injury plaintiff. Tecumseh agreed to pay the medical provider a certain sum of money in exchange for the provider providing medical services to the plaintiff. The plaintiff in turn agreed to pay Tecumseh

---

[2] Oliver Hemmers and Anne Pantelas, the Debtor's principals, testified in a Rule 2004 examination in the main bankruptcy. HASelect's counsel objected to questioning of Hemmers related to this adversary proceeding. Hemmers Trans. at 169:9-170:22.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

3

a larger amount of money (represented by the face amount of the receivable) secured by an interest in the plaintiff's claim. *Id.*

3. HASelect's motion is directed to the Disputed Receivables – a specific subset of 2,833 receivables with a face value approximately $6.1 million – acquired by Tecumseh at the beginning of its relationship with the Debtor. As with its remaining receivables, Tecumseh purchased these receivables directly from the medical providers using the Debtor as a broker and manager. *See* Belotz Decl. at ¶ 7.

**A.    The Debtor acted as a broker and servicer for Tecumseh**

4. The relationship between Tecumseh and the Debtor was governed by a June 2020 Sub-Advisory Agreement,[3] which generally provided that the Debtor would (i) assist Tecumseh is purchasing medical receivables "directly from the Medical Service Provider" and (ii) service and collect any receivables that Tecumseh might acquire. *See* Sub-Advisory Agreement at Exh. A, ¶ 3(b), (e); Belotz Decl. at ¶ 7 ("The purpose of the Sub-Advisory Agreement was to facilitate the sale of receivables from medical providers to Tecumseh and to provide for servicing of the receivables by the Debtor.").

5. To that end, the Sub-Advisory Agreement called for the Debtor to identify receivables for Tecumseh to purchase and to negotiate a purchase price on Tecumseh's behalf. Sub-Advisory Agreement at ¶¶ 1(b), 3(a), 3(b). The Debtor was also to arrange all of the paperwork necessary to "evidence the sale of the Receivable to [Tecumseh] by the Medical Service Provider." *Id.* at ¶ 3(d). The Sub-Advisory Agreement provided no mechanism by which the Debtor would sell receivables that it owned to Tecumseh.

6. The Debtor was not buying receivables and reselling them to Tecumseh. *See* Excerpts of Transcript of 2004 Examination of Oliver Hemmers, Volume II (Nov. 18, 2021) ("**Hemmers Trans.**") at 186:9-11.[4] The Debtor was merely an intermediary and servicer for Tecumseh. *See* Belotz Decl. at ¶ 7. As such, the Debtor was not to acquire an interest in the receivables purchased on Tecumseh's behalf or to be part of the chain of title. *See id.*; Hemmers

---

[3] Disputed Facts, Exhibit A.

[4] Disputed Facts, Exhibit N.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

4

63241790;1

Trans. at 186:3-8. Because the Debtor was not reselling receivables to Tecumseh, the Debtor had no opportunity to profit on the receivables Tecumseh purchased. Thus, Tecumseh agreed to pay the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables. *See* Belotz Decl. at ¶ 8.

7. In practice, the Debtor acquired no interest in the receivables; it merely serviced them. *See* Hemmers Trans. at 186:12-17. The funds to purchase the receivables came from Tecumseh not the Debtor. *Id*. at 185:21-186:2. All dollars collected on the receivables were paid directly to Tecumseh as the money belonged to Tecumseh and not to the Debtor. *Id*. at 186:18-23. Hemmers, one of the Debtor's principals, testified that the Debtor did not own an interest in any of the receivables acquired by Tecumseh. *Id*. at 173:18-174:14, 174:15-175:3.

**B.    The Debtor acted as an agent in Tecumseh's purchases; not as a principal**

8. The process for purchasing a receivable began with the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. *See* Belotz Decl. at ¶ 10. FTM Investments, Inc. ("**FTM**") would then verify the receivable on behalf of Tecumseh, after which Tecumseh would approve of the purchase. *Id.* Tecumseh then paid the price agreed to by the medical provider along with the fee required by the Sub-Advisory Agreement. *Id.* The payments were made in two primary ways: (1) payments directly from Tecumseh's BofA Account (defined below) to the medical providers and (2) payments to the Debtor to fund the purchases of receivables on Tecumseh's behalf. *Id.*

9. To facilitate the purchase of receivables and collection of proceeds, Tecumseh ultimately opened an account with Bank of America (the "**BofA Account**") that was funded by Tecumseh and granted signing authority to Hemmers and Anne Pantelas (along with Belotz and another Tecumseh principal, Chad Meyer). *See* Belotz Decl. at ¶ 12. However, the BofA Account was not opened until October of 2020 because of difficulties encountered in setting up an account with multiple authorized signatories and because of the almost insurmountable challenge of in-person banking in the midst of the COVID-19 pandemic. *Id.* Therefore, from approximately July through October 2020, Tecumseh transferred funds to the Debtor to purchase the receivables on Tecumseh's behalf. *Id.* Of the approximately 8,670 receivables purchased,

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

5

only 2,833 with a face value of approximately $6.1 million involved a transfer of funds to the Debtor. These are the Disputed Receivables. *Id.*

10. With respect to the Disputed Receivables, the Debtor periodically (roughly, every two weeks) provided Tecumseh with a list of receivables from various medical providers that the Debtor recommended that Tecumseh purchase. From July 13, 2020 through October 29, 2020, the Debtor sent twelve such lists. *See* Belotz Decl. at ¶ 13 and Exhibits B – K to the Disputed Facts. Each list identified a set of receivables that the Debtor planned to purchase on Tecumseh's behalf. For each receivable, the Debtor provided the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price and an estimated total cost including the Debtor's fee. *See* Belotz Decl. at ¶ 14.

11. The lists also included a "Date Paid" column. The "Date Paid" column was often blank, sometimes contained dates that were months after the date of the list, and sometimes contained dates prior to the date of the list. *See id.* The "Date Paid" was taken from the Debtor's internal database of receivables and reflected the date that the Debtor reached an agreement with the provider as to the price of the receivable. Blank dates and November dates were placeholders. The "Date Paid" column did not reflect the date that the Debtor had paid for the particular receivables.[5] *Id.*

12. Once Tecumseh approved a list, the Debtor generated a purchase order which Tecumseh paid. The Debtor then used the money to purchase receivables on Tecumseh's behalf.[6] *See* Belotz Decl. at ¶ 15. On occasion, the Debtor underestimated how much the receivables would cost. When that occurred, the Debtor requested and Tecumseh provided additional funds enabling the Debtor to complete the acquisition of the listed receivables on Tecumseh's behalf.

---

[5] Part of Belotz's duties were to reconcile the Debtor's records with Tecumseh's records. As part of his reconciliation, Belotz noted that the Debtor's data frequently changed and was often inconsistent. The "Date Paid" field was particularly problematic. The Debtor would quite often leave that field blank for months. Even after the Debtor populated the date field, the dates changed frequently. *See* Belotz Decl. at ¶ 22. Thus, the "Date Paid" field (or "PaidDate" field in the master lists of Disputed Receivables) is not a reliable indicator of when the Disputed Receivables were purchased. *See id.* at ¶¶ 23-24.

[6] The Debtor used its own funds to acquire receivables on only one occasion (July 27, 2020), as indicated on Exhibit C to the Disputed Facts, in which BillID 23043 notes that "Infinity has already paid - no balance amount on the invoice it says zero." *See* Belotz Decl. at ¶ 18.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

6

63241790;1

*See id.* at ¶ 16 (noting that Oliver Hemmers would typically call him to request additional funds when the Debtor underestimated the cost of receivables it planned to acquire on Tecumseh's behalf).[7] On other occasions, the Debtor was unable to acquire certain receivables that it had planned to acquire for Tecumseh. When this occurred, the Debtor would indicate that it had cancelled those receivables. *See id.* at ¶ 17.

13. The remaining receivables purchased by Tecumseh from and after October 29, 2020—4,190 receivables at a face amount of approximately $19,846,621.37—were paid for with transfers directly from Tecumseh's BofA Account to the medical providers. These receivables are not at issue in HASelect's Motion. *See* Belotz Decl. at ¶ 20.

14. Once the BofA Account was opened, the transactions followed the same process except that, upon Tecumseh's approval of the purchase of a receivable, Hemmers or Pantelas would send the funds for the purchase directly from Tecumseh's BofA Account to the medical provider. Further, rather than purchasing groups of receivables every two weeks or so, Tecumseh purchased receivables throughout the month, and Tecumseh paid the Debtor its servicing fee for its work in locating and servicing the receivables monthly from the BofA Account. *See id.* at ¶ 21.

15. While funds may have flowed from Tecumseh through the Debtor to the medical providers, the Debtor never acquired an interest in the Disputed Receivables. See Hemmers Trans. at 186:12-17. As such, the Disputed Receivables never became the property of the Debtor and HASelect's lien never attached.

### III. LEGAL ARGUMENT

A. **Legal Standard.**

Rule 56, made applicable through Bankruptcy Rule 7056, provides that "[the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that is relevant to an element of a claim or defense and whose existence

---

[7] Attached to the Disputed Facts as Exhibit L is a June 25, 2020 email representing an occasion when Hemmers contacted Belotz to request additional funds with which to complete a planned purchase. *See* Belotz Decl., ¶ 16.

7

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

might affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. P. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). The materiality of a fact is thus determined by the substantive law governing the claim or defense. *Id.*

Where material facts are disputed, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. "If reasonable minds could differ as to the import of the evidence," summary judgment must be denied. *Id.* at 250-51.

**B.     The Court should first address the issue of subject-matter jurisdiction.**

Tecumseh's pending *Motion to Dismiss all Claims for Lack of Subject Matter Jurisdiction* [ECF No. 59] (the "**Motion to Dismiss**"), seeks dismissal of HASelect's claims on the basis that this Court lacks subject matter jurisdiction to hear such claims.[8] And a court must have subject matter jurisdiction to enter a valid, enforceable judgment on a claim. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("To hear a case, a federal court must have subject matter jurisdiction over the matter at hand."). This Court must therefore dispose first of Tecumseh's pending Motion to Dismiss, before considering HASelect's Motion for Summary Judgment (if necessary).

HASelect asserts claims for declaratory relief based on state law, conversion, unjust enrichment, and related equitable relief. As set forth in the Motion to Dismiss, none are claims "arising under" the Bankruptcy Code because they are not created or determined by the Bankruptcy Code, nor does their existence depend on a substantive provision of bankruptcy law. Similarly, HASelect's claims do not "arise in" a case under the Bankruptcy Code because they exist independent of the Debtor's bankruptcy case. HASelect's alleged claims also fail to meet the "related to" standard for jurisdiction. HASelect's alleged claims solely concern two non-debtors' respective rights, title, interests, and encumbrances in two sub-sets of receivables, neither of which are property of the bankruptcy estate.

---

[8] The Motion to Dismiss is adopted in full and incorporated herein.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

8

63241790;1

C. **The Motion is Premature.**

As a threshold matter, the Motion should be denied because discovery is this case is in its early stages and the Motion is premature. Document discovery is far from complete. HASelect has not yet provided responses or produced documents in response to Tecumseh's request for documents, which were served on March 29, 2022, and Tecumseh is continuing to gather and produce documents in response to the document request propounded by HASelect. *See* Hamm Decl. at ¶ 4. Multiple subpoenas to third parties in the Debtor's Chapter 7 case remain outstanding, including subpoenas seeking documents and information directly relevant to the issues of material fact in this action. *Id.* at ¶ 5.

Further, HASelect's argument rests largely on a one line response from an examination of the Debtor's principal taken pursuant to Bankruptcy Rule 2004, without the benefit of documents produced in this adversary or documents still being sought from third parties, and more than a month before HASelect's Amended Complaint in this action was filed. No witnesses have been deposed in this action, and depositions would be premature prior to the substantial completion of document discovery in any event. *Id.* at ¶ 6.

But even if the Court were to consider the substance of HASelect's arguments, HASelect has wholly failed to satisfy its burden on summary judgment because the Motion is dependent upon a conclusory inference that the Debtor purchased the Disputed Receivables before receiving Tecumseh's payment for them, while the evidence adduced does not establish that the Debtor actually acquired the receivables from the medical providers prior to receiving payment from Tecumseh or with its own funds. Rather, as set forth in the Belotz Declaration, the Debtor's internal database of receivables, from which the "Date Paid" information is derived, does not accurately reflect the actual date the receivables were purchased. *See* Belotz Decl., ¶¶ 14, 22-24.

The financial records and other information from which the actual date of payment from the Debtor to the medical providers may be determined has not yet been produced in discovery. Such discovery includes documents and information requested pursuant to subpoena issued by HASelect to the Debtor's accounting software company, Xero Inc., for the Debtor's accounting

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

9

63241790;1

records,[9] Tailor Made Servers, for information regarding the Debtor's data storage systems and alteration or deletion of the debtor's electronically stored information,[10] Nevada State Bank, for the Debtor's banking records including records of payments to medical providers,[11] GPMicro, Inc., a non-debtor affiliate in possession of the Debtor's email records,[12] and individuals who provided information technology services to the Debtor for information relating to the Debtor's records and electronically stored information.[13] Accordingly, the Motion is premature and should be denied.

Moreover, none of the parties has had an opportunity to review the Debtor's communications with the parties or with third-parties. These communications are obviously relevant to the manner in which the Debtor arranged for the purchase of the Disputed Receivables and the existence of the resulting trust. In addition, Hemmers testified to substantial communications with HASelect regarding Tecumseh's purchases of receivables. According to Hemmers, these communications reflect HASelect's knowledge of and acquiescence to Tecumseh's purchases and to HASelect's deposit of proceeds of receivables to Tecumseh. *See* Hemmers Trans. at 195:24-198:7; 198:8-199:2; 200:3-17; 201:3-12.

In the alternative, Tecumseh requests the opportunity to conduct discovery regarding the Debtor's handling and accounting of Tecumseh's funds and payments made to medical providers, the dates on which payments were made to medical providers, communications between the Debtor and medical providers regarding the Disputed Receivables and payment for the Disputed Receivables, and communications between the Debtor and Hemmers. See Fed. R. Civ. P. 56(d) (when a nonmoving party shows by affidavit or declaration that it is unable to marshal necessary facts to oppose summary judgment, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3)

---

[9] Case No. 21-14486-abl, ECF No. 207.

[10] *Id.*, ECF No. 206.

[11] *Id.*, ECF No. 142.

[12] *Id.*, ECF No. 161.

[13] *Id.*, ECF No. 193 (subpoena to Robert Land) and ECF No. 204 (subpoena to Kevin Grimes).

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

10

63241790;1

issue any other appropriate order).

D. **Debtor Purchased and Held the Receivables for the Benefit of Tecumseh.**

The Debtor holds the Disputed Receivables subject to a purchase money resulting trust in favor of Tecumseh, as beneficiary. It is black-letter law that property which a debtor holds subject to a resulting trust never becomes part of bankruptcy estate.. *In re Torrez*, 63 B.R. 751, 755 (B.A.P. 9th Cir. 1986), *aff'd,* 827 F.2d 1299 (9th Cir. 1987); *see also* 11 U.S.C. § 541(d); *Cage v. Kang (In re Kang),* 2013 Bankr. LEXIS 844 (Bankr. S.D. Tex. Mar. 7, 2013). Accordingly, the Disputed Receivables are not subject to HASelect's lien or the Trustee's strong-arm powers.

There is, at a minimum, a factual question as to the existence of the resulting trust. The Debtor did not acquire receivables and then resell them to Tecumseh. Instead, it identified new receivables, recommended them to Tecumseh and requested funds with which to purchase them. Only after obtaining Tecumseh's approval and the necessary funds from Tecumseh did the Debtor purchase the Disputed Receivables. *See* Belotz Decl. at ¶¶ 12-15.

Tecumseh was not buying receivables that the Debtor itself owned, but instead was using the Debtor as an intermediary and servicer for Tecumseh. *Id.* at ¶ 7. Under the Sub-Advisory Agreement, the Debtor acted as a purchasing agent, broker and servicer for Tecumseh. The purpose of the Debtor's efforts was to arrange a purchase by Tecumseh "directly from the Medical Service Provider." *See* Sub-Advisory Agreement at Exh. A, ¶ 3(b); *also* Hemmers Trans. at 185:15-20 (testifying that the purpose of the Sub-Advisory Agreement was to facilitate a sale between the medical service providers and Tecumseh).

The funds paid to purchase the receivables did <u>not</u> come from the Debtor, but from Tecumseh. *See* Belotz Decl. at ¶ 7; Hemmers Trans. at 185:21-186:2. All dollars collected on the receivables were paid directly to Tecumseh as the money belonged to Tecumseh and not to the Debtor. *Id*. at 186:18-23. The Debtor conceded that it did not own an interest in the Tecumseh Receivables. *Id*. at 173:18-174:4, 174:15-175:3.

Where "a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid."

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

Restatement (Third) of Trusts § 9 (2003); *see also Hayne Fed. Credit Union v. Bailey,* 489 S.E. 2d 472, 475 (S.C. 1997) ("Equity devised the theory of resulting trust to effectuate the intent of the parties in certain situations where one party pays for property, in whole or in part, that for a different reason is titled in the name of another."); *Cummings v. Tinkle*, 91 Nev. 548, 550, 539 P.2d 1213, 1214 (1975) ("Where the consideration for the property is provided by one party, but title is taken by another, and the circumstances negate the possibility of the consideration being a gift, equity will intervene to protect the rights of the first party."). A resulting trust may likewise arise in personalty. *McDowell v. S.C. Dept. of Soc. Services*, 370 S.E.2d 878 (S.C. App. 1987) (food stamp applicant rebutted presumption that automobile, which was titled in both applicant's and son's name, but registered only in applicant's name, was gift to son, establishing that applicant was trustee of resulting trust that arose in favor of son, and thus, automobile was not applicant's asset for purpose of food stamp eligibility).

The determination of whether a resulting trust exists is thus intrinsically factual in nature. A "resulting trust for the payor of the purchase price is recognized only after any relevant circumstances, written and oral statements, associated agreements or understandings, and other admissible parol evidence have been considered in an effort to ascertain and give effect to any discernible, actual intentions of the payor or objectives of the parties." *Id.*; *see also In re Goldstein*, 135 B.R. 703, 705 (Bankr. S.D. Fla. 1992) (A "vital element [of a resulting trust] is the intention [of the parties] which will be presumed from the facts.")

The intent of the parties is clear. The Sub-Advisory Agreement provides that the Debtor was to work on Tecumseh's behalf to assist it in acquiring receivables directly from medical providers. *See* Sub-Advisory Agreement at Exh. A; Hemmers Trans. at 186:9-11 (testifying that the Debtor was not buying and reselling). It is a brokering and advisory agreement; not a purchase and sale agreement. The Debtor was not to acquire an interest in any of the Disputed Receivables and concedes that it did not do so. *See* Hemmers Trans. at 186:3-8, 12-17. Tecumseh's money and not the Debtor's was used to buy the Disputed Receivables. *Id.*; *see also* Belotz Decl. at ¶ 7. Only after obtaining Tecumseh's approval and the necessary funds from Tecumseh did the Debtor purchase the Disputed Receivables. *See* Belotz Decl. at ¶ 15.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

The presumption of the resulting trust is, therefore, that the Debtor intended to hold the receivables for the benefit of the intended owner, Tecumseh. And while HASelect may rebut this presumption it has failed to do so. *See Hayne Fed. Credit Union v. Bailey*, 489 S.E.2d 472, 475 (S.C. 1997) ("The presumption [of the resulting trust]…may be rebutted and the actual intention shown by parol evidence.") Instead, HASelect relies upon unproven allegations, namely that the Debtor sold to Tecumseh a subset of receivables owned by the Debtor, and, as such, receivables in which HASelect held a perfected, first-priority security interest.[14] HASelect provides no evidence of this other than a reference to a portion of Mr. Hemmers testimony taken out of context.[15] Such allegations are directly contradicted by the full testimony of Mr. Hemmers, the testimony of Mr. Belotz, and records that the Debtor itself sent in connection with each sale.

HASelect argues that the Debtor's records and the purchase orders show that the Debtor purchased receivables and then resold them to Tecumseh relying heavily on "date paid" field in certain spreadsheets produced at the start of the bankruptcy. The records show no such thing. Instead, as discussed at length above, they reflect a process in which the Debtor identified receivables for purchase by Tecumseh and negotiated on Tecumseh's behalf. When it gathered a set of receivables for purchase by Tecumseh, the Debtor identified the receivables and requested funds from Tecumseh with which to acquire the receivables. Only after Tecumseh approved and forwarded funds did the Debtor acquire the receivables for Tecumseh's benefit.

Moreover, HASelect's reliance on the "date paid" column as definitive proof of the date that a receivable was acquired is misplaced. The "date paid" field is at most an unreliable indicator of anything, much less the date that the Debtor acquired anything. On a purely evidentiary basis, it is based on Hemmers' very brief testimony (less than a full line) about the Debtor's records generally and not about the records related to the acquisition of Disputed Receivables.

The records related to the Disputed Receivables tell a very different story. The lists underlying the purchase orders included a "date paid" column based on the Debtor's records. *See*

---

[14] Statement of Undisputed Facts at ¶ 14.

[15] *See* Response to Statement of Undisputed Facts at ¶ 14.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

13

Belotz Decl. at ¶ 14. The "Date Paid" column was often blank, sometimes contained dates that were months after the date of the list, and sometimes contained dates prior to the date of the list. *Id*. Using **Exhibit B** (July 13, 2020) as an example, the "Date Paid" column has 25 blanks and 34 dates ranging from June to November 2020. *Id*. When asked about the dates, Tecumseh was told that the "Date Paid" was taken from the Debtor's internal database of receivables and did not reflect the date that the Debtor had paid for these particular receivables. *Id*. Hemmers informed Tecumseh that past dates reflected the date that the Debtor reached an agreement with the provider as to the price of the receivable, and blank dates and November dates were placeholders. For the prescription receivables (marked RX on the lists), the "date paid" indicates the date that a prescription card was issued; not the date that a receivable related to that card was acquired.[16] *Id*. at ¶ 11.

As a general matter, the Debtor's records and in particular the "date paid" field, were often unreliable. Belotz was charged with reconciling Tecumseh's records with the Debtor's records. *See* Belotz Decl. at ¶ 22. To that end, he regularly reviewed the Debtor's internal database of receivables. During the course of his review, he noted that data related to the receivables purchased by Tecumseh changed frequently. Frequently, the "Date Paid" field remained blank for months at a time. Even after the field was populated, the date often changed. *Id*. The "Date Paid" field typically did not match the actual purchase dates for the receivables listed on Exhibits B through K. *Id*. The "date paid" field is just not a reliable indicator of the date of acquisition or anything else. *Id.* at ¶¶ 22-24.

Finally, HASelect attempts to stretch Hemmers' testimony well beyond its context. Tecumseh acknowledges that it made one purchase of receivables previously owned by the Debtor. *See* Belotz Decl. at ¶ 19. In June 2020, Tecumseh purchased the receivables shown on **Exhibit M** to the Belotz Declaration. *Id*. HASelect extrapolates Hemmers' testimony related to this single transaction in June 2020 to all transactions involving the Debtor and Tecumseh to create the misleading impression that the Debtor routinely purchased and then resold receivables

---

[16] Allowing the parties sufficient time to take discovery would flesh out these issues and provide the Court with a sufficient evidentiary record.

to Tecumseh. This June 2020 transaction was a "one off" transaction and not typical of Tecumseh's purchases. Hemmers Trans. at 187:14-19; Belotz Decl. at ¶ 19.

Contrary to HASelect's assertions, the records related to the one-off June 2020 transaction actually demonstrate that the Debtor had not acquired the Disputed Receivables itself before Tecumseh acquired them. An important difference between Exhibit M and Exhibits B through K is that Exhibit M identifies the wires and checks by which the Debtor paid for the receivables identified on Exhibit M. There is no such information on Exhibits B through K. *Id*.

The Debtor holds the Disputed Receivables subject to a purchase money resulting trust in favor of Tecumseh, as beneficiary. It is black-letter law that property which a debtor holds subject to a resulting trust never becomes part of bankruptcy estate. *See* 11 U.S.C. § 541(d); *see also In re Torrez*, 63 B.R. 751, 755 (B.A.P. 9th Cir. 1986), *aff'd,* 827 F.2d 1299 (9th Cir. 1987) (property held at all times in a resulting trust is not part of the estate); *In re Golden Triangle Capital, Inc.,* 171 B.R. 79 (Bankr. App. 9th Cir. 1994) (A "transaction that has failed to carry out the parties' intent becomes a resulting trust, and a resulting trust cannot be part of the debtor's estate.") Assets held in trust are not subject to the trustee's (here the Debtor's) creditors, whether they be secured or unsecured. *See In re Anchorage Nautical Tours, Inc.,* 102 B.R. 741 (9th Cir. BAP 1989) (in which prepetition oral assignment of insurance proceeds effective against subsequent lienholders and bankruptcy estate). Accordingly, the Disputed Receivables are not subject to HASelect's lien.

Nor are they subject to the Trustee's strong-arm powers found in Section 543. As the Bankruptcy Appellate Panel in *In re Golden Triangle Capital*, explained:

> Determination of whether bankruptcy's policy of ratable distribution outweighs imposition of a trust depends on whether the trust arises out of intended ownership rights in the property [resulting trust] or whether it is to be imposed as a remedy to correct a wrong [constructive trust]. Analysis focuses on the legal relationship between the parties. If no debtor-creditor relationship exists, a trust will exclude property from the estate. If, on the other hand, the trust is imposed as a remedy for a claim, circumstances may warrant treating the claimant as any other creditor of the debtor, and thus subject to the policy of ratable distribution. This is the result in *In re Tleel*, 876 F.2d 769 (9th Cir. 1989) (inchoate trust remedy not superior to trustee's strong-arm power) . . .

*In re Golden Triangle Capital, Inc*., 171 B.R. at 82. Tecumseh and the Debtor had a contractual

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

15

63241790;1

relationship whereby the Debtor was to act as a purchasing agent or broker for Tecumseh and to service the receivables that Tecumseh acquired. Belotz Decl. at ¶ 7. Tecumseh—unlike HASelect— is not a creditor of the Debtor. Furthermore, allowing HASelect to utilize the strong arm powers of Section 543 will certainly not a effectuate a ratable distribution, as avoidance under these circumstances would serve to benefit only HASelect.

E. **HASelect is not entitled to summary judgment on the June 2020 one-off transaction.**

Although the one-off June 2020 transaction involved receivables on which HASelect had a lien, HASelect is not entitled to summary judgment. There is some evidence that HASelect consented to the sale of these receivables free of its lien in order to obtain funds from the Debtor. As such, Tecumseh took the receivables free of the lien. NRS § 104.9315 (1)(a)(providing that a security interest continues through sale "unless the secured party authorized the disposition free of the security interest"). At the time of the purchase, Hemmers informed Tecumseh that HASelect had consented to the sale so that it could be paid the $294,000 that Tecumseh was paying for the receivables in partial repayment of HASelect's loan. Belotz Decl. at ¶ 19; *also* Hemmers Trans. Vol II at 200:3-17 (testifying that he believed that HASelect was aware of the June 2020 sale) and at 195:24-198:7 (testifying that HASelect had knowledge of the business relationship between the Debtor and Tecumseh and authorized the payments to Tecumseh from funds received by the Debtor).[17]

For purposes of the June 2020 one-off sale, Tecumseh's purchase automatically perfected without the necessity of it filing a UCC-1. This sale was of a very small portion of the receivables that the Debtor owned. The June 2020 purchase was for $294,000. It represented one set of receivables that the Debtor held for an attempted draw on the HASelect facility. *See* Hemmers Trans. at 186:24-187:10. By that time, the Debtor had borrowed at least $11 million from HASelect supported by receivables it owned. As of the petition date, the Debtor held

---

[17] This is another area in which discovery is needed in order to allow Tecumseh access to evidence. Hemmers testified that much of his communications with HASelect on Tecumseh's receivable purchases were by e-mail. Hemmers Trans. at 198:8-199:2 and 201:3-12. All of the Debtor's e-mail is located at a non-debtor affiliate, GP Micro, from whom the parties have been attempting to obtain records. *Id.* at 199:3–200:2. For its part, HASelect has not produced any documents.

63241790;1

receivables with a cost value of $5.78 million. *See id.* at 173:18-174:14 (testifying regarding the Debtor's schedules). The June 2020 purchase represents approximately 2.7% of the $11 million purchased under the HASelect facility and about 5% of the $5.78 million in receivables that the Debtor held at the petition date.

For purchases of receivables that comprise less than a significant part of an assignor's accounts receivable, the purchaser's interest is automatically perfected without the necessity of filing. NRS § 104.9309(2). Courts in the Ninth Circuit use the "percentage of accounts" test. *See In re Vigil Bros. Const., Inc.*, 181 B.R. 453, 456-57 (Bankr. D. Ariz. 1995) (examining various tests and selecting percentage test based on statutory language). As a general matter, assignments of accounts comprising less than 16% of the assignor's accounts receivable are not significant. *Standard Lumber Co. v. Chamber Frames, Inc.*, 317 F.Supp. 837, 840 (E.D. Ark. 1970) cited in *Concrete Equip. Co. v. Fox (In re Vigil Bros. Const.)*, 193 B.R. 513, 518 (9th B.A.P. 1996). Here the percentage is between 2.7% and 5% making the June 2020 purchase safely insignificant.

## IV. CONCLUSION

HASelect's Motion should be denied. First, this Court should determine whether it has jurisdiction over this case before considering the substance of the dispute. Second, the Motion, which was offered before any substantial discovery has taken place and while numerous discovery requests remain open, is premature. Third, HASelect has failed to establish that no issues of material fact exist. Instead, there are at the very least fact issues regarding Tecumseh's purchases of the Disputed Receivables, the existence of a resulting trust precluding the attachment of HASelect's lien and the Trustee's strong-arm powers, HASelect's consent to the June 2020 sale and whether that sale was perfected by operation of law – all of which require that the Court deny this motion.

Accordingly, Tecumseh respectfully requests that the Court deny the Motion in its entirety.

. . .

. . .

17

63241790;1

Dated April 28, 2022.

GARMAN TURNER GORDON LLP

By: */s/ Gabrielle A. Hamm*
    GERALD M. GORDON, ESQ.
    WILLIAM M. NOALL, ESQ.
    GABRIELLE A. HAMM, ESQ.
    7251 Amigo St., Suite 210
    Las Vegas, Nevada 89119

and

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

4867-4758-6077, v. 1

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

63241790;1

18