| | |
|---|---|
| GARMAN TURNER GORDON LLP | MICHAEL D. NAPOLI, ESQ. |
| GERALD M. GORDON | *Pro hac vice* |
| Nevada Bar No. 229 | AKERMAN LLP |
| E-mail: ggordon@gtg.legal | 2001 Ross Avenue, Suite 3600 |
| WILLIAM M. NOALL | Dallas, Texas 75201 |
| Nevada Bar No. 3549 | Tel: (214) 720-4360 / Fax: (214) 720-8116 |
| E-mail: wnoall@gtg.legal | Email: michael.napoli@akerman.com |
| GABRIELLE A. HAMM | ARIEL E. STERN, ESQ. |
| Nevada Bar No. 11588 | Nevada Bar No. 8276 |
| E-mail: ghamm@gtg.legal | AKERMAN LLP |
| 7251 Amigo St., Suite 210 | 1635 Village Center Circle, Suite 200 |
| Las Vegas, Nevada 89119 | Las Vegas, Nevada 89134 |
| Tel: (725) 777-3000 / Fax: (725) 777-3112 | Tel: (702) 634-5000 / Fax: (702) 380-8572 |
| | Email: ariel.stern@akerman.com |

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. 21-14486-abl |
| INFINITY CAPITAL MANAGEMENT, INC. *dba* INFINITY HEALTH CONNECTIONS, | Chapter 7 |
| Debtor. | |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, | Adversary Case No. 21-01167-abl |
| Plaintiff, | **TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP'S STATEMENT OF DISPUTED FACTS IN SUPPORT OF OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| v. | |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, | |
| Defendant. | |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, | |
| Counter-Claimant, | |
| v. | |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP; ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE, | Date:   May 26, 2022<br>Time:   9:30 a.m. |
| Counter-Defendants. | |

1

|   | ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE, |   |
|---|---|---|
|   | Counter-Claimant, |   |
|   | v. |   |
|   | TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, |   |
|   | Counter-Defendant. |   |

Pursuant to LR 7056, Defendant and Counterclaimant Tecumseh–Infinity Medical Receivable Fund, LP ("**Tecumseh**") respectfully submits this following statement of disputed facts in support of its opposition (the "**Opposition**") to the *Motion for Partial Summary Judgment as to Certain Disputed Receivables* [ECF No. 53] of Plaintiff *HASelect-Medical Receivables Litigation Finance Fund International LP* ("**HASelect**").

|   | **HASELECT'S UNDISPUTED FACTS AND SUPPORTING EVIDENCE** | **TECUMSEH'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|---|
| 1. | Beginning in February 2019, HASelect made a series of loans to Infinity that were documented through various written loan agreements and promissory notes through which Infinity pledged substantially all of its personal property, including accounts receivable, to HASelect as collateral for such loans. *See* Declaration of Michael Griffin (the "Griffin Declaration") ¶ 5, submitted herewith. | Admitted |
| 2. | HASelect perfected its security interest in all of Infinity's personal property through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019. *See id.* at ¶ 6; *see also* UCC-1 filing submitted as Exhibit 2. | Admitted |
| 3. | On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a | Admitted |

2

| | | | |
|---|---|---|---|
| | | Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all prior and related loan documents, the "MLA"), which superseded all prior written loan agreements and promissory notes entered into between HASelect and Infinity.<br><br>*See* Griffin Declaration, ¶ 7; *see also* MLA submitted as Exhibit 1. | |
| | 4. | HASelect holds a perfected security interest in substantially all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral").<br><br>*See id.* at § 4.1. | Admitted |
| | 5. | Pursuant to the MLA, Infinity agreed to use the loan proceeds it received from HASelect to purchase accounts receivable from medical providers.<br><br>*Id.* at § 3.2. | Admitted |
| | 6. | Such accounts receivable generally arose from medical treatment or prescription medication provided to individuals who were injured in accidents and had asserted personal injury claims against third parties. These accounts receivable are secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.<br><br>*See* Griffin Declaration, ¶ 11. | Admitted |
| | 7. | Infinity purchased these accounts receivable pursuant to contracts it entered into directly with various medical providers.<br><br>*See* Infinity's Amended Schedule G filed in the chapter 7 case at ECF No. 91. | Admitted |
| | 8. | In addition to the contracts Infinity entered into with the sellers of the accounts receivable, Infinity also | Admitted |

3

| | | |
|---|---|---|
| | received direct assignments of the individual personal injury claimants' rights to recovery.<br><br>See Excerpts from Transcript of November 9, 2021 Rule 2004 Examination of Anne Pantelas (the "Pantelas Transcript") submitted herewith as Exhibit 4, pp. 66-67. | |
| 9. | To ensure that HASelect received a perfected, first-priority security interest in all accounts receivable purchased by Infinity (as well as all other Collateral), HASelect required that Infinity use part of loan proceeds advanced by HASelect to repay and retire a prior secured debt owed to Law Finance Group, LLC, which had similarly advanced funds to Infinity for the purchase of accounts receivable.<br><br>See Pantelas Transcript (Exhibit 4), pp. 82- 83 | Admitted |
| 10. | HASelect also required that Infinity apply an electronic stamp to certain documents associated with its accounts receivable to identify the accounts receivable as HASelect's Collateral.<br><br>See Hemmers Transcript (Exhibit 3), pp. 108-110; Exhibit 18 to Hemmers Transcript (February 26, 2019 email chain discussing electronic stamping of documents as HASelect collateral). | Admitted |
| 11. | From February 2019 through April 2020, HASelect advanced loan proceeds totaling approximately $13.7 million to Infinity, which was obligated under the MLA to use such proceeds to purchase accounts receivable.<br><br>See Griffin Declaration, ¶ 13. | Admitted |
| 12. | On or about June 18, 2020, Infinity and Tecumseh entered into a Sub-Advisory | HASelect misquotes and misstates the Sub-Advisory Agreement. |

| | | |
|---|---|---|
| | Agreement (the "Sub-Advisory Agreement") under which Infinity agreed, among other things, to "assist [Tecumseh] in acquiring an interest in medical receivables in connection with personal injury cases" in exchange for which Tecumseh agreed to pay Infinity a 20% fee at the time of acquisition as well as 15% of the net profit earned on each such account receivable at the time of collection.<br><br>See Sub-Advisory Agreement on file in Infinity's chapter 7 case at ECF No. 59-3. A copy of the Sub-Advisory Agreement is submitted herewith as Exhibit 5; see Sub-Advisory Agreement, Exhibit A, § 1(a) and Exhibit B §§ (a)-(b) | The Sub-Advisory Agreement provided (at Exhibit A) that the Debtor would (i) assist Tecumseh in acquiring medical receivables [¶ 1(a)]; (ii) identify receivables for purchase by Tecumseh [¶ 3(a)]; (iii) negotiate the purchase [¶ 1(b), ¶ 3(b)]; (iii) arrange for Tecumseh to secure a lien or equivalent security against plaintiff's recovery [¶ 1(c)]; and (iv) arrange for documentation to "evidence the sale of the Receivable to the Company by the Medical Service Provider." [¶ 3(d)]. The purpose was to arrange a purchase by Tecumseh "directly from the Medical Service Provider." Sub-Advisory Agreement at Exh. A, ¶ 3(b).<br><br>See  Sub-Advisory Agreement, attached hereto as Exhibit A; *Declaration of Michael Belotz in Support of Opposition to Motion for Partial Summary Judgment as to Certain Disputed Receivables* ("**Belotz Declaration**"), at ¶ ___.  See also Transcript of 2004 Examination of Oliver Hemmers ("**Hemmers Trans.**") Vol. II, attached hereto as Exhibit N, at 185:15-20 (testifying that the purpose of the Sub-Advisory Agreement was to facilitate a sale between the medical service providers and Tecumseh). |
| 13. | Upon signing the Sub-Advisory Agreement, Infinity began preparing to transfer accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh by, among other things, removing the electronic stamps that identified such accounts receivable as HASelect's Collateral.<br><br>See Hemmers Transcript (Exhibit 3), pp. 61, 110-112; Exhibit 25 to Hemmers Transcript (June 23, 2020 emails from Oliver Hemmers to Endre Debozy confirming removal of electronic stamps). | Disputed. Except for a small initial sale, Tecumseh did not purchase receivables in which HASelect claimed a lien or which the Debtor had previously owned. Instead, it purchased new receivables directly from medical providers. The Debtor acquired no interest in the receivables; but merely serviced them. The funds paid to purchase the receivables did not come from the Debtor, but from Tecumseh.<br><br>See Exhibit A (Sub-Advisory Agreement) at Exh A., ¶ 3; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2, 186:9-17; Belotz Decl. at ¶¶ 7-17, 18, 25 (describing process by which Tecumseh used the Debtor as a |

5

| | | |
|---|---|---|
| | | broker to purchase receivables) |
| 14. | Within a few days after signing the Sub-Advisory Agreement, Infinity began selling accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh without HASelect's knowledge or consent and in violation of Infinity's contractual obligations under the MLA.<br><br>*See* Hemmers Transcript, pp. 110-114 ("Q: And it may have not been clear earlier, but I believe I asked you if any accounts in which HASelect held a security interest were sold to any other party, and I thought you had told me no. So just -- A: Under the blanket UCC[?] Q: Yes, under the blanket UCC. A: Yeah. In that case the Tecumseh receivables were the only ones that fall in that category."); *see also* Griffin Declaration, ¶ 15 | Disputed. Except for a small initial sale, Tecumseh did not purchase receivables in which HASelect claimed a lien or which the Debtor had previously owned. Instead, it purchased new receivables directly from medical providers. The Debtor acquired no interest in the receivables; but merely serviced them. The funds paid to purchase the receivables did not come from the Debtor, but from Tecumseh.<br><br>*See* Sub-Advisory Agreement (Exhibit A) at Exh A., ¶ 3; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2; 186:9-17; Belotz Decl. at ¶¶ 7-17, 25 (describing process by which Tecumseh used the Debtor as a broker to purchase receivables).<br><br>*See also* Hemmers Trans. Vol II (Exhibit N) at 200:3-17 (testifying that he believed that HASelect was aware of the June 2020 sale) and 195:24-198:7 (testifying that HASelect had knowledge of the business relationship between the Debtor and Tecumseh and authorized the payments to Tecumseh from funds received by the Debtor); Belotz Decl. at ¶ 19 (testifying that Hemmers informed Tecumseh that HASelect had consented to the sale so that it could be paid the $294,000 that Tecumseh was paying for the receivables in partial repayment of HASelect's loan.).<br><br>Further discovery is necessary to fully respond. In particular, correspondence between HASelect and the Debtor must be produced and the following persons need to be deposed: Oliver Hemmer, Anne Pantelas, appropriate representatives of HASelect. HASelect has yet to respond to discovery and the Debtor has failed to produced any material portion of Hemmers' email. |
| 15. | On June 19, 2020, Tecumseh issued a Receivables Purchase Order to Infinity (the "1-A Purchase Order") identifying | In June 2020, Tecumseh purchased the receivables shown on Exhibit M. This June 2020 transaction was a "one off" transaction |

6

| | | |
|---|---|---|
| | approximately 258 separate accounts receivable (the "1-A Accounts") it intended to purchase from Infinity for a total price of $294,465.70.<br><br>The 1-A Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-4 and designated as "Exhibit D-1". A copy of the 1-A Purchase Order is submitted herewith as Exhibit 6. | and not typical of Tecumseh's purchases of Disputed Receivables.<br><br>See Belotz Decl. at ¶ 19; Exhibit M; Hemmer Trans. Vol. II at 187:14-19. |
| 16. | On June 26, 2020, Tecumseh wired the $294,465.70 purchase price for the 1-A Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>See Infinity's Nevada State Bank account ending in 8420 dated June 30, 2020 is submitted herewith as Exhibit 7. | Admitted |
| 17. | That same day, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-A Accounts to Tecumseh.<br><br>See June 26, 2020 Assignment and Bill of Sale for the 1-A Accounts is submitted herewith as Exhibit 8. | Admitted |
| 18. | On July 13, 2020, Tecumseh issued a second Receivables Purchase Order to Infinity (the "1-B Purchase Order") identifying approximately 59 separate accounts receivable (the "1-B Accounts") it intended to purchase from Infinity for a total price of $90,008.34.<br><br>The 1-B Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-5 and designated as "Exhibit D-2". A copy of the 1-B Purchase Order is submitted herewith as Exhibit 9. | Tecumseh admits that it received the 1-B Purchase Order but denies that the transaction was a purchase from the Debtor.<br><br>As described in the Belotz Declaration, the process for purchasing a receivable began with the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. FTM Investments, Inc. ("FTM") would then verify the receivable on behalf of Tecumseh, after which Tecumseh would approve of the purchase. Tecumseh then paid the price agreed to by the medical provider along with the fee required by the Sub-Advisory Agreement. With respect to the Disputed Receivables, the Debtor periodically (roughly, every two weeks) provided Tecumseh with a list of |

7

| | | |
|---|---|---|
| | | receivables from various medical providers that the Debtor recommended that Tecumseh purchase. |
| | | From July 13, 2020 through October 29, 2020, the Debtor sent twelve such lists. Each list (attached hereto as Exhibits B through K) identified a set of receivables that the Debtor planned to purchase on Tecumseh's behalf. For each receivable, the Debtor provided the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price and an estimated total cost including the Debtor's fee. |
| | | Once Tecumseh approved a list, the Debtor generated a purchase order which Tecumseh paid, such as the 1-B Purchase Order. The Debtor then used the money to purchase receivables on Tecumseh's behalf. On occasion, the Debtor underestimated how much the receivables would cost. When that happened, the Debtor requested and Tecumseh provided additional funds that allowed the Debtor to complete the acquisition of the listed receivables on Tecumseh's behalf. On other occasions, the Debtor was unable to acquire certain receivables that Tecumseh sought to purchase. When this happened, the Debtor would indicate that it had cancelled those receivables. |
| | | *See* Belotz Decl. at ¶¶ 10, 13-17; Exhibits B, L. |
| 19. | On July 23, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-B Accounts to Tecumseh.<br><br>*See* July 23, 2020 Assignment and Bill of Sale for the 1-B Accounts submitted herewith as Exhibit 10. | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>*See* Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and |

| | | banking records, its correspondence, and documents and information regarding the Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
|---|---|---|
| 20. | The following day, Tecumseh wired the $90,008.34 purchase price for the 1-B Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated July 31, 2020 submitted herewith as Exhibit 11. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 21. | On August 11, 2020, Tecumseh issued a third Receivables Purchase Order to Infinity (the "1-C Purchase Order") identifying approximately 120 separate accounts receivable (the "1-C Accounts") it intended to purchase from Infinity for a total price of $178,056.19.<br><br>The 1-C Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-6 and designated as "Exhibit D-3". A copy of the 1-C Purchase Order is submitted herewith as Exhibit 12. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>*See* Belotz Decl. at ¶¶ 10, 13-17; Exhibits C, L. |
| 22. | On August 12, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-C Accounts to Tecumseh.<br><br>*See* July 23, 2020 Assignment and Bill of Sale for the 1-C Accounts submitted herewith as Exhibit 13. | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>*See* Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and documents and information regarding the |

9

| | | |
|---|---|---|
| | | Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
| 23. | On August 12, 2020, August 13, 2020, and August 27, 2020, Tecumseh sent three wire transfers totaling the $178,056.19 purchase price for the 1-C Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated August 31, 2020 submitted herewith as Exhibit 14. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 24. | On August 28, 2020, Tecumseh issued a fourth Receivables Purchase Order to Infinity (the "1-D Purchase Order") identifying approximately 1,465 separate accounts receivable (the "1-D Accounts") it intended to purchase from Infinity for a total price of $114,323.03.<br><br>The 1-D Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-7 and designated as "Exhibit D-4". A copy of the 1-D Purchase Order is submitted herewith as Exhibit 15. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits D, L. |
| 25. | On September 10, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-D Accounts to Tecumseh.<br><br>*See* September 10, 2020 Assignment and Bill of Sale for the 1-D Accounts submitted herewith as Exhibit 16. | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and documents and information regarding the |

10

| | | |
|---|---|---|
| | | Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
| 26. | On August 31, 2020 and September 11, 2020, Tecumseh sent two wire transfers totaling the $114,323.33 purchase price for the 1-D Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>*See* monthly account statements for Infinity's Nevada State Bank account ending in 8420 dated August 31, 2020 (Exhibit 16) and September 30, 2020 submitted herewith as Exhibit 17. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 27. | On September 15, 2020, Tecumseh issued a fifth Receivables Purchase Order to Infinity (the "1-E Purchase Order") identifying approximately 196 separate accounts receivable (the "1-E Accounts") it intended to purchase from Infinity for a total price of $203,469.67.<br><br>The 1-E Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-8 and designated as "Exhibit D-5". A copy of the 1-E Purchase Order is submitted herewith as Exhibit 18. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits E, L. |
| 28. | On September 16, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-E Accounts to Tecumseh.<br><br>*See* September 16, 2020 Assignment and Bill of Sale for the 1-E Accounts submitted herewith as Exhibit 19. | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and |

11

| | | |
|---|---|---|
| | | documents and information regarding the Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
| 29. | On September 16, 2020, Tecumseh wired the $203,467.67 purchase price for the 1-E Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated September 30, 2020 submitted herewith as Exhibit 17. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 30. | On September 22, 2020, Tecumseh issued a sixth Receivables Purchase Order to Infinity (the "1-F Purchase Order") identifying approximately 332 separate accounts receivable (the "1-F Accounts") it intended to purchase from Infinity for a total price of $481,023.10.<br><br>The 1-F Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-9 and designated as "Exhibit D-6". A copy of the 1-F Purchase Order submitted herewith as Exhibit 20. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits F-1, F-2, L.<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and documents and information regarding the Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
| 31. | On September 25, 2020, Tecumseh wired the $481,023.10 purchase price for the 1-F Accounts to Infinity's Nevada State Bank account ending in 8480.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated September 30, 2020 submitted herewith as Exhibit 17. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 32. | On September 30, 2020, Tecumseh | Tecumseh incorporates its response to |

| | | |
|---|---|---|
| | issued a seventh Receivables Purchase Order to Infinity (the "<u>1-G Purchase Order</u>") identifying 13 separate accounts receivable (the "<u>1-G Accounts</u>") it intended to purchase from Infinity for a total price of $55,459.80.<br><br>The 1-G Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-010 and designated as "Exhibit D-7". A copy of the 1-G Purchase Order submitted herewith as Exhibit 21. | HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits G, L. |
| 33. | The purchase price for the 1-G Accounts was paid using proceeds that Infinity had collected on certain of the Sold Accounts receivable Infinity had previously sold to Tecumseh. On September 30, 2020, Infinity paid itself the $55,459.80 purchase price for the 1-G Accounts through a check drawn on a Bank of America account established by Infinity and Tecumseh for the purpose of collecting proceeds of the Sold Accounts (the "<u>BOA Account</u>"), which was deposited to Infinity's Nevada State Bank account ending in 6375.<br><br>The BOA Account was established under Infinity's trade name, Infinity Health Connections. *See* Hemmers Transcript (Exhibit 3), p. 119, ll. 1-25; *see also* account statements from the BOA Account on file in Infinity's chapter 7 case at ECF No. 156-1; *see also* monthly account statement for Infinity's Nevada State Bank account ending in 6375 dated September 30, 2020 submitted herewith as Exhibit 22. | Disputed. To facilitate the purchase of receivables and collection of proceeds, Tecumseh opened an account with Bank of America (the "**BofA Account**") that was funded by Tecumseh, and granted signing authority to Hemmers and Anne Pantelas (along with Belotz and another Tecumseh principal, Chad Meyer). The BofA Account belongs to Tecumseh. To the extent the Debtor deposited funds in the BofA Account, it was because those funds belonged to Tecumseh. Any funds paid to the Debtor were for the purpose of the Debtor acquiring receivables on Tecumseh's behalf. The Debtor had no interest in any funds in the BofA Account.<br><br>Hemmer Trans. Vol. II (Exhibit N) at 186:18-23; 189:8-15; Belotz Decl. at ¶ 12. |
| 34. | On September 30, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-G Accounts to Tecumseh.<br><br>*See* September 30, 2020 Assignment and Bill of Sale for the 1-G Accounts | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to |

13

| | | |
|---|---|---|
| | submitted herewith as Exhibit 23. | Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and documents and information regarding the Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and the date of payment to the medical provider. |
| 35. | On October 4, 2020, Tecumseh issued an eighth Receivables Purchase Order to Infinity (the "<u>1-H Purchase Order</u>") identifying approximately 310 separate accounts receivable (the "<u>1-H Accounts</u>") it intended to purchase from Infinity for a total price of $149,802.81.<br><br>The 1-H Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-011 and designated as "Exhibit D-8". A copy of the 1-H Purchase Order submitted herewith as Exhibit 24. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits H-1, L. |
| 36. | On October 4, 2020, Infinity executed an Assignment and Bill of Sale by which it sold and assigned the 1-H Accounts to Tecumseh<br><br>*See* October 4, 2020 Assignment and Bill of Sale for the 1-H Accounts submitted herewith as Exhibit 25. | Tecumseh admits that the bill of sale was executed but denies that it actually represented a sale and assignment by the Debtor to Tecumseh.<br><br>Hemmer Trans. Vol. II (Exhibit N) at 186:9-11 (testifying that the Debtor was not buying receivables and reselling them to Tecumseh); Belotz Decl. at ¶ 7 (same).<br><br>Further discovery is necessary to fully respond, including depositions of Hemmers and Pantelas, the Debtor's accounting and banking records, its correspondence, and documents and information regarding the Debtor's records and electronically stored information. Such discovery is expected to show the date on which the Debtor acquired the relevant Disputed Receivables from the medical provider on Tecumseh's behalf and |

14

| | | |
|---|---|---|
| | | the date of payment to the medical provider. |
| 37. | On October 7, 2020, Tecumseh wired the $149,802.81 purchase price for the 1-H Accounts to Infinity's Nevada State Bank account ending in 8420.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 submitted herewith as Exhibit 26. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 38. | On October 12, 2020, Tecumseh issued a ninth Receivables Purchase Order to Infinity (the "1-I Purchase Order") identifying approximately 718 separate accounts receivable (the "1-I Accounts") it intended to purchase from Infinity for a total price of $209,320.99.<br><br>The 1-I Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-012 and designated as "Exhibit D-9". A copy of the 1-I Purchase Order submitted herewith as Exhibit 27. | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits I, L. |
| 39. | On October 14, 2020, Tecumseh wired the $209,320.99 purchase price for the 1-I Accounts to Infinity's Nevada State Bank account ending in 8420.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 submitted herewith as Exhibit 26. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 40. | On October 23, 2020, Tecumseh issued a tenth Receivables Purchase Order to Infinity (the "1-J Purchase Order") identifying approximately 125 separate accounts receivable (the "1-J Accounts" and together with the 1-A Accounts, 1-B Accounts, 1-C Accounts, 1-D Accounts, 1-E Accounts, 1-F Accounts, 1-G Accounts, 1-H Accounts, and 1-I Accounts, the "Sold Accounts") it intended to purchase from Infinity for a | Tecumseh incorporates its response to HASelect's Statement of Fact No. 18 by reference as though fully set forth here.<br><br>Belotz Decl. at ¶¶ 10, 13-17; Exhibits J-1, J-2, J-3, J-4, L. |

15

| | | |
|---|---|---|
| | total price of $136,063.26.<br><br>The 1-J Purchase Order was filed in Infinity's chapter 7 case at ECF No. 201-013 and designated as "Exhibit D-10". A copy of the 1-J Purchase Order submitted herewith as Exhibit 28. | |
| 41. | On October 26, 2020, Tecumseh wired the $136,063.26 purchase price for the 1-J Accounts to Infinity's Nevada State Bank account ending in 8420.<br><br>*See* monthly account statement for Infinity's Nevada State Bank account ending in 8420 dated October 30, 2020 submitted herewith as Exhibit 26. | Admitted. Tecumseh wired funds in that amount to the Debtor for the purpose of the Debtor acquiring the Disputed Receivables on Tecumseh's behalf.<br><br>Belotz Decl. at ¶¶12, 15; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2. |
| 42. | Through the Purchase Orders and the Sold Accounts, Tecumseh paid a total of $1,912,083.19 to Infinity for the Sold Accounts, which had a total face value of $6,792,518.86 at the time of sale.<br><br>*See generally* Purchase Orders and related documents attached as Exhibits 6-28. | Tecumseh did not pay the Debtor for the Disputed Receivables. It forwarded funds to the Debtor so that the Debtor could acquire the Disputed Receivables on Tecumseh's behalf and for its account.<br><br>Belotz Decl. at ¶¶ 7-17, 25 (describing process by which Tecumseh used the Debtor as a broker to purchase receivables) and Exhibits B through K. |
| 43. | Each of the Sold Accounts was purchased by Infinity using funds paid from its operating account at Nevada State Bank prior to the sale or assignment of any interest in such Sold Account to Tecumseh and prior to the receipt of payment from Tecumseh.<br><br>A list of the Disputed Accounts is on file in Infinity's chapter 7 case at ECF Nos. 201-1 and 201-2. That list includes a column labeled "PaidDate", which denotes the date on which each Disputed Account was acquired by Infinity. *See* Hemmers Transcript (Exhibit 3), pp. 38-39 (Q: "... the Paid Date shown here in column DV, does that represent the date on which Infinity acquired the receivable?" A: "Yeah, that's the date, | Disputed. All funds to purchase the receivables came from Tecumseh, not the Debtor. The Debtor identified potential receivables for purchase, which Tecumseh approved. Once Tecumseh approved a list, the Debtor generated a purchase order which Tecumseh paid. The Debtor then used Tecumseh's money to purchase receivables on Tecumseh's behalf. The "Date Paid" field in the lists of Disputed Receivables did not represent the date that the receivable was acquired.<br><br>*See* Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2; Belotz Decl. at ¶ 15 and at ¶¶ 11, 14, 22-24 (testifying that "Date Paid" field was to represent the date that the Debtor negotiated an agreement on pricing with a provider on Tecumseh's behalf but |

| | | |
|---|---|---|
| | yeah.") | that the date paid field was often blank, was a placeholder and often changed, making it unreliable). |
| 44. | Tecumseh does not dispute that it purchased the Sold Accounts from Infinity pursuant to the above-described Purchase Orders.<br><br>*See Amended Declaration of Chad Myer in Support of Motion of Party in Interest Tecumseh-Infinity Medical Receivables Fund, LP to (1) Abandon Property and (2) Lift Automatic Stay* filed in Infinity's chapter 7 case at ECF No. 201, ¶ 11 ("[Tecumseh] purchased the remaining Tecumseh Receivables from the Debtor. Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of [the] Tecumseh Receivables from the Debtor."). | HASelect misreads the Meyer Declaration and takes one sentence out of context. Factually, Tecumseh purchased the receivables from the medical service providers using the Debtor as a broker and payment agent.<br><br>*See* Sub-Advisory Agreement (Exhibit A) at Exh A., ¶ 3; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2; 186:9-17; Belotz Decl. at ¶¶ 7-17, 25 (describing process by which Tecumseh used the Debtor as a broker to purchase receivables). |
| 45. | Tecumseh did not file any UCC-1 financing statement to perfect any interest it purchased in any of the Sold Accounts.<br><br>A UCC Search Report from the Office of the Secretary of State of the State of Nevada submitted herewith as Exhibit 29. | Admitted. As discussed above, Tecumseh did not purchase the Disputed Receivables from the Debtor with the exception of those identified in the 1-A Purchase Order. As there was no transfer from the Debtor to Tecumseh, there was nothing to perfect.<br><br>However, further discovery is necessary to determine whether Tecumseh's purchase was of a significant part of the Debtor's accounts receivable.<br><br>The June 2020 purchase was for $294,000. It represented one set of receivables that the Debtor held for an attempted draw on the HASelect facility. By that time, the Debtor had borrowed at least $11 million from HASelect supported by receivables it owned. As of the petition date, the Debtor held receivables with a cost value of $5.78 million. The June 2020 purchase represents approximately 2.7% of the $11 million purchased under the HASelect facility and about 5% of the $5.78 million in receivables that the Debtor held at the petition date. |

| | | |
|---|---|---|
| | | Hemmer Trans. Vol. II (Exhibit N) at 186:24-187:10 and at 173:18-174:14 (testifying regarding the Debtor's schedules). |
| 46. | On or about December 3, 2021, Chapter 7 Trustee Robert E. Atkinson, through his counsel, filed a *Motion to: (I) Approve Sale of Certain Assets; (II) Set Sale/Auction Procedures; and (III) Set Auction Hearing Date* (the "Sale Motion") seeking to sell whatever interest the bankruptcy estate may have in the Tecumseh Receivables (as defined therein) (i.e., the Disputed Accounts, including the Sold Accounts that are the subject of this Motion) as well as all claims and causes of action that the Trustee or bankruptcy may have relating thereto. Ultimately, HASelect purchased all of the estate's rights and interests in the Disputed Receivables, which includes the Sold Accounts subject of HASelect's motion for partial summary judgment. | Tecumseh admits that the Trustee filed the Sale Motion and that HASelect purchased all of the estate's rights and interests in the Disputed Receivables. However, Tecumseh disputes that the estate had any interest in the Disputed Receivables, including the Sold Accounts, as they were Tecumseh's property.<br><br>*See* Sub-Advisory Agreement (Exhibit A) at Exh A., ¶ 3; Hemmer Trans. Vol. II (Exhibit N) at 185:21-186:2; 186:9-17; Belotz Decl. at ¶¶ 7-17, 25 (describing process by which Tecumseh used the Debtor as a broker to purchase receivables). |

18

Dated April 28, 2022.

GARMAN TURNER GORDON LLP

By: /s/ Gabrielle A. Hamm
    GERALD M. GORDON, ESQ.
    WILLIAM M. NOALL, ESQ.
    GABRIELLE A. HAMM, ESQ.
    7251 Amigo St., Suite 210
    Las Vegas, Nevada 89119

and

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*