GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
GABRIELLE A. HAMM
Nevada Bar No. 11588
E-mail: ghamm@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116
Email: michael.napoli@akerman.com

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC. *dba* INFINITY HEALTH CONNECTIONS,<br><br>Debtor. | Case No. 21-14486-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br><br>**DECLARATION OF MICHAEL BELOTZ IN SUPPORT OF OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP; ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE,<br><br>Counter-Defendants. | Date: May 26, 2022<br>Time: 9:30 a.m. |

| ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE, |
| --- |
| Counter-Claimant, |
| v. |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, |
| Counter-Defendant. |

I, Michael Belotz, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Michael Belotz. I am over the age of twenty one years, of sound mind, and fully competent to testify in this cause.

2. I submit this declaration in support of the *Opposition to Motion for Partial Summary Judgment as to Certain Disputed Receivables* (the "**Opposition**")[1] of Tecumseh–Infinity Medical Receivable Fund, LP ("**Tecumseh**"), defendant and counterclaimant in the above-captioned adversary proceeding.

3. I am a principal of Tecumseh Alternatives, LLC, the advisor to Tecumseh. In that capacity, I have personal knowledge of the facts stated herein, all of which are true and correct. If called upon to testify regarding the contents of this Declaration, I could and would do so.

4. In my role as a principal of Tecumseh, I am responsible for all aspects of Tecumseh's investments in medical receivables. Part of my duties require that I ensure the proper accounting and reporting of funds flowing to and from Tecumseh. In order to do so, I review and manage Tecumseh's banking records, financial records, contracts, and investments.

5. As such, I was personally involved in the business between Tecumseh and Infinity Capital Management, Inc. ("**Debtor**"), particularly the purchase of receivables pursuant to a sub-advisory agreement entered with the Debtor on June 18, 2020, as modified by Addendum A on or about January 5, 2021 (the "**Sub-Advisory Agreement**"). A true and correct copy of the Sub-Advisory Agreement is attached to Tecumseh's *Statement of Disputed Facts in*

---

[1] Capitalized terms not defined in this Declaration shall have the meanings ascribed to them in the Opposition.

*Support of Opposition to Motion for Partial Summary Judgment as to Certain Disputed Receivables* (the "**Disputed Facts**") as **Exhibit A**.

6. As part of my work coordinating with the Debtor, I had access to the Debtor's internal database of receivables that it managed on behalf of Tecumseh, which I regularly reviewed in the course of my duties. I also had extensive contact with various employees of the Debtor, including Oliver Hemmers ("**Hemmers**"). Prior to the Debtor's bankruptcy, I spoke regularly, multiple times per week, with FTM Investments, Inc. ("**FTM**") and with the Debtor's employees about the receivables that Tecumseh owned. We also had frequent e-mail exchanges. I would generally contact FTM before reaching out to the Debtor, as it was FTM's contractual responsibility to manage all receivables accounting on behalf of Tecumseh.

**A.     The Relationship Between Tecumseh and the Debtor.**

7. The purpose of the Sub-Advisory Agreement was to facilitate the sale of receivables from medical providers to Tecumseh and to provide for servicing of the receivables by the Debtor. The funds paid to purchase the receivables did not come from the Debtor, but from Tecumseh. Under the Sub-Advisory Agreement, the Debtor was not supposed to acquire an interest in the receivables purchased on Tecumseh's behalf or to be part of the chain of title. Tecumseh was not buying receivables that the Debtor owned, but using the Debtor as an intermediary and servicer for Tecumseh.

8. As the Debtor would not profit from receivables it did not own, Tecumseh agreed to pay the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables.

9. Prior to the bankruptcy, Tecumseh acquired a total of about 8,670 receivables with a face value of $28,045,874 under the Sub-Advisory Agreement. Each receivable represented a three-way transaction between Tecumseh, a medical provider, and a personal injury plaintiff. Tecumseh agreed to pay the medical provider a certain sum of money in exchange for the provider providing medical services to the plaintiff. The plaintiff, in turn, agreed to pay Tecumseh a larger amount of money (represented by the face amount of the receivable) secured by an interest in the plaintiff's claim.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

10. The process for purchasing a receivable began with the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. FTM would then verify the receivable on behalf of Tecumseh, after which Tecumseh would approve of the purchase. Tecumseh then paid the price agreed to by the medical provider along with the fee required by the Sub-Advisory Agreement. The payments were made in two primary ways: (1) payments directly from Tecumseh's BofA Account (defined below) to the medical providers and (2) payments to the Debtor to fund the purchases of receivables on Tecumseh's behalf. Both are discussed more fully below.

11. Tecumseh and the Debtor explored the possibility that Tecumseh would purchase the receivables securing HASelect's loan as part of an effort to refinance that loan. Ultimately, HASelect and the Debtor could not reach agreement on the refinancing and Tecumseh did not purchase the receivables securing HASelect's loan.

**B.    Payments to the Medical Provider Through the Debtor.**

12. To facilitate the purchase of receivables and collection of proceeds, Tecumseh ultimately opened an account with Bank of America (the "**BofA Account**") that was funded by Tecumseh and granted signing authority to Hemmers and Anne Pantelas (along with myself and another Tecumseh principal, Chad Meyer). However, the BofA Account was not opened until October of 2020 because of difficulties encountered in setting up an account with multiple authorized signatories and because of the almost insurmountable challenge of locating an open Bank of America branch accessible to each signatory in the midst of the COVID-19 pandemic, and setting up simultaneous in-person appointments at each branch so that each signatory could be in the presence of a Bank of America banker executing the necessary paperwork at the same time. Therefore, from approximately July through October 2020, Tecumseh transferred funds to the Debtor to purchase the receivables on Tecumseh's behalf. Of the approximately 8,670 receivables purchased, only 2,833 with a face value of approximately $6.1 million involved a transfer of funds to the Debtor. These are the receivables at issue in HASelect's Motion.

13. With respect to this subset of receivables, the Debtor periodically (approximately every two weeks) provided Tecumseh with a list of receivables from various medical providers

that the Debtor recommended Tecumseh purchase. From July 13, 2020 through October 29, 2020, the Debtor sent twelve such lists, attached to the Disputed Facts as **Exhibits B** through **K**:[2]

| Exhibit | Purchase Order | Date |
|---|---|---|
| B | Series 1, Intake B | July 13, 2020 |
| C | Series 1, Intake C | July 27, 2020 |
| D | Series 1, Intake D | August 30, 2020 |
| E | Series 1, Intake E | September 15, 2020 |
| F-1 | Series 1, Intake F | September 22, 2020 |
| F-2 | Series 1, Intake F, version 2 | September 25, 2020 |
| G | Series 1, Intake G | September 30, 2020 |
| H | Series 1, Intake H (Batch 10) | October 4, 2020 |
| H-2 | Series 1, Intake H (Batch 11) | October 4, 2020 |
| I | Series 1, Intake I (Batch 12) | October 12, 2020 |
| J-1 | Series 1, Intake J (Batch 13) | October 12, 2020 |
| J-2 | Series 1, Intake J (Batch 14-A) | October 23, 2020 |
| J-3 | Series 1, Intake J (Batch 14-B) | October 23, 2020 |
| J-4 | Series 1, Intake J (Batch 14-C) | October 23, 2020 |
| K | Series 1, Intake K | October 29, 2020 |

14. For each receivable, the Debtor provided the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price, and an estimated total cost that included the Debtor's fee. The lists also included a "Date Paid" column. The "Date Paid" column was often blank, sometimes contained dates that were months after the date of the list, and sometimes contained dates prior to the date of the list. Using Exhibit B (July 13, 2020) as an example, the "Date Paid" column has 25 blanks and 34 dates ranging from June to November 2020. When I asked about the dates, I was told that the "Date Paid" was taken from the Debtor's internal database of receivables and did not reflect the date that the Debtor had paid for these particular receivables. Hemmers said that past dates reflected the date that the Debtor reached an agreement with the provider as to the price of the receivable, and blank dates and November dates were placeholders.

---

[2] The names of patients have been redacted to preserve their privacy.

15. Once Tecumseh approved a list of receivables for purchase, the Debtor generated a purchase order, which Tecumseh paid. The Debtor then used the funds to purchase the receivables on Tecumseh's behalf.

16. On occasion, the Debtor underestimated how much the receivables would cost. When that happened, the Debtor requested and Tecumseh provided additional funds that allowed the Debtor to complete the acquisition of the listed receivables on Tecumseh's behalf. Typically, Hemmers would contact me by telephone to request additional funds when he underestimated the cost of receivables Tecumseh was purchasing. On occasion, however, he would contact me by e-mail. Attached to the Disputed Facts as **Exhibit L** is a true and correct copy of an e-mail from Hemmers to me, dated June 25, 2020, noting that he needed additional funds because the receivables he planned to acquire cost more than he had anticipated. Only upon receipt of an updated PO and list of receivables, however, would Tecumseh provide such additional funds.

17. On other occasions, the Debtor was unable to acquire certain receivables that Tecumseh sought to purchase. When this happened, the Debtor would indicate that it had cancelled those receivables. For example, Exhibit F-1 reflects the cancellation of several receivables due to the Debtor's inability to acquire them.

18. The Debtor used its own funds to acquire receivables on only one occasion, as indicated on Exhibit C (July 27, 2020), in which BillID 23043 notes that "Infinity has already paid - no balance amount on the invoice it says zero."

C.  **The "One-Off" Transaction ($294,000).**

19. Tecumseh made one purchase of receivables that had previously been owned by the Debtor. In June 2020, Tecumseh purchased the receivables shown on **Exhibit M** to the Disputed Facts. At the time of the purchase, Hemmers informed us that HASelect had consented to the sale so that it could be paid the $294,000 that Tecumseh was paying for the receivables in partial repayment of HASelect's loan. An important difference between Exhibit M and Exhibits B through K is that Exhibit M identifies the wires and checks by which the Debtor paid for the receivables identified on Exhibit M. There is no such information on Exhibits B through K.

**D.    Payments Directly to the Medical Provider (After October 2020).**

20.    The remaining receivables purchased by Tecumseh from and after October 29, 2020—4,190 receivables at a face amount of approximately $19,846,621.37—were paid for with transfers directly from Tecumseh's BofA Account to the medical providers. These receivables are not at issue in HASelect's Motion.

21.    Once the BofA Account was opened, the transactions followed the same process except that, upon Tecumseh's approval of the purchase of a receivable, Hemmers or Pantelas would send the funds for the purchase directly from Tecumseh's BofA Account to the medical provider. Further, rather than purchasing groups of receivables every two weeks or so, Tecumseh purchased receivables throughout the month, and Tecumseh paid the Debtor its servicing fee for its work in locating and servicing the receivables monthly from the BofA Account.

**E.    Records Pertaining to Date Receivables Were Purchased.**

22.    Part of my duties for Tecumseh included attempting to reconcile our records with the Debtor's records. To that end, I regularly reviewed the Debtor's internal database of receivables. During the course of my review, I noted that data related to the receivables purchased by Tecumseh changed frequently. Frequently, the "Date Paid" field remained blank for months at a time. Even after the field was populated, the date often changed. As discussed in paragraph 14, above, the "Date Paid" field typically did not match the actual purchase dates for the receivables listed on Exhibits B through K.

23.    HASelect states in the Motion that "[e]ach of the Sold Accounts was purchased by Infinity using funds paid from its operating account at Nevada State Bank prior to the sale or assignment of any interest in such Sold Account to Tecumseh and prior to the receipt of payment from Tecumseh" based on the "Date Paid" column in the Debtor's records and Hemmers testifying "Yeah, that's the date, yeah" in his 2004 examination early in the bankruptcy case.

24.    For the reasons discussed above, I believe Hemmers was mistaken and that the "Date Paid" column does not represent the date the receivables were purchased from medical providers in most cases.

25. Further, HASelect's conclusions that the receivables were purchased 1) with the Debtor's funds, 2) prior to the sale or assignment to Tecumseh and 3) prior to the receipt of payment from Tecumseh, are incorrect. It was always our understanding and expectation that Tecumseh's funds were being used to pay the medical providers for the receivables we were purchasing and that we were purchasing new receivables. Having decided not to purchase HASelect's collateral in a refinancing of the HASelect loan, we wanted to avoid any overlap with the receivables securing HASelect's loan. It was also our understanding that the Debtor was not paying the medical providers until it had the money from Tecumseh to do so. When the Debtor used its own funds to acquire receivables one time, as indicated in paragraph 18, above, and Exhibit C, I reiterated to Hemmers that Tecumseh only wanted to purchase new receivables unrelated to HASelect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated April 28, 2022.

                                                                     /s/ Michael Belotz
                                                                     MICHAEL BELOTZ