Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:   blarsen@shea.law
         kwyant@shea.law

*Attorneys for HASelect-Medical Receivables Litigation Finance Fund International SP*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br>**REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Plaintiff,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP; ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE<br><br>Counter-Defendants. | Hearing Date:  May 26, 2022<br>Hearing Time:  9:30 a.m. |

HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by and through counsel, respectfully submits this Reply in Support of its *Motion for Partial Summary Judgment as to Certain Disputed Receivables* [ECF No. 53][1] (the "Motion") and in Response to Tecumseh-Infinity Medical Receivables Fund, LP's ("Tecumseh") Opposition to the same [ECF No. 74] (the "Opposition"). This Reply is made and based on the following memorandum of points and authorities, the exhibits filed with the Motion, Opposition, and this Reply, the documents on file in the above-captioned Bankruptcy Case and Adversary Proceeding, judicial notice of which is respectfully requested, and the any argument that this Court may entertain at the hearing on the Motion.

## INTRODUCTION

In Opposition, Tecumseh does not dispute that HASelect holds a perfected security interest in all of Debtor Infinity Capital Management's ("Debtor" or "Infinity") personal property, defined in § 4.1 of the MLA[2] as the "Collateral."[3] Tecumseh likewise does not dispute that HASelect provided Infinity with approximately $13.7 million between February 2019 and April 2020 which was to be used solely to purchase accounts receivable in which HASelect would hold a perfected, first-priority security interest.[4] Tecumseh further admits that it did not file any UCC-1 to perfect any interest it may hold in the accounts at issue in the Motion (i.e. the "Sold Accounts").[5] In fact, Tecumseh concedes that if Infinity purchased the Sold Accounts and then resold them to Tecumseh, then HASelect's perfected security interest attached to the same.[6]

Having no choice but to concede the foregoing, Tecumseh's Opposition relies almost entirely on the affirmative defense that the rarely granted remedy of a resulting trust[7] arose in Tecumseh's favor over the Sold Accounts, preventing them from becoming the property of Infinity or subject to

---

[1] Throughout this Opposition, all references to AECF No. ___ are citations to electronic filings in Adversary Case No. 21-01167-abl while references to ECF No. ___ are citations to electronic filings in Bankruptcy Case No. 21-14486-abl.
[2] All terms not otherwise defined herein shall have the meaning attributed to them in the Motion.
[3] *See* AECF No. 75, ¶¶ 2-4.
[4] *Id.* ¶ 11.
[5] *See* AECF No. 75, ¶ 45.
[6] *See* AECF No. 74, 2:21-25.
[7] *Secure Leverage Grp., Inc. v. Bodenstein (In re Peregrine Fin. Grp., Inc.)*, No. 12 B 27488, 2014 Bankr. LEXIS 2328, at *9 (Bankr.N.D. Ill. May 27, 2014).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

HASelect's perfected security interest. This belated and ill-advised attempt by Tecumseh to avoid the consequences of its poorly conceived business venture with Infinity is not convincing. First, Tecumseh has not and cannot carry its burden of establishing a resulting trust in its favor. Second, Tecumseh cannot rectify its failure to perfect its interest in the Sold Accounts by claiming a resulting trust. *See In re Foam Systems Co.,* 92 Bankr. 406 (9th Cir. BAP 1988), *affirmed, 893 F.2d 1338 (9th Cir. 1989)* (where no trust, but rather a security transaction, was intended by the parties, a resulting trust will not be imposed to remedy defective perfection of the security interest).

If a resulting trust over the Sold Accounts could exist, Tecumseh would have to establish through clear and convincing evidence that (1) Tecumseh paid for the Sold Accounts, (2) Infinity and Tecumseh intended to create a resulting trust, and (3) Tecumseh paid for the Sold Accounts on or before the date they were purchased. "If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails." *See In re Peregrine Fin. Grp., Inc.*, 2014 Bankr. LEXIS 2328 at *9. Here, the undisputed evidence unequivocally shows that (1) Infinity, not Tecumseh, paid for the Sold Accounts with its own funds, (2) neither Tecumseh nor Infinity had any intent to create a resulting trust in entering into the Sub-Advisory Agreement, and (3) the Sold Accounts were purchased and paid for by Infinity well before Tecumseh paid Infinity for the Sold Accounts. Among other things, such evidence includes:

- Infinity's bankruptcy schedules make no mention whatsoever of any account receivable it held in trust for Tecumseh or to which it held only bare legal title;

- Tecumseh, in filing its motions to reject the Sub-Advisory Agreement and to compel the Trustee to abandon the estate's interests in the Disputed Accounts[8], Tecumseh make no mention whatsoever of any account receivable held in trust by Infinity or to which Infinity held only bare legal title;

- Consistent with the testimony of Infinity's principal, Oliver Hemmers[9] as cited in HASelect's Motion, Infinity's business records unequivocally show that virtually all of the Sold Accounts were purchased by Infinity with its own funds (and in many cases loan proceeds received from HASelect) prior to Infinity's receipt of the corresponding

---

[8] ECF Nos. 57 and 61.

[9] A list of the Disputed Accounts (and the Sold Accounts, which are included therein) is on file in Infinity's chapter 7 case at ECF No. 201-1. That list includes a column labeled "PaidDate", which denotes the date on which each Disputed Account was acquired by Infinity. *See* Hemmers Transcript (Exhibit 3), pp. 38-39 (Q: "… the Paid Date shown here in column DV, does that represent the date on which Infinity acquired the receivable?" A: "Yeah, that's the date, yeah.").

- purchase price from Tecumseh;[10]
- Infinity's business records unequivocally show that virtually all of the Sold Accounts were assigned directly to Infinity by the sellers of the Sold Accounts along with a direct assignment to Infinity of a lien against the associated personal injury recovery;
- Tecumseh has failed to produce a single document evidencing its direct purchase of any account receivable from any medical provider or any direct communication with any medical provider that sold accounts receivable to Infinity;
- Tecumseh was undoubtedly aware of HASelect's prior perfected security interest in all of Infinity's personal property when it began purchasing the Sold Accounts as two of Tecumseh's principals, Chad Meyer and Simon Clark, are former employees of an affiliate of HASelect and were personally involved in negotiating and administering HASelect's loan to Infinity;
- Tecumseh admits it purchased the Sold Accounts directly from Infinity rather than Infinity purchasing them with Tecumseh's funds on Tecumseh's behalf;[11]
- Tecumseh admits its business relationship with Infinity under the Sub-Advisory Agreement began with Tecumseh's purchase of accounts already owned by Infinity, not with the purchase of new accounts from any medical provider;[12]
- All documents between Tecumseh and Infinity relating to the Sold Accounts reference the sale of such accounts by Infinity to Tecumseh and are entitled "Purchase Order" or "Assignment and Bill of Sale"[13];
- Neither the Sub-Advisory Agreement nor any Purchase Order or Assignment and Bill of Sale or any other document between Tecumseh and Infinity make any reference to Infinity holding any property in trust for Tecumseh or otherwise owing any fiduciary duty to Tecumseh; and
- For at least the first four months after entering into the Sub-Advisory Agreement, Tecumseh's purchases of accounts thereunder were almost exclusively limited to purchases from Infinity of accounts that had previously been purchased (and paid for) by Infinity, which directly refutes and contradicts any claim Tecumseh might make that it intended to establish a trust relationship with Infinity.

In attempting avoid summary judgment, Tecumseh relies on evidence that, without explanation, directly contradicts the Meyer Declaration[14] and further asserts, without any supporting

---

[10] *See* Exhibit 30 attached hereto. In fact, the Sold Accounts were purchased by Infinity an average of 168 days before Infinity's receipt of any payment corresponding to the sale and assignment of the Sold Accounts to Tecumseh.

[11] *See Declaration of Chad Meyer in Support of Motion of Party in Interest Tecumseh-Infinity Medical Receivables Fund, LP to (1) Abandon Property and (2) Lift Automatic Stay* filed in Infinity's chapter 7 case (the "Meyer Declaration") at ECF No. 54, ¶ 11 ("[Tecumseh] purchased the remaining Tecumseh Receivables from the Debtor. Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of [the] Tecumseh Receivables from the Debtor.").

[12] *See* AECF No. 75, ¶¶ 15-17.

[13] *See* Exhibits 6, 8-10, 12-13, 15-16, 18-21, 23-24, 27-28 to the Motion [ECF Nos. 57-6, 57-8, 57-9, 57-10, 57-12, 57-13, 57-15, 57-16, 57-18, 57-19, 57-20, 57-21, 57-23, 57-24, 57-27, and 57-28] in the Adversary Proceeding.

[14] Well after the commencement of this Adversary Proceeding, Tecumseh refiled an amended version of the Meyer

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

evidence, that the "Date Paid"[15] column from its own purchase orders issued to Infinity does not accurately reflect when the Sold Accounts were actually purchased by Infinity. In contrast, HASelect offers the Court a full analysis of all of the Sold Accounts[16], showing (1) that the "PaidDate" column is accurate as confirmed by Infinity's business and banking records and (2) that, in virtually every instance, Infinity purchased and paid for the Sold Accounts using its own funds before receiving funds from Tecumseh. Such facts, as a matter of law, preclude the imposition of a resulting trust. *See, e.g.*, *Anderson v. Monroe (In re Hester)*, No. 18-03903, 2019 Bankr. LEXIS 2371, *8-9 (S.C. Bankr. July 26, 2019) (stating that a resulting trust arises at the time of purchase, or not at all, and only arises if intent and payment coincide with the transfer of assets). Tecumseh has plainly failed to establish any such intent or payment in opposing the Motion.

Tecumseh's remaining arguments also fall short. First, as this Court has already found in granting the Trustee's Motion to Substitute[17], subject matter jurisdiction exists as to the claims at issue in this adversary proceeding. Furthermore, no additional discovery is necessary concerning the Sold Accounts as the facts surrounding Infinity's purchase of the Sold Accounts are clear and beyond reasonable dispute. Discovery in this matter, as well as Infinity's chapter 7 case, has been ongoing for many months. HASelect has issued subpoenas to more than 20 third parties and has obtained discovery from Infinity, Tecumseh, and the Trustee. Aside from recently requesting documents from HASelect, Tecumseh has made no ostensible effort to conduct its own discovery. Tecumseh's own delays in seeking discovery do not require that summary judgment be postponed. Accordingly, for these reasons and those set forth more fully below, HASelect's Motion should be granted.

---

Declaration on March 22, 2022 [ECF No. 201] repeating the admission that Tecumseh purchased the Sold Accounts from Infinity.

[15] Tecumseh's Opposition conflates the "Date Paid" column reflected in Tecumseh's purchase orders with the "PaidDate" column included in the list of Disputed Accounts, as shown at ECF No. 201-1, which reflects the date on which each Disputed Account was purchased by Infinity as confirmed through Oliver Hemmers Rule 2004 examination testimony. There are obvious errors in the "Date Paid" column in Tecumseh's purchase orders. In contrast, the "PaidDate" column in the list of Disputed Accounts as referenced in HASelect's Motion is nearly 100% accurate.

[16] *See* Exhibit 30 attached hereto.

[17] AECF No. 45.

# ARGUMENT

**A.    This Court Has Subject Matter Jurisdiction over the Sold Accounts.**

In recently granting the Trustee's Motion to Substitute, this Court expressly found (1) it holds both "arising under" and "related to" subject matter jurisdiction over the claims at issue in this adversary proceeding and (2) HASelect's payment of $100,000 to purchase the avoidance claims conferred a substantial benefit on the bankruptcy estate and, as such, HASelect has standing to prosecute those avoidance claims for its own benefit.

Consistent with the Court's ruling on the Motion to Substitute, and as stated more fully in HASelect's Opposition to the Motion to Dismiss[18], which is incorporated herein by reference, this Court has "arising under" jurisdiction over bankruptcy estate's avoidance claims as purchased by HASelect pursuant to the Court's order approving the sale of the same.[19]  As to HASelect's remaining claims, "related to" jurisdiction exists as the outcome of this Adversary Proceeding "conceivably alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) in such a way as to impact on the administration of the bankruptcy estate." *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1998).  Indeed, to the extent that Tecumseh is found to be an unsecured creditor as to the Sold Accounts, Infinity will face new liabilities and claims from Tecumseh.[20]  Additionally, a sound basis exists for the Court's exercise of supplemental jurisdiction over this adversary proceeding as the claims at issue all arise out of the same common nucleus of operative facts as the avoidance claims purchased by HASelect.  Finally, Tecumseh has consented to subject matter jurisdiction as a result of the filing of its Proof of Claim.

**B.    Tecumseh Has Not Met Its Burden of Establishing a Resulting Trust.**

Tecumseh's Opposition is plainly insufficient as a matter of law.  First, Tecumseh fails to

---

[18] AECF No. 78.

[19] ECF No. 184.

[20] *See* Claim 11-1 in the Bankruptcy Case ("Therefore, Tecumseh files this protective and unliquidated proof of claim (the "Claim") in an abundance of caution to preserve its rights and all claims (both secured and unsecured) against the Debtor and its bankruptcy estate, including, but not limited to, claims for breach of the Sub-Advisor Agreement, conversion, fraud, and resulting or constructive trust, in the event that it is adjudicated in the Adversary or in any other proceeding that the Tecumseh Receivables, or any of them, were property of the Debtor and/or subject to the lien of HASelect, and claim(s) under 11 U.S.C. § 502(d) *to the extent Tecumseh's interest is avoided, under 11 U.S.C. § 544 or otherwise*.") (emphasis added).

satisfy its burden in opposing HASelect's Motion. Second, the undisputed facts show that, as a matter of law, Tecumseh is not entitled to a resulting trust over the Sold Accounts because, among many other reasons, Tecumseh purchased the Sold Accounts from Infinity after Infinity had purchased the Sold Accounts from various third-party medical providers.[21] Accordingly, Tecumseh has not and cannot establish, through clear and convincing evidence, that either it or Infinity intended to create a resulting trust, or any other trust or fiduciary relationship, in entering into the Sub-Advisory Agreement. To the contrary, Tecumseh's conduct in purchasing the Sold Accounts from Infinity proves that no such intent existed.

### 1. *Tecumseh Failed to Meet Its Burden of Establishing a Resulting Trust.*

In opposing HASelect's Motion, Tecumseh must do more than simply speculate or assert unsupported allegations. *See, e.g.*, *Loomis v Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (holding that speculative affidavits were insufficient to defeat a motion for summary judgment). Yet, Tecumseh's Opposition relies entirely on speculation and unsupported allegations. For example, the Declaration of Michael Belotz states that "I believe Hemmers was mistaken and that the 'Date Paid' column does not represent the date the receivables were purchased from medical providers in most cases."[22] This gross speculation is plainly incorrect. The Hemmers testimony cited in the Motion did not reference the dates in the "Date Paid" column from Tecumseh's purchase orders to Infinity, which in several instances is obviously missing or incorrect. Rather, such testimony referenced the "PaidDate" column from Infinity's own master list of the Disputed Accounts, a version of which is on file in the chapter 7 case at ECF No. 201-1, which is complete and accurate as shown below.

In addition to this burden, and because Tecumseh asserted its resulting trust theory as an affirmative defense in its answer[23], Tecumseh is required to "establish sufficient facts to support a finding in its favor." *Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*, 55 F.Supp.2d 1113, 1122

---

[21] *See* Exhibit 30 attached hereto.
[22] *See* AECF No. 76, ¶ 24.
[23] *See* AECF No. 26, p. 8.

(D. Nev. 1999); *Neilson v. Cedar Funding, Inc. (In re Cedar Funding, Inc.)*, No. 08-52709-mm, 2010 Bankr. LEXIS 1005 (N.D. Cal. 2010) (holding that, at a minimum, a party who asserts an affirmative defense then opposes a motion for summary judgment based on the affirmative defense must offer sufficient evidence as to each element of the defense) (citing to *Johnson v. Georgia-Pacific Corp.*, 329 Fed. Appx. 65, *9 (9th Cir. 2009)).

Tecumseh alleges that South Carolina law applies to its resulting trust argument.[24] Assuming arguendo that South Carolina law applies, which HASelect does not concede, Tecumseh is, at a minimum, required to establish, through clear and convincing evidence (1) it paid for the property (2) with the intent to own it (3) on the date of purchase. *See, e.g. In re Hester*, No. 18-03903, 2019 Bankr. LEXIS 2371 at *8-9. Payment contemporaneously or prior to the actual transaction is required:

> The last requirement is important. South Carolina trust law is clear that a resulting trust arises at the time of purchase, ***or not at all***. [T]he trust must be coequal with the deed, and cannot arise from any subsequent transactions. That a party pays for property and/or intends to own it ***at some point in time*** fails to establish a trust. For a resulting trust to arise, payment and intent must coincide with a deed's execution.

*Anderson v. Architectural Glass Constr., Inc. (In re Pfister)*, 749 F.3d 294, 299 (4th Cir. 2014) (emphasis in original) (citations omitted); *see also Glover v. Glover*, 234 S.E.2d 488 (S.C. 1977) ("In order to establish a resulting trust [under South Carolina law], it was necessary that respondent show by definite, clear, unequivocal, and convincing evidence that she paid a definite portion of the purchase money at the time of the transaction."). Many other states, including Nevada, require that "in order to establish a resulting trust from the payment of the purchase money, it must be shown that it was paid at the time the title passed; that no subsequent payment will satisfy the statute." *See Boskowitz v. Davis*, 12 Nev. 446 (1877); *see also, e.g.*, *Buckwalter Stove Co. v. Edmonds*, 128 A. 835, 836 (Pa. 1925) ("A subsequent payment of purchase money will not raise a resulting trust.").

Here, Tecumseh has not carried its burden of proving, via clear and convincing evidence, that it provided payment prior to or contemporaneously with the medical providers sale of the Sold Accounts to Infinity, nor can it establish that either it or Infinity intended to create a resulting trust

---

[24] *See* AECF No. 26, p. 8.

over the Sold Accounts (or the remaining Disputed Accounts). Moreover, Tecumseh offers nothing to explain the prior declaration testimony of Chad Meyer admitting that Tecumseh purchased the Sold Accounts from Infinity.[25] Tecumseh's undeniable failure to carry its burden in opposing the Motion, standing alone, is sufficient reason for the Court to grant HASelect's Motion.

### 2. *Tecumseh's Purchase of the Sold Accounts from Infinity Precludes Any Finding of a Resulting Trust.*

Starting with Tecumseh's purchase of the 1-A Accounts on June 26, 2020, Tecumseh admits that Infinity had previously purchased the 1-A Accounts with its own funds.[26] As to the remaining Sold Accounts, Tecumseh boldly claims, citing no evidence whatsoever, that "[o]nly after Tecumseh approved and forwarded the funds did Infinity acquire the receivables for Tecumseh's benefit."[27] This claim directly contradicts Tecumseh's earlier admission that the purchase orders attached as exhibits to both the Motion and the Meyer Declaration "reflect[] the purchase of Tecumseh Receivables from the debtor."[28] Moreover, this claim is easily disproved.

Based on Tecumseh's about-face with respect to its purchase of the Sold Accounts, HASelect performed a full analysis of all of the Sold Accounts, which is attached hereto as Exhibit 30 and includes references to and copies of Infinity's business and banking records confirming when Infinity purchased each of the Sold Accounts.[29] This analysis confirms beyond any reasonable doubt that virtually all of the Sold Accounts were purchased and paid for by Infinity using its own funds paid from its operating account at Nevada State Bank Account ending in 6375 (the "NSB Payment Account") before receiving the corresponding purchase price for such accounts from Tecumseh.

Beyond the full analysis provided in Exhibit 30, the examples set forth in the following table

---

[25] *See* ECF No. 201, ¶ 10.
[26] *See* Opposition, pp. 14-15.
[27] *See* AECF No. 74, p. 13, ll. 17-18.
[28] *See* the Meyer Declaration filed in the Bankruptcy Case [ECF No. 201], ¶ 10, and eleven (11) purchase orders attached thereto which Tecumseh's principal attests, under oath, evidence purchases directly from the Debtor.
[29] The list of Sold Accounts included in Exhibit 30 was extracted from the same master list of Disputed Accounts as ECF 201-1. The only information added to the list is the "Intake" column, which identifies each Sold Account as being part of the 1-A Accounts, 1-B Accounts, etc., and the "Bates No." column which includes a reference to a separate page from Exhibit 30 at which the specific check or other transfer remitted in payment by Infinity can be found and confirmed.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  demonstrate that Tecumseh is undeniably wrong both in claiming to have funded Infinity's purchase
2  of the Sold Accounts and in claiming that the "PaidDate" referenced in the Hemmers Rule 2004
3  examination testimony cited in the Motion is not accurate.[30]

| Intake | BillID | "PaidDate" [ECF 201-1] | Actual Payment[31] | Amount | Assignment to Tecumseh[32] | Tecumseh Payment[33] |
|---|---|---|---|---|---|---|
| 1-B | 23032 | 6/29/2020 | 6/29/2020 | $41,251.70 | 7/23/2020 | 7/24/2020 |
| 1-C | 23038 | 6/29/2020 | 6/29/2020 | $41,425.00 | 8/12/2020 | 8/12/2020 |
| 1-C | 23878, et al. | 7/8/2020 | 7/8/2020 | $58,800.00 | 8/12/2020 | 8/12/2020 |
| 1-D | 684 | 9/11/2015 | 9/11/2015 | $15,966.80 | 9/10/2020 | 8/31/2020 |
| 1-E | 24635, et al. | 8/5/2020 | 8/5/2020 | $55,200.00 | 9/16/2020 | 9/16/2020 |
| 1-F | 25144, et al. | 9/9/2020 | 9/9/2020 | $79,800.00 | N/A | 9/25/2020 |
| 1-F | 24858 | 8/24/2020 | 8/24/2020 | $29,640.00 | N/A | 9/25/2020 |
| 1-F | 24979, et al. | 8/31/2020 | 8/31/2020 | $24,980.00 | N/A | 9/25/2020 |
| 1-G | 25334; et al. | 9/18/2020 | 9/18/2020 | $42,174.95 | 9/30/2020 | 9/30/2020 |
| 1-G | 25336, et al. | 9/24/2020 | 9/24/2020 | $24,711.25 | 9/30/2020 | 10/7/2020 |

Furthermore, Tecumseh cannot dispute the fact that the funds it provided to Infinity were deposited in Infinity's NSB Account ending in 8480 (the "NSB Deposit Account"), which is the same account used by HASelect to advance loan funds to Infinity up to May 2020. Indeed, as of June 26, 2020, when Tecumseh wired the purchase price for the 1-A Accounts to Infinity, NSB Deposit Account still held HASelect loan proceeds of approximately $744,831.46 that had been deposited into the NSB Deposit Account by HASelect in April and May 2020.[34] Thereafter, Infinity

---

[30] Full supporting documentation for each of the Accounts referenced in this table is included within Exhibit 30.

[31] This is the date on which Infinity remitted payment to the sellers of the Sold Accounts.

[32] This is the date on which Infinity executed its Assignment and Bill of Sale transferring the Sold Accounts to Tecumseh.

[33] This is the date on which Tecumseh remitted payment to Infinity for Tecumseh's purchase of the Sold Accounts.

[34] See NSB Account 8480 Bank Statement at Exhibits 7, 11, 14, 17, and 26 [AECF Nos. 57-7, 57-11, 57-14, 57-17, and 57-26].

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

periodically transferred both the HASelect loan proceeds and funds received from Tecumseh to the NSB Payment Account and used such comingled funds to purchase additional accounts receivable that it later resold to Tecumseh and to fund Infinity's ongoing business expenses.[35] Additionally, as Infinity collected proceeds from the Sold Accounts, it again commingled those funds with other funds it used to purchase additional accounts that it later resold to Tecumseh.[36] Based on this commingling, Tecumseh cannot prove that "by definite, clear, unequivocal, and convincing evidence that it paid a definite portion of the purchase money at the time of the transaction" with respect to the Sold Accounts. *See Glover*, 234 S.E.2d at 489.

Nor has Tecumseh met its burden of providing clear and convincing evidence that its funds were used to purchase the Sold Accounts, as it was required to do in relying on its affirmative defense to oppose the Motion. *See Tiffany Design, Inc.*, 55 F.Supp.2d at 1122. Tecumseh's transfer of funds to Infinity's NSB Deposit Account as payment for the Sold Accounts resulted in such funds becoming Infinity's personal property. *See, e.g.*, *Yoder v. T.E.L. Leasing*, 124 B.R. 984, 996 (S.D. Ohio 1990) ("Once money is transferred into a debtor's corporate account, the funds are deemed property of the debtor's bankruptcy estate….") (citing *LaRose v. Bourg Ins. Agency (In re Dick Henley, Inc.)*, 45 Bankr. 693, 698 (Bankr. M.D. La. 1985) (finding that the transfer of money by a stockholder into a debtor's corporate account was a loan and resulted in creditor status for the stockholder and not that of a trust beneficiary). Infinity's later use of such funds, commingled with other funds, to purchase additional accounts receivable that were subsequently sold and assigned to Tecumseh does not give rise to a resulting trust.

The evidence provided in support of the Motion clearly establishes that virtually all of the Sold Accounts were purchased by Infinity with its own funds before Infinity sold such accounts to Tecumseh. Consequently, and as a matter of law, Tecumseh cannot establish a resulting trust.

3. *Neither Tecumseh nor Infinity Intended to Create a Resulting Trust.*

While the Court can easily dispense with Tecumseh's affirmative defense of resulting trust

---

[35] *Id.*

[36] For example, the 1-G Accounts identified in Exhibit 21 to the Motion [AECF 57-21], were purchased with funds collected by Infinity from earlier Sold Accounts.

Page 11 of 19

based on the foregoing facts relating to the timing of Tecumseh's payments to Infinity, the Court must also find, based on such facts, that neither Tecumseh nor Infinity intended to create a resulting trust or any similar fiduciary relationship in entering into the Sub-Advisory Agreement. *See In re Peregrine Fin. Grp., Inc.*, 2014 Bankr. LEXIS 2328 at *9. ("If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails.").

The Sub-Advisory Agreement between Tecumseh and Infinity makes no mention of any resulting trust or other fiduciary relationship.[37] Furthermore, the specific agreements between Tecumseh and Infinity relating to the Sold Accounts are titled as "Purchase Order" or "Assignment and Bill of Sale," evidencing Infinity's clear intent to resell the Sold Accounts to Tecumseh. Tecumseh further admits that its business relationship with Infinity began in a way that is absolutely and completely at odds with any supposed intent to create a resulting trust – by purchasing and paying for the 1-A Accounts well after Infinity had purchased and paid for the 1-A Accounts with its own funds.[38] The language of the Sub-Advisory Agreement itself does not support Tecumseh's claim of intent to create a resulting trust. Moreover, Hemmer's Rule 2004 examination testimony clearly describes Infinity's typical practice of purchasing accounts in advance as they became available and later seeking funds for such accounts, which were then "already owned by Infinity."[39]

Tecumseh's repeated claims that it paid for the Disputed Accounts "by paying the assigning medical provider directly" and that it owns the same "outright"[40] are entirely inconsistent with any supposed intent to create a resulting trust. Rather, as acknowledged by the Opposition, a purchase money resulting trust might arise when "a transfer of property is made to one person and the purchase price is paid by another."[41] Tecumseh's present arguments that Infinity held legal title to the Sold Accounts for Tecumseh's benefit directly contradict Tecumseh's earlier claims to "outright" ownership of the Disputed Receivables.[42] Tecumseh's arguments are also contradicted by Infinity's

---

[37] *See* Exhibit 5 to the Motion, [AECF No. 57-5].

[38] *See* AECF No. 75, ¶¶ 15-17.

[39] *See* Exhibit 3 to the Motion, [AECF No. 57-3], p. 113-114.

[40] *See, e.g.*, ECF No. 201, ¶¶ 4-7, 11.

[41] Opposition [AECF No. 74], p. 11, ll. 27-28.

[42] HASelect does not concede that Tecumseh took title to the Disputed Receivables. HASelect reserves all rights and defenses to dispute any claim of ownership by Tecumseh in the Disputed Accounts.

bankruptcy schedules, which are entirely devoid of any reference to any account receivable held for the benefit of Tecumseh or to which Infinity held only legal title.[43]  If Infinity had any intent to create a resulting trust relationship in entering into the Sub-Advisory Agreement, or any knowledge that it was a party to a resulting trust as of the Petition Date, it would have disclosed such items in its bankruptcy schedules.  Likewise, in filing its motion to reject the Sub-Advisory Agreement[44] and its motion to compel the Trustee to abandon the bankruptcy estate's interests in the Disputed Accounts[45], Tecumseh made no mention whatsoever of any resulting trust.  Tecumseh's Opposition makes no effort to explain these omissions nor any effort to explain why Tecumseh filed a proof of claim in this matter if it is not a creditor of Infinity.

Tecumseh's own actions in purchasing the Sold Accounts from Infinity further evidence the lack of intent to create a resulting trust under the Sub-Advisory Agreement.  As shown above, Tecumseh sent funds to Infinity to purchase the Sold Accounts only after Infinity had already paid for the Sold Accounts.  Through at least ten separate transactions occurring in the four months immediately following the execution of the Sub-Advisor Agreement, Tecumseh plainly purchased the Sold Accounts from Infinity with no indication whatsoever that Infinity was to continue to hold legal title to such accounts or that any trust relationship existed.[46]  Courts have granted summary judgment in similar situations a party opposing summary judgment failed to produce clear and convincing evidence of an intent to create a resulting trust.  *See, e.g.*, *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exchange Servs. (In re Landamerica Fin. Group, Inc.)*, No. 08-35994, 2009 Bankr. LEXIS 4133, *43 (E.D. Va. Bankr. May 7, 2009) (granting summary judgment on the issue of intent because the parties were sophisticated and could have ensured a trust arose); *Rent-A-Center East, Inc. v. Leonard (In re Web2B Payment Solutions, Inc.)*, 515 B.R. 716, 723 (D. Minn. 2014) (affirming the grant of summary judgment, finding no resulting trust based on lack of intent because, among other things, the commingling of funds and the concerning issue of raising the resulting trust

---

[43] *See* ECF No. 91 and 112.
[44] ECF No. 61.
[45] ECF No. 57.
[46] HASelect reserves all rights and defenses to dispute any arguments asserted by Tecumseh with respect to any Disputed Accounts not at issue in the Motion.

argument as an afterthought); *Obuchowski v. Entis (In re Robert)*, No. 05-12461, 2007 Bankr. LEXIS 2852, *33 (Vt. Bankr. Aug. 17, 2007) (granting summary judgment and finding no resulting trust when the operative agreement contained no provision referencing that funds provided to debtor would be held in trust or kept separate from debtor's assets).

Tecumseh is a sophisticated commercial entity that was entirely capable of including language in the Sub-Advisory Agreement confirming any intent that existed to create an express or resulting trust. The Sub-Advisory Agreement contains no such language, which is yet another clear indication of the lack of any such intent. Tecumseh has failed to establish by clear and convincing evidence that either it or Infinity intended to create a resulting trust. As a result, this affirmative defense must be rejected. This is especially true considering the equitable nature of a resulting trust and Tecumseh's inequitable conduct in acquiring the Sold Accounts. *See In re Foam Systems Co.*, 92 B.R. 406, 409 (9th Cir. 1988) ("The imposition of a resulting trust is an equitable remedy."); *Sparks v. Sparks*, 353 S.E.2d 508 (Ga. 1987) (finding that a party who engaged in inequitable conduct was not entitled to the equitable remedy of resulting trust). Tecumseh was aware of HASelect's perfected security interest but worked with Infinity in attempting to avoid the same by, among other things, advising Infinity to remove electronic stamps from documents associated with the Sold Accounts that identified such accounts as HASelect's collateral.[47]

**C.    Tecumseh's June 2020 Purchase of the 1-A Accounts Was Not a "One-Off" Transaction.**

As shown above and in Exhibit 30 attached hereto, the June 2020 transaction between Infinity and Tecumseh was far from the only time Tecumseh purchased accounts from Infinity that Infinity had previously purchased using its own funds. Rather, virtually all of the Sold Accounts were purchased from Infinity by Tecumseh after Infinity purchased the same using its own funds. Thus, the percentage of accounts at issue is much higher than suggested by Tecumseh's Opposition as the Sold Accounts had a total purchase price of $1,912,083.19 and a face value of $6,792,518.86.[48] As such, Tecumseh cannot rely on any automatic perfection of an interest in accounts pursuant to

---

[47] *See* Exhibits 18, 24, and 25 to the Hemmer Transcript Excerpts [ECF No. 57-3], Exhibit 3 to the Motion.
[48] *See* Motion [ECF No. 53], p. 11, l. 4.

NRS § 104.9309(2).

Nor is NRS 104.9309(2) applicable here based on Tecumseh's continuous and systematic purchase of accounts from Infinity. The official comment to UCC 9-309(2), upon which NRS 104.9309(2) is based, states that this limited exception is only applicable "to save from *ex post facto* invalidation casual or isolated assignments—assignments which no one would think of filing." UCC § 9.309, cmt. 4. The comment continues and is explicit that "[a]ny person who regularly takes assignments of any debtors' accounts…***should file***." *Id.* (emphasis supplied). The United States Court for the District of Nevada has acknowledged the limited effect of NRS 104.9309(2)'s reach. *See Valley Bank of Nev. v. Henderson*, 528 F. Supp. 907, 914 (D. Nev. 1981). In *Valley Bank*, a party sought to claim perfection through NRS 104.9302(1)(e), which is identical to current NRS 104.9309(2). *Id.* The Court refused to find perfection of the party's security interest under this statute because the party regularly engaged in transactions involving accounts receivable. *See id.* "[Former NRS 104.9309(2)] was carefully drafted so that no assignee, engaged in a regular course of financing, will ever be tempted to rely on it in order to avoid a filing which ought to be made. [Former NRS 104.9309(2)] was never intended to provide an escape hatch for negligent institutional financiers…[and] was to protect assignees who are both insignificant and ignorant." *Id.*

### D. There Is No Need for Additional Discovery.

Finally, Tecumseh argues in the Opposition that the Motion is premature because this case is in "its early stages" and Tecumseh needs to engage in additional discovery. This argument fails in several respects. The main purpose of summary judgment is to dispose of factually unsupported claims and defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The plain language of Fed. R. Civ. P. 56 does not require that a party wait until discovery is completed before filing a motion for summary judgment. This is to ensure that meritless cases can be disposed of instead of wasting the resources of the court and the parties. Courts from the Ninth Circuit, including the District of Nevada, have granted summary judgment motions prior to any discovery being conducted. *See, e.g.*, *Osawe v. Tinsley*, No. 3:18-cv-00600, 2019 U.S. Dist. LEXIS 133238 (D. Nev. Aug. 8, 2019). Discovery in this adversary case has been ongoing since the parties participated in a Rule 26(f)

conference on December 13, 2021, and a substantial amount of discovery has already been conducted by HASelect, both in this adversary proceeding and the chapter 7 case. HASelect has issues more than 20 subpoenas to third parties and has obtained discovery from Infinity, Tecumseh, and the Trustee. The only ostensible discovery undertaken by Tecumseh to date is its submission of a request for production of documents to HASelect. Tecumseh has not issued subpoenas to any of the third parties from whom it claims to need information. As such, Tecumseh cannot claim that it has not had sufficient time to engage in discovery efforts. *See, e.g.*, *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1130 (9th Cir. 2004) ("The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, or of the movant fails to show how the information would preclude summary judgment.").

Tecumseh had the burden in requesting additional time for discovery to not only show it did not delay, but "to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Id.* "Rule 56(d) is not a license for a fishing expedition in the hopes that [a party] might find facts to support its claims." *Morris v. Geico Ins. Agency, Inc.*, 2:20-cv-764, 2021 U.S. Dist. LEXIS 188272, *10 (D. Nev. Sept. 27, 2021) (denying a Rule 56(d) request for additional time to conduct discovery). Here, the declaration in support of Tecumseh's Rule 56(d) request does not meet this burden, but simply states what discovery Tecumseh wishes to conduct, not how such discovery would lead to evidence that exists.

More importantly, no amount of discovery will alter the bank statements, check images, and other business records establishing timing of the Tecumseh's purchases of the Sold Accounts.[49] The indisputable evidence shows, and will always show, that Tecumseh provided purchase funds to

---

[49] Moreover, HASelect did not consent to any transfer of its Collateral or consent to relinquish its security interest in the same. *See* Griffin Declaration, ¶ 15, [ECF No. 54] in the Adversary Case. In fact, HASelect made it a requirement in the MLA that Infinity put stamps on its Collateral to identify HASelect's security interest, and such Collateral was prohibited from being transferred or assigned without HASelect's "prior written consent." *See* MLA, § 4.2, Exhibit 1 to the Motion [ECF No. 57-1] in the Adversary Case. No such writing exists. Further, baseless speculation on Tecumseh's part in the Opposition does not create any issue of material fact. *See, e.g.*, *Loomis*, 836 F.3d at 997 (9th Cir. 2016) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Nor is consent material because HASelect now has the Trustee's §544 claim and can avoid Tecumseh's unperfected interest. *See* ECF No. 64, § C, on file in the Bankruptcy Case.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Infinity after Infinity had purchased the Sold Accounts from third parties that had no dealings, direct or indirect, with Tecumseh. Accordingly, the Court has all of the information necessary to grant the Motion and should do so considering Tecumseh's failure to meet its numerous burdens in opposing the Motion

## CONCLUSION

Based on the foregoing HASelect respectfully requests that the Court enter an order granting the Motion in its entirety.

Dated this 12th day of May 2022.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
BART K. LARSEN, ESQ.
Nevada Bar No. 8538
KYLE M. WYANT, ESQ.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables Litigation Finance Fund International SP*

# CERTIFICATE OF SERVICE

1. On May 12, 2022, I served the following document(s): **REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES**

2. I served the above document(s) by the following means to the persons as listed below:

☒     a.     ECF System:

CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ggordon@gtg.legal, bknotices@gtg.legal

GABRIELLE A. HAMM on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ghamm@Gtg.legal, bknotices@gtg.legal

MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

☐     b.     United States mail, postage fully prepaid:

☐     c.     Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐     For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐     For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐     d.     By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐     e.     By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐     f.     By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 12, 2022.

By: /s/ <i>Bart K. Larsen, Esq,</i>