GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116
Email: michael.napoli@akerman.com

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No.: 21-14486-abl<br>Chapter 7<br><br>Adversary Case No. 21-01167-abl |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | **TECUMSEH–INFINITY MEDICAL RECEIVABLE FUND, LP MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DIRECT PURCHASE RECEIVABLES** |
| TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v. | |

65410923;9

| | |
|---|---|
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Counter-Defendant.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Counter-Claimant<br><br>v.<br><br>TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Defendant. | Date: Hearing Requested<br><br>Time: To be set |

**MOTION FOR SUMMARY JUDGMENT AS TO DIRECT PURCHASE RECEIVABLES**

Tecumseh–Infinity Medical Receivable Fund, LP ("Tecumseh") by and through counsel, respectfully submits this Motion for Partial Summary Judgment as to Direct Purchase Receivables (the "Motion") finding: (i) Tecumseh to be the equitable owner of the Direct Purchase Receivables (defined herein); (ii) the Direct Purchase Receivables are not and were never property of the bankruptcy estate of Infinity Capital Management, Inc. ("Infinity" or "Debtor"); (iii) the perfected security interest of HASelect's-Medical Receivables Litigation Finance Fund International SP ("HASelect") in the Debtor's collateral does not extend to the Direct Purchase Receivables; and (iv) the strong arm rights and powers afforded to the Trustee under 11 U.S.C. § 544 and sold to HASelect should not, and indeed cannot, be utilized to make the Direct Purchase Receivables property of the Debtor's bankruptcy estate.

This Motion is made pursuant to Fed. R. Civ. P. 56 and Federal Rules of Bankruptcy Procedure 7056 and Rule 7056 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada,[1] and is made and based upon the following memorandum

---

[1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all

2

of points and authorities as well as statement of undisputed facts submitted herewith and referenced herein:

## I. PRELIMINARY STATEMENT

It is undisputed that, of the thousands of medical receivables at issue in this case, those purchased from and after October 29, 2020—or 4,190 receivables with a collective face amount of approximately $19,846,621.37—were paid for with purchase monies transferred from Tecumseh's bank account directly to medical providers. It is likewise undisputed that both the Debtor and Tecumseh intended Tecumseh to be the beneficial owner of these direct purchase receivables, and that the parties behavior was at all times consistent with such intent. Equity therefore mandates the recognition of the existence of a valid purchase money resulting trust wherein the Debtor holds these direct purchase receivables for the benefit of Tecumseh, as beneficiary. It would be entirely inequitable for the Court to find that HASelect's lien attaches to these direct purchase receivables, notwithstanding the Debtor's position as a resulting trustee in possession of Tecumseh's property. Neither HASelect's loan to the Debtor nor proceeds of HASelect's loan led to the creation of these direct purchase receivables— and HASelect acknowledges this. Indeed, allowing HASelect to attach its liens to these direct purchase receivables would unjustly enrich HASelect, who has to date recovered collateral valued at or around 13.7 million dollars on a 16 million dollar claim.

## II. JURISDICTION AND VENUE

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are FRCP 56, Bankruptcy Rule 7056, and Local Rule 7056.

## III. STATEMENT OF FACTS

**A.    The Debtor purchased receivables on its own account.**

Prior to the commencement of the above-captioned bankruptcy case, the Debtor was in the business of purchasing receivables from medical providers, which receivables typically arose from

---

references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

medical treatment provided to individuals who were injured in accidents who then asserted personal injury claims arising from the accidents.[2]

These receivables were secured by liens against recovery on the personal injury claims; the Debtor only recovered on its Receivables when Plaintiff's personal injury claims were settled.[3] The Debtor used proceeds of its loan from HASelect to purchase Receivables on its own account and to fund its operations.[4] Among other things, those Receivables legally and beneficially owned by the Debtor secured the HASelect loan.[5]

HASelect asserts that is owed $16,000,543.00 as of September 14, 2021 (the "Petition Date").[6] On October 15, 2021, the Trustee abandoned to HASelect collateral valued by the Debtor at approximately 10 million dollars.[7] The Court subsequently ruled that HASelect may also recover receivables totaling $3,734,397.25,[8] concluding that HASelect's position as a "lien creditor" under 11 U.S.C. § 544(a) was superior to any interest held by Tecumseh in those particular Receivables, and therefore, that any interest held by Tecumseh in such receivables was avoided pursuant to 11 U.S.C. § 544(a).[9]

**B.    The Debtor acted as a broker and servicer for the Tecumseh Receivables.**

The Debtor also arranged for the purchase of certain receivables on behalf of Tecumseh (the "Tecumseh Receivables"). The relationship between Tecumseh and the Debtor was governed by a

---

[2] *See* Testimony of Oliver Hemmer, Debtor's principal ("Hemmer Dep.") Vol. I at 42:1-46:15, Vol. II at 175:7-179:3. Both volumes of Hemmer's testimony are attached as **Exhibit A** to the *Tecumseh's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment as to Direct Purchase Receivables* (the "Statement of Undisputed Facts") submitted herewith.

[3] Hemmer Dep. Vol. I at 44:20-47:3, Vol. II at 176:8; 180:4-183:8.

[4] Hemmer Dep. Vol. I at 108:12-109:1.

[5] Hemmer Dep. Vol. I at 108:12-109:1, Vol. II at 168:17-169:5.

[6] *See* Main Case, Proof of Claim No. 8-2.

[7] *See* Main Case, ECF Nos. 12, 64, and 97.

[8] From approximately July through October 2020, Tecumseh transferred funds to the Debtor to purchase the receivables on Tecumseh's behalf. These receivables are referred to herein as the "Disputed Receivables." The Disputed Receivables are not the subject of this Motion.

[9] *See* Adv. Case, ECF No. 88.

4

65410923;9

June 2020 Sub-Advisory Agreement.[10] The Sub-Advisory Agreement generally provided that the Debtor would (i) assist Tecumseh with purchasing the Tecumseh Receivables "directly from the Medical Service Provider" and (ii) service and collect the Tecumseh Receivables. ("The purpose of the Sub-Advisory Agreement was to facilitate the sale of receivables from medical providers to Tecumseh and to provide for servicing of the receivables by the Debtor.").[11] To that end, the Sub-Advisory Agreement called for the Debtor to identify receivables for Tecumseh to purchase and to negotiate a purchase price on Tecumseh's behalf.[12] The Debtor was also to arrange all of the paperwork necessary to "evidence the sale of the Receivable to [Tecumseh] by the Medical Service Provider."[13]

In summary, the Tecumseh Receivable purchase process involved the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. FTM Investments, Inc. ("FTM") would then verify the receivable on behalf of Tecumseh, after which Tecumseh would approve of the purchase.[14] Tecumseh then paid the price agreed to by the medical provider along with the fee to the Debtor required by the Sub-Advisory Agreement.[15]

In detail, the purchase process commenced with the referral of a personal injury plaintiff to the Debtor.[16] Each plaintiff was then assigned a unique ClaimID number by the Debtor.[17] The plaintiff would then seek care from a medical provider. Acting on behalf of Tecumseh, the Debtor would provide a preauthorization letter to the medical provider prior to the performance of any authorized

---

[10] *See* Declaration of Michael Belotz ("Belotz Decl."), ¶ 5 see also Sub-Advisory Agreement, attached as **Exhibit B** to the Statement of Undisputed Facts. The Sub-Advisory Agreement is controlled by the law of the state of South Carolina. *Id.*

[11] Sub-Advisory Agreement at Exh. A, ¶ 3(b), (e); Belotz Decl. at ¶ 7.

[12] Sub-Advisory Agreement at ¶¶ 1(b), 3(a), 3(b).

[13] *Id*. at ¶ 3(d).

[14] Belotz Decl., ¶ 10.

[15] *Id.*

[16] See Referral, attached as **Exhibit C** to the Statement of Undisputed Facts.

[17] Hemmer Dep. Vol. I at 45:15-46:23.

65410923;9

service by the provider to the Plaintiff.[18] Subsequent to the provision of an authorized procedure, Tecumseh would provide payment in a previously agreed upon amount.[19]

The Debtor then assigned each authorized procedure a unique BillID number.[20] Debtor would retain in its records an HCFA 1500 medical billing claim form ("Claim Form") reflecting, among other things, the face amount of each Receivable, and transmitting the Claim Form to the Plaintiff's counsel of record.[21] Each Claim Form represented a distinct Receivable, associated with a unique BillID number.[22]

Each receivable would receive its own unique BillID number, and the Debtor would maintain in its records a corresponding Claim Form, together with evidence of Tecumseh's contemporaneous payment.[23] To facilitate the purchase of Tecumseh Receivables and collection of proceeds, Tecumseh opened an account with Bank of America (the "BofA Account"). Tecumseh funded the BofA Account with money from its investors. It granted signing authority to Hemmers and Anne Pantelas (with co-signature by Belotz and another Tecumseh principal, Chad Meyer).[24]

The receivables purchased by Tecumseh from and after October 29, 2020—4,190 receivables at a face amount of approximately $19,846,621.37 (the "Direct Purchase Receivables")—were paid for with transfers of purchase money directly from Tecumseh's BofA Account to the respective medical providers.[25] The Direct Purchase Receivables are the subject of this Motion.

**C.    Tecumseh provided the purchase money for the Direct Purchase Receivables.**

Tecumseh paid for the Direct Purchase Receivables directly from its BofA Account to the medical provider.[26] Further, rather than purchasing groups of receivables every two weeks or so,

---

[18] See Preauthorization Letter, attached as **Exhibit D** to the Statement of Undisputed Facts.

[19] Belotz Decl., ¶ 9-10.

[20] See Hemmer Dep. Vol. I at 45:15-46:23.

[21] See Claim Form, attached as **Exhibit E** to the Statement of Undisputed Facts.

[22] See Hemmer Dep. Vol. I at 45:15-46:23.

[23] See Claim Form, attached as **Exhibit E** to the Statement of Undisputed Facts.

[24] Belotz Decl., ¶ 11.

[25] Belotz Decl., ¶ 12.

[26] Belotz Decl., ¶ 13.

65410923;9

Tecumseh purchased receivables throughout the month, and Tecumseh paid the Debtor its servicing fee for its work in locating and servicing the Tecumseh Receivables monthly from the BofA Account.[27]

As required by the Sub-Advisory Agreement, the Debtor maintained a log of the Tecumseh Receivables along with any collections on them.[28] Debtor made these records available to Tecumseh on a regular basis through an application known as "Case Manager."[29] In addition, Tecumseh maintained its own records related to the Tecumseh Receivables.[30] Accordingly, Tecumseh has prepared a reconciliation evidencing the payment and detailed purchase history of the Direct Purchase Receivables in reliance on both its and the Debtor's records.[31] The Debtor likewise created a Claim Form for each Direct Purchase Receivable purchased by Tecumseh.[32] The Debtor also maintained several binders, a segregated compilation of documents, evidencing Tecumseh's direct payments to medical providers and all corresponding Claim Forms for nearly all of the Direct Purchase Receivables.[33] Each Claim Form represented a distinct Receivable, affiliated with a unique BillID number.[34]

The Direct Purchase Receivables include the following:

| Month/Year | Number of Receivables | Face Value | Total Purchase Price | Infinity Fee |
|---|---|---|---|---|
| October/2020[35] | 92 total | $828,614.88 | $142,862.63 | $28,572.52 |

---

[27] *Id.*

[28] Belotz Decl., ¶ 14.

[29] *Id.*

[30] Belotz Decl. ¶ 14.

[31] *See* Reconciliation, attached as **Exhibit F** to the Statement of Undisputed Facts.

[32] Belotz Decl., ¶ 19; *see also* Claim Form, attached as **Exhibit E** to the Statement of Undisputed Facts, and FN 33.

[33] The binders contain PII and HIPPA protected information. Contemporaneously with the filing of this Motion, Tecumseh will be seeking the Court's permission to submit such binders under seal of the Court.

[34] Hemmer Dep. Vol. I at 45:15-46:23; *see also* Claim Form, attached as **Exhibit E** to the Statement of Undisputed Facts, and FN 33.

[35] A copy of Tecumseh's monthly account statement for the BofA Account dated October 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

65410923;9

| | | | | |
|---|---|---|---|---|
| November/2020[36] | 266 total | $501,921.54 | $170,027.05 | $30,142.28 |
| December/2020[37] | 441 total | $1,305,197.62 | $283,162.07 | $56,692.44 |
| January/2021[38] | 430 total | $1,500,807.25 | $284,325.87 | $56,865.78 |
| February/2021[39] | 323 total | $1,248,675.56 | $321,377.94 | $64,588.45 |
| March/2021[40] | 412 total | $2,081,787.17 | $285,862.33 | $46,100.85 |
| April/2021[41] | 425 total | $1,278,990.10 | $308,721.70 | $33,371.64 |
| May/2021[42] | 582 total | $2,647,439.26 | $349,515.96 | $69,903.19 |
| June/2021[43] | 533 total | $4,233,654.73 | $539,763.82 | $98,999.89 |
| July/2021[44] | 245 total | $2,154,768.92 | $197,192.40 | $29,861.69 |
| August/2021[45] | 394 total | $1,751,688.53 | $199,942.76 | $31,348.54 |
| September/2021[46] | 47 total | $313,075.81 | $102,827.82 | - |

---

[36] A copy of Tecumseh's monthly account statement for the BofA Account dated November 30, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[37] A copy of Tecumseh's monthly account statement for the BofA Account dated December 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[38] A copy of Tecumseh's monthly account statement for the BofA Account dated January 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[39] A copy of Tecumseh's monthly account statement for the BofA Account dated February 28, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[40] A copy of Tecumseh's monthly account statement for the BofA Account dated March 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[41] A copy of Tecumseh's monthly account statement for the BofA Account dated April 30, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[42] A copy of Tecumseh's monthly account statement for the BofA Account dated May 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[43] A copy of Tecumseh's monthly account statement for the BofA Account dated June 30, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[44] A copy of Tecumseh's monthly account statement for the BofA Account dated July 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[45] A copy of Tecumseh's monthly account statement for the BofA Account dated August 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[46] A copy of Tecumseh's monthly account statement for the BofA Account dated September 30, 2020 is attached as part **Composite Exhibit G** to the to the Statement of Undisputed Facts.

65410923;9

**D.      The Parties intended Tecumseh to possess beneficial ownership interest in the Direct Purchase Receivables.**

Both Tecumseh and the Debtor agreed that the Debtor was to act solely as an intermediary and servicer for Tecumseh in relation to the Tecumseh Receivables.[47] As such, the Debtor was not to acquire a beneficial ownership interest in receivables purchased on Tecumseh's behalf.[48] The Sub-Advisory Agreement evidences this intent, providing that the Debtor would (i) assist Tecumseh with purchasing medical receivables "directly from the Medical Service Provider" and (ii) service and collect any receivables that Tecumseh might acquire.[49] Hemmer, one of the Debtor's principals, likewise testified that the Debtor did not possess a beneficial interest in any of the receivables acquired by Tecumseh.[50] The Debtor's internal records likewise denote which receivables belong to Tecumseh and which receivables belonged to the Debtor and secured HASelect's loan.[51]

The parties behavior is consistent with such intent. Tecumseh has, at all times relevant hereto, held itself out as the beneficial owner of the Tecumseh Receivables. Tecumseh relayed to its fund administrator the "Bill ID, cost of the receivable, the overhead charge, the total cost, date paid and the type" of receivables "bought since the [time the] last report was generated."[52] Tecumseh likewise made this information available to its investors on a regular basis, posting publicly available fund reports detailing, among other things, the "date of purchase" together with the "purchase cost" of each Tecumseh Receivable denoted by its "BillID."[53] Tecumseh reported its ownership interest and any resulting capital gains and losses to the Internal Revenue Service.[54]

The Debtor has likewise manifested, at all times, its intent that it should possess no more than bare legal title of the Tecumseh Receivables. Not surprisingly, the Debtor's bankruptcy schedules do

---

[47] Belotz Decl. at ¶ 7 *see also* Hemmer Dep. Vol. II at 186:12-17.

[48] *Id.*; *see also* Hemmer Dep. Vol. II at 186:3-8.

[49] Sub-Advisory Agreement, Exh. A, ¶ 3(b), (e); Belotz Decl. at ¶ 7.

[50] Hemmer Dep. Vol. II at 173:18-174:4, 174:15-175:3.

[51] Hemmer Dep. Vol. II at 170:24-171:6.

[52] *See* Email Correspondence attached as **Exhibit H** to the Statement of Undisputed Facts.

[53] Belotz Decl. at ¶ 22; see also Reports (tecumsehalts.com), last visited 8.26.22.

[54] Belotz Decl. at ¶ 22.

9

not claim an ownership interest in Direct Purchase Receivables.[55] The Debtor also maintained several binders, a segregated compilation of documents, evidencing Tecumseh's direct payments to medical providers and all corresponding Claim Forms for nearly all of the Direct Purchase Receivables purchased by Tecumseh.[56] Each Claim Form represented a distinct Receivable, affiliated with a unique BillID number. Its records distinguish between its receivables and Tecumseh's receivables. Importantly, all dollars collected on the Tecumseh Receivables were paid directly to Tecumseh and not to the Debtor.[57]

Further, because the Debtor was not reselling receivables to Tecumseh, the Debtor had no opportunity to profit on the receivables Tecumseh purchased. Thus, Tecumseh agreed to pay the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables.[58] Under the Sub-Advisory Agreement, the Debtor received a 20% acquisition fee.[59] The Debtor earned 10% of the acquisition fee immediately, and 10% according to a contingency schedule.[60] The contingency schedule turned on the average investor annual rate of return; the Debtor earned up to 10% if the annual rate of return exceeded 30%.[61] In other words, the Sub-Advisory Agreement incentivized the identification and servicing of high yielding receivables by the Debtor for Tecumseh's benefit.[62]

## IV. ARGUMENT

### A. Summary Judgment is Appropriate and Warranted.

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine

---

[55] Hemmer Dep. Vol. II at 173:18-174:4, 174:15-175:3; see also Debtor's Schedules [Main Case, ECF No. 47].

[56] *See* FN 33 above.

[57] Belotz Decl. at ¶ 23; *see also* Hemmer Dep. Vol. II at 186:18-23.

[58] Belotz Decl. at ¶ 24.

[59] Sub-Advisory Agreement, Addendum A, ¶ (a).

[60] Sub-Advisory Agreement, Addendum A, ¶ (a).

[61] Sub-Advisory Agreement, Addendum A, ¶ (a).

[62] Belotz Decl. ¶ 24.

65410923;9

issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996). As to materiality, a "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. P. Elec. Contractors* Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The materiality of a fact is thus determined by the substantive law governing the claim or defense. *Id.*

**B.    The Debtor Never Had an Ownership Interest in the Direct Purchase Receivables**

It is undisputed that the Debtor never owned an interest in any of the Direct Purchase Receivables. The Direct Purchase Receivables belong to Tecumseh and the Debtor has never claimed an interest in them. As Mr. Hemmer testified, the purpose of the Sub-Advisory Agreement was to facilitate a sale between the medical service providers and Tecumseh.[63] The funds to purchase the receivables came from Tecumseh, not the Debtor.[64] The Debtor was not to acquire an interest in the receivable or to be part of the chain of title.[65] The Debtor was not buying and reselling.[66] In fact, the Debtor acquired no interest in the receivables; it merely serviced them.[67] All dollars collected on the receivables were paid directly to Tecumseh as the money belonged to Tecumseh and not to the Debtor.[68]

Mr. Hemmer further testified that the funds to purchase the receivables from the medical

---

[63] Hemmer Dep. Vol. II at 185:15-20.

[64] *Id*. at 185:21-186:2.

[65] *Id*. at 186:3-8.

[66] *Id*. at 186:9-11.

[67] *Id*. at 186:12-17.

[68] *Id*. at 186:18-23.

11

65410923;9

providers came from a Bank of America account owned by Tecumseh.[69] All of the funds in that account belonged to Tecumseh and the Debtor had no interest in the funds.[70] None of the dollars that Tecumseh used to purchase the receivables flowed through any of the Debtor's accounts.[71] Instead, there was a direct payment from Tecumseh to the medical service provider.[72] Mr. Hemmer expressly testified that the Debtor does not own an interest in these receivables.[73]

### C. Alternatively, a Purchase Money Resulting Trust Arose in Tecumseh's Favor with Respect to the Direct Purchase Receivables at the Time of their Purchase

South Carolina law follows the Restatement (Third) of Trusts § 9 (2003), which provides that where "a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid." Restatement (Third) of Trusts § 9 (2003); *see also Hayne Fed. Credit Union v. Bailey,* 489 S.E. 2d 472, 475 (S.C. 1997) ("Equity devised the theory of resulting trust to effectuate the intent of the parties in certain situations where one party pays for property, in whole or in part, that for a different reason is titled in the name of another.")

According to the South Carolina Supreme Court, it is presumed that the party who pays the purchase money intended a benefit to himself, and accordingly a resulting trust is raised in his behalf. *Id.* (citing *Caulk v. Caulk*, S.E. 2d 600 (S.C. 1947)). That presumption may be rebutted with contrary intention shown by parol evidence. *Id.* (citing *Larisey v. Larisey*, 77 S.E. 129, 130 (S.C. 1913)). It follows logically that "if the presumption may be wholly rebutted by parol evidence, it may [also] be strengthened by such evidence…" *Larisey*, 77 S.E. 129 at 130.

In other words, "for issues involving a purported resulting trust, the actual intention of the parties at the time of the purchase is the critical determination." *In re Macdonald*, 622 B.R. 837, 856

---

[69] *Id*. at 188:6-11; 188:14-189:6.

[70] *Id*. at 189:8-15.

[71] *Id*. at 189:16-19.

[72] *Id*. at 189:20-22.

[73] *Id*. at 173:18-174:4, 174:15-175:3.

65410923;9

1  (Bankr. D.S.C. 2020), *reconsideration denied* (Oct. 15, 2020), *aff'd sub nom. Furlow v. Macdonald*,
2  2:20-CV-3820-DCN, 2021 WL 2982864 (D.S.C. July 15, 2021).

3  South Carolina law is clear that a purchase money resulting trust:

> must arise, if at all, at the time the purchase is made. The funds must then be advanced and invested. It cannot be made by after advances, or funds subsequently furnished. It does not arise upon subsequent payments, under a contract by another to purchase.

*In re Prince*, CA 11-01041-DD, 2011 WL 2747797, at *3 (Bankr. D.S.C. July 12, 2011) (internal citations omitted).

The matter of *In re Rivers-Jones*, CA 07-02607-JW, 2007 WL 7714892, at *3 (Bankr. D.S.C. Sept. 4, 2007) is illustrative. In *Rivers–Jones,* the debtor's grandmother financed the purchase of a mobile home for the debtor and her husband because they "were unable to obtain financing to purchase the Mobile Home themselves." *Rivers–Jones*, at *1. After the debtor filed a chapter 13 bankruptcy case, Green Tree, a lien holder on the mobile home, objected to confirmation of the debtor's chapter 13 plan because the debtor lacked privity with Green Tree and because the debtor's plan attempted to value Green Tree's lien. *Id.* at *3. The court found that a resulting trust arose in the debtor's favor because the debtor had made all payments on the mobile home, because the parties intended the debtor to have an ownership interest in the mobile home, and because the grandmother did not claim any ownership interest in the mobile home. *Id*. at *6.

**1.     Tecumseh provided the purchase monies for the Direct Purchase Receivables.**

It is undisputed that the purchase monies for the Direct Purchase Receivables were transmitted from Tecumseh's BofA Account directly to respective medical providers.[74] Tecumseh's bank records evidence this contemporaneous payment of purchase monies for the Direct Purchase Receivables.[75]

As required by the Sub-Advisory Agreement, the Debtor maintained a log of the Direct Purchase Receivables along with any collections on them.[76] Debtor made these records available to

---

[74] Belotz Decl. at ¶ 12 *see also* Hemmer Dep. Vol. II at 185:21-186:2.

[75] *See* **Composite Exhibit G** to the Statement of Undisputed Facts.

[76] Belotz Decl. at ¶ 14.

13

65410923;9

Tecumseh on a regular basis.[77] In addition, Tecumseh maintained its own records related to the Direct Purchase Receivables.[78] Tecumseh's reconciliation, prepared by Tecumseh in reliance on both its and the Debtor's records, provides the payment and detailed purchase history of the Direct Purchase Receivables.[79] The Debtor also maintained several binders, a segregated compilation of documents, evidencing Tecumseh's direct payments to medical providers and all corresponding Claim Forms for nearly all of the Direct Purchase Receivables.[80] Each Claim Form represented a distinct Receivable, affiliated with a unique BillID number.[81]

### 2. The Parties intended Tecumseh to have ownership interest in the Direct Purchase Receivables.

Both Tecumseh and the Debtor agreed that the Debtor was to act solely as an intermediary and servicer for Tecumseh in relation to the Tecumseh Receivables.[82] As such, the Debtor was not to acquire a beneficial ownership interest in receivables purchased on Tecumseh's behalf.[83] The Sub-Advisory Agreement evidences this intent, providing that the Debtor would (i) assist Tecumseh with purchasing medical receivables "directly from the Medical Service Provider" and (ii) service and collect any receivables that Tecumseh might acquire.[84] Hemmer, one of the Debtor's principals, likewise testified that the Debtor did not own an interest in any of the receivables acquired by Tecumseh.[85] And the Debtor's internal records likewise denote which receivables belong to Tecumseh and which receivables belonged to the Debtor and secured HASelect's loan.[86]

The parties behavior is consistent with such intent. Tecumseh has, at all times relevant hereto,

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *See* FN 33 above.

[81] *See* Hemmer Dep. Vol. I at 45:15-46:23; *see also* Claim Form, attached as **Exhibit E** to the Statement of Undisputed Facts, and FN 33.

[82] Belotz Decl. at ¶ 7; *see also* Hemmer Dep. Vol. II at 186:12-17.

[83] Belotz Decl. at ¶ 7.; *see also* Hemmer Dep. Vol. II at 186:3-8.

[84] The Sub-Advisory Agreement, Exh. A, ¶ 3(b), (e); Belotz Decl. at ¶ 7.

[85] Hemmer Dep. Vol. II at 173:18-174:4, 174:15-175:3.

[86] Hemmer Dep. Vol. II at 170:24-171:6.

14

65410923;9

held itself out as the beneficial owner of the Tecumseh Receivables. Tecumseh relayed to its fund administrator the "Bill ID, cost of the receivable, the overhead charge, the total cost, date paid and the type" of receivables "bought since the [time the] last report was generated."[87] Tecumseh likewise made this information available to its investors on a regular basis, posting publicly available fund reports detailing, among other things, the "date of purchase" together with the "purchase cost" of each Tecumseh Receivable denoted by its "BillID."[88] Tecumseh accordingly reported its ownership interest and any resulting capital gains and losses to the Internal Revenue Service.

### 3. The Debtor does not claim any ownership interest in the Direct Purchase Receivables.

The Debtor has likewise manifested, at all time, its intent that it should possess no more than bare legal title of the Tecumseh Receivables. Not surprisingly, the Debtor's bankruptcy schedules do not claim an ownership interest in Direct Purchase Receivables.[89] The Debtor maintained a log of the Tecumseh Receivables along with any collections on them, and made these records available to Tecumseh on a regular basis. The Debtor also maintained a compilation of documents evidencing Tecumseh's direct payments to medical providers and all corresponding Claim Forms for each Direct Purchase Receivable purchased by Tecumseh.[90] Further, because the Debtor was not reselling receivables to Tecumseh, the Debtor had no opportunity to profit on the receivables Tecumseh purchased. Thus, Tecumseh agreed to pay the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables.[91] It also paid the proceeds on the Direct Purchase Receivables directly into Tecumseh's BofA account.[92]

### C. HASelect's lien does not extend to the Direct Purchase Receivables

It is axiomatic that HASelect's lien only attaches to property owned by the Debtor. Under the UCC, a lien attaches only when "the debtor has rights in the collateral or the power to transfer rights

---

[87] Email Correspondence attached as **Exhibit H** to the Statement of Undisputed Fact.

[88] Belotz Decl. at ¶ 22; see also Reports (tecumsehalts.com), last visited 8.26.22.

[89] Hemmer Dep. Vol. II at 173:18-174:4, 174:15-175:3; *see also* Debtor's Schedules [Main Case, ECF No. 47].

[90] *See* FN 33 above.

[91] Belotz Decl. at ¶ 24.

[92] Belotz Decl. at ¶ 23.

15

65410923;9

in the collateral to a secured party." N.R.S. § 104.9203(2)(b). The Debtor never had rights in the Direct Purchase Receivables. The Sub-Advisory Agreement precluded that – as repeatedly acknowledged by Mr. Hemmer in his testimony. .

Even if the Debtor had title, it held as a resulting trustee precluding HASelect's lien from attaching. Although "a beneficial interest in a trust may generally be reached by creditors of the beneficiary … the trustee's personal creditors or trustee in bankruptcy may not reach either the trust property or the trustee's nonbeneficial interest therein." Restatement (Third) of Trusts § 42 (2003); *see also Hinds v. McNair*, 129 N.E.2d 553 (Ind. 1955) (A trustee of oral trust in realty may carry it out, and courts will protect trust res against claims of trustee's creditors).

The forgoing reflects the elemental common law doctrine that "the beneficiaries hold the beneficial interests (or 'equitable title') in the trust property, while the trustee (ordinarily) holds 'bare' legal title to the property. " Restatement (Third) of Trusts § 42 (2003). In other words, the "interest taken by the trustee is nonbeneficial. " *Id*. Courts who have examined this issue have protected trust corpus from creditors of the trustee. *See Universal Bonding Insurance Co. v. Gittens & Sprinkle Enterprises*, 960 F.2d 366 (3d. Cir. 1992) (funds held by the debtor subject to statutory trust imposed by New Jersey Trust Fund Act were not subject to Chapter 11 debtor' general creditors' claims); *In re Intrenet, Inc.,* 273 B.R. 153 (Bankr. S.D. Ohio 2002) (Chapter 11 bankruptcy estate did not include "funds held by the debtor as trustee under a statutorily imposed trust).

The Ninth Circuit in the case of *S & H Packing & Sales Co., Inc. v. Tanimura Distributing., Inc.,* 883 F.3d 797, 803 (9th Cir. 2018) examined the issue in the context of the Perishable Agricultural Commodities Act (PACA), concluding that "because ordinary principles of trust law apply to trusts created under PACA, trust assets are excluded from the bankruptcy estate if the PACA trustee goes bankrupt."  The facts of this case compel the same result. Because ordinary principles of trust law apply to state law created purchase money resulting trusts, the trust assets—the Direct Purchase Receivables—are excluded from the bankruptcy estate of the trustee, Infinity, and thus not subject to the claims of HASelect.

**D.    The Direct Purchase Receivables are not property of the Debtor's bankruptcy estate, and the strong arm rights and powers of 11 U.S.C. § 544 cannot be utilized to make the Direct Purchase Receivables property of the Debtor's bankruptcy estate.**

Property comprising the bankruptcy estate is defined in 11 U.S.C. § 541. Property in which the debtor holds only legal title but not an equitable interest is included as property of the estate under 11 U.S.C. § 541(a)(1). Section 541(d) clarifies section 541(a)(1) by expressly providing that any such interest held by the debtor at the commencement of the case becomes estate property under subsection (a)(1) or (2) but <u>only</u> to the extent of the debtor's legal title to the property, not including any equitable interest in the property not held by the debtor. Under the plain language of the statute, the Direct Purchase Receivables are not property of the Debtor's bankruptcy estate.

A different issue is whether section 541(d) is subject to the purchased rights of HASelect to avoid an unperfected security interest in property under other provisions of the Bankruptcy Code. The Ninth Circuit has found that section 544(a) confers the substantive right to bring certain property transferred by the debtor prior to the bankruptcy filing back into the estate—**not all**. *See In re Tleel,* 876 F.2d 769, 772 (9th Cir. 1989) (Observing that there exists a "possibility that under certain circumstances the corpus of a valid resulting trust may become estate property upon exercise of section 544(a)(3)'s avoidance powers.")

Likewise, in the matter of *In re Torrez,* 63 B.R. 751, 754 (B.A.P. 9th Cir. 1986), *aff'd on other grounds*, 827 F.2d 1299 (9th Cir. 1987), the Court held that the "strong arm" power of section 544 could not make the corpus of the valid resulting trust under California law property of a bankruptcy estate. The *Torrez* Court examined California state law, concluding that a lien creditor in California would not prevail against a resulting trust and finding that the estate did not qualify as a bona fide purchaser for value without notice under California law and therefore could not invoke the avoidance power of section 544(a)(3). *Id.* In other words, the rights and powers of a trustee under section 541(d) are determined by applicable non-bankruptcy law, and **not** section 544. *See In re Michigan Lithographing Co.*, 997 F.2d 1158 (6th Cir. 1993).

Accordingly, a trustee can "avoid" a security interest only if applicable non-bankruptcy law provides such rights and powers to a judicial lien creditor. *See In re Anchorage Nautical Tours, Inc.,* 102 B.R. 741 (Bankr. App. 9th Cir. 1989) (Under Alaska state law, debtor shipowner's prepetition oral

17

agreement with shipyard to assign insurance proceeds in exchange for repairs constituted effective assignment to yard of owner's insurance claims, valid against interests of owner's bankruptcy estate, notwithstanding absence of executed payment orders; despite lack of formalities, transfer would have been effective against subsequent lien creditor, and thus was effective against estate).

The appropriate focus, therefore, is whether and when, under South Carolina state law, a judgment lien creditor may "void the resulting trust." *Torrez,* 63 B.R. 751, 755. A survey of South Carolina case law reveals that a fraudulent intent will void a purchase money security interest. In *Hayne Fed. Credit Union v. Bailey*, 489 S.E. 2d 472 (S.C. 1997), the South Carolina Supreme Court examined the issue of whether a purchase money resulting trust precluded a lender from proceeding in a mortgage foreclosure action brought by creditor that had loaned money to son's widow in reliance on her properly perfected title to the property. In doing so, the South Carolina Supreme Court found that while the presumption of a purchase money resulting trust may have arisen, parole evidence determined that the Father's fraudulent actions, in purchasing the property for his own benefit in name of his son with intention of thereby concealing property from his creditors and wife, rebutted such a presumption, and precluded him from establishing a purchase money resulting trust in property. *Id.* at 475.

The record before this Court is factually devoid of any allegations of fraudulent intent or actions on behalf of Tecumseh. And "[a]lthough by statute or otherwise a creditor who obtains judgment is entitled to a lien upon land or other property of the judgment debtor, the judgment creditor … cannot enforce such a lien upon property which the judgment debtor holds in trust." Restatement (Second) of Trusts § 308 (1959). HASelect, as successor in interest to the trustee is therefore unable to "avoid" Tecumseh's interest in the Direct Purchase Receivables, as applicable non-bankruptcy law fails to provide such rights and powers to a judicial lien creditor.

### V.   CONCLUSION

Based on the foregoing, Tecumseh respectfully requests that this Court enter an order (i) granting partial summary judgment in its favor, (ii) determining Tecumseh to be the equitable owner of the Direct Purchase Receivables; (ii) holding the Direct Purchase Receivables are not and were never property of the Debtor's bankruptcy estate; (iii) determining that the perfected security interest

18

of HASelect in the Debtor's collateral does not extend to the Direct Purchase Receivables; and (iv) the strong arm rights and powers afforded to the Trustee under 11 U.S.C. § 544 and sold to HASelect cannot be utilized to make the Direct Purchase Receivables property of the Debtor's bankruptcy estate.

Dated this 26th day of August.

Respectfully submitted,

GARMAN TURNER GORDON LLP

By: /s/ William M. Noall
Gerald M. Gordon, Esq.
William M. Noall, Esq.
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119

and

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

65410923;9