| | |
|---|---|
| GARMAN TURNER GORDON LLP<br>GERALD M. GORDON<br>Nevada Bar No. 229<br>E-mail: ggordon@gtg.legal<br>WILLIAM M. NOALL<br>Nevada Bar No. 3549<br>E-mail: wnoall@gtg.legal<br>7251 Amigo St., Suite 210<br>Las Vegas, Nevada 89119<br>Tel: (725) 777-3000 / Fax: (725) 777-3112 | MICHAEL D. NAPOLI, ESQ.<br>*Pro hac vice*<br>AKERMAN LLP<br>2001 Ross Avenue, Suite 3600<br>Dallas, Texas 75201<br>Tel: (214) 720-4360 / Fax: (214) 720-8116<br>Email: michael.napoli@akerman.com<br>ARIEL E. STERN, ESQ.<br>Nevada Bar No. 8276<br>AKERMAN LLP<br>1635 Village Center Circle, Suite 200<br>Las Vegas, Nevada 89134<br>Tel: (702) 634-5000 / Fax: (702) 380-8572<br>Email: ariel.stern@akerman.com |

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.,<br><br>Debtor. | Case No. 21-14486-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br>**DECLARATION OF MICHAEL BELOTZ IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DIRECT PURCHASE RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Counter-Defendant. | |

1

|   |   |
|---|---|
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, | |
| Counter-Claimant, | |
| v. | |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, | Date:  to be set<br>Time:  to be set |
| Counter-Defendant. | |

I, MICHAEL BELOTZ, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Michael Belotz. I am over the age of twenty one years, of sound mind, and fully competent to testify in this cause.

2. I submit this declaration in support of the Motion for Partial Summary Judgment as to Direct Purchase Receivables (the "Motion") of Tecumseh–Infinity Medical Receivable Fund, LP ("Tecumseh"), defendant and counterclaimant in the above-captioned adversary proceeding.

3. I am a principal of Tecumseh Alternatives, LLC, the advisor to Tecumseh. In that capacity, I have personal knowledge of the facts stated herein, all of which are true and correct. If called upon to testify regarding the contents of this Declaration, I could and would do so.

4. In my role as a principal of Tecumseh, I am responsible for all aspects of Tecumseh's investments in medical receivables. Part of my duties require that I ensure the proper accounting and reporting of funds flowing to and from Tecumseh. In order to do so, I review and manage Tecumseh's banking records, financial records, contracts, and investments.

5. As it relates to Tecumseh, I was personally involved in the business between Debtor and Tecumseh, particularly as it relates to the purchase of receivables pursuant to a sub-advisory agreement entered with the Debtor on June 18, 2020, as modified by Addendum A on or about January 5, 2021 (the "**Sub-Advisory Agreement**").[1]

---

[1] A true and correct copy of the Sub-Advisory Agreement is attached to Tecumseh's Statement of Undisputed Facts in *Support of Motion for Partial Summary Judgment as to Direct Purchase Receivables* (the "**Statement of Undisputed Facts**") as **Exhibit B**.

66091359;1

6. As part of my work coordinating with the Debtor, I had access to the Debtor's internal database that stored all receivables Debtor managed on behalf of Tecumseh. I regularly reviewed the database in the course of my duties. I also had extensive contact with various employees of the Debtor, including Oliver Hemmers ("**Hemmers**"). I also spoke regularly, multiple times per week, with FTM Investments, Inc. ("**FTM**"), Tecumseh's and with the Debtor's employees about the receivables that Tecumseh owned. We also had frequent e-mail exchanges. Generally, I would contact FTM before reaching out to the Debtor because contractually FTM managed accounting on all Tecumseh receivables.

A. **The Relationship Between Tecumseh and the Debtor.**

7. The Sub-Advisory Agreement served two purposes: (1) facilitate the sale of receivables from medical providers to Tecumseh and (2) to provide for servicing of the receivables by the Debtor. Under the Sub-Advisory Agreement, the Debtor was not supposed to, and did not, acquire a beneficial ownership interest in the receivables purchased on Tecumseh's behalf. Debtor exclusively served as an intermediary and servicer for Tecumseh.

8. Under the Sub-Advisory Agreement, Tecumseh agreed to pay the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables.

9. Prior to the bankruptcy, Tecumseh acquired a total of about 8,670 receivables with a face value of $28,045,874 under the Sub-Advisory Agreement. It is my understanding that, each receivable represented a three-way transaction between Tecumseh, a medical provider, and a personal injury plaintiff. Tecumseh agreed to pay the medical provider a certain sum of money in exchange for the provider's medical services to the plaintiff. The plaintiff, in turn, agreed to pay Tecumseh a larger amount of money (represented by the face amount of the receivable) secured by an interest in the plaintiff's claim.

10. Thus, the process for purchasing a receivable began with the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. FTM would then verify the receivable on behalf of Tecumseh, after which Tecumseh would approve of the purchase. Tecumseh then paid the price agreed to by the medical provider along

with the fee to the Debtor required by the Sub-Advisory Agreement. Thereafter, each receivable received its own unique BillID number, and the Debtor would maintain in its records a corresponding Claim Form, together with evidence of Tecumseh's contemporaneous payment.

**B.    Tecumseh provided the purchase money for the Direct Purchase Receivables.**

11.    To facilitate the purchase of Tecumseh Receivables and collection of proceeds, Tecumseh opened an account with Bank of America (the "**BofA Account**"). Tecumseh funded the BofA Account with money from its investors. It granted signing authority to Hemmers and Anne Pantelas (with co-signature by Belotz and another Tecumseh principal, Chad Meyer).

12.    The receivables purchased by Tecumseh from and after October 29, 2020—4,190 receivables at a face amount of approximately $19,846,621.37—were paid for with transfers of purchase money directly from Tecumseh's BofA Account to the respective medical providers. These receivables are referred to herein as the "Direct Purchase Receivables."

13.    Tecumseh paid for the Direct Purchase Receivables directly from its BofA Account to the medical provider. Further, rather than purchasing groups of receivables every two weeks or so, Tecumseh purchased receivables throughout the month, and Tecumseh paid the Debtor its servicing fee for its work in locating and servicing the Tecumseh Receivables monthly from the BofA Account.

14.    As required by the Sub-Advisory Agreement, the Debtor maintained a log of the Tecumseh Receivables along with any collections on them. Debtor made these records available to Tecumseh on a regular basis through an application known as "Case Manager". In addition, Tecumseh maintained its own records related to the Tecumseh Receivables. Accordingly, Tecumseh prepared its own reconciliation evidencing the payment and detailed purchase history of the Direct Purchase Receivables in reliance on both its and the Debtor's records.[2]

15.    I and people working under my supervision traced payments made by Tecumseh to medical service providers. To do so, we began with the two spreadsheets provided by the

---

[2] A true and correct copy of the Reconciliation is attached to Tecumseh's Statement of Undisputed Facts as **Exhibit F.**

Debtor -- TIFDumpWithIncomeFinal.xlsx and ESDVerifiedHASOverlapDumpWithIncome.xlsx (collectively "the Debtor's spreadsheets") – and compared the data entered by the Debtor in the Provider's name, the BillID, the PaidCheckNo. and the Bill Cost columns to the BofA Account Statements and cancelled checks.

16. The Debtor did not record the actual amount that Tecumseh paid the providers for receivables. For the Bill Cost data, the Debtor combined the actual amount that Tecumseh paid to the provider with an allocation of the fee that Tecumseh paid to the Debtor for its services. After backing out the Debtor's fee, we were able to tie cancelled checks and wire transfer confirmations in the account statements to individual receivables. We were also able to largely reconcile our bank records to the fees paid to the Debtor for its services.

17. An example of this reconciliation is the purchase of four receivables from South Atlanta MUA Center on or about October 29, 2020 shown on Exhibit F at page 2. According to the Debtor's Spreadsheets, Tecumseh purchased four receivables (BillID Nos. 27183, 27278, 27292, 27293) with a total face amount of $115,108.00 from South Atlanta MUA Center. The Debtor recorded a BillCost for the four receivables of $34,532.40. As discussed the BillCost is comprised of the amount that Tecumseh paid South Atlanta MUA Center and the fee paid to the Debtor. We reduced the BillCost by the 20% fee ($5,755.40) to obtain the actual amount that Tecumseh paid to South Atlanta MUA Center ($28,777.00). We then identified a wire transfer (No. 301693158) paid in that amount on October 29, 2020 to South Atlanta MUA Center in the BofA Account Statements.

18. We used the same reconciliation process for all 4,190 receivables totaling $19,846,621.37 in face value.

19. Since the filing of this action, Tecumseh has learned that Debtor also maintained several binders, or a compilation of documents, evidencing Tecumseh's direct payments to medical providers and all corresponding Claim Forms for some of the Direct Purchase Receivables purchased by Tecumseh. Each Claim Form represented a distinct Receivable, affiliated with a unique BillID number.

66091359;1

20. The chart below represents a reconciled accounting of the Direct Purchase Receivables:

| Month/Year | Number of Receivables | Face Value | Total Purchase Price | Infinity Fee |
|---|---|---|---|---|
| October/2020[3] | 92 total | $828,614.88 | $142,862.63 | $28,572.52 |
| November/2020[4] | 266 total | $501,921.54 | $170,027.05 | $30,142.28 |
| December/2020[5] | 441 total | $1,305,197.62 | $283,162.07 | $56,692.44 |
| January/2021[6] | 430 total | $1,500,807.25 | $284,325.87 | $56,865.78 |
| February/2021[7] | 323 total | $1,248,675.56 | $321,377.94 | $64,588.45 |
| March/2021[8] | 412 total | $2,081,787.17 | $285,862.33 | $46,100.85 |
| April/2021[9] | 425 total | $1278990.10 | $308,721.70 | $33,371.64 |
| May/2021[10] | 582 total | $2647439.26 | $349,515.96 | $69,903.19 |
| June/2021[11] | 533 total | $4233654.73 | $539,763.82 | $98,999.89 |
| July/2021[12] | 245 total | $2154768.92 | $197,192.40 | $29,861.69 |

---

[3] A copy of Tecumseh's monthly account statement for the BofA Account dated October 31, 2020 is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[4] A copy of Tecumseh's monthly account statement for the BofA Account dated November 30, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[5] A copy of Tecumseh's monthly account statement for the BofA Account dated December 31, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[6] A copy of Tecumseh's monthly account statement for the BofA Account dated January 31, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[7] A copy of Tecumseh's monthly account statement for the BofA Account dated February 28, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[8] A copy of Tecumseh's monthly account statement for the BofA Account dated March 31, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[9] A copy of Tecumseh's monthly account statement for the BofA Account dated April 30, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[10] A copy of Tecumseh's monthly account statement for the BofA Account dated May 31, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[11] A copy of Tecumseh's monthly account statement for the BofA Account dated June 30, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[12] A copy of Tecumseh's monthly account statement for the BofA Account dated July 31, 2020, is attached as part

| | | | | |
|---|---|---|---|---|
| August/2021[13] | 394 total | $1751688.53 | $199,942.76 | $31,348.54 |
| September/2021[14] | 47 total | $313075.81 | $102,827.82 | - |

C. **Tecumseh intended to possess beneficial ownership interest in the Direct Purchase Receivables.**

21. Tecumseh expected and intended to be owner of the Receivables it purchased. Tecumseh has, at all times relevant hereto, held itself out as the beneficial owner of the Tecumseh Receivables. Tecumseh relayed to its fund administrator the "Bill ID, cost of the receivable, the overhead charge, the total cost, date paid and the type" of receivables "bought since the [time the] last report was generated."[15]

22. Tecumseh ownership information available to its investors on a regular basis, posting publicly available fund reports detailing, among other things, the "date of purchase" together with the "purchase cost" of each Tecumseh Receivable denoted by its "BillID."[16] Tecumseh also reported its ownership interest and any resulting capital gains and losses to the Internal Revenue Service.

23. All dollars collected on the Tecumseh Receivables were paid directly to Tecumseh and not to the Debtor.

24. Tecumseh paid the Debtor a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables as set forth in the Sub-Advisory Agreement. These provisions of the Sub-Advisory Agreement were intended to incentivize the identification and servicing of high yielding receivables by the Debtor for Tecumseh's benefit.

---————————————— (continued)
of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[13] A copy of Tecumseh's monthly account statement for the BofA Account dated August 31, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[14] A copy of Tecumseh's monthly account statement for the BofA Account dated September 30, 2020, is attached as part of **Composite Exhibit G** to the to the Statement of Undisputed Facts.

[15] *See* Email Correspondence attached as **Exhibit H** to the Statement of Undisputed Facts.

[16] *See* Reports (tecumsehalts.com), last visited 8/26/2022.

66091359;1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated August 26, 2022.

_____
MICHAEL BELOTZ

66091359;1