# EXHIBIT A

Volumes I and II of Rule 2004 Transcript
of Olive Hemmers' Testimony

Volume I

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 1

1                    UNITED STATES BANKRUPTCY COURT

2                          DISTRICT OF NEVADA

3

4

5
      In re:                                )
6                                           )
           INFINITY CAPITAL MANAGEMENT, INC.  )    Case No.
7                                           )  21-14486-abl
                               Debtor.       )    Chapter 7
8      _____)

9

10

11

12

13

14          RULE 2004 EXAMINATION OF OLIVER HEMMERS

15                          Volume I

16                  [via web videoconference]

17

18          Taken on Wednesday, November 10, 2021
                  by a Certified Court Reporter
                      At 9:03 a.m.
19              Held in Las Vegas, Nevada

20

21

22

23

24

25          Reported by:  Ellen A. Goldstein, CCR 829

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 42

1    Q    But in terms of how they were actually paid,
2    was there a separate check written for each account or
3    was it more of a monthly true-up or something of that
4    nature?
5    A    Yeah, it was probably more like a monthly,
6    maybe bimonthly depending on how much volume came in.  We
7    didn't pay for each receivable.
8    Q    But typically there was a check written to the
9    provider from whom the receivable was purchased for each
10   receivable or for at least specific groups of
11   receivables?
12   A    Yeah.  Providers -- the payment to providers is
13   usually a payment for a whole bunch of receivables.  It's
14   not common to write a check for one receivable.  We might
15   have just -- you know, we might have said four months,
16   let's say, we pay 50 receivables and there was a check
17   made out to a provider for those 50 receivables.
18   Q    Okay.  To the extent in columns DV and DW
19   there's a check number for a particular receivable, that
20   check might relate to more than just that receivable;
21   correct?
22   A    Yeah.  When you go down the column, let's say
23   you sort it by check number.  You'll find some check
24   numbers multiple times, and those were the -- effectively
25   the check to the same provider for those receivables.

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 43

1      Q    All right.  In this backup database that you

2   still have that includes all of this information, is

3   there a field that you could export that would -- that

4   could have been included in this report or even exported

5   separately that would show the check amounts that tie in

6   with these check numbers?

7      A    Yeah, it's in the database.  I didn't check

8   every heading.  It's definitely something we have in the

9   database, the direct amount paid to the provider.

10     Q    In that database, is there a separate field

11  that identifies the actual cost paid to the provider --

12     A    Yes.

13     Q    -- that can be exported?

14     A    Yes.

15     Q    Is there a field that shows the actual amount

16  paid to the broker?

17     A    No.

18     Q    Is there any field that shows the amount paid

19  to -- or the amount allocated to overhead for Infinity?

20     A    No.

21     Q    In terms of that field that would show the

22  actual amount paid to the provider, can you tell me why

23  that wasn't included in the spreadsheet?

24     A    I thought it was, but as I said, I did not

25  check every -- it's not a standard report; right?  So I

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

                                                                    Page 44
1    have to look.  I have to find out, you know, why it's not

2    in there.

3         Q    But, you know, to be perfectly honest -- I'm

4    sorry, I didn't mean to interrupt.

5         A    I was asked to provide a data dump and did the

6    best I could with the tools I had after the filing, and

7    that's what effectively was produced.  Now, did I check

8    every field if they were exported properly?  No, I did

9    not.  So that probably can be exported as well.

10        Q    Okay.  What would be the heading on that field

11   if it had been included in this report, do you know?

12        A    It would say something was maybe paid, paid

13   amount or paid -- you know, something in that -- along

14   those lines.

15        Q    Do you know, in the prebankruptcy reports that

16   were provided to HASelect, was that information

17   included?

18        A    No.  The paid amount was never part of the

19   reports.

20        Q    Okay.  This next column under the heading

21   Bill GFB, what I understood from your wife's answer

22   yesterday is that it represents the face amount of the

23   Invoice being acquired.  Is that correct?

24        A    That's correct.

25        Q    Okay.  And then this next column, Total Bill



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 45

1    Income, can you tell me what that represents?

2        A    I think that is the amount that was received

3    when the case settled for that individual bill.

4        Q    And is that the actual amount received or other

5    modifications to accounts or overhead or brokerage fees

6    or anything else of that nature?

7        A    No.  That was the actual amount received.

8        Q    And backing up to the Bill Cost column, if I

9    were to scroll through 18,000 lines down in this

10   spreadsheet and total that column up, I would get a

11   number, but that wouldn't necessarily be the number that

12   was paid for these receivables.  That wouldn't include

13   brokerage fees and overhead; correct?

14       A    That's correct.

15       Q    With respect to this column, the Bill GFB

16   column, if I were to scroll down to the bottom and add it

17   up, that would actually be, though, the correct face

18   amount for the Invoices or receivables acquired by

19   Infinity; is that correct?

20       A    That's correct.

21       Q    This next column, Total Bill Income -- I'm

22   sorry, I did that already.

23            Bill Claim Income, what does that represent?

24       A    Well, the way the structure of the database

25   works is that every patient can have an incident, which

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 46

1   would be like a motor-vehicle accident, for example,

2   which is associated with a certain date; and in that

3   incident you can have, as an attorney, file several

4   claims against a third party, let's say the tortfeasor or

5   UIM, whatever.  There are certain potential pots of money

6   that that can tap into and file a claim against the loss,

7   and in most cases it's only one claim because there's

8   only one tortfeasor insurance.  And under each claim you

9   will then have those associated medical bills, and when

10  you have more than one, then the claim income is larger

11  than the bill income because you have to add up several

12  bills, right, and that gives you the claim income.  And

13  so this way you know, okay, the case settled in total,

14  let's say, for $10,000 but there were 20 bills in there

15  and they split up those incomes accordingly.

16      Q    Okay.  So that seems to relate more to a

17  capability of the database rather than, you know,

18  anything specific with a lot of these accounts.

19      A    Well, that's data management, right, especially

20  when you have multiple entities paying for individual

21  bills within the same claim; right?  Then you know how

22  they relate and then you know how to split up a

23  settlement check.

24      Q    This column AV, Claim Status, this first group

25  are designated as closed.  It's my understanding that



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 47

1   means that it's a receivable that's been collected.  Is

2   that correct?

3        A    Yeah.  It's a settled case.

4        Q    Where if we have notations designating this as

5   "collections," can you tell me what that means?

6        A    The case did not settle, but effectively it's

7   also not closed.  So in cases, let's say, when the

8   patient fires their attorney, then there's nobody

9   collecting on behalf of the patient; and therefore the

10  only person who could pay for any outstanding amount

11  would be the patient themselves, and that's what

12  "collections" means.

13       Q    What, if any, action did Infinity attempt -- or

14  take to attempt to collect on those accounts here that

15  are designated as "collections"?

16       A    We used a third-party collection company.

17       Q    Was Infinity using a third-party collection

18  company as of September 14th?

19       A    Yes.

20       Q    Who was that third party?

21       A    It's called Dynamic Legal.

22       Q    Is there a written contract between Infinity

23  and Dynamic Legal -- was there?

24       A    Yes, there's a contract.

25       Q    And was that something that was handled on a

OASIS
REPORTING SERVICES

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 108

1   information necessary to do that accounting as of

2   September 14th of 2021?

3       A    Yes.

4       Q    So even if you couldn't personally do it,

5   somebody at Infinity or an accountant on behalf of

6   Infinity could have used the books and records that it

7   had in its possession at that time and arrived at that

8   number?

9       A    Yeah.  I think Infinity probably was the best

10  to determine that number for that particular amount, but

11  I don't think anybody did it.

12      Q    Let's look at another document.  This document

13  is in the Dropbox as Exhibit 18.  It's a series of emails

14  that were exchanged between you and Endre at FTM.  This

15  was around the inception of the dividing relationship

16  between Infinity and HASelect.  It's referencing, you

17  know, placing stamps on certain documents.  Can you tell

18  me what that relates to?

19      A    Yes.  It was agreed on putting electronic

20  stamps, using mostly Adobe Acrobat stamping features, on

21  the liens that were related to the receivables that

22  Infinity purchased and that was a collateral of the

23  HedgeACT loans.  So this way, on the collection, it would

24  be immediately visible that those liens were funded -- or

25  the receivables under those liens were funded -- by



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 109

1    HedgeACT.

2        Q    Were the documents that were stamped, or were

3    contemplated being stamped, documents that would have

4    been retained by Infinity or are they documents that

5    would have been shared with third parties?

6        A    Well, those documents were all retained by

7    Infinity in the database; right?  It was -- usually it

8    did not really need to share any documents with attorneys

9    that had outstanding liens.  They would know, "Okay, we

10   have this with Infinity."  They would contact Infinity

11   and say, "What is the outstanding amount," and there

12   would be effectively a simple communication.  Now that we

13   had all the supporting documents and they needed that

14   maybe for the court dockets, we could provide those to

15   them when they needed to go to court so they could

16   prewrite the package, but on a lot of cases they didn't

17   require any documents.

18       Q    And it looks, based on the top email here, that

19   there was an agreement that electronic stamps could be

20   used.  Is that correct?

21       A    Yes.  We kind of discussed that for a while if

22   we do that with an ink stamp or electronic, and it was

23   decided to go with an electronic stamp that Infinity

24   designed.  We sent that to everybody and HedgeACT, and

25   they looked at it and approved that; and moving forward,



Volume II

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 163

1                    UNITED STATES BANKRUPTCY COURT

2                         DISTRICT OF NEVADA

3

4
        In re:                        )
5                                     )    CASE NO.:
                                      )    21-14486-abl
6       INFINITY CAPITAL MANAGEMENT,  )
        INC.; dba INFINITY HEALTH     )    Chapter 7
7       CONNECTIONS,                  )
                                      )    Volume II
8            Debtor.                  )    Pages 163 - 219
        _____)

9

10

11

12          CONTINUED REMOTE FRCP 2004 EXAMINATION

13                    OF OLIVER HEMMERS

14              Taken on November 18, 2021

15      By a Stenographic Certified Court Reporter

16                    At 9:05 a.m.

17         Location of Witness:  Las Vegas, Nevada

18         Via Zoom Web-Based Videoconferencing

19

20

21

22

23      Reported by:  Janet C. Trimmer,
        NV CCR 864, RPR, CRR
24      Location of Reporter:  Las Vegas, Nevada

25      Job No. 47158

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

                                                                    Page 168
1   will take turns, me asking a question, you answering
2   the question, it will be much easier for Ms. Trimmer
3   to take our statements down cleanly.  Can we do that?
4        A.  Yes.
5        Q.  If you don't understand one of my questions,
6   please let me know and I will try to rephrase it in a
7   way that you do.  Is that okay?
8        A.  That's good.
9        Q.  As a reminder, although we are on video and
10  can see each other, the only true testimony is what
11  you say.  The court reporter can't take down a
12  head-shake or a nod or an uh-huh or an huh-uh.  She
13  needs an actual verbal answer from you, and I know
14  sometimes that can be difficult and I'll try to remind
15  you as we go along.  Is that fine?
16       A.  Yes.
17       Q.  Before we begin, just let me briefly make a
18  preemptive apology.  I'm working from home today,
19  which means my dogs are here and they tend to review
20  everything that they can see and sense as their domain
21  and they bark.  Hopefully that won't happen, but
22  you've been warned.
23            Mr. Hemmers, I'd like to start -- and I'll
24  skip around a little bit, but I want to start with
25  just some general information and just to kind of



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 169

1    understand the assets that are at issue here.

2         It's correct that Infinity owned a set of

3    receivables that secured HA Select's loan; is that

4    correct?

5         A.  Yes.

6         Q.  Is it also correct that Infinity serviced a

7    second set of receivables that were run by Tecumseh?

8         A.  Yes.

9              MR. LARSEN:  Michael.

10             MR. NAPOLI:  Yes.

11             MR. LARSEN:  Just to put something on the

12   record here, to the extent you are getting into things

13   that are going to relate to the adversary proceeding,

14   I would object based on the pending proceeding rule as

15   I -- it is not appropriate to seek discovery through a

16   2004 examination relating to claims or defenses at

17   issue in an adversary proceeding.  I just want --

18             MR. NAPOLI:  No, I understand, Bart, but, you

19   know, I'm going over ground that you covered.

20             MR. LARSEN:  Understood.  I don't necessarily

21   want to object every time you raise a question that

22   goes in that direction.  Can we agree to just have a

23   standing objection on that issue --

24             MR. NAPOLI:  Yeah.

25             MR. LARSEN:  -- so that if it comes up down



Oliver Hemmers                                                    In re: Infinity Capital Management, Inc.

Page 170

1    the road, the record is there?

2             MR. NAPOLI:  Yeah, but I would note that I

3    think this line of questioning and testimony is going

4    to bear on this proposed sale.

5             MR. LARSEN:  Understood.  Like I said, I

6    don't want to have to object every time we go that

7    direction.

8             MR. NAPOLI:  No.

9             MR. LARSEN:  So, I mean, if you prefer that I

10   do it question by question, that's fine too.

11            MR. NAPOLI:  No, Bart, I prefer that you

12   didn't.  I understand what you are saying.  In all

13   candor, I don't agree with you on that and I think --

14            MR. LARSEN:  Understood.

15            MR. NAPOLI:  -- you kicked the door open

16   pretty wide in your direct.

17            MR. LARSEN:  Yes, and I get that.  Like I

18   said, I want to preserve the record here so that if it

19   comes up down the road, the objection is preserved.

20            MR. NAPOLI:  I get it, and we may be doing

21   this again in our case, and that's fine.

22            MR. LARSEN:  Okay.  All right.  Thank you.

23   BY MR. NAPOLI:

24      Q.  Infinity's internal records denote which

25   receivables belong to Infinity and which belong to



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 171

1    Tecumseh; correct?

2        A.  Yes.

3        Q.  So somebody reviewing Infinity's records

4    would be able to tell the difference between the two

5    categories?

6        A.  Yes.

7        Q.  How would they do that?  Where would they

8    look?

9        A.  In the database.

10       Q.  Which field would show that?

11       A.  The field for a thing that's called "Fund."

12       Q.  I'm going to show you a couple of

13   spreadsheets, one of which I think you saw on the

14   first day, one of which is similar to one you saw, and

15   again, because there are Excel documents, they are not

16   going into the Dropbox.

17           Okay.  The first one I'm showing you is a

18   spreadsheet called "TIFDumpWithIncomeFinal."  Do you

19   see that?  Is it visible on your screen?

20       A.  Yes, it is.

21       Q.  And if I understand your testimony from last

22   time, you created this spreadsheet for purposes of the

23   bankruptcy.  Is that correct?

24       A.  That's correct.

25       Q.  And you did so using information from



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 173

1   owned but which served as collateral for HA Select's

2   loan; correct?

3       A.  Yes.

4       Q.  All right.  So I'm going to define a term

5   with you that we can use for the next several

6   questions.  I'm going to define the term "Tecumseh

7   receivables" to be the receivables listed on the TIF

8   dump spreadsheet that I showed you first, and that's

9   marked TIF on the overlap spreadsheet.  Does that make

10  sense?

11      A.  Yes.

12      Q.  And if I say "Tecumseh receivables" you'll

13  know what I'm talking about?

14      A.  Yes.

15          (Previously designated Exhibit 1 for

16  identification in Volume I referred to as follows:)

17  BY MR. NAPOLI:

18      Q.  I'm now going to show you the schedule that

19  was part of your deposition or the first day of your

20  deposition, and this, I believe, was Exhibit 1 as

21  marked by Mr. Larsen.  Do you see that, sir?

22      A.  Yes.

23      Q.  I want to direct your attention to page 4 of

24  49 which I have up on your screen.  Do you see items

25  10 and 11 under part 3?



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 174

1        A.   Yes.

2        Q.   Okay.  This refers to accounts receivable in

3    the amount of 5.78 million; is that correct?

4        A.   Yes.

5        Q.   It says "face amount" but really, as I

6    recall, that's cost; is that correct?

7        A.   That's the purchase cost.

8        Q.   And remind me what purchase cost is.

9        A.   It's the amount paid to the medical providers

10   that originally owned those receivables.

11       Q.   It does not -- therefore, it does not include

12   the 20 percent or so that represents Infinity's

13   overhead?

14       A.   That's correct.

15       Q.   Does this 5.78 million include any of what we

16   have defined as the Tecumseh receivables?

17       A.   No, it does not.

18       Q.   Why not?

19       A.   Because they are on a different schedule.

20       Q.   Are the Tecumseh -- go ahead.  I interrupted

21   you, sir.  Go ahead and finish your answer.

22       A.   It's distinguished in the database that who

23   paid for which receivables, and the Tecumseh

24   receivables were not paid by the forum Infinity and,

25   therefore, they don't show up in our accounting.



Oliver Hemmers                              In re: Infinity Capital Management, Inc.

Page 175

1       Q.  Is that because, in your view, Infinity does

2   not own an interest in those receivables?

3       A.  That's correct.

4           (Previously designated Exhibit 17 for

5   identification in Volume I referred to as follows:)

6   BY MR. NAPOLI:

7       Q.  All right.  I want to move now to what was

8   marked as Exhibit 17 to -- on the first day of your

9   deposition, which is the Tecumseh/Infinity

10  sub-advisory agreement.  This is Exhibit 17, the

11  Tecumseh/Infinity sub-advisory agreement.  Is that

12  visible on your screen, sir?

13      A.  Yes.

14      Q.  I want to direct your attention to exhibit A.

15      A.  Yeah.

16      Q.  Does exhibit A set forth the particular

17  services that Infinity was to provide to Tecumseh?

18      A.  Yes.

19      Q.  All right.  I'd like to go through this.  So

20  in this agreement "sub-advisor" refers to Infinity; is

21  that correct?

22      A.  Yes.

23      Q.  And "company" refers to Tecumseh?

24      A.  Yes.

25      Q.  So under item 1(a), Tecumseh or Infinity is



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 176

1    to assist Tecumseh in acquiring some medical

2    receivables; is that correct?

3         A.  Yes.

4         Q.  Okay.  And it's going to help -- it's going

5    to do a review of the receivables; correct?

6         A.  Yes.

7         Q.  And what did that review entail?

8         A.  It's validation and due diligence to make

9    sure that these are real receivables, that the real

10   services have been provided from the medical provider

11   to the patients, and that there is a lien between in

12   this case the provider and the attorneys that the

13   provider can assign, and that -- and the payment

14   schedule, what the costs were from the -- that the

15   provider identified for those services.

16        Q.  The point of all the due diligence is to make

17   sure that this is something that Tecumseh would want

18   to purchase?

19        A.  Yes.

20        Q.  And part of Infinity's responsibilities were

21   to locate and validate receivables for Tecumseh to

22   purchase; correct?

23        A.  Yes.

24        Q.  I'm going to scroll down to item 3.  Do you

25   see that at the bottom of your -- on your screen where



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 180

1   do to take care of these receivables on Tecumseh's

2   behalf?

3       A.  Yes.

4       Q.  Can you describe to me generally what

5   servicing a medical litigation receivable entails?

6       A.  Yes.

7       Q.  Would you?

8       A.  We go into the detail.  The case status needs

9   to be followed up on every -- usually every 60 days in

10  the beginning until the attorneys identify that they

11  are getting closer to a settlement, and then the

12  follow-up will be every 30 days on the status of the

13  case, and at that point it gets closer to settling.

14       It also includes the settlement amount and

15  the time frame of payment, and then usually within the

16  last, you know, months of the case there might be a

17  weekly follow-up on case status, on settlement status

18  in this case, and payment arrangements.  So it's a

19  process, it's a constant contact and communication on

20  the case with the attorney.

21       Q.  Now, if you have a receivable with a face

22  value of $1,000, you are not necessarily going to

23  collect the full $1,000; correct?

24       A.  Correct.

25       Q.  Why not?



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 183

```
1            But, you know, in other cases they might not
2    send you anything, they might send it to -- I don't
3    know.  They might just hold the funds or start an
4    interplead.  You know, there are different ways of
5    kind of going about that.
6            But none of those cases would be kind of
7    favorable for anybody who wants to collect these
8    amounts.
9       Q.  Or they could just send the money to the
10   client too; right?
11      A.  That's another option.
12      Q.  Because that would make the client happy,
13   that would make the lawyer happy; correct?
14      A.  It would -- the lawyer would tell the client
15   you have to deal with the medical bills now, yes, the
16   money; right.  So that --
17      Q.  Right and --
18      A.  -- can happen.
19      Q.  -- in the situation we find ourselves in
20   right now, though, there is no -- Infinity is out of
21   business; correct?
22      A.  That's correct.
23      Q.  So there is no longer any relationship
24   between the lawyer and the company; correct?
25      A.  That's correct.
```



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 185

1      Q.  The owner's ability to realize on the
2   receivables is impacted by the servicing; is that
3   correct?
4      A.  Yes.
5      Q.  Better servicing will lead to better
6   outcomes?
7      A.  Yes.
8      Q.  Or servicing will lead to worse servicing --
9   I'm sorry.  Worse servicing will lead to worse
10  outcomes; correct?
11     A.  Yes.
12     Q.  And no servicing will lead to even worse
13  outcomes; is that correct?
14     A.  Yes.
15     Q.  Going back to the sub-advisory agreement
16  generally, the purpose of this agreement was for
17  Infinity to assist Tecumseh in purchasing receivables
18  directly from the medical service providers; is that
19  correct?
20     A.  Yes.
21     Q.  The dollars to purchase these receivables
22  were to come from Tecumseh and not Infinity; is that
23  correct?
24     A.  Yes.
25     Q.  Certainly the dollars to pay for this were



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 186

1  not to come from HA Select; is that correct?

2      A.  Yes.

3      Q.  Infinity was not to acquire any interest in

4  the receivable; correct?

5      A.  Yes.

6      Q.  And Infinity was not supposed to be part of

7  the chain of title; correct?

8      A.  Yes.

9      Q.  Infinity was not buying or selling, it was

10  brokering; is that fair?

11      A.  Yes.

12      Q.  So Infinity acquired no interest in the

13  receivable?

14      A.  Yes.

15      Q.  It merely serviced the receivables on

16  Tecumseh's behalf?

17      A.  Yes.

18      Q.  And all of the dollars were to go directly to

19  Tecumseh; is that correct?

20      A.  Yes.

21      Q.  And that's because it was Tecumseh's money,

22  not Infinity's money?

23      A.  Yes.

24      Q.  All right.  On the first day of your

25  deposition, do you recall discussing a purchase of

