Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
           kwyant@shea.law

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL<br>RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br>**PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH–INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL<br>RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP,<br><br>Counter-Defendant. | Hearing Date:  October 25, 2022<br>Hearing Time: 1:30 p.m. |

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  HASELECT-MEDICAL RECEIVABLES
2  LITIGATION FINANCE FUND
   INTERNATIONAL SP,

3                          Counter-Claimant,

4  v.

5  TECUMSEH–INFINITY MEDICAL
   RECEIVABLES FUND, LP,
6
7                          Counter-Defendant.

8          HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by

9  and through counsel, respectfully submits this Opposition to Tecumseh-Infinity Medical

10 Receivables Fund, LP's ("Tecumseh") *Motion for Partial Summary Judgment as to Direct Purchase*

11 *Receivables* [ECF No. 90] (the "Motion").  This Opposition is made pursuant to Fed. R. Civ. P. 56

12 and Federal Rules of Bankruptcy Procedure 7056 and Rule 7056 of the Local Rules of Bankruptcy

13 Practice and Procedure of the United States Bankruptcy Court for the District of Nevada,[1] and is

14 made and based upon the following memorandum of points and authorities as well as the exhibits

15 submitted herewith and on file with the Court and referenced herein:

16                    **I.      PRELIMINARY STATEMENT**

17         As this Court previously found in granting HASelect's Motion for Partial Summary

18 Judgment with respect to receivables contained in the 1-A through 1-E, 1-G, and 1-H Accounts [ECF

19 Nos. 84 and 88],[2] HASelect holds a perfected security interest in all of Infinity Capital

20 Management's ("Debtor" or "Infinity") personal property and proceeds thereof (the "Collateral").

21 In an attempt to avoid this security interest, and because Tecumseh indisputably did not perfect its

22 claimed security interest in any account receivable it supposedly acquired from Infinity, Tecumseh

23

24
_____

25 [1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
26 and all references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

27 [2] As to the 1-F, 1-I and 1-J Accounts, the Court denied HASelect's Motion for Partial Summary Judgment based on genuine issues of material fact but expressly stated that HASelect could again move for summary judgment on these
28 account batches at a later date—which HASelect intends to do.

**SHEA LARSEN**

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  has created an argument that the Direct Purchase Receivables[3] are not property of Infinity's estate

2  because either (1) Tecumseh purchased them directly with its own funds or, alternatively, (2) Infinity

3  purchased them and held them in the form of a resulting trust for Tecumseh's benefit using

4  Tecumseh's funds held in Infinity and Tecumseh's shared Bank of America account ending in 8995

5  (the "<u>BOA Account</u>").  Ignoring the fact that Tecumseh's own arguments conflict with its burden to

6  put forth clear and convincing and unambiguous intent to create the rarely granted remedy of a

7  resulting trust,[4] Tecumseh's Motion must be denied for numerous other reasons.

8          First, Tecumseh's Motion is fundamentally and factually flawed, precluding any award of

9  summary judgment.  For example, the Motion makes bold misstatements regarding the funds used

10  to purchase the Direct Purchase Receivables, including, but not limited to, the statement that "[a]ll

11  of the funds in that [BOA Account] belonged to Tecumseh and the Infinity had no interest in the

12  funds."[5]  Additionally, Tecumseh boldly misstates that "none of the dollars that Tecumseh used to

13  purchase the receivables flowed through any of Infinity's accounts,"[6] which is provably false.  As

14  shown from the unredacted BOA Account statements submitted herewith as well as Tecumseh's

15  own accounting records and Infinity's bank account statements, the BOA Account contained

16  collection proceeds from HASelect's Collateral, including, but not limited to, funds from receivables

17  associated with the 1-A through 1-E, 1-G and 1-H Accounts that the Court has already found are

18  subject to HASelect's security interest, which has priority over any claim by Tecumseh in the same.

19  Additionally, the BOA Account contained commingled funds transferred from Infinity's operating

20  account at NSB ending in 6375 (the "<u>Operating Account</u>").  The funds from the Operating Account

21  came from Infinity's 8480 Account, which contained commingled funds received from both

22  HASelect and Tecumseh.  Put differently, Infinity and Tecumseh indisputably rolled proceeds from

23  HASelect's Collateral, as well as commingled proceeds of HASelect's loan to Infinity from the

---

[3] Defined in the Motion as accounts purchased from and after October 29, 2020, which are the subject of the Motion. *See* Motion, 6:17.

[4] *Secure Leverage Grp., Inc. v. Bodenstein (In re Peregrine Fin. Grp., Inc.)*, No. 12 B 27488, 2014 Bankr. LEXIS 2328, at *9 (Bankr.N.D. Ill. May 27, 2014)

[5] *See* Motion, 12:1-2.

[6] *See* Motion, 12:2-4.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Operating Account and 8480 Account into the BOA Account and used those funds to purchase the Direct Purchase Receivables.

Second, the Motion should be denied because Tecumseh has not and cannot establish through clear and convincing evidence that the rare remedy of a resulting trust should be imposed here over the Direct Purchase Receivables.  Nothing in any of the documents between Tecumseh and Infinity reference a trust relationship.  Infinity's bankruptcy schedules also fail to list any of the receivables being held in trust by Infinity for Tecumseh. Moreover, as the Court previously found in ruling in favor of HASelect's Motion for Partial Summary Judgment, the relationship between Tecumseh and Infinity is not that of a trustee-beneficiary but rather that of a buyer-seller relationship.  Additionally, the relationship between Infinity and the medical providers associated with the Direct Purchase Receivables is not that of a buyer and seller but rather a lender and borrower.  Indeed, the transactions between Infinity and the medical providers through whom most of the Direct Purchase Receivables were funded took the form of loans in which Infinity received a contractual right to repayment instead of any outright claim to ownership of the accounts receivable at issue, which cannot satisfy the purchase requirement for a resulting trust to exist.

Lastly, the Motion must be denied because Tecumseh seeks equitable relief from this Court despite coming to it with unclean hands.  It is indisputable that Tecumseh's principals were directly and materially involved in the origination of HASelect's loan to Infinity and related security interest in all of Infinity's Collateral.  Despite being armed with the knowledge of Infinity's indebtedness to HASelect and HASelect's security interest, including the electronic stamps used to identify accounts receivable as HASelect's Collateral, Tecumseh's principals knowingly persuaded Infinity to sell it millions of dollars in accounts receivable included in HASelect's Collateral.  As evidenced by the communications submitted herewith, Tecumseh further conspired with Infinity to remove these electronic stamps and attempted to negate HASelect's security interest.  Further, Tecumseh conspired with Infinity to continue to profit from their business relationship by transferring Infinity's Collateral to newly created Infinity Health Solutions, which is simply a continuation of Infinity under a different name.  Tecumseh's unclean hands in these regards preclude it from seeking an equitable

remedy such as a resulting trust. For any of these reasons, the Motion must be denied.

## II.    STATEMENT OF FACTS

**A.    HASelect Loaned $16 Million to Infinity and Obtained a Perfected Security Interest in All of Infinity's Personal Property.**

1.    Beginning in February 2019, HASelect made a series of loans to Infinity that were documented through various written loan agreements and promissory notes through which Infinity pledged substantially all of its personal property, including all existing and after acquired accounts receivable, to HASelect as collateral for such loans.[7]

2.    HASelect perfected its security interest in all of Infinity's personal property through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.[8]

3.    On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all prior and related loan documents, the "MLA"), which amended and superseded all prior written loan agreements and promissory notes entered into between HASelect and Infinity.[9]

4.    Accordingly, HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral"). Specifically, Section 4.1 of the MLA describes the Collateral as follows:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted

---

[7] *See* Declaration of Michael Griffin (the "Griffin Declaration"), ¶ 5.

[8] *Id.* at ¶ 6.  A copy of this UCC-1 filing is submitted herewith as Exhibit 2.

[9] *See* Griffin Declaration, ¶ 7.  A copy of the MLA is submitted herewith as Exhibit 1.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

a lien or security interest, is referred to herein, collectively, as the "Collateral").[10]

5. Pursuant to the MLA, Infinity agreed to use the loan proceeds it received from HASelect to purchase accounts receivable from medical providers.[11]

6. Such accounts receivable generally arose from medical treatment or prescription medication provided to individuals who were injured in accidents and had asserted personal injury claims against third parties and were typically paid at the time the personal injury claims were settled. Infinity represented to HASelect that these accounts receivable were secured by liens against these personal injury claims.[12]

7. Infinity purchased these accounts receivable pursuant to contracts it entered into directly with various medical providers.[13] In addition to the contracts Infinity entered into with the sellers of these accounts receivable, Infinity also received direct assignments of liens against the individual personal injury claimants' rights to recovery.[14]

8. To ensure that HASelect received a perfected, first-priority security interest in all accounts receivable purchased by Infinity (as well as all other Collateral), HASelect required that Infinity use approximately $2.2 million in loan proceeds advanced by HASelect to repay and retire prior secured debts owed to Law Finance Group, LLC ("LFG"), which had similarly advanced funds to Infinity for the purchase of accounts receivable.[15]

9. HASelect also required that Infinity apply an electronic stamp to certain documents associated with its accounts receivable to identify the accounts receivable as HASelect's Collateral.[16]

10. From February 2019 through April 2020, HASelect advanced loan proceeds totaling

---

[10] See MLA (Exhibit 1), § 4.1.

[11] See MLA (Exhibit 1), § 3.2.

[12] See Griffin Declaration at ¶ 11.

[13] See Infinity's Amended Schedule G filed in the chapter 7 case at ECF No. 91.

[14] See Excerpts from Transcript of November 9, 2021 Rule 2004 Examination of Anne Pantelas (the "Pantelas Transcript") submitted herewith as Exhibit 4, pp. 66-67 ("Q: Was there any version of this form that you're aware of that was used in the last two years by Infinity in which, you know, Infinity was not identified as the party receiving the assignment? A: No, no."); Exhibit 7 to Pantelas Transcript (Assignment of Benefits/Medical Lien and Security Agreement).

[15] See Pantelas Transcript (Exhibit 4), pp. 82-83.

[16] See Hemmers Transcript (Exhibit 3), pp. 108-110; Exhibit 18 to Hemmers Transcript (February 26, 2019 email chain discussing electronic stamping of documents as HASelect collateral).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

approximately $16 million to Infinity, which was obligated under the MLA to use such proceeds to purchase accounts receivable.[17]

**B.    HASelect Engaged FTM Limited to Protect Its Interests under the MLA.**

11.    To ensure loan proceeds were used appropriately, HASelect engaged FTM Limited under a sub-advisory agreement dated February 7, 2019 (the "FTM Agreement")[18] to provide sub-advisory and fiduciary services to HASelect that included the investigation and verification of accounts receivable to be purchased by Infinity and the approval of draw requests submitted by Infinity on which HASelect relied in advancing funds to Infinity under the Loan.[19]

12.    FTM Limited is a Vanatu limited liability company.  The principals of FTM Limited are Endre Debozy and William Dalzell.  Debozy and Dalzell introduced HASelect to Infinity in late 2018 and strongly encouraged HASelect to enter into a lending relationship with Infinity.  In doing so, Debozy and Dalzell did not disclose to HASelect that they had a nearly 20-year history of soliciting investment capital and financing for Infinity – very little of which was ever repaid.[20]

13.    In or around 2000, Infinity's principals, Oliver Hemmers and Anne Pantelas, began working with Debozy and Dalzell to solicit investment capital for Infinity.  Debozy and Dalzell guided Hemmers and Pantelas in establishing Coastal Investments, PLC ("Coastal") as a Cook Islands public limited company owned by Hemmers, Pantelas, and Infinity.  Debozy and Dalzell then solicited potential investors to make loans to Coastal that would, in turn, be loaned by Coastal to Infinity to be used to purchase accounts receivable.[21]

14.    Over the next few years, Debozy and Dalzell convinced dozens of investors to loan

---

[17] *See* Griffin Declaration, ¶ 13.

[18] FTM Limited later assigned its rights and interests under the FTM Agreement to a related entity, Alternative Investment Specialists Limited.

[19] *See* Griffin Declaration, ¶ 14.   Under the FTM Agreement, FTM Limited agreed that its services would be exclusive to GAM and HASelect and agreed it would not use, disclose, or distribute any confidential information received from GAM or HASelect.  FTM Limited also agreed that it would act professionally and in best interests of GAM and HASelect at all times and that its principals would act in accordance with the FTM Agreement.  *See* Verified Complaint filed in Circuit Court of Cook County, Illinois (case no. 2020CH044270 submitted herewith as Exhibit 5, ¶¶ 22-41.

[20] *See* Griffin Declaration, ¶ 16.

[21] A summary of Infinity's relationship with Debozy and Dalzell that was prepared by Infinity's principal, Oliver Hemmers, and included in the business records surrendered to HASelect after Infinity's bankruptcy filing is submitted herewith as Exhibit 6.

several million dollars to Coastal under short term promissory notes.  Coastal then loans those funds to Infinity under dozens of separate short term promissory notes.  By early 2019, Infinity owed approximately $12 million to Coastal under such notes.  Infinity was unable to repay the notes as they matured and struggled to even pay interest on the notes as it came due.[22]

15.    Yet, in spending several months from late 2018 through February 2019 discussing a potential lending relationship and later negotiating the terms of the MLA, Debozy, Dalzell, Hemmers, and Pantelas failed to disclose to HASelect the $12 million Infinity owed on Coastal notes or the $2.2 million in secured debt Infinity owed to LFG.  HASelect did not learn of these issues until shortly before the Loan was set to close.  When confronted with this information, Debozy, Dalzell, Hemmers, and Pantelas misrepresented the debts owed to Coastal as debts owed to FTM Limited or a related entity, concealing Coastal's existence and ownership from HASelect, and misrepresented the amounts of the indebtedness owed under both the Coastal notes and LFG loan as $8.8 million and $1.9 million, respectively – approximately $3.5 million less than Infinity actually owed.[23]

16.    After reconsidering the matter, HASelect advised Infinity it would go forward with entering into the MLA only if (i) FTM Limited agreed to subordinate all indebtedness owed under the Coastal notes to the HASelect Loan, which Debozy and Dalzell agreed to do, and (ii) the indebtedness owed to LFG was repaid immediately and LFG released its security interest in Infinity's assets. Ultimately, HASelect and Infinity agreed that HASelect would advance additional Loan proceeds to refinance the LFG loan as referenced above.[24]

**C.    FTM Limited Colluded with Infinity to Misappropriate Loan Proceeds.**

17.    HASelect began advancing Loan funds to Infinity under the MLA on March 5, 2019. All advances made under the MLA were wired to an Infinity deposit account at Nevada State Bank ending in 8480 (the "8480 Account").  From March 2019 through April 2020, wired nearly $16 million

---

[22] Also, an accounting of the outstanding balances due under the Coastal notes that was emailed to Oliver Hemmers by an advisor to Coastal on February 11, 2019 is submitted herewith as Exhibit 7.

[23] See Griffin Declaration, ¶ 17; Emails submitted herewith as Exhibit 8.  Similarly, Debozy, Dalzell, Hemmers, and Pantelas failed to disclose to HASelect that Infinity had been in default of its obligations under the LFG loan since February 2018.  See LFG notice of default submitted herewith as Exhibit 9.  Likewise, Infinity did not disclose its ownership interest in Coastal in its bankruptcy schedules.  See Case No. 21-14486, ECF Nos. 47 and 112.

[24] See Griffin Declaration, ¶ 19; Emails submitted herewith as Exhibit 10.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

in Loan proceeds to the 8480 Account, which were the only material deposits to or funds held in the 8480 Account during that period.[25] In making such advances, HASelect relied on Debozy and Dalzell's representations that FTM Limited had investigated and verified Infinity's use of funds to be advanced for the purchase of accounts receivable.[26]

18. Within a few weeks of receiving the first advance, Infinity began using Loan proceeds to pay down the Coastal notes. Between April 2019 and June 2020, Infinity wired over $2.5 million in proceeds from the Loan directly to Coastal without HASelect's knowledge.[27] Debozy and Dalzell, however, undoubtedly knew that Loan proceeds were being used to pay down the Coastal notes as they and their investors were the end recipients of such payments. Yet, Debozy and Dalzell said absolutely nothing to HASelect regarding such payments.[28]

**D.     Simon Clark Negotiated and Administered the Loan for HASelect.**

19. In communicating with FTM Limited and Infinity and in negotiating and entering into the MLA, HASelect was represented by Simon Clark, who was then employed by Griffin Asset Management, LLC ("GAM")[29] and was responsible for GAM's offshore division, which included HASelect. Following the execution of the MLA, Clark remained responsible for the administration of the Loan and for protecting HASelect's rights and interests under the MLA. Instead of fulfilling these obligations, however, Clark ignored Infinity's misappropriation Loan proceeds and later assisted Tecumseh and FTM in soliciting Infinity to terminate its relationship with HASelect.[30]

20. In seeking advances under the MLA, Infinity routinely misrepresented both the cost and value of the accounts receivable it intended to purchase. For example, in December 2019, Infinity, requested that HASelect advance Loan funds in the amount of $3.2 million to Infinity[31] for the

---

[25] *See* 8480 Account records submitted herewith as Exhibit 11.

[26] *See* Griffin Declaration, ¶ 19.

[27] *See* 8480 Account records submitted herewith as Exhibit 11.

[28] *See* Griffin Declaration, ¶ 28.

[29] HASelect is an investment fund that was sponsored by an affiliated entity, and Griffin Asset Management, LLC serves as its investment manager.

[30] *See* Griffin Declaration, ¶¶ 20 and 28.

[31] A copy of this draw request is submitted herewith as Exhibit 12.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

purchase certain preexisting accounts receivable from HealthPlus Imaging ("HealthPlus").[32]   The actual purchase price for these accounts receivable was only $2.5 million, not $3.2 million as Infinity represented.[33]   Even worse, upon receiving the full $3.2 million it requested, Infinity paid only $1.75 million of the purchase price to HealthPlus and used the remaining Loan proceeds to pay down the Coastal notes and for other improper purposes.[34]   When questioned about these facts during his 2004 examination in Infinity's chapter 7 case, Hemmers admitted these facts to be true and claimed that Clark and FTM Limited were fully aware of Infinity's practice of inflating the cost and value of accounts receivable to HASelect in seeking draws under the MLA and of Infinity's habitual misuse of Loan proceeds for purposes other than those approved by HASelect.[35]

### E.    Tecumseh Partnered with Debozy and Dalzell to Solicitate Infinity to Terminate Its Relationship with HASelect.

21.    Clark continued to serve as HASelect's primary point of contact for Infinity and FTM until he resigned his position with GAM in February 2020 to join another former GAM employee, Chad Meyer, along with Debozy, Dalzell, Hemmers, and Pantelas in establishing Tecumseh to replace HASelect in its role as lender to Infinity.[36]

22.    Meyer was terminated from his position with GAM in May 2019.  Unbeknownst to HASelect or GAM at the time, Meyer, Clark, and another individual they met through GAM, Michael Belotz, formed Tecumseh Alternatives, LLC in August of 2019[37] as an investment advisory

---

[32] In seeking this advance, Infinity represented that all preconditions to the advance, as set forth in § 3.2 of the MLA, had been satisfied, including the precondition that the value of the accounts receivable to be purchased be at least 200% of amount advanced.  In other words, in requesting this advance, Infinity represented to HASelect that the value of the accounts receivable to be purchased under the HealthPlus agreement was at least $6.4 million.  Infinity's internal emails show that Hemmers and Pantelas undoubtedly knew as of October 2019 that Infinity was likely to collect less than $5 million on these accounts receivable.  *See* Emails submitted herewith as Exhibit 13.

[33] *See* Exhibit 38 submitted herewith.

[34] *See* 8480 Account records submitted herewith as Exhibit 11.

[35] *See* Hemmers Transcript (Exhibit 3), pp. 39-42, 67-74.

[36] *See* Griffin Declaration, ¶ 21.  On August 12, 2022, filed a verified complaint against Clark in the U.S. District Court for the Northern District of Illinois (case no. 1:22-cv-04269) (the "Chicago Federal Court Action") asserting claims for breach of fiduciary duty and fraud based on Clark's conduct in connection with the negotiation of the MLA and the administration of the Loan.  A copy of this verified complaint is submitted herewith as Exhibit 14.

[37] In an ADV Form filed by Tecumseh Alternatives, LLC on April 4, 2022, Tecumseh claims that Clark has been a principal of Tecumseh Alternatives, LLC since August 2019 – roughly six months before he resigned his position with GAM.  *See* Exhibit 39 (page 26 of 28) submitted herewith.

firm modeled after and designed to compete with GAM.  Shortly thereafter, Tecumseh Alternatives LLC formed Tecumseh and, upon Clark's resignation, began working with Debozy and Dalzell to solicit Infinity to terminate its relationship with HASelect and to enter into a new financing arrangement with Tecumseh.[38]

23.    Meyer, Debozy, and Dalzell wrongfully used confidential and trade secret information gained through their relationships with GAM and HASelect and routinely misrepresented facts and disparaged GAM's principals in their attempts to solicit Infinity.[39]

24.    Meyer, Debozy, and Dalzell represented in email communications to Infinity that HASelect was charging "exorbitant interest" under the Loan, had "stifled Infinity with interest rates, origination fees and absurd demands", and was preventing Infinity being successful through its "greed" and "shortsightedness" despite being the same individuals who negotiated and encouraged both HASelect and Infinity to enter into the MLA.[40]

25.    In other emails to Infinity, Meyer personally attached and repeatedly disparaged GAM's principal, Michael Griffin, and promised that Infinity's new agreement with Tecumseh would not include any "sneaky 'Griffin-type' gotchas".[41]

26.    Similarly, Dalzell repeatedly disparaged GAM's chief financial officer, Debbie Griffin, and instructed that Infinity not send records requested by Griffin relating to HASelect's Collateral or the Coastal notes and to instead falsely claim that such records could not be sent to Griffin because HASelect was not "HIPPA compliant".[42]  Debozy also slandered and disparaged Michael Griffin represented to Infinity that he and Dalzell could avoid breaching their fiduciary obligations as subadvisors to HASelect by simply forming a new entity to partner with Tecumseh.[43]

---

[38] *See* Griffin Declaration, ¶ 22.

[39] *See* Emails submitted herewith as Exhibit 15.

[40] *See* Emails submitted herewith as Exhibit 15

[41] *See* Emails submitted herewith as Exhibit 15

[42] Presumably, Dalzell meant to refer to the Health Insurance Portability and Accountability Act of 1996, which is commonly referenced as HIPAA.  HASelect was fully HIPAA compliant at the time this Dalzell's email was sent. *See* emails submitted herewith as Exhibit 16.

[43] *See* Emails submitted herewith as Exhibit 15.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

27.     Hemmers eventually questioned Tecumseh representations regarding the supposed benefits of a new relationship with Tecumseh in an email stating, "This model is either completely fucked up or you come up with an explanation how and why it is a benefit for Infinity to take money from Tecumseh."  Debozy and Dalzell responded by misrepresenting the terms of the Loan in comparison to the supposed benefits of Tecumseh's plan and using confidential information gained through their fiduciary relationship with HASelect to persuade Hemmers to move forward.[44]

28.     While at the same time assisting Tecumseh in soliciting Infinity (and concealing such activities from HASelect), Debozy and Dalzell continued to assist Infinity in obtaining additional Loan advances from HASelect under the MLA.  From March through May 2020, Infinity requested and received Loan advances totaling approximately $1.45 million.  HASelect advanced such funds in reliance upon Debozy and Dalzell's representations that FTM Limited had verified the information provided by Infinity concerning the accounts receivable to be purchased with such funds.[45]

29.     As of June 2020, over $744,000 in Loan proceeds remained on deposit in the 8480 Account.  Infinity used $170,000 of this amount to pay amounts owed under the Coastal notes and transferred the remaining funds to its operating account to pay Infinity's operating expenses during the initial months of its new funding relationship with Tecumseh and purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh.[46]  Tecumseh and FTM were undoubtedly aware of, if not complicit in, and clearly benefited from this misappropriation of HASelect's Loan proceeds.

**F.     Tecumseh and FTM's Wrongful Conduct Continued Long After the Execution of the Sub-Advisory Agreement.**

30.     On or about June 18, 2020, Infinity and Tecumseh concluded their negotiations and entered into the Sub-Advisory Agreement.[47]  Although they are not mentioned in the Sub-Advisory

---

[44] *See* Emails submitted herewith as <u>Exhibit 17</u>.

[45] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>; Griffin Declaration, ¶ 19.

[46] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>.

[47] A copy of the Sub-Advisory Agreement is submitted with the Motion as <u>Exhibit B</u>.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Agreement, Tecumseh's early marketing materials represented to potential investors that Debozy and Dalzell would serve as members of Tecumseh's "management team" alongside Meyer and Belotz.[48]  While the precise roles that Debozy and Dalzell accepted with Tecumseh remain unclear, HASelect believes they formed a new entity to serve as a subadvisor to Tecumseh.[49]

31.    After signing the Sub-Advisory Agreement, Infinity, FTM, and Tecumseh began preparing to transfer accounts receivable in which HASelect held a perfected first-priority security interest to Tecumseh by, among other things, removing the electronic stamps that identified such accounts receivable as HASelect's Collateral.[50]

32.    Infinity then sold a substantial portion of its accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh without HASelect's knowledge or consent and in violation of Infinity's contractual obligations under the MLA.[51]

33.    After learning of Tecumseh and FTM's solicitation of Infinity, GAM and HASelect filed a complaint against Meyer, Tecumseh, FTM Limited, and Alternative Investment Specialists Limited (another entity controlled by Debozy and Dalzell) in the Circuit Court of Cook County, Illinois (case no. 2020CH04427) (the "Chicago State Court Action") in which they asserted claims for trade secrets violations, breach of contract, breach of fiduciary duty, tortious interference, and civil conspiracy.[52]

34.    In an attempt to compel GAM and HASelect to drop the Chicago State Court Action and eliminate HASelect's involvement in Infinity's business operations, Tecumseh, FTM, and

---

[48] *See* Emails submitted herewith as Exhibit 18.

[49] A private placement memorandum ("PPM") prepared by Tecumseh in June 2020 indicates that Debozy and Dalzell would serve as subadvisors to Tecumseh through a Hong Kong limited company, Forget the Market, Ltd.  *See* Email with excerpt of PPM submitted herewith as Exhibit 19.    Tecumseh's Statement of Facts [ECF No. 92] indicates that a different entity, FTM Investments, Inc., was engaged to provide subadvisor services to Tecumseh. *See* ECF No. 92, p. 4.

[50] *See* Hemmers Transcript (Exhibit 3), pp. 61, 110-112; Exhibit 25 to Hemmers Transcript (June 23, 2020 emails from Oliver Hemmers to Endre Debozy confirming removal of electronic stamps).

[51] *See* Hemmers Transcript (Exhibit 3), pp. 110-114 ("Q: And it may have not been clear earlier, but I believe I asked you if any accounts in which HASelect held a security interest were sold to any other party, and I thought you had told me no. So just -- A: Under the blanket UCC[?] Q: Yes, under the blanket UCC. A: Yeah. In that case the Tecumseh receivables were the only ones that fall in that category."); *see also* Griffin Declaration, ¶ 15.

[52] A copy of this complaint is submitted herewith as Exhibit 5.  GAM and HASelect later voluntarily dismissed their claims against FTM Limited.

Infinity concocted a plan in July 2020 to attempt to persuade Three Bell Capital, which is a registered investment advisor whose clients invested in HASelect to whom Clark and Meyer were introduced through their employment with GAM, to demand a redemption of its investment in HASelect, which they believed would force the liquidation of HASelect and create an opportunity for Tecumseh to acquire all remaining Infinity accounts receivable in which HASelect held a perfected, first-priority security interest.  From July 2020 through July 2021, Tecumseh and Infinity frequently contacted Three Bell Capital in an attempt to implement this plan.[53]

35.    Tecumseh also conspired with Infinity to exploit the bankruptcy process through Infinity's chapter 7 filing.  Tecumseh, FTM, and Infinity clearly planned to continue to profit from their business relationship while leaving Infinity's debts to HASelect unpaid by transferring Infinity's business records and intangible assets to Infinity Health Solutions, LLC through which Infinity's principals, after misappropriating more than $100,000 in proceeds collected from accounts receivable included in HASelect's Collateral to finance their new company in the weeks prior to Infinity's chapter 7 filing[54], continued to service and collect disputed Tecumseh Receivables and to acquire new accounts for Tecumseh after Infinity's bankruptcy filing just as Infinity had done previously.[55]

**G.    Infinity Commingled Loan Proceeds with Funds Received from Tecumseh.**

36.    As referenced above, all Loan proceeds advanced to Infinity under the MLA were wired to the 8480 Account and were the only material amounts deposited to or held in the 8480 Account from March 2019 through May 2020.

37.    As of June 2020, over $744,000 in Loan proceeds remained on deposit in the 8480 Account.  Infinity used $170,000 of this amount to pay amounts owed under the Coastal notes and

---

[53] *See* Emails submitted herewith as Exhibit 20.

[54] *See* Transcript of October 27, 2021 Meeting of Creditors attached hereto as Exhibit 21, pp. 7-9.

[55] *See* Infinity Health Solutions, LLC bank account statement for account ending in 5736 for September 29, 2021 filed in Adversary Proceeding 22-01109-abl as ECF No. 4-15; *see also* October 12, 2021 email from Tecumseh's principal Mike Belotz stating that Tecumseh is "going to have to suspend all purchases of receivables from [Infinity Health Solutions]…" filed in Adversary Proceeding 22-01109-abl as ECF No. 4-16.  Additionally, in responding to a separate adversary complaint filed by HASelect, Hemmers and Pantelas admit that they used Infinity Health Solutions, LLC to continue providing precisely the same servicing and collection services to Tecumseh that Infinity provided prior to its bankruptcy filing.  *See* Adversary Case No. 22-01109, ECF No. 21, ¶¶ 61-62.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  transferred the remaining funds, approximately $575,000, to its operating account to pay Infinity's

2  operating expenses during the initial months of its new funding relationship with Tecumseh and to

3  purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh.[56]

4       38.     On June 26, 2020, Tecumseh made its first deposit into the 8480 Account in the

5  amount of $294,465.70.[57] At the end of June 2020, the 8480 Account held $425,269.66, well above

6  what Tecumseh transferred to the 8480 Account, evidencing the commingled nature of Tecumseh's

7  funds with HASelect's Loan proceeds.  Tecumseh continued to deposit funds in the 8480 Account

8  in payment of accounts receivable purchased from Infinity through at least September 2020.[58]

9       39.     Infinity routinely transferred funds deposited to the 8480 Account to its operating

10  account at Nevada State Bank and ending in 6735 (the "Operating Account").  For example, on June

11  8, 2020 and June 16, 2020, Infinity wired $244,000 and $200,000, respectively, from the 8480

12  Account to the Operating Account.[59]

13       40.     Infinity used funds transferred to the Operating Account to pay operating expenses[60]

14  and to purchase or fund additional accounts receivable.[61]

15       41.     Additionally, Infinity began transferring funds from its Operating Account (which

16  included the commingled funds received from HASelect and Tecumseh transferred from the 8480

17  Account), to the BOA Account shortly after it was opened.  For example, on August 1, 2020, the

18  BOA Account contained only $269.72 but ended with a balance of $3,084.80 based on a deposit in

19  the amount of $2,815.08 made from Infinity's Operating Account.[62]

20       42.     This trend continued as numerous transfers from Infinity's Operating Account made

---

[56] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>; Griffin Declaration, ¶ 19.

[57] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>.

[58] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>.

[59] *See* Operating Account records submitted herewith as <u>Exhibit 22</u>.

[60] For example, the Operating Account bank statement for June 2020 reflects payments to National Payment Corp., which is a payroll/direct deposit company.  *See generally* nationalpayment.com.

[61] *See* Operating Account statement submitted herewith as <u>Exhibit 22</u> reflecting a payment on June 9, 2020 of $53,739.72 to medical provider Preva Advanced SurgiCare.

[62] *Compare* Operating Account bank statement for August 2020 (reflecting a transfer of $2,815.08 on August 12, 2020), submitted herewith as <u>Exhibit 22</u>, *with* BOA Account bank statement for August 2020 (reflecting a deposit of $2,815.08 on August 13, 2020), submitted herewith as <u>Exhibit 23</u>.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

their way into the BOA Account.  On September 21, 25, and 28, 2020, Infinity wired $5,430.16, $36,042.51, and $11,617.59, respectively, from its Operating Account to the BOA Account.[63]

43.    Additionally, proceeds from the 1-A through 1-E, 1-G, and 1-H Accounts (over which the Court has already granted summary judgment in favor of HASelect),[64] as well as other amounts from the 1-F, 1-I, and 1-J accounts in which HASelect claims a perfected security interest were frequently deposited to the BOA Account and commingled with funds used by Infinity to purchase and fund the Direct Purchase Receivables.[65]

44.    The following non-exhaustive analysis shows that for each month from October 2020 through September 2021, proceeds of accounts the Court has already determined rightfully belong to HASelect (or other proceeds in dispute that remain unresolved) were rolled into the BOA Account and commingled with the funds therein:

- On October 9, 2020, $10,545.42 was deposited into the BOA Account with Payment Info listed as "September 2020 Collections."  The Operating Account reflects a transfer of $10,545.42 on October 8, 2020;[66]

- On November 23, 2020, a total of $4,583.27 was deposited into the BOA Account through pre-encoded deposits, which is the exact total amount for all amounts collected on November 23, 2020 with respect to the 1-D, 1-F, and 1-I Accounts as reflected by the Spreadsheet;[67]

- On December 9, 2020 and December 16, 2020, $752.28 and $5,500.00, respectively, was deposited into the BOA Account through pre-encoded deposits.  The December 9, 2020 amount of $752.28 reflets the exact amount of all amounts collected on this date contained in the Spreadsheet with respect to the 1-D Accounts, and the $5,500 reflects a payment collected on December 16, 2020 associated with a 1-A Account;[68]

- On January 28, 2021, a total of $38,077.88 was deposited into the BOA Account through six pre-encoded deposits.  The Spreadsheet reflects a total of $38,077.88 collected on

---

[63] *See id.*

[64] *See* ECF Nos. 84 and 88 on file herein.

[65] *Compare* BOA Account statements, submitted herewith as Exhibit 23, *with* Tecumseh's Spreadsheet entitled "Collections (Inc. to June 2021 – Aug 2021.xlsx)" (the "Spreadsheet"), submitted herewith as Exhibit 24, which shows the corresponding BillID with the 1-A through 1-J Accounts and the amount collected.  The Spreadsheet only continues through June 2021.

[66] *Id.*

[67] *Id.*

[68] *Id.*

January 28, 2021 from the 1-D, 1-E, 1-F, and 1-H Accounts.[69]  Moreover, the BillIDs contained in the Spreadsheet correlate with the BillIDs and amounts contained in the purchase orders previously submitted to this Court;[70]

- On February 16, 2021, a pre-encoded deposit in the amount of $9,236.43 was deposited into the BOA Account which correlates to the Spreadsheet, reflecting an amount of $9,236.43 collected on February 16, 2021 from a 1-B Account;[71]

- On March 4, 2021, and March 12, 2021, pre-encoded deposits in the amount of $550.24 and $769.30, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for all 1-D Accounts collected on March 4, 2021 (totaling $550.24) as well as a 1-D Account collected on March 12, 2021;[72]

- On April 12, 2021 and April 22, 2021, pre-encoded deposits totaling the amount of $5,238.12 and $1,856.63, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for the 1-A, 1-B, and 1-D Accounts collected on April 12, 2021 and the 1-D, 1-F, and 1-J Accounts collected on April 22, 2021;[73]

- On May 5, 2021 and May 19, 2021, pre-encoded deposits of $219.21 and $9,459.90, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for all of the accounts collected on May 5, 2021 in the amount of $219.21 from the 1-D Accounts and a $9,459.50 collection on May 19, 2021 from a 1-F Account;[74]

- On June 8, 2021 and June 10, 2021, pre-encoded deposits totaling $16,848.58 and $13,569.69, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for amounts collected on accounts including the 1-D Accounts on June 8, 2021 in the amount of $16,848.58, and the 1-D, 1-H, 1-I, and 1-J Accounts on June 10, 2021 in the total amount of $13,569.69;[75]

- On July 19, 2021, a pre-encoded deposit of $2,129.68 was deposited into the BOA Account, which corresponds to a check and letter dated July 15, 2021 from the Richard Harris Law Firm regarding a certain patient assigned to BillID number including, but not limited to, 24546, which is included in the 1-H Accounts;[76]

- On August 2, 2021 and August 23, 2021, pre-encoded deposits of $5,250 and $32,380.00

[69] Id.

[70] See generally ECF No. 75-1 on file herein.

[71] Compare BOA Account bank statements, submitted herewith as Exhibit 23, with Tecumseh's Spreadsheet, submitted herewith as Exhibit 24, which shows the corresponding BillID with the 1-A through 1-J Accounts and the amount collected.

[72] Id.

[73] Id.

[74] Id.

[75] Id.

[76] Compare BOA Account bank statements, submitted herewith as Exhibit 23, with check 120046 and corresponding letter dated July 15, 2021, submitted herewith as Exhibit 35.  See also ECF No. 75-1 on file herein.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

were deposited into the BOA Account, which corresponds to checks involving certain patients assigned to BillID numbers including, but not limited to, 19958, 15585 and 26889, respectively, which are included in the 1-D and 1-J Accounts;[77]

- On September 1, 2021, a pre-encoded deposit of $599.22 was deposited into the BOA Account, which corresponds to check and letter dated August 30, 2021 from the Mountain Vista Law Group involving a patient assigned to BillID number 25461, which is included in the 1-H Accounts.[78]

45.    Based on a collections report prepared by FTM and sent to Tecumseh and Infinity on August 17, 2021, it appears that Infinity collected at least $500,000 in proceeds from the Tecumseh Receivables that it deposited to the BOA Account (sometimes directly and sometimes through transfers from other Infinity bank accounts) and later used to purchase additional Tecumseh Receivables.[79]

46.    Tecumseh's Motion entirely ignores the deposit of such funds to the BOA Account – a large portion, if not all, of which were clearly proceeds of HASelect's Collateral and remained subject to HASelect's perfected security interest.  In fact, in the BOA Account statements provided as exhibits to the Motion, Tecumseh obtusely redacts these deposits as if they never occurred.[80] Similarly, Tecumeh makes no effort to explain how such proceeds were allocated or used by Infinity to purchase or fund additional Tecumseh Receivables or to trace the use of its own investors' funds it claims were deposited to the BOA Account and used by Infinity to purchase or fund the Direct Purchase Receivables.[81]

**H.    Infinity Controlled and Made All Payments from the BOA Account, Not Tecumseh.**

47.    The BOA account was opened under the fictitious firm name "Infinity Health Connections", which is a fictitious firm name registered to and used by Infinity since at least 2016.[82]

---

[77] *Compare* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *with* checks 14056 and 1237, submitted herewith as <u>Exhibit 35</u>.  *See also* ECF No. 75-1 on file herein.

[78] *Compare* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *with* checks 2021 and corresponding letter dated August 30, 2021, submitted herewith as <u>Exhibit 35</u>.  *See also* ECF No. 75-1 on file herein.

[79] *See* Email and accounting records submitted herewith as <u>Exhibit 24</u>.

[80] Unredacted (except for account numbers) copies of the BOA Account statements are submitted herewith as <u>Exhibit 23</u>.

[81] *See generally,* the Motion.

[82] *See* <u>Exhibit 25</u> submitted herewith.

All parties responsible for payment of the Tecumseh Receivables were instructed to send payment to Infinity under the fictitious firm name "Infinity Health Connection". No such party was ever instructed to send payment to Tecumseh or even advised of Tecumseh's existence. Infinity's principals, Oliver Hemmers and Anne Pantelas, were signatories on the BOA Account and made all payments from the BOA account.[83]

**I.    All Tecumseh Receivables Were Purchased or Funded by Infinity, Not Tecumseh.**

48.    All Tecumseh Receivables were purchased or funded by Infinity pursuant to written contracts between Infinity and medical service providers, which in most cases existed long before the execution of the Sub-Advisory Agreement and in all cases govern Infinity's rights in the Tecumseh Receivables. Infinity purchased or funded the Tecumseh Receivables pursuant to approximately 100 separate such contracts. Infinity's rights under such contracts are included in the Collateral in which HASelect holds a perfected security interest in connection with the MLA. Tecumseh is not a party to and holds no rights under any such contract.[84]

49.    Except with respect to those Tecumseh Receivables for which Infinity and Tecumseh entered into an Assignment and Bill of Sale, not a single document exists that evidences the purchase of any Tecumseh Receivable (including the so-called Direct Purchase Receivables) by Tecumseh. Similarly, no document exists that evidences any sale or assignment of any Tecumseh Receivable to Tecumseh by any medical provider.[85]

50.    In reviewing business records obtained from Infinity after its bankruptcy filing, HASelect has discovered that a majority of the Direct Purchase Receivables originated from transactions between Infinity and medical providers that were effectively loans rather than outright

---

[83] *See* Exhibit 25 submitted herewith. Additionally, Debtor often treated the funds in the BOA Account as its own. In at least one instance, Debtor borrowed funds from the BOA Account to pay its own operating expenses without informing Tecumseh. On March 10, 2021, Debtor transferred $25,000 from the BOA Account to its own operating account at Nevada State Bank, which at the time was overdrawn by $720.81. Debtor was obligated to fund its payroll the following day. On March 11, 2021, after satisfying its payroll obligations and obtaining a loan from a third party, Debtor returned the $25,000 to the BOA account. *See* BOA Account records submitted herewith as Exhibit 23; Operating Account records submitted herewith as Exhibit 22.

[84] *See* Tecumseh's excerpts of responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to requests nos. 94-99. *See also* Tecumseh's responses to interrogatories submitted herewith as Exhibit 27, p. 9, response to interrogatory no. 3.

[85] *Id.*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

purchases of an account receivable.

51.    While such transactions involved an advance of funds by Infinity and were typically designated by Infinity as a purchase of an account receivable, Infinity did not actually acquire ownership of or the right to collect the account receivable in question.  Rather, the medical provider retained ownership of and all rights to collect the account receivable and generally bore the risk of non-payment of the account receivable.  Neither the individual obligated as to payment of the account receivable nor that individual's attorney was informed of any transaction involving Infinity, nor were they instructed to pay any amount to Infinity, nor did they grant Infinity any lien against any personal injury claim.  Rather, all such individuals and their attorneys were instructed only to pay the medical provider, and all such lien rights were given to and retained by the medical provider.

52.    For example, on September 20, 2019, Infinity entered into an agreement with Cueva Diagnostics, LLC d/b/a Stat Diagnostics ("Stat Diagnostics") under which Infinity agreed to pay $600 for each account receivable arising from a magnetic resonance imaging scan ("MRI") performed by Stat Diagnostics that Stat Diagnostics offered to Infinity and Infinity elected to "purchase".[86]  Infinity's payment, however, did not give Infinity the right to collect such account receivable.  Rather, all collection rights remained with Stat Diagnostics.[87]  In fact, Infinity was expressly prohibited from making any contact with Stat Diagnostic's patient or the patient's attorney and did not receive any assignment of any lien or other interest in any personal injury claim from such patient or attorney.[88]  In consideration for Infinity's payment, Stat Diagnostics agreed that it would refund Infinity's $600 payment and pay an additional fixed fee to Infinity of $180 to $480 at the time of collection depending on the length of time that passed between Infinity's funding of the account receivable and collection.[89]  Stat Diagnostics had the right to refund Infinity's $600 payment along with the applicable fixed fee at any time regardless of collection.[90]  Stat Diagnostics retained

---

[86] *See* Contract dated September 20, 2019 between Infinity and Stat Diagnostics (the "Stat Diagnostics Contract") submitted herewith as Exhibit 28.

[87] *See* Stat Diagnostics Contract, § 6.

[88] *See* Stat Diagnostics Contract, § 6(c)

[89] *See* Stat Diagnostics Contract, § 6.

[90] *See* Stat Diagnostics Contract, § 9.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

the rights to all amounts collected in excess of Infinity's $600 payment and the applicable fixed fee.[91]  Infinity received only limited records relating to the accounts receivable it funded.[92]  Stat Diagnostics was required to indemnify Infinity for all losses arising out of any breach of any representation or warranty by Stat Diagnostic or its negligence.[93]  Finally, Infinity was precluded from assigning any right under this contact to any other person without Stat Diagnostic's prior written consent.[94]

53.    After entering into the Stat Diagnostics Contract, Infinity periodically sent payments to Stat Diagnostics (first from the Operating Account and later the BOA Account) along with correspondence identifying the accounts receivables to be funded through such payments.[95]  The Direct Purchase Receivables include accounts receivable funded by Debtor under the Stat Diagnostics Contract with a face value of $5,796,689.[96]

54.    On June 2, 2020, Infinity entered into an agreement with Preva Advanced Surgicare – The Woodlands, LLC ("Preva") under which Infinity agreed to pay 22% of the face value of accounts receivable arising from medical services provided by Preva that Preva offered to Infinity and Infinity elected to "purchase".[97]  Infinity's payment, however, did not give Infinity the right to collect such accounts receivable, nor did Infinity receive any assignment of any lien or other interest in any personal injury claim from Preva's patients or their attorneys.[98]  All collection and lien rights remained with Preva.[99]  In consideration for Infinity's payment, Preva agreed it would refund Infinity's 22% payment and pay an additional fixed fee to Infinity of 10% to 15% at the time of collection depending on the length of time that passed between Infinity's funding of the account

---

[91] *See* Stat Diagnostics Contract, § 8.

[92] *See* Stat Diagnostics Contract, § 10.

[93] *See* Stat Diagnostics Contract, § 11.

[94] *See* Stat Diagnostics Contract, § 23.

[95] Examples of such payments are submitted herewith as Exhibit 29.

[96] *See* Accounting attached here to as Exhibit 30.

[97] *See* Contract dated June 2, 2020 between Infinity and Preva (the "Preva Contract") submitted herewith as Exhibit 31, § 4.

[98] *See* Preva Contact, § 5.

[99] *See* Preva Contact, § 5.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

receivable and collection.[100]  For any accounts receivable that remained uncollected 18 months after Infinity's Payment to Preva, Preva was obligated to pay Infinity double the amount of its 22% payment.[101]  Preva had the right to refund Infinity's 22% payment along with the applicable fixed fee at any time regardless of collection.[102]  Preva also retained the rights all amounts collected in excess of Infinity's 22% payment and the applicable fixed fee.[103]  Infinity received only limited records relating to the accounts receivable it funded.[104]  Preva was required to indemnify Infinity for all losses arising out of any breach of any representation or warranty by Preva or its negligence.[105]  Finally, Infinity was precluded from assigning any right under this contact to any other person without Preva's prior written consent.[106]

55.    After entering into the Preva Contract, Infinity periodically sent payments to Preva (first from the Operating Account and later the BOA Account) along with correspondence identifying the accounts receivables to be funded through such payments.[107]  The Direct Purchase Receivables include accounts receivable funded by Debtor under it the Preva Contract with a face value of $1,022,473.[108]

56.    On January 6, 2021, Infinity entered into an agreement with Viking Pain Management, LLC ("Viking") under which Infinity agreed to pay either $1,800 or $300 for each account receivable arising from medical services provided by Viking (depending on the type of service) that Viking offered to Infinity and Infinity elected to "purchase".[109]  Infinity's payment, however, did not give Infinity the right to collect such accounts receivable, nor did Infinity receive

---

[100] *See* Preva Contact, § 5.

[101] *See* Preva Contact, § 5 D.

[102] *See* Preva Contact, § 8.

[103] *See* Preva Contact, § 7.

[104] *See* Preva Contract, § 9.

[105] *See* Preva Contract, § 12.

[106] *See* Preva Contact, § 22.

[107] Examples of such payments are submitted herewith as Exhibit 32.

[108] *See* Accounting attached here to as Exhibit 30.

[109] *See* Agreement dated January 6, 2021 between Infinity and Viking (the "Viking Contract") submitted herewith as Exhibit 33, §§ 5-6.

any assignment of any lien or other interest in any personal injury claim from Viking's patients or their attorneys.  All collection and lien rights remained with Viking.[110]  In consideration for Infinity's payment, Viking agreed that it would refund Infinity's $1,800 or $300 payment and pay an additional fixed fee to Infinity of $700 or $300, respectively, at the time of collection.[111]  Viking retained the rights to all amounts collected in excess of Infinity's payment and the applicable fixed fee.[112]  In the event that Viking's collections were insufficient to refund the full amount of Infinity's payment and the applicable fixed fee, Viking was expressly obligated to pay such amounts to Infinity from other sources subject to certain limitations.[113]  Infinity received only limited records relating to the accounts receivable it funded.[114]  Viking was required to indemnify Infinity for all losses arising out of any breach of any representation or warranty by Viking or its negligence.[115]Finally, Infinity was precluded from assigning any right under this contact to any other person without Viking's prior written consent.[116]

57.    After entering into the Viking Contract, Infinity periodically sent payments to Viking along with correspondence identifying the accounts receivables to be funded through such payments.[117]  The Direct Purchase Receivables include accounts receivable funded by Debtor under the Viking Contract with a face value of $5,743,993.[118]

58.    Together, the Direct Purchase Receivables funded by Infinity pursuant to its contracts with Stat Diagnostics, Preva, and Viking account for $12,563,155 (roughly 63.3%) of the total Direct Purchase Receivables of $19,846,625 by face value.[119]

---

[110] *See* Viking Contract, § 7.

[111] *See* Viking Contact, § 7 A.

[112] *See* Viking Contact, § 7.

[113] *See* Viking Contact, § 7 C and D.

[114] *See* Viking Contract, § 8.

[115] *See* Viking Contract, § 11.

[116] *See* Viking Contact, § 21.

[117] An example of such a payment is submitted herewith as Exhibit 30.

[118] *See* Accounting attached here to as Exhibit 32.

[119] *See* Accounting attached here to as Exhibit 32.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

59.     Neither the Stat Diagnostics Contract, the Preva Contract, nor the Viking Contract make any mention of Tecumseh, a resulting trust, or any trust relationship whatsoever.[120]

## III.    ARGUMENTS

### A.    Summary Judgment Is Not Appropriate and Must Be Denied.

Summary judgment may only be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (incorporated herein by Bankruptcy Rule 7056).  A moving party meets its initial burden under Rule 56 only when it presents sufficient evidence to support a verdict at trial on all the elements of the claims sought to be summarily adjudicated.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-250 (1986).  Only then does the burden shift to the non-moving party to put forth evidence showing a genuine issue of material fact.  *See id.*

A court "must view the evidence and inferences therefrom in the light most favorable to the nonmoving party," which here is HASelect.  *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1328 (9th Cir. 1983).  Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment because the court's function at summary judgment is not to weight the evidence or credibility but rather to simply determine whether there is a genuine issue for trial. *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)).  "Similarly, the district court must recognize that, where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'"  *Zetwick*, 850 F.3d at 441.

Here, the Motion must be denied because Tecumseh cannot establish it is entitled to a resulting trust over the Direct Purchased Receivables or that it purchased the same directly. Moreover, Tecumseh cannot obtain the equitable relief it seeks—a resulting trust—because it comes to this Court with unclean hands.  Lastly, no resulting trust exists between Infinity and Tecumseh based on the evidence currently before this Court, as well as this Court's previous findings.  At a

---

[120] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as Exhibits 28, 31, and 33, respectively.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

minimum, genuine issues of material fact exist regarding the resulting trust issue and as such, summary judgment cannot be granted.

**B.    It Was Infinity, Not Tecumseh, that Purchased and Funded the Direct Purchase Receivables.**

Despite Tecumseh's unsupported assertions to the contrary, it was Infinity that purchased or funded all Tecumseh Receivables, including the Direct Purchase Receivables, not Tecumseh. Consequently, HASelect's perfected security interest attached to all Tecumseh Receivables. The fact that Tecumseh provided funds to Infinity is irrelevant as the use of such funds granted Tecumseh nothing more than an unperfected security interest in the disputed Tecumseh Receivables.

All Tecumseh Receivables were purchased or funded by Infinity pursuant to written contracts between Infinity and medical service providers, which in most cases existed prior to the execution of the Sub-Advisory Agreement and in all cases govern Infinity's rights in the Tecumseh Receivables. Infinity's rights under such contracts are included in HASelect's Collateral and subject to HASelect's perfected security interest.[121]  Tecumseh is not a party to and holds no rights under any such contract.[122]  Tecumseh further admits it never communicated or entered into any contractual relationship with any medical provide whose services gave rise to any Tecumseh Receivable or any personal injury claimant or attorney obligated as to payment of any Tecumseh Receivable and received no assignment of any lien from any such claimant or attorney.[123]

Except with respect to those Tecumseh Receivables for which Debtor and Tecumseh entered into an Assignment and Bill of Sale, which this Court has already awarded to HASelect[124], not a single document exists to evidence the sale or assignment of any account receivable to Tecumseh by Infinity, any medical provider, or any other person.[125]  The lack of any document supporting

---

[121] *See* MLA, § 4.1.

[122] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, response to request no. 95.  *See also* Tecumseh's responses to interrogatories submitted herewith as Exhibit 27, p. 9, response to interrogatory no. 3.

[123] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to request nos. 94 and 96-99.

[124] *See* ECF No. 88.

[125] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to request nos. 94-99.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  Tecumeh's claim to have purchased the Direct Purchase Receivables directly from medical providers

2  is entirely consistent with Tecumseh's lack of involvement in the actual process by which Infinity

3  purchased and funded the Direct Purchase Receivables.

4          Further, Tecumseh has failed to establish that any particular Direct Purchase Receivable (let

5  alone all Direct Purchase Receivables) was purchased or funded by Infinity using funds received

6  from Tecumseh's investors.  In fact, the statements on which the Motion relies to claim sole

7  ownership over the Direct Purchase Receivables are clearly untrue.[126]  For example, the Motion

8  claims that "all dollars collected on the [Direct Purchase Receivables] were paid directly to

9  Tecumseh…."[127]  However, as shown by the checks included herewith, all of the checks were made

10  out and paid to Infinity, not Tecumseh.[128]  Further, the Motion is entirely incorrect in claiming that

11  all of the funds in the BOA Account belonged to Tecumseh and nothing flowed through any of

12  Infinity's bank accounts.[129]  As shown above, commingled funds from Infinity's Operating Account

13  were routinely transferred to the BOA Account.  Moreover, as much as $500,000 in proceeds of

14  HASelect's collateral were deposited to the BOA Account.[130]  Such proceeds remained subject to

15  HASelect's perfected security interest under the MLA and clearly did not belong to Tecumseh.[131]

16  Those proceeds were then used by Infinity to purchase and fund additional Direct Purchase

17  Receivables.  The Motion makes no attempt whatsoever to address these facts.  Instead, Tecumseh

18  simply redacts these deposits from the BOA Account statements on which the Motion is based.

19          As the moving party, it is Tecumseh that bears the burden of proof.  Tecumseh has plainly

20  failed to meet that burden here.  As such, the Motion must be denied.  At a minimum, the documents

21  and evidence submitted herewith directly contradict the evidence contained in the motion show that

22

23  [126] Tecumseh also relies heavily on 'Reports' that it provided to its investors to substantiate its ownership in the

24  accounts receivable at issue in this adversary. However, as the Court recently ruled, these self-serving statements made by Tecumseh to its investors are patently false.

   [127] Motion, 11:18-20.

25  [128] *See* Checks attached hereto as <u>Exhibit 36</u>.

26  [129] Motion, 12:1-4.

27  [130] *Compare* Operating Account bank statements, submitted herewith as <u>Exhibit 22</u>, *with* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *and* Tecumseh's Spreadsheet, submitted herewith as <u>Exhibit 24</u>.

28  [131] *See* MLA, § 4.1.  *See also* NRS 104.9315; 810 ILCS 5/9-315.

there is a genuine issue of material fact regarding Infinity's ownership over the Direct Purchase Receivables.

## C. No Resulting Trust Exists Over the Direct Purchase Receivables.

As Tecumseh is well aware, it come forward with clear and convincing evidence showing that not only it provided the funds on the date of purchase of the Direct Purchase Receivables, but also that it and Infinity had the intent to create such a resulting trust relationship. *See, e.g.*, *Anderson v. Monroe (In re Hester)*, No. 18-03903, 2019 Bankr. LEXIS 2371, *8 (D.S.C. Bankr. July 26, 2019); *see also Glover v. Glover*, 234 S.E.2d 477 (S.C. 1977) ("In order to establish a resulting trust [under South Carolina law], it was necessary that respondent show by ***definite, clear, unequivocal, and convincing evidence*** that she paid…the purchase money at the time of the transaction.") (emphasis supplied); Restatement (Third) of Trusts, § 9, Comment f(1) ("[T]he party alleging the purchase-money resulting trust has the burden of proving by clear and convincing evidence that the claimant…paid or furnished the purchase price…thereof."). "If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails." *In re Peregrine Fin. Grp., Inc.*, 2014 Bankr. LEXIS 2328 at *9. Here, Tecumseh cannot establish either that it paid for the Direct Purchase Receivables or that Tecumseh and Infinity intended to create a resulting trust. As such, the Motion must fail.

### 1. Tecumseh Cannot Establish that Its Funds Were Used by Infinity to Purchase or Fund the Direct Purchase Receivables.

Tecumseh's argument for the rarely granted remedy of a resulting trust must fail because the Direct Purchase Receivables were purchased with commingled funds received from HASelect and Tecumseh and with proceeds of HASelect's Collateral. Funds from Infinity's Operating Account, which included both Loan proceeds advanced by HASelect and proceeds collection on Tecumseh Receivables in which HASelect holds a superior perfected security interest, were plainly transferred to the BOA Account.[132] For example, on June 8, 2020 and June 16, 2020, Infinity transferred $244,000 and $200,000, respectively, from the 8480 Account to its Operating Account.[133] Such

---

[132] *Compare* Operating Account bank statement, submitted herewith as Exhibit 22, *with* BOA Account bank statement, submitted herewith as Exhibit 23.

[133] *Compare* 8480 Account bank statements, submitted herewith as Exhibit 11, *with* Operating Account bank

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

funds were clearly Loan proceeds advanced to Infinity by HASelect as Tecumseh did not wire any funds to the 8480 Account until June 26, 2020.[134]  Infinity thereafter used such funds to finance is business operations under its new funding arrangement with Tecumseh, which did not provide sufficient cash flow to support Infinity business operations, if at all, until several months later, and to purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh as Tecumseh Receivables.

Additionally, collections from the Tecumseh Receivables, which were made payable and delivered to Infinity, were often deposited to Infinity's Operating Account and later transferred to the BOA Account as outlined above.  Even where such collections were deposited directly to the BOA Account, such collections were proceeds of HASelect's Collateral and remained subject to HASelect's perfected security interest under the MLA as discussed above.  This Court has already determined that HASelect holds superior interests in the 1-A through 1-E, 1-G, and 1-H Accounts, and that no resulting trust existed with respect to these account batches.[135]  The BOA Account and Tecumseh's own records reflect that proceeds of HASelect's Collateral were regularly deposited to the BOA Account and later used to purchase additional Direct Purchase Receivables.[136]

Tecumseh has made no effort to trace to the source any of the funds deposited in the BOA Account or how such funds were used by Infinity in purchasing and funding the Direct Purchase Receivables as is required of a party seeking to impose a resulting trust.  *See Old Republic Nat'l title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) ("[A] party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust."); *Hatoff v. Lemons & Assocs., Inc.*, 67 B.R. 198, 213 (Bankr. D. Nev. 1986) ("A party who wishes to exempt trust property from the estate must not only prove the existence of a trust relationship but must also specifically identify the trust property in either its original or substituted form.").

---

statements, submitted herewith as <u>Exhibit 22</u>.

[134] *Compare* 8480 Account bank statements, submitted herewith as <u>Exhibit 11</u>, *with* Operating Account bank statements, submitted herewith as <u>Exhibit 22</u>.

[135] See ECF Nos. 84 and 88.  Priority rights over the 1-F, 1-I, and 1-J Accounts remain unresolved.

[136] *See* ¶¶ 36-46 above.

Tecumseh has not and cannot trace the use of any funds deposited to the BOA Account by Infinity.[137]

As the moving party, it is Tecumseh that bears the burden of proof. Tecumseh has plainly failed to meet that burden here. As such, the Motion must be denied. At a minimum, as a genuine issue of material fact exists regarding the sources and uses of the funds used by Infinity to purchase or fund the Direct Purchase Receivables.

### 2. There Was No Intent to Create a Resulting Trust.

In an interesting departure from its prior arguments in this matter, Tecumseh's primary argument under the Motion is that there was no trust relationship between it and Infinity (and therefore no intent to create any trust relationship) because Tecumseh purchased the Direct Purchase Receivables in its own name directly from the medical providers. As shown above, Tecumseh is plainly wrong in claiming to have been a party to any transaction of any kind with any of the medical providers at issue. However, by arguing that Infinity never took ownership of the Direct Purchase Receivables, Tecumseh completely undercuts any argument either it or Infinity intended to create a resulting trust.

Moreover, the Court has already entertained Tecumseh's arguments for a resulting trust and found them wanting.[138] There is no reference to any trust relationship between Tecumseh and Infinity in the Sub-Advisory Agreement or any other document before this Court.[139] The failure to include such language by sophisticated commercial parties should be fatal. *In re Landamerica Fin. Grp., Inc.*, No. 08-35994, 2009 Bankr. LEXIS 4133, *44 (E.D. Va. May 7, 2009). Infinity's bankruptcy schedules make no mention whatsoever of any account receivable it held in trust for Tecumseh or to which it held only bare legal title.[140] Likewise, in filing its motions in Infinity's chapter 7 case to reject the Sub-Advisory Agreement and to compel the Trustee to abandon the estate's interests in the Disputed Accounts, Tecumseh make no mention whatsoever of any account

---

[137] Tecumseh similarly cannot attempt to trace funds in its reply brief because to do so would be against binding case law. *See, e.g.*, *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) ("[W]e do not consider issues raised for the first time in reply briefs.").

[138] *See* ECF Nos. 84 and 88.

[139] *See* Exhibit B attached to the Motion.

[140] *See* Bankruptcy Case No. 21-14486-abl, ECF No. 112.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    receivable held in trust by Infinity or to which Infinity held only bare legal title.[141]

2        The commingling addressed above further shows that there was no intent to create a resulting

3    trust.  *See Obuchowski v. Entis (In re Robert)*, No. 05-12461, 2007 Bankr. LEXIS 2852, *33 (Vt.

4    Bankr. Aug. 17, 2007) (finding that as a matter of law, there was no intent to create a resulting trust

5    when the operative agreement contained no provision that the funds provided to debtor would be

6    held in trust or kept separate from debtor's assets).  Moreover, none of the various contacts between

7    Infinity and the medical providers whose services gave rise to the Direct Purchased Receivables to

8    which Tecumseh admits it was not a party made any reference whatsoever to Tecumseh or any trust

9    in its favor.[142]  Rather, the majority of those contracts expressly precluded Infinity from assigning

10   its interests to any other person with the medical providers prior written consent.[143]

11       Additionally, Tecumseh has admitted through the amended declaration of Chad Meyer filed

12   in Infinity's chapter 7 case on March 22, 2022 that it purchased a significant portion of what it now

13   claims to be the Direct Purchase Receivables from Infinity – specifically, accounts receivable with

14   a face value of $64,621.43 identified in "Exhibit D-10" thereto and accounts receivable with a face

15   value of $584,935.85 identified in "Exhibit D-11" thereto.[144]  Clearly, there can be no resulting trust

16   where Tecumseh admits it purchased so-called Direct Purchase Receivables directly from Infinity.

17       Finally, as the Court has already found, the initial series of transactions under the Sub-

18   Advisory Agreement were clearly not intended to create a resulting trust relationship.  Rather, those

19   consisted of Tecumseh purchasing accounts receivable from Infinity after Infinity had already paid

20   for and acquired the same.[145]  The Sub-Advisory Agreement was never amended to address any

21   change in the nature of the parties' relationship.  Thus, the original actions of the parties show that

22   there was no intent to create a resulting trust or trust relationship.  Tecumseh has plainly failed to

23   ────────────────

24   [141] *See* Bankruptcy Case No. 21-14486-abl, ECF Nos. 57 and 61.

[142] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as
25   Exhibits 28, 31, and 33, respectively.

[143] *Id.*

26   [144] *See* Bankruptcy Case No. 21-14486-abl, ECF Nos. 200, 201-13, and 201-14 ("[Tecumseh] purchased the remaining
27   Tecumseh Receivables from the Debtor. Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase
     of Tecumseh Receivables from the Debtor.").

28   [145] *See* ECF Nos. 84 and 88.

establish by clear and convincing evidence that any resulting trust was intended under the Sub-Advisory Agreement.  Moreover, Tecumseh has certainly not met its burden of proof in seeking summary judgment.  *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F.Supp.2d 1013, 1020 (D. Nev. 2009) ("[t]he parties' intentions regarding a contractual provision present a question of fact."). Accordingly, Summary judgment cannot be granted in Tecumseh's favor.

3.    **The Nature of Infinity's Transactions with Medical Providers Precludes Any Finding of a Resulting Trust Over the Majority of the Direct Purchase Receivables.**

It is beyond reasonable dispute that a transfer of title through a purchase must occur in order to support the remedy of a resulting trust.  Where there is no purchase, there can be no resulting trust.  The purchase requirement is referenced in both the cases cited herein and in Tecumseh's Motion.  *See, e.g.*, *In re Hester*, 2019 Bankr. LEXIS at * 8 (referencing a "date of purchase"); Restatement (Third) of Trusts § 9 (discussing a "purchase price" being paid); *In re Macdonald*, 622 B.R. 837, 856 (Bankr. D.S.C. 2020) (stating that the actual intention of the parties ***at the time of purchase*** is the critical determination) (emphasis supplied). Unless a purchase results in an actual transfer of title, no resulting trust can arise. *See In re Welch*, No. 12-05082-8, 2012 Bankr. LEXIS 4747, *12-14 (Bankr. E.D.N.C. Oct. 10, 2012). In *In re Welch*, the court acknowledged that where legal title has not changed hand, no resulting trust can arise. *Id.* (collecting cases where a resulting trust cannot arise because no legal title was transferred).  Here, the nature of the transactions with the medical providers associated with the majority of the Direct Purchase Receivables were not outright purchases of these accounts receivable.  Rather, these transactions were effectively made by Infinity loans to these medical providers.[146]

To determine the nature of a transaction, courts look to the "substance of the relationship" and "not simply the label attached to the transaction." *S&H Packing & Sales Co. v. Tanimura Distrib.*, 883 F.3d 797, 804-08 (9th Cir. 2018). One of the largest factors in determining whether a transaction constitutes a loan or a sale of an account receivable turns on who bears the risk of nonpayment.  *See id.* (stating that the root of the factors turns on the transfer of risk).  Other factors

---

[146] A right to repayment is a general intangible, which is expressly covered by HASelect's perfected security interest. *See* MLA, § 4.1.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

include whether the buyer has a right of recourse against the seller, whether the seller continues to service and collect the accounts, whether there was an independent investigation by the buyer of the account debtor, whether the seller has the right to excess collections, and whether the seller has the absolute power to alter the terms of the underlying asset. *CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 812-13 (Bankr. D. Mont. 2021). All such factors support a finding that the transactions between Infinity and Stat Diagnostics, Preva, and Viking were loans, not purchases of accounts receivable.

As set forth in paragraphs 47 through 58 above, approximately 63% of Direct Purchase Receivables were funded by Infinity under its contracts with just three medical providers – Stat Diagnostics, Preva, and Viking. Notwithstanding the fact that each of those contracts was designated a "purchase and sale agreement", the terms of those contracts undoubtedly reflect loan transactions, not sales of accounts receivable. The rights to settle, compromise, and collect the accounts receivable, the potential benefits of collection above the amounts owed to Infinity and, in most cases, the risk of loss stayed with the medical providers.[147]

Moreover, the contracts require that the medical providers deposit collected in an account held in the medical provider's name for which Infinity has "read only access,"[148] similar to Infinity's obligation to do the same for HASelect under the MLA. Thus, the fact that the medical providers continue to service the accounts post-funding by Infinity shows that the relationship with these medical providers is more akin to a loan, not a purchase. Further, the medical providers continued to have the exclusive right to service the accounts receivable as Infinity was not allowed to directly contact an attorney of an individual associated with an account receivable held by these medical providers.[149] If Infinity indeed purchased these accounts receivable from the medical providers, then Infinity would be free to contact the relevant individuals regarding repayment and collection on these accounts. In the event of any default by the medical provider, Infinity was required to give notice

---

[147] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as Exhibits 28, 31, and 33, respectively.

[148] *Id.*

[149] *See* Stat Diagnostics Contract, ¶ 12(c), submitted herewith as Exhibit 28; *see also* Preva Contract, ¶ 11(c), submitted herewith as Exhibit 31; Viking Contract, ¶ 10(c), submitted herewith as Exhibit 34.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

and an opportunity to cure, which would not be required in an actual sale of an account receivable.[150]
As there was no purchase of the Direct Purchase Receivables funded by Infinity through these three
medical providers, a resulting trust relationship is precluded as a matter of law. *See In re Welch*,
2012 Bankr. LEXIS 4747 at *12-14.

### 4.    Tecumseh's Unclean Hands Precludes It from Establishing a Resulting Trust.

Although the foregoing establishes that no resulting trust exists over the Direct Purchase
Receivables, Tecumseh would be unable to obtain such a remedy based on its own inequitable
conduct.[151] "The unclean hands doctrine generally 'bars a party from receiving equitable relief
because of that party's own inequitable conduct.'" *Las Vegas Fetish & Fantasy Halloween Ball,
Inc. v. Ahern Rentals, Inc.*, 124 Nev. 272, 182 P.3d 764 (2008) (quoting *Food Lion, Inc. v. S.L.
Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000)). "The imposition of a resulting trust
is an equitable remedy." *In re Foam Systems Co.*, 92 B.R. 406, 409 (9th Cir. 1988). If a party seeking
an equitable remedy comes to court with unclean hands, the court will not aid the party who engaged
in inequitable conduct but rather "will leave them where it finds them." *See, e.g.*, *Goldman v.
Dardashti (In re Melamed)*, 634 B.R. 361, 372 (C.D. Cal. 2021).

Here, Tecumseh has unclean hands with respect to the Direct Purchase Receivables as a result
of its wrongful conduct described herein with respect to both the administration of the MLA and the
solicitation of Infinity to terminate its relationship with HASelect in favor of a new funding
arrangement with Tecumseh. Two of Tecumseh's principals, Meyer and Clark, are former
employees of GAM that used confidential and proprietary knowledge they gained through their
employment with GAM both in soliciting Infinity and in soliciting investors to whom they were
introduced through GAM to fund Tecumseh. Moreover, Clark was directly and materially involved
in the origination and administration of HASelect's Loan to Infinity and reportedly knew of
Infinity's habitual misconduct in overstating the cost and value of accounts receivable presented to

---

[150] *See* Stat Diagnostics Contract, ¶ 14(a), submitted herewith as <u>Exhibit 28</u>; *see also* Preva Contract, ¶ 13(a), submitted herewith as <u>Exhibit 31</u>; Viking Contract, ¶ 12(a), submitted herewith as <u>Exhibit 34</u>.

[151] This was asserted as an affirmative defense to Tecumseh's claims for a resulting trust. *See* ECF No. 25.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1   HASelect for financing through draw requests and the resulting misappropriation of Loan proceeds
2   by Infinity but took no action to protect HASelect's from such misconduct.  Likewise, the principals
3   of FTM Limited, Dobozy and Dalzell, were clearly complicit in such misrepresentations and
4   personally benefited from Infinity's misappropriation of loan proceeds through Infinity's use of such
5   proceeds to pay amounts owed under the Coastal notes.

6           Despite Meyer and Clark's knowledge that HASelect's Collateral included all of Infinity's
7   accounts receivable, they still solicited Infinity to sell Tecumseh millions of dollars of such accounts
8   receivable, which further harmed HASelect by reducing the Collateral available to satisfy the
9   indebtedness owed under the MLA.  Tecumseh further conspired with Infinity to continue to profit
10  from their business relationship by transferring Infinity's business records and intangible assets to
11  Infinity Health Solutions, LLC through which Infinity's principals continued to service and collect
12  the disputed Tecumseh Receivables and to acquire new accounts receivable for Tecumseh after
13  Infinity's bankruptcy filing just as Infinity had done previously.  Such conduct plainly evidences a
14  fraudulent intent to assist Infinity in attempting to avoid repayment of its obligations to HASelect
15  by stripping Infinity of its assets and transferring the same to Infinity Health Solutions where such
16  assets could continue to be used for Tecumseh's benefit.   As such, there is a question of fact as to
17  whether a resulting trust is precluded by the fraudulent actions of Tecumseh and Infinity.[152]

18          Finally, there is clear evidence Tecumseh intended to harm HASelect through its collusion
19  with FTM and Infinity to persuade Three Bell Capital to demand a redemption of its investment in
20  HASelect, which they believed would force the liquidation of HASelect and create an opportunity
21  for Tecumseh to acquire all remaining Infinity accounts receivable included in HASelect's
22  Collateral.  This Court should not sanction or reward Tecumseh's wrongful conduct but should leave
23  Tecumseh as it found it – without the extreme and undeserved equitable remedy of a resulting trust.
24  Because the "application of the unclean hands doctrine raises primarily a question of fact," the
25  Motion must be denied. *See, e.g.*, *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173
26  (9th Cir. 1989).

27

28  [152] *See* Motion, 18:5-16.

**D.    The Motion Must be Denied to Allow HASelect to Conduct Further Discovery under FRCP 56(d).**

Although the foregoing is sufficient to deny the Motion, in the event that the Court is inclined to grant the Motion, HASelect requests that it be allowed to conduct discovery pursuant to FRCP 56(d), incorporated herein by Bankruptcy Rule 7056.  FRCP 56(d) allows a party, through affidavit or declaration, to request more time to marshal necessary facts and provide the reasons for the additional discovery time.  Here, as set forth by the declaration of Bart K. Larsen, Esq. submitted herewith, HASelect requests additional time to, among other things, fully investigate and determine what payments applied to what receivables, review the binders that are referenced in the Motion to be submitted to the Court under seal, depose Infinity and Tecumseh's FRCP 30(b)(6) designees to determine the intent of the parties and all discussions regarding any trust relationship.  These areas of discovery are directly material to the issues of fact raised in the Motion.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, HASelect respectfully requests that the Court deny Tecumseh's Motion in its entirety.

Dated this 30th day of September 2022.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
BART K. LARSEN, ESQ.
Nevada Bar No. 8538
KYLE M. WYANT, ESQ.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivable*
*Litigation Finance Fund International SP*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## CERTIFICATE OF SERVICE

1.    On September 30, 2022, I served the following document(s): **PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH-INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES**.

2.    I served the above document(s) by the following means to the persons as listed below:

☒    a.    ECF System:

CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ggordon@gtg.legal, bknotices@gtg.legal

MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐      f.      By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2022.

By: /s/ *Bart K. Larsen, Esq.*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432