# **EXHIBIT 6**

**Timeline and Background on Tecumseh-Infinity**

The following is a brief timeline and an introduction to the players.

1. Infinity used private direct investors for about the first ten years of operation and the operation volume of funding medical receivables was small.

2. In 2000 Infinity started to work with FTM, an international fund that signed on investors. FTM was holding the investor funds and transferred those funds into a Cook Islands company called Coastal Investments Plc, owned by Infinity and Anne Pantelas but managed by Southpac, a trust company.

3. Coastal Investments transferred the funds that it received from FTM to Infinity and issued promissory notes to FTM on one side and Infinity issued promissory notes to Coastal on the other side. Infinity then invested those funds into medical receivables.

4. FTM was not able to keep up with Infinity's growth and the funding structure caused other issues.

5. Nevertheless, Infinity's principals have a good relationship with the FTM fund managers, an Australian living in Hungary (Endre Dobozy) and a Canadian living in Vanuatu (William Dalzell).

6. In early 2017 Infinity entered a loan agreement with Law Finance Group, based in New York to get funding for the receivables business, which ran for two years until the end of 2018. Infinity's funding interests shifted to include other states, which became a problem for Law Finance Group and in addition more funding was needed. FTM came back into the picture in finding a solution to secure funding for Infinity.

7. This time FTM introduced Infinity to the principals of Griffin Asset Management – Michael Griffin (CEO), Simon Clark (President), and Chad Meyer to start HedgeAct a Cayman Island based Hedge Fund, which went live in February of 2019.

8. One of GAM's requirements was that all LFG receivables have to be bought by HedgeAct, which removed all long-term profits for Infinity for that deal. FTM was the subadvisor to HedgeAct and had certain duties regarding verifying the receivables batches funded by HedgeAct and FTM was also charged with reporting duties to the HedgeAct fund administrator called NAV.

9. During our funding period, HedgeAct fired Chad Meyer and then Simon Clark left in January 2020 and others, as well, which were the main contacts that Infinity had with HedgeAct.

10. They also never compensated FTM or its principles for their work as subadvisors to the fund (that's what we have been told by the FTM principles) who then started removing themselves as subadvisors to HedgeAct in June 2020.

11. All separations mentioned above involved legal battles. In a December 2019 meeting with Michael Griffin, his wife Debbie and Simon Clark and his wife, a question was raised if we needed more funding for growth and if a domestic fund should begin funding.

12. At the time we had just signed a contract renewal with HedgeAct that superseded all prior funding agreements with HedgeAct with a new funding ceiling of $30M of which we had used about $10M at the time.

13. We did not expect that we would need a domestic fund for at least another year before we used all $30M of the offshore fund. Nevertheless, HedgeAct setup the domestic fund by February 2020 and wanted us to sign the new agreement, move funds from the offshore fund into the domestic fund and in the process cut out FTM, whose role was related only to the offshore fund and not the domestic fund.

14. Infinity's interest was focusing on a better deal with HedgeAct and Infinity took some time to think about how to proceed and how we envisioned moving forward with HedgeAct. With the COVID-19 crisis starting in March things got further delayed.

15. Another concern was that the President of HedgeAct left the company in January 2020 due to ethical concerns with GAM and how the fund (HedgeAct) was managed.

16. In February of 2020, Chad Meyer (a prior GAM executive), and Mike Belotz (Hedge Fund expert for many years) set out to create a fund based on some early ideas from FTM also looking into funding medical receivables. Their proposal to Infinity was to hire Infinity as subadvisor to secure medical receivables for them rather than lending money to Infinity. In this structure the Fund (Tecumseh-Infinity) would hold the receivables and not Infinity.

17. Being a subadvisor would also not violate the stringent funding requirements by HedgeAct meaning that Infinity was not allowed to increase their existing debt by accepting a different fund as source of new loans.

18. On May 25, 2020 we sent an email to GAM explaining our position and suggesting to renegotiate the new domestic contract for continued funding with HedgeAct. That email was answered with a notice of default by GAM to Infinity on May 30, 2020 and at that time we got Larry Oldham and Brook Borg involved. It was determined after several months that the breach is immaterial and mostly due to missed deadlines of company financial/audit.

19. At this point it became clear that HedgeAct stopped funding Infinity and Infinity signed a subadvisor agreement with the Tecumseh-Infinity fund on June 18, 2020 in which Infinity would receive a service fee for work performed on behalf of the Tecumseh-Infinity fund.