GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
JARED M. SECHRIST
Nevada Bar No. 10439
E-mail: jsechrist@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116
Email: michael.napoli@akerman.com

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical
Receivable Fund, LP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re:

INFINITY CAPITAL MANAGEMENT, INC.

Debtor.

Case No.:  21-14486-abl
Chapter 7

Adversary Case No. 21-01167-abl

HASELECT-MEDICAL RECEIVABLES
LITIGATION FINANCE FUND
INTERNATIONAL SP,

Plaintiff,

v.

TECUMSEH-INFINITY MEDICAL
RECEIVABLES FUND, LP,

Defendant.

**REPLY IN SUPPORT OF
TECUMSEH-INFINITY MEDICAL
RECEIVABLE FUND, LP'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AS TO DIRECT PURCHASE
RECEIVABLES**

Hearing Date: October 25, 2022
Hearing Time: 1:00 p.m.

TECUMSEH-INFINITY MEDICAL
RECEIVABLES FUND, LP,

Counter-Claimant,

v.

66959851;1

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,

             Counter-Defendant.

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,

             Counter-Claimant

v.

TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP,

             Counter-Defendant.

Tecumseh-Infinity Medical Receivables Fund, LP ("Tecumseh"),[1] through counsel, respectfully submits this reply in support ("Reply") of its *Motion for Partial Summary Judgment as to Direct Purchase Receivables* [ECF No. 90] ("Motion") and in response to HASelect-Medical Receivables Litigation Finance Fund International SP's ("HASelect") opposition to the Motion [ECF No. 122] (the "Opposition"). This Reply is made and based on the following memorandum of points and authorities, the exhibits filed with the Motion, Opposition, and this Reply, the documents on file in the above-captioned Bankruptcy Case and Adversary Proceeding, judicial notice of which is respectfully requested, and the any argument that this Court may entertain at the hearing on the Motion.

## I.    **INTRODUCTION**

By the Motion, Tecumseh presents indisputable evidence that it directly purchased the identified receivables and, as a result, HASelect has no security interest in them. HASelect has no evidence to rebut the Motion. Instead, in the Opposition and supporting declarations, it attempts to

---

[1] Unless otherwise stated, the capitalized terms in this Reply have the same meaning as those defined in the Motion.

confuse the issues before this Court by asserting unfounded and immaterial factual allegations, including sweeping misstatements pertaining to Tecumseh and its principals. But these issues are neither genuine nor material—they do not speak to the substantive legal issues raised in the Motion—and should not prevent this Court from granting Tecumseh summary judgment.

## II.   ARGUMENT

### A.   HASELECT'S FACTUAL DISPUTES ARE IMMATERIAL TO THE DISCRETE LEGAL ISSUES TECUMSEH PRESENTS TO THIS COURT IN THE MOTION.

Tecumseh raised a narrow set of issues in the Motion: i) Did the Debtor ever have an ownership interest in the Direct Purchase Receivables (Mot. at 11); ii) alternatively, did a purchase money resulting trust arise in Tecumseh's favor with respect to the Direct Purchase Receivables at the time of their purchase (Mot. at 12); iii) whether HASelect's lien extends to the Direct Purchase Receivables (Mot. at 15); and iv) whether 11 U.S.C. § 544 can be used to make the Direct Purchase Receivables part of the bankruptcy estate (Mot. at 17). These issues are consistent with this Court's ruling on HASelect's Motion for Partial Summary Judgment ("HASelect MPSJ Order") [ECF No. 88]. *Id.* Accordingly, the questions presented in by Motion, which relate to and flow from this Court's instruction in the HASelect MPSJ Order, establish the framework for the Court to assess the materiality of issues bearing on the Motion.

Federal Rule of Civil Procedure 56(a) states a Court should grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When considering a motion for summary judgment, a Court views facts in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. FRCP 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). And, as to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.").

The Motion focuses exclusively on demonstrating that HASelect does not have and has never had any recoverable interest in the Direct Purchase Receivables. *See* Mot. at 11-19. Tecumseh provided evidence that it had a contractual relationship with the Debtor through which Tecumseh funded the acquisition of the Direct Purchase Receivables "directly from the Medical Service Provider" for its own benefit. *Id.* at 14; Ex. A (Sub-Advisory Agreement) ¶ 3(b). But in the Opposition, HASelect raises issues concerning: i) its interest in the Debtor's personal property (not the Direct Purchase Receivables) (Opp. at 5-7); ii) its relationship with FTM Limited (*id.* at 7-8); iii) FTM's relationship with the Debtor (*id.* at 8-9); Tecumseh's principal's prior relationship with HASelect (*id.* at 9-12); iv) Tecumseh and its principal's actions in cultivating its relationship with the Debtor (*id.* at 12-15); and v) Infinity's access to and use of Tecumseh's money (*id.* at 18-24). None of these issues is material to an analysis of the evidence, including the contract documents between HASelect and the Debtor on the one hand and Tecumseh and the Debtor on the other, that informs whether Tecumseh acquired the Direct Purchase Receivables free of any recoverable interest HASelect asserts. And HASelect cannot rebut and has not rebutted Tecumseh's evidence supporting the Motion.

Instead, HASelect seeks to avoid summary judgment by asserting unfounded and inadmissible factual disputes, including personal attacks on Tecumseh's principals, to suggest summary judgment is unwarranted. *See* Opp. at 27-34; Declaration of Michael Griffin [ECF No. 123] and Declaration of Bart Larsen [ECF No. 125]; *see also* Motions to Strike the Griffin and Larsen Declarations filed

4

66959851;1

concurrently with this Motion. HASelect's allegations are not sufficient to raise a fact issue even if the facts were supported and material.

It is well established that the nonmovant must provide evidence, not merely allegations and speculation. "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). As discussed in the concurrently filed Motions to Strike portions of the Griffin and Larsen declarations, HASelect offers nothing more than speculation and allegations, relying instead on its complaints in cases filed in other courts. Allegations in complaints are not evidence and are never sufficient to defeat summary judgment.

On June 6, 2020, HASelect and Griffin Asset Management, LLC ("GAM") filed a complaint (the "Meyer Complaint") in the Circuit Court of Cook County, Illinois, County Department, Chancery Division against Tecumseh, its principal, Chadwick Meyer, Alternative Investment Specialists Limited and FTM Limited (the "Meyer Action").[2] In the Meyer Complaint, HASelect asserted claims against Tecumseh (and the other defendants) arising from Tecumseh's business dealings with the Debtor. Notably, the Meyer Complaint contains allegations that: (i) HASelect and GAM owned and possessed confidential, proprietary, and trade secret information;[3] and (ii) Tecumseh, Meyer, and FTM misappropriated the confidential, proprietary and trade secret information in the manner alleged herein and used it to try to usurp Plaintiffs' existing and future business;[4] the misappropriation of HASelect's confidential, proprietary, and trade secret information by HASelect was intentional, knowing, willful, malicious, and fraudulent.[5] HASelect attempts to rely on these unproven (and false) allegations in the

---

[2] *See* Opposition, Ex. 5.

[3] Meyer Complaint, ¶ 92.

[4] Meyer Complaint, ¶ 95.

[5] Meyer Complaint, ¶ 96.

66959851;1

Opposition without providing anything more than the Meyer Complaint and speculation.[6]

On August 12, 2022, HASelect and GAM filed a complaint (the "Clark Complaint") in the United States District Court for the Northern District of Illinois against Simon Clark, another of Tecumseh's principals (the "Clark Action").[7] The Clark Action, like the Meyer Action, arises from HASelect's grievances with Clark concerning Tecumseh's formation and business dealings with the Debtor.[8] The Clark Action, which remains pending, however, consists entirely of HASelect's and GAM's unfounded and unproven allegations, as the Clark Action court has not made a single substantive ruling. Other than the Clark Complaint, HASelect provides nothing on the claims asserted in the Clark Action yet suggests in the Opposition that the allegations in the Clark Complaint should carry some sort of evidentiary weight.[9] Of course, they do not.

HASelect has not supported its factual allegations stated in the Meyer Complaint, Clark Complaint, or as discussed in the Motions to Strike, the Griffin and Larsen Declarations. Moreover, these unsupported factual claims, even if proven, are immaterial (and wrong) and should be disregarded by this Court.

### B. HASELECT IS PRECLUDED FROM ARGUING TECUMSEH DID NOT PURCHASE THE DIRECT PURCHASE RECEIVABLES.

In the Opposition, HASelect argues incorrectly the Debtor, not Tecumseh, purchased the Direct Purchase Receivables. HASelect has tried that argument before and lost; therefore, the doctrine of claim preclusion prevents HASelect from taking a second bite at that apple.

As discussed, the Meyer Complaint contains allegations that: (i) HASelect and GAM owned and possessed confidential, proprietary, and trade secret information;[10] (ii) Tecumseh, Meyer, and

---

[6] As does Clark, Meyer and Tecumseh deny the allegations in the Meyer Complaint.

[7] Opposition, Ex. 14.

[8] *See generally id.*

[9] Although it is not necessary for the Motion, Clark denies the allegations in the Clark Complaint.

[10] Meyer Complaint, ¶ 92.

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

66959851;1

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

FTM misappropriated the confidential, proprietary and trade secret information in the manner alleged herein and used it to try to usurp Plaintiffs' existing and future business;[11] the misappropriation of HASelect's confidential, proprietary, and trade secret information by HASelect was intentional, knowing, willful, malicious, and fraudulent.[12]

Based on the foregoing allegations and others in the Meyer Complaint, HASelect sought to enjoin Tecumseh from conducting business with the Debtor and damages.[13] In furtherance of that goal, HASelect sought a preliminary injunction against Tecumseh, Meyer, and FTM to "enjoin Defendants from doing business with nonparty [Infinity]."[14] "After a two-day hearing in which testimony was taken, various documents were admitted into evidence, and having heard the arguments of counsel," the Meyer Action court denied HASelect's motion for preliminary injunction issuing the following findings in its Order dated February 17, 2021:

- Defendant Meyer worked for GAM until May 2019. Subsequently, Meyer formed [Tecumseh] to purchase medical receivables in connection with personal injury cases. [Tecumseh] and Infinity entered into a sub-advisory agreement under which Infinity provides portfolio management and administrative services, including negotiating the price of receivables. [Tecumseh] purchases receivables for itself and secures a lien on proceeds from the receivable…

- As to the interference claim related to Infinity, **it seems that the Defendants structured [Tecumseh] to avoid interfering with Infinity's pre-existing contractual obligations with [HASelect]. Significantly, unlike [HASelect] which**

---

[11] Meyer Complaint, ¶ 95.

[12] Meyer Complaint, ¶ 96.

[13] Meyer Complaint, pp. 19-20

[14] **Exhibit J** (Court Order dated February 17, 2021).

7

66959851;1

**loans money to Infinity to purchase the medical receivables, [Tecumseh] is not a lender.**

*Id.* at 2- 3 (emphasis added). Without any evidence that Tecumseh's business dealings wrongfully interfered with HASelect's, the Meyer Action court denied the preliminary injunction. And having failed to obtain that remedy, HASelect subsequently dismissed the Meyer Action without appeal.[15]

HASelect filed its Complaint in this Adversary Proceeding on October 19, 2021, and its Amended First Amended Complaint ("AFAC") [ECF No. 24] in this Adversary Proceeding, the presently operative Complaint, on December 13, 2021.[16] Like the Meyer Complaint, the AFAC includes claims against Tecumseh for declaratory relief, injunctive relief, and damages arising from Tecumseh's business dealings with the Debtor.[17] In its Opposition, HASelect raises (quite blatantly) the very claims it has lost.

The three elements essential to establish claim preclusion are: (1) the identities of the parties are the same as a prior litigation; (2) the subject matter is the same as the prior litigation, and (3) there was a prior adjudication of the issue by a court of competent jurisdiction. *Garris v. S.C. Reinsurance Facility*, 333 S. C. 432, 511 S.E.2d 48, 57 (1998); *Johnson v. Greenwood Mills, Inc.*, 317 S. C. 248, 452 S.E.2d 832, 833 (1994); *Pye v. Aycock*, 325 S. C. 426, 480 S.E 2d 455, 458 (Ct. App. 1997). If these conditions are met, a litigant is barred from raising any of the issues which were raised in the prior action as well as any issues which might have been raised then. *Garris*, 511 S.E.2d at 57, *Hilton Head Center of South Carolina, Inc. v Public Service Comm'n*, 294 S.C. 9, 362 S.E.2d 176, 177 (1987).

Here, the parties and issues are the same as in the Meyer Action—with HASelect on the one

---

[15] *See* **Exhibit K** (docket sheet for the Meyer Action demonstrating the case was dismissed).

[16] ECF Nos. 1 and 24

[17] *See generally* AFAC.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

side and Tecumseh on the other. *See also Pye*, 480 S.E.2d at 458 (stating it is well settled that the doctrine of claim preclusion has been extended to include privies of the parties to the prior litigation). Without question, the subject matter—HASelect's grievances concerning Tecumseh's business transactions with the Debtor and rights to the identified medical receivables—is the same as in the Meyer Action. *See Murphy v. Owens-Corning Fiberglass Corp.*, 356 S.C. 592, 590 S E.2d 479, 481 (2003) (The "subject of the action" is "the matter or thing, differing both from the wrong and the relief, in regard to which the controversy has arisen, concerning which the wrong has been done; and **this is, ordinarily the property, or the contract and its subject matter, or the thing involved in the dispute**." (emphasis added)).

There was a prior adjudication of the subject matter by a court of competent jurisdiction. As set forth above, Judge Mitchell of the Circuit Court of Cook County, Illinois has already heard two days of testimony and considered the parties' evidence on HASelect's claims against Tecumseh, including whether Tecumseh was a lender or a purchaser of medical receivables, holding Tecumseh was a purchaser.

In the Opposition, however, HASelect avoids directly rebutting Tecumseh's evidence (because it cannot), and instead seeks to convince this Court that unsupported and irrelevant statements in the Larsen and Griffin Declarations create genuine issues of fact.[18] But, just as Judge Mitchell determined, this is a business dispute that should be decided by applying law to evidence—i.e. identifiable business records and contracts—not unsubstantiated mud-slinging.[19] To have this Court revisit the personal attacks and arguments Judge Mitchell found unnecessary[20] undermines the integrity of the ruling of

[18] Tecumseh has filed Motions to Strike the Griffin and Larsen Declarations concurrently herewith. For the sake of efficiency, Tecumseh references the arguments made in those Motions here only as necessary to demonstrate HASelect's efforts to confuse the issues before this Court.

[19] *See* Ex. J (PI Order) at 3.

[20] *Id.* (ruling based on contract documents).

9

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

66959851;1

the Cook County Circuit Court, unfairly subjects Tecumseh to the possibility of inconsistent results, and unjustly provides HASelect with another opportunity to drag this litigation out. Accordingly, this Court should give effect to Judge Mitchell's ruling and not consider any arguments raised by HASelect that the alleged, but unsupported, actions of Tecumseh or its principals somehow demonstrate Tecumseh does not own the Direct Purchase Receivables.

### C. THE DEBTOR DOES NOT POSSESS AN OWNERSHIP INTEREST IN THE DIRECT PURCHASE RECEIVABLES.

Notwithstanding HASelect's unsupportable allegations, the Debtor has never claimed an ownership interest in the 4,190 receivables with a face amount of approximately $19,846,621.37 purchased by Tecumseh from and after October 29, 2020 (the Direct Purchase Receivables). To the contrary, the Debtor's principal, Mr. Hemmer, testified the purpose of the Sub-Advisory Agreement was to facilitate a sale of the receivables directly between the medical service providers and Tecumseh.[21] The Debtor was not to acquire an interest in the receivables or to be part of the chain of title.[22] And, in fact, did not do so. Indeed, as detailed in the Motion and (below) in this Reply, the Direct Purchase Receivables were paid for with transfers of purchase money directly from Tecumseh's Bank of America account ending in 8995 (the "<u>BofA Account</u>") to the respective medical providers, and neither the Debtor nor HASelect possess **any** ownership interest (secured or otherwise) in the BofA Account. HASelect has presented no competent rebuttal evidence, as none exists.

### 1. Infinity Unquestionably Used Tecumseh's Funds to Purchase or Fund the Acquisition of the Direct Purchase Receivables.

Tecumseh has established as a matter of law that it paid for the Direct Purchase Receivables—the only receivables contemplated by this Motion. Mike Belotz painstakingly tied each purchase to a check or wire transfer from Tecumseh's BofA Account payable to the selling medical service

---

[21] Hemmer Dep. Vol. II at 185:15-20. See Ex. L for excerpts from Volume I and Volume II of Hemmer's Rule 2004 testimony.

[22] *Id*. at 186:3-8.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

provider.[23] HASelect does not and cannot effectively challenge Belotz's careful accounting.

An example of this accounting is the purchase of four receivables from South Atlanta MUA Center on or about October 29, 2020 shown on Exhibit F at page 2.  According to the Debtor's Spreadsheets,[24] Tecumseh purchased four receivables (BillID Nos. 27183, 27278, 27292, 27293) with a total face amount of $115,108.00 from South Atlanta MUA Center. The Debtor recorded a BillCost for the four receivables of $34,532.40. The BillCost is comprised of the amount that Tecumseh paid South Atlanta MUA Center and the fee paid to the Debtor. Belotz testified that he reduced the BillCost by the 20% fee ($5,755.40) to obtain the actual amount that Tecumseh paid to South Atlanta MUA Center ($28,777.00). He then identified a wire transfer (No. 301693158) paid in that amount on October 29, 2020 to South Atlanta MUA Center in the BofA Account Statements.[25] He performed the same accounting for all 4,190 Direct Purchase Receivables that are the subject of this Motion.

Unable to contest the direct evidence of Tecumseh's banking records, HASelect argues: i) the BofA Account belonged to Debtor and not to Tecumseh; and ii) the proceeds of receivables that it has a claim on were comingled in the BofA Account preventing Tecumseh from establishing that its funds were used to purchase the Direct Purchase Receivables. Neither argument has merit.

### a.    Tecumseh Owned the BofA Account.

The evidence conclusively establishes that Tecumseh owned the BofA account and all of the funds within it. As the account statements and checks show, the BofA Account was titled in the name of "Tecumseh-Infinity Medical Receivables Fund, LP," Tecumseh's legal name.[26] Oliver Hemmer,

---

[23] *See* Reconciliation, attached as **Exhibit F** to Tecumseh's Statement of Undisputed Facts [ECF No. 92]; Declaration of Michael Belotz ("Belotz Decl.") [ECF No. 91] at ¶¶ 15-18.

[24] Two spreadsheets provided by the Debtor -- TIFDumpWithIncomeFinal.xlsx and ESDVerifiedHASOverlapDumpWithIncome.xlsx (collectively "the Debtor's Spreadsheets"); see also Belotz Decl. at ¶ 15.

[25] Belotz Decl. at ¶ 17 and Reconciliation.

[26] Composite Exhibit G. In response to HASelect's complaints, Tecumseh has attached to this Reply at **Exhibit M** copies of the BofA Account statements from July 2020 (the date the account opened) through September 2021 (including the Petition Date) with substantially fewer redactions. For privacy reasons, Tecumseh continues to redact the account number

66959851;1

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Debtor's principal and Mike Belotz, Tecumseh's principal, both testified that the BofA Account, as well as all of the funds within it, belonged to Tecumseh.[27] Hemmer specifically testified that "Infinity had no interest in any of the funds in Tecumseh's BofA account."[28] Belotz also testified that the funds in the BofA account came from Tecumseh's investors.[29] Notably, the Debtor did not include the BofA Account on its Schedules.[30] There is no evidence to support any conclusion other than that the BofA Account and all of the funds within it belong to Tecumseh.[31]

Nor did Infinity have control over the BofA Account as HASelect suggests. While the Debtor's principals had the ability to sign checks, they did so as agents of Tecumseh and were allowed to do so only for Tecumseh's business.[32] Moreover, Debtor's signatures had to be countersigned by a representative of Tecumseh.[33] The checks drawn on the BofA Account attached in Composite Exhibit G show the signatures of both Tecumseh and Debtor's principals.

### b.    Tecumseh's Funds in the BofA Account Are Identifiable.

HASelect's commingling argument fares no better. The funds in the BofA Account are Tecumseh's funds. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir. 1996) (holding that deposits in an account belong to the entity in whose name the

---

and any patient names appearing on the statements. As **Composite Exhibit G** includes checks that cleared in October 2020 and after, Tecumseh has not included those checks in Exhibit M. Copies of the Northbrook Account statements reflecting Tecumseh investor funds are attached as **Exhibit N**.[26]

[27] *See* Belotz Decl. at ¶ 11; Hemmer Dep. Vol. II at 188:25-189:15.

[28] Hemmer Dep. Vol. II. at 189:13-14.

[29] Belotz Decl. at ¶ 11; Belotz Supp. Decl. at ¶¶ 9, 12-13.

[30] *See* Debtor's Schedules [Main Case, ECF No. 47].

[31] HASelect makes much of the Debtor allowing Tecumseh to associate the Debtor's assumed name with the BofA Account. It is actually nothing. It was done to allow checks to be deposited in the account. Hemmer Dep. Vol. II at 212:4-23. It did not signify that Infinity had or claimed an interest in the account. *Id.* at 215:18-21; *see also* Belotz Supp. Decl. at ¶ 8.

[32] Hemmer Dep. Vol. II at 215:22-216:6.

[33] Belotz Decl. at ¶ 11; Hemmer Dep. Vol. II at 215:18-216:11 (testifying that a representative of Tecumseh had to countersign all transactions on the BofA Account).

12

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

account is established). As discussed above, Tecumseh established the BofA Account in its name and both the Debtor and Tecumseh have testified that the Debtor had no interest in the account or the funds within it. Thus, the burden falls on HASelect (i) to prove the existence of its interest in the funds in the BofA Account and (ii) to specifically identify its funds in either their original or substituted form. *See Hatoff v. Lemons & Assocs., Inc.*, 67 B.R. 198, 213 (Bankr. D. Nev. 1986). In this procedural context, HASelect must raise a fact issue as to each prong, which it has failed to do.

HASelect has no interest in any funds in the BofA Account. Even assuming (as HASelect argues) funds were transferred to the BofA Account by the Debtor, Tecumseh took the funds free of HASelect's security interest. N.R.S. § 104.9314.

Assuming HASelect held an interest in funds that were deposited in the BofA Account, Nevada's UCC provides that if they were commingled with other property, they are identifiable only (i) if the proceeds are "goods," or (ii) "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this chapter with respect to commingled property of the type involved." N.R.S. § 104.9315(2). "Thus, once a debtor deposits cash proceeds into an account and commingles it with other money, the identifiability of a secured creditor's proceeds is destroyed unless the secured creditor can prove the money currently in the debtor's account corresponds to its collateral." *In re Skagit Pac. Corp.,* 316 B.R. 330, 338 (9th Cir. BAP 2004). The burden on tracing the proceeds is on the party claiming the security interest in the proceeds. *Id.* (citing *Stoumbos v. Kilimnik,* 988 F.2d 949, 957 (9th Cir. 1993)). *Skagit* further noted that "[h]istorically, courts have required a creditor to submit detailed documentary evidence or testimony proving that an account contained proceeds. Still, under the revised UCC, a creditor must provide documentation of its identifiable or traced proceeds." *Id.* (citing *Stoumbos,* 988 F.2d at 958.)

Because HASelect has not shown exactly what went in to the BofA Account and that it had an interest in those funds, HASelect has not raised a fact issue as to the identification of its collateral in

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

66959851;1

the BofA Account. But even if it had, a proper tracing analysis demonstrates that Tecumseh's funds were used to purchase the Direct Purchase Receivables.[34]

Tracing, which is fundamentally equitable, is designed to fairly sort out the interests of competing claimants in commingled funds. Because dollars are fungible, in many cases "'[t]he goal of 'tracing' is not to trace anything at all ... but rather [to] serve[ ] as an equitable substitute for the impossibility of specific identification.'" *In re Burke,* Case No. 305–31572, p. 7, 2005 Bankr.LEXIS 1886 (Bankr. D. Or. August 2, 2005) (quoting *United States v. Henshaw,* 388 F.3d 738, 741 (10th Cir. 2004) (internal citations omitted)). Courts "must use alternative or multiple methods of tracing and 'exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them.'" *In re Drescher*, No. BR 12-64729-TMR7, 2013 WL 4525232, at *5 (Bankr. D. Or. Aug. 27, 2013).

This case presents an unusual situation for tracing. Here, money allegedly moved back and forth between the BofA Account and the Debtor's accounts. Assuming (as HASelect argues) this happened, the alleged damage created by funds going into the BofA Account is cured when funds move out of that account and into the Debtor's accounts. HASelect is harmed only if more money went to the BofA Account than came back to the Debtor's account on which HASelect had a lien. Similarly, Tecumseh is harmed if it spent more for receivables than it is allowed to keep. Thus, the fair and equitable result in this case would be that Tecumseh gets credit for purchases to the extent that it independently provided funds for those purchases and that HASelect gets credit to the extent that the proceeds of the receivables were less than the amount distributed to the Debtor from the BofA Account.

The evidence shows that only Tecumseh's funds were used to purchase the Direct Purchase

---

[34] *See* Supplemental Declaration of Michael Belotz ("Belotz Supp. Decl.") at ¶ 11; see also Tracing Analysis attached hereto and incorporated herein as **Exhibit O**.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Receivables. Tecumseh deposited $3.7 million of its investor's money into the BofA Account.[35] It paid $3.2 million out of the BofA Account to purchase the Direct Purchase Receivables.[36] At all times, Tecumseh Deposits exceeded Provider Payments by a wide margin. From July 2020 through September 2021, cumulative Tecumseh Deposits were higher than cumulative Provider Payments in each month. Thus, there were more than sufficient funds deposited by Tecumseh to purchase the receivables.[37] In no circumstance was it ever necessary to dip into the proceeds of receivables to purchase new receivables.

Proceeds of receivables purchased by Tecumseh were deposited into the BofA Account but they represented a relatively minor part of the total funds (approximately 15%) in the account. Deposits related to receivables totaled $696,747.[38] Tecumseh paid the Debtor $723,073 out of the BofA Account in fees and expense reimbursements.[39] Tecumseh distributed $55,580.80 to the Debtor in October 2020 (Check 1001, dated 9/30/2020 cleared 10/1/2020) to enable the Debtor to purchase the Batch 1-G receivables, which are part of the Disputed Receivables, on Tecumseh's behalf.[40] Thus, the Debtor received $778,654 out of the BofA Account – an amount that exceeds by a comfortable margin any amount attributable to receivable proceeds.  To the extent that HASelect has any argument that it (or the Debtor) had any interest in the proceeds of receivables deposited into the BofA Account, all of those proceeds were returned to the Debtor. Indeed, HASelect's cash collateral position was improved by more than $80,000.

---

[35] Belotz Supp. Decl. at ¶ 12.

[36] Reconciliation, **_Exhibit F_** to Tecumseh's Statement of Undisputed Facts.

[37] Belotz Supp. Decl. at ¶ 18.

[38] Belotz Supp. Decl. at ¶ 14. To calculate the amount of deposits related to receivables, Tecumseh credited all deposits that it could not positively identify as either a deposit by Tecumseh or a returned item or the like as a receivable deposit. *Id.* This is a worst case. Certain of the deposits from receivables may well be proceeds of Direct Purchase Receivables and, thus, not subject to HASelect's claim.

[39] Belotz Supp. Decl. at ¶ 17.

[40] Belotz Supp. Decl. at ¶ 18.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

The traditional tracing methods do not work well here. Lowest intermediate balance is often used to determine what portion of a remaining fund is a trust balance.[41] But that is not the situation before us. Because money allegedly moved back and forth between the BofA Account and the Debtor's accounts, the lowest intermediate balance test does not provide a meaningful result. Assuming (as HASelect argues) this happened, the problem created by funds going into the BofA Account is cured when funds move out of that account and into the Debtor's accounts.

Similarly, a pro rata methodology does not work well. The Court could determine that 15% of each payment to the Debtor and 15% of each payment to a provider was paid with proceeds of receivables. But that would be completely arbitrary providing a windfall to HASelect at Tecumseh's expense. Again, the transactions in the BofA Account benefited rather than harmed HASelect's collateral position. HASelect had more collateral than it would otherwise have had.

## D. A "RESULTING TRUST" EXISTS OVER THE DIRECT PURCHASE RECEIVABLES.

### 1. Tecumseh Has Established That Its Intention Was To Secure The Benefits Of Ownership Of The Direct Purchase Receivables For Itself.

As a threshold matter, whether property in the possession of a debtor in bankruptcy is held in trust for a claimant is a question of state law. *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exchange Servs. (In re Landamerica Fin. Group, Inc.),* Case No. 08-35994, 2009 Bankr. LEXIS 4133, * 44 (E.D. Va. May 7, 2009). Tecumseh asserts a purchase money resulting trust pursuant to South Carolina law. HASelect's Opposition is flawed, therefore, in that it relies, in part, upon property rights under Virginia state law. The Opposition also conflates express trusts, resulting trusts, and purchase money resulting trusts, arguing that "[t]here is no reference to any trust relationship between Tecumseh and Infinity in the Sub-Advisory Agreement or any other document before this Court" and that the

---

[41] Our proposed tracing can be seen as a flavor of the lowest intermediate balance test with the amount of "tainted" money being reduced by each transfer back to the Debtor.

66959851;1

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

"failure to include such language by sophisticated commercial parties should be fatal." Opposition, p. 29, citing *In re Landamerica Fin. Group, Inc.,* 2009 Bankr. LEXIS 4133, * 44.

Where "a person pays the purchase price and has the property transferred to another, accompanied by a properly manifested intention to create an express trust for the payor or others, there is an express trust for the intended beneficiaries." Restatement (Third) of Trusts § 9 (2003). Accordingly, "there is no occasion for a resulting trust to arise." *Id.* After all, an "express trust … arises from a transferor's manifestation of intention to create it." Restatement (Third) of Trusts § 7 (2003). Conversely, a "resulting trust arises from an intention that is legally attributed to a transferor based on the nature of the transaction, rather than from manifested intent." *Id.* The presumption of resulting trust thus "makes it wholly unnecessary to prove by affirmative evidence an intention to create a trust, or to reserve a trust interest, in favor of the transferor." *Id.* Moreover, resulting trusts "arise in two fundamentally different types of situations … one of which is and one of which is not associated with express trusts. Compare § 8 [When Express Trust Fails in Whole or in Part] with § 9 [Purchase-Money Resulting Trusts]." Restatement (Third) of Trusts § 7 (2003).

The Court in *Landamerica* examined express trusts, resulting trusts associated with a failed express trust, and (briefly) purchase money resulting trusts, holding that:

> The existence of a resulting trust thus depends upon an equitable presumption of intention, based upon the natural precept that one who advances the purchase money for real property is entitled to its benefits. Therefore, after it has been shown that payment of all or a part of the purchase price for property has been paid by one person and title thereto has been placed in the name of another, the factor which will determine whether the title is to be impressed with a trust in favor of the payor is the intention of the party providing the purchase money. If no evidence of intention is available, then the presumed intention will stand; *but if there is evidence that the person who provided the money had some intention other than to secure the benefits for himself, the presumed intention fails and no resulting trust will be recognized.*

*Landamerica,* 2009 Bankr. LEXIS 4133, *41-43 (citing *Morris v. Morris*, 449 S.E. 2d 816, 818 (1994)) (emphasis in original). Following this logic, the appropriate standard would not be, as HASelect argues, whether Tecumseh can point to an express manifestation of intention that the Direct

17

Purchase Receivables be held in trust. Instead, at issue is whether there is sufficient evidence demonstrating that Tecumseh had some intention other than to secure beneficial ownership of the Direct Purchase Receivables for itself. *See Morris v. Morris*, 449 S.E. 2d 816, 818 (1994).

Further, unlike the Sub-Advisory Agreement, the objective language of the exchange agreements at issue in *Landamerica* precluded consideration of any subjective belief that the parties may have had regarding the relationship between them. *Landamerica* concerned the ownership of funds deposited by certain Taxpayers with the debtor to purchase properties for 1031 exchanges. *Landamerica*, 2009 Bankr. LEXIS 4133 at *2. The contract provided that the debtor had "sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds." Id. at *13. It went on to provide that the Taxpayers had "no right, title, or interest in or to the Exchange Funds" and "no right … obtain the benefits of the Exchange Funds." *Id.* As the *Landamerica* court found, this language is wholly inconsistent with any claim by the Taxpayers to ownership of the deposited funds.

In direct contrast, the Sub-Advisory Agreement provides that the receivables to be acquired belong to Tecumseh and not the Debtor. Under the Sub-Advisory Agreement, the Debtor is to "negotiate the purchase of the Receivable by [Tecumseh]" and "arrange for [Tecumseh] to simultaneously secure a lien" securing the total retail cost of the receivables for Tecumseh.[42] The Agreement goes on to require the Debtor (i) assist Tecumseh with purchasing medical receivables "directly from the Medical Service Provider" and (ii) service and collect any receivables that Tecumseh might acquire.[43] In all respects, the Debtor was to treat the receivables as Tecumseh's property.[44] The Debtor was not to acquire an interest in the Direct Purchase Receivables or to be part

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

---

[42] Sub-Advisory Agreement, Ex. A, ¶¶ 1(b), (c).

[43] *Id.* ¶¶ 3(b), (e).

[44] *Id.* ¶ 3.

66959851;1

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

of the chain of title.[45] As discussed in the Motion, there is ample and uncontested evidence of the joint intent of Debtor and Tecumseh that the Direct Purchase Receivables be Tecumseh's and that the Debtor have no interest in them.[46]

The Opposition is silent as to the true issue, arguing only that Tecumseh is not entitled to the presumption of a purchase money resulting trust simply because the Sub-Advisory Agreement fails to expressly identify any such trust. In fact, if could be shown that Tecumseh manifested an express intention in the Sub-Advisory Agreement that the Direct Purchase Receivables were to be held in trust wholly or partially for the Tecumseh's own benefit, any such provision would create an express trust or an express-trust interest, and not a purchase money resulting trust. Restatement (Third) of Trusts § 7 (2003). The Opposition wholly fails to identify any evidence whereby Tecumseh (and the Debtor) intended anything other than to secure the benefits of ownership of the Direct Purchase Receivables for itself and its investors—because all evidence is to the contrary.

## 2. Infinity Purchased The Direct Purchase Receivables From Medical Providers For Tecumseh.

In the Opposition, HASelect argues there is no corpus for any purchase money resulting trust, as there is no corresponding "purchase" of certain account receivables. Opposition at 31. Instead, HASelect argues—for the first time, and in direct contradiction of its own filings to date— that rather than the purchase of "account receivables pursuant to contracts it entered into directly with various medical providers" [Opposition, ¶ 7] and, in return, receiving "direct assignments of liens against the individual personal injury claimants' rights to recovery" [*Id.*] these "transactions were effectively made by … loans to these medical providers." Opposition, p. 31.

As a threshold matter, how the underlying transaction is categorized is not relevant for purposes of the pending Motion; therefore, HASelect's reliance on *S & H Packing & Sales Co., Inc.*

---

[45] Hemmer Dep. Vol. II at 186:3-8.

[46] Motion at 9.

*v. Tanimura Distribg., Inc.*, 883 F.3d 797 (9th Cir. 2018) is misplaced. The issue in *S & H Packing* was whether a particular factoring arrangement complied with the Perishable Agricultural Commodities Act ("PACA"). As a result, the court interpreted factoring law and trust law in the context of the Act, which has nothing to do with this case. *Id.* at 809-11. As the *S & H Packing* court noted, HASelect's argument is inapplicable to the issue of whether a resulting trust exists, which is the issue before the Court:

> The dissent is not incorrect in asserting that distinction between a sale and a secured lending agreement does not ordinarily make a difference under general trust principles, so long as the transaction at issue is commercially reasonable.

*Id.* at 811. But, the distinction made a significant difference in the context of a PACA trust. *Id.*

None of this matters here because not only does PACA not apply to the sale of medical receivables but also the exact nature of what was purchased is irrelevant. Under HASelect's theory, Tecumseh purchased a payment intangible rather than a receivable. N.R.S. 104.9102(1)(hhh). So what? Both are personal property and can be transferred under the UCC. As everyone concedes that something was purchased, the only question before this Court is did Tecumseh purchase or did the Debtor.

Under the theory of a purchase money resulting trust, it is presumed that Tecumseh, as the party who paid for the personal property, intended a benefit for itself and its investors. *Caulk v. Caulk*, S.E. 2d 600 (S.C. 1947). Therefore, after it has been shown that payment of all (or a part) of the purchase price for property has been paid by one person and title thereto has been placed in the name of another, the factor which will determine whether the title is to be impressed with a trust in favor of the payor is the intention of the party providing the purchase money—<u>not</u> the nature of the underlying property itself (i.e. payment intangible or account receivable).

HASelect also mistakenly relies upon *In re Welch,* No. 12-05082-8-JRL, 2012 Bankr. LEXIS 4747, at *11 (Bankr. E.D.N.C. Oct. 10, 2012) for the proposition that "unless a purchase results in an actual transfer of title, no resulting trust can arise." Opposition at 31. First, property interests are

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

created and defined by state law, and *In re Welch* applies and analyzes North Carolina property law which is inapplicable to this matter. Second, *In re Welch* is also based upon an inapposite fact pattern. In *Welch*, the debtor owned a portion of real property, and subsequently sold his partial interest in the real property without documenting the sale. *Id.* at * 4. In determining that the partial interest in real property was property of the bankruptcy estate, the *Welch* Court noted that North Carolina law does not permit the imposition of a resulting or constructive trust in favor of a would-be purchaser in situations where legal title to real property has not been transferred. *Id.* at *11. Here, the Direct Purchase Receivables were purchased with Tecumseh funds directly from the medical providers (not the Debtor) thereby creating presumption that Tecumseh, as the party who paid for the Direct Purchase Receivables, intended a benefit for itself. Unlike *Welch*, Infinity possessed no title (bare or otherwise) to the Direct Purchase Receivables until such time as Tecumseh provided the purchase monies. In any event, title was in fact transferred, HASelect's only actual issue is whether title was transferred to a payment intangible or to a receivable – an issue that this Court need not ever resolve.

To the extent that the difference between a payment intangible or a receivable is at all relevant, HASelect has not raised a fact issue as which is at issue. All three of the purchase and sale agreements expressly refer to the sale of receivables.

Indeed, two of the three purchase and sale agreements relied upon by HASelect and entered by and between the Debtor and the medical providers expressly contemplated these future sales of accounts receivables, providing:

3. THE FUTURE ACCOUNTS. On an ongoing basis, during the Term, Seller may offer for sale to Buyer, any accounts receivable it desires and if Buyer so chooses to purchase said accounts, such future accounts shall be referred to herein as the "Purchased Future Accounts."

*See* Opposition, Exhibits 28 and 33, ¶ 3. Were that not the case HASelect would itself be forced to sue to collect upon any outstanding Infinity "loan", and would find itself unable to avail itself of the relief sought and obtained in the main bankruptcy case by virtue of the Court's *Order Granting Joint Motion to Enforce Court Orders and Require Preva Advanced Surgicare – The Woodlands LLC to Remit*

66959851;1

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

*Payments Relating to Accounts Receivable.*[47] HASelect's position as to a lack of "purchase" is wholly without merit.

### 3. Tecumseh's Hands Are Clean.

First, as discussed *supra*, HASelect's factual allegations concerning Tecumseh's principals' alleged misconduct are unsupported by any evidence. They are also immaterial to the issues presented by the Motion and should be disregarded.

Further, in the Ninth Circuit, "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Republic Molding Corp. v. B. W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir. 1963). The appropriate focus for the Motion, therefore, is whether and when, under South Carolina state law, a judgment lien creditor may "void the resulting trust." *In re Torrez,* 63 B.R. 751, 754 (B.A.P. 9th Cir. 1986), *aff'd on other grounds,* 827 F.2d 1299 (9th Cir. 1987). A survey of South Carolina case law reveals that a fraudulent intent towards creditors of the resulting trust beneficiary (here, Tecumseh) will void a purchase money security interest. *See In Hayne Fed. Credit Union v. Bailey*, 489 S.E. 2d 472 (S.C. 1997). In order words, utilizing the purchase money resulting trust in an effort to conceal assets and defraud creditors is a "material" fact whose existence might affect the outcome of the Motion.

In the context of a resulting of a resulting trust, fraud or fraudulent intent is limited to the beneficiary's attempt to hide its assets from its creditors. In other words, the beneficiary uses the resulting trust to disguise its ownership interest so that the beneficiary appears to have fewer assets than it does. As discussed in the Motion, Tecumseh has always and publicly recognized its ownership of the Direct Purchase Receivables.[48] HASelect does not argue otherwise and certainly has provided no contrary evidence. The record before this Court is devoid of any evidence of fraudulent intent or

---

[47] Main Case, ECF No. 253.

[48] Motion at 14-15 and evidence cited therein.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

66959851;1

1    fraudulent actions by Tecumseh with regards *towards its creditors*.

2        While HASelect in its Opposition may accuse Tecumseh and its principals of a multitude of

3    "bad acts"—all entirely unfounded, as discussed *supra*[49]—the alleged "bad acts" are not evidence and

4    are immaterial for purposes of the Motion.

5        **E.  THIS MOTION DOES NOT REQUIRE ADDITIONAL DISCOVERY.**

6        HASelect argues the Motion should be denied pursuant to FRCP 56(d) because it needs

7    additional discovery. But HASelect has not demonstrated how additional discovery would inform the

8    issues before the Court on the Motion. The Debtor's principals have been deposed, as HASelect cites

9    to both the Pantelas and Hemmers transcripts. *See* Opp. Ex. 3, 4. HASelect had ample opportunity for

10   discovery in its failed Meyer Action, which included two days of testimony before Judge Mitchell.

11   And, most importantly, the issues presented in the Motion are legal issues rooted in contracts.

12   HASelect's anticipated discovery (*see* Opp. at 35) relates to factual issues that, as discussed at length

13   *supra*, are immaterial. The Motion is, therefore, ripe for decision and further discovery is not required.

14

15   **III.    CONCLUSION**

16       For all of the forgoing reasons, Tecumseh respectfully requests that this Court enter an order

17   (i) granting partial summary judgment in its favor, (ii) determining Tecumseh to be the owner of the

18   Direct Purchase Receivables; (ii)      holding the Direct Purchase Receivables are not and were never

19   property of the Debtor's bankruptcy estate; (iii) determining that the perfected security interest of

20   …

21

22   …

23

24   HASelect in the Debtor's collateral does not extend to the Direct Purchase Receivables; and (iv) the

25   strong arm rights and powers afforded to the Trustee under 11 U.S.C. § 544 and sold to HASelect

26

27

28

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

---

[49] *See* Motions to Strike Griffin and Larsen Declarations filed concurrently herewith.

66959851;1

cannot be utilized to make the Direct Purchase Receivables property of the Debtor's bankruptcy estate.

Dated October 24, 2022.

Respectfully submitted,

GARMAN TURNER GORDON LLP

By: /s/ Jared M. Sechrist
    GERALD M. GORDON, ESQ.
    JARED M. SECHRIST, ESQ.
    7251 Amigo St., Suite 210
    Las Vegas, Nevada 89119

    and

    MICHAEL D. NAPOLI, ESQ.
    *Pro hac vice*
    AKERMAN LLP
    2001 Ross Avenue, Suite 3600
    Dallas, Texas 75201
    Tel: (214) 720-4360 / Fax: (214) 720-8116

    ARIEL E. STERN, ESQ.
    Nevada Bar No. 8276
    AKERMAN LLP
    1635 Village Center Circle, Suite 200
    Las Vegas, Nevada 89134
    Tel: (702) 634-5000 / Fax: (702) 380-8572
    Email: ariel.stern@akerman.com

    *Attorneys for Tecumseh–Infinity Medical*
    *Receivable Fund, LP*

66959851;1