1
2
3
4
5
6
7
8
9
10

GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
JARED SECHRIST
Nevada Bar No. 10439
E-mail: jsechrist@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112
*Attorneys for Tecumseh–Infinity Medical
Receivable Fund, LP*

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical
Receivable Fund, LP*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.,<br><br>                 Debtor. | Case No. 21-14486-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>             Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>            Defendant. | Adversary Case No. 21-01167-abl<br><br><br>**OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN 1-F, 1-I, AND 1-J ACCOUNTS** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>            Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>            Counter-Defendants. | Hearing Date: March 30, 2023<br>Time:    9:30 a.m. |

HASELECT-MEDICAL RECEIVABLES
LITIGATION FINANCE FUND
INTERNATIONAL SP,

                     Counter-Claimant,

v.

TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

                     Counter-Defendant.

Defendant and Counter-plaintiff Tecumseh–Infinity Medical Receivable Fund, LP, ("**Tecumseh**") respectfully submits this opposition (the "**Opposition**") to the *Motion for Partial Summary Judgment as to Certain 1-F, 1-I, and 1-J Accounts* [ECF No. 170] of Plaintiff *HASelect-Medical Receivables Litigation Finance Fund International LP* ("**HASelect**").

This Opposition is made and based on the following memorandum of points and authorities, the declarations of Michael Belotz (the "**Belotz Decl.**")[1] and Chad Meyer (the "**Meyer Decl.**"), which declaration is filed in support of this Opposition, the statement of disputed facts submitted herewith, the exhibits attached hereto as well as the pleadings and other documents on file in this Adversary Proceeding and related Chapter 7 bankruptcy case of Infinity Capital Management, Inc. *dba* Infinity Health Connections (the "**Debtor**"), judicial notice of which is requested.

## I.      <u>INTRODUCTION</u>

HASelect seeks—for the second time—summary judgment as to the 1-F Accounts, 1-I Accounts, and 1-J Accounts (defined below). The Court denied the same relief now sought by HASelect when it considered HASelect's March 2022 *Motion for Partial Summary Judgment* [ECF No. 53]. For the same reasons previously addressed as well as the reliance by HASelect, the Trustee and the Court on a mistaken assumption as to the scope of the HASelect security interest, the Court must do so once again.

---

[1] The April 28, 2022 Belotz Declaration [ECF No. 76] was filed in support of Tecumseh's *Opposition to Motion for Partial Summary Judgment as to Certain Disputed Receivables* [ECF No. 74]. It is incorporated by reference.

**Garman Turner Gordon LLP**
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

In its previous ruling, based upon the evidence before it, the Court denied HASelect's motion as to these accounts because there was no executed bill of sale between the Debtor and Tecumseh for the 1-F Accounts, 1-I Accounts, and 1-J Accounts establishing what the Court found to be a resale of accounts by the Debtor. As HASelect itself acknowledges, there exists no executed bill of sale agreement for these Accounts. Any "clarifying" information provided in the Motion, i.e. the compendium of the Debtor's checks, is illustrative only of the date Infinity purportedly issued them. As before, there still remains insufficient evidence in the record to conclude that the date of Debtor's checks or HASelect's calculation of "Date Paid" conclusively establishes either: (i) the date the Debtor actually paid the medical providers; or (ii) the date title to the subset of 1-F Accounts, 1-I Accounts, and 1-J Accounts was transferred. Furthermore, absent an understanding of when title transferred—a predicate legal and factual issue—it is impossible to determine the timeliness, or lack thereof, of Tecumseh's funding. This alone must preclude the granting of summary judgment. HASelect's Motion is likewise flawed in that it fails to account for more than 190 incidents of contemporaneous payment from Tecumseh to the Debtor.

Moreover, HASelect predicates its motion on a material misstatement of fact and misapplication of law. As briefed in Tecumseh's pending Rule 60(b) Motions (defined below), HASelect's claim to a first priority perfected secured interest in the 1-F Accounts, 1-I Accounts, and/or the 1-J Accounts is questionable, at best. HASelect's Motion fails to resolve this issue as a matter of law; therefore, at the very least, the record before the Court as to this issue demonstrates an issue of fact.

For these reasons, HASelect's Motion must be denied.

## II.    RELEVANT FACTS

### A.    HASELECT DOES NOT POSSESSES A SECURED INTEREST IN ALL ASSETS OF THE DEBTOR

The Motion exclusively relies on the definition of "Collateral" stated in Section 4.1 of the *Second Amended & Restated Loan & Security Agreement* ("Loan Agreement"). Section 4.1 is not, however, the controlling definition of "Collateral" in the lender/borrower relationship between

HASelect and the Debtor. Instead, Paragraph 16 of the executed *Form of Promissory Note* ("Note"),[2] which states a materially different, and far narrower, definition of "Collateral", controls.

Section 9.4 of the Loan Agreement fully integrated the Note into the Loan Agreement. Section E of the Note provides, in pertinent part, "[t]his Note is being issued to Lender by Borrower pursuant, and otherwise subject, to the terms and conditions of the Loan Agreement. Capitalized terms used herein *unless otherwise defined*, have the meanings given such terms in the Loan Agreement." (emphasis added).

Accordingly, the definition of "Collateral" in Paragraph 16 of the Note is the operative and controlling definition—**not** Section 4.1. And Section 16 of the Note defines "Collateral" narrowly—it does not include any assets beyond HASelect's "Receivables"[3] and "Claims",[4] as those terms are specifically defined in the Loan Agreement.

## B. THE DEBTOR ACTED AS AN AGENT IN TECUMSEH'S PURCHASES OF ACCOUNTS RECEIVABLES.

A June 2020 Sub-Advisory Agreement governed the relationship between Tecumseh and the Debtor.[5] It generally provided that the Debtor would: (i) assist Tecumseh in purchasing medical receivables "directly from the Medical Service Provider" and (ii) service and collect any receivables that Tecumseh might acquire. Sub-Advisory Agreement ¶ 3(b), (e); Belotz Decl. ¶ 7 ("The purpose of the Sub-Advisory Agreement was to facilitate the sale of receivables from medical providers to Tecumseh and to provide for servicing of the receivables by the Debtor."). To that end, the Sub-Advisory Agreement called for the Debtor to identify receivables for

---

[2] The Note and Loan Agreement are collectively referred to as the "Loan Documents". The Loan Documents are attached as Exhibit 1 to the Griffin Declaration, ¶ 7 [ECF Nos. 54 and 57-1].

[3] The Loan Agreement defines "Receivables" only as "receivables owing to medical providers for health care services or other service providers of the type approved by Lender, and acquired by Borrower, in each case secured by a Claim or some other collateral approved by Lender." Loan Agreement § 2.

[4] The Loan Agreement defines "Claims" as "a claim by an Obligor for medical and other damages in connection with event or events for which Borrower has acquired the Receivable." Loan Agreement § 2.

[5] The Sub-Advisory Agreement is attached as Exhibit A to Tecumseh' April 29, 2022 Statement of Disputed Facts [ECF No. 75] (the "**April 29, 2022 Tecumseh Statement of Disputed Facts**") which is incorporated by reference.

Tecumseh to purchase and to negotiate a purchase price on Tecumseh's behalf. Sub-Advisory Agreement ¶¶ 1(b), 3(a), 3(b).

The process for purchasing a receivable began with the Debtor identifying a receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh. Belotz Decl. at ¶ 10. After verification of the receivable, Tecumseh would approve of the purchase. *Id.* Tecumseh provided the funds for the purchase price agreed to by the medical provider along with the fee required by the Sub-Advisory Agreement. *Id.* Tecumseh made the payments in two primary ways: (1) payments directly from Tecumseh's BofA Account[6] to the medical providers and (2) payments to the Debtor to fund the purchases of receivables on Tecumseh's behalf. *Id.*

Prior to the establishment of the BofA Account, the Debtor periodically (roughly every two weeks) provided Tecumseh with a list of receivables from various medical providers that the Debtor recommended Tecumseh purchase. From July 13, 2020 through October 29, 2020, the Debtor sent twelve such lists. Belotz Decl. ¶ 13 and Exhs. B-K to the April 29, 2022 Statement of Disputed Facts. Each list identified a set of receivables the Debtor planned to acquire on Tecumseh's behalf. For each receivable, the Debtor provided the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price and an estimated total cost including the Debtor's fee. *Id.* ¶ 14.

The lists also included a "Date Paid" column, which was quite often blank, sometimes contained dates that were months after the date of the list and sometimes contained dates prior to the date of the list. *Id.* The "Date Paid" was taken from the Debtor's internal database of receivables and reflected the date that the Debtor reached an agreement with the provider as to the price of the receivable. Blank dates and November dates were placeholders. It did **not** reflect the date the Debtor had paid for these particular receivables. *Id.*

---

[6] To facilitate the purchase of receivables and collection of proceeds, Tecumseh ultimately opened an account with Bank of America (the "**BofA Account**") in October of 2022 that was funded by Tecumseh and granted signing authority to Hemmers and Anne Pantelas (along with Belotz and another Tecumseh principal, Chad Meyer). *Id.* ¶ 12. Therefore, from approximately July through October 2020, Tecumseh transferred funds to the Debtor to purchase the receivables on Tecumseh's behalf. *Id.*

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

Belotz's duties included reconciling the Debtor's records with Tecumseh's. In doing this, Belotz noted the Debtor's data frequently changed and was often inconsistent. The "Date Paid" field was particularly problematic. The Debtor quite often left it blank for months and, even if populated, frequently changed the field. Belotz Decl. ¶ 22. As such, the "date paid" field is **not** a reliable indicator of when any receivables were purchased. *Id*. ¶¶ 23-24.

Once Tecumseh approved a list, the Debtor generated a purchase order which Tecumseh paid. The Debtor then used the money to purchase receivables on Tecumseh's behalf. Belotz Decl. at ¶ 15. On occasion, the Debtor underestimated how much the receivables would cost. When that happened, the Debtor requested and Tecumseh provided additional funds enabling the Debtor to complete the acquisition of the listed receivables on Tecumseh's behalf. *Id.* at ¶ 16 (noting that Oliver Hemmers would typically call him to request additional funds when the Debtor underestimated the cost of receivables it planned to acquire on Tecumseh's behalf).[7] On other occasions, the Debtor was unable to acquire certain receivables that it had planned to acquire. When this happened, the Debtor would indicate that it had cancelled those receivables. *Id*. at ¶ 17.

While funds may have flowed from Tecumseh through the Debtor to the medical provider, the Debtor never acquired an interest in the 1-F Accounts, 1-I Accounts, and 1-J Accounts. Hemmer Tr. Vol. II at 186:12-17. As such, these accounts never became the property of the Debtor.

## C.    THE ACCOUNT RECEIVABLES

### 1.    The 1-F Accounts, the 1-I Accounts, and the 1-J Accounts.

On or about September 22, 2020, the Debtor generated a sixth Receivables Purchase Order (the "**1-F Purchase Order**") identifying approximately 332 separate accounts receivables (the "**1-F Accounts**") Tecumseh had agreed to purchase from medical providers for a total price of $481,023.10.[8] On September 25, 2020, Tecumseh wired the $481,023.10 purchase price for the 1-

---

[7] Belotz Exhibit L represents an occasion when Hemmers contacted Belotz to request additional funds with which to complete a planned purchase.

[8] The 1-F Purchase Order was filed in the chapter 7 case at Main ECF No. 201-9 and designated as "Exhibit D-6". A copy of the 1-F Purchase Order was also submitted as Exhibit 20 to HASelect's March 22, 2022 Statement of Undisputed Facts [Adversary ECF No. 55] (the "**March 22, 2022 HASelect Statement of Disputed Facts**") and as HASelect Exhibit 1 to its Motion.

1   F Accounts to Infinity's Nevada State Bank account ending in 8480 (the "**8480 Account**").[9] There
2   was no executed bill of sale agreement entered between the Debtor and Tecumseh for the 1-F
3   Receivables.[10]

4        On or about October 12, 2020, the Debtor generated a ninth Receivables Purchase Order
5   (Batches 12 and 13) (the "**1-I Purchase Order**") identifying approximately 843 separate accounts
6   receivable (the "**1-I Accounts**") Tecumseh agreed to purchase from medical providers for a total
7   price of $209,320.99.[11] On October 14, 2020, Tecumseh wired the $209,320.99 purchase price for
8   the 1-I Accounts to Infinity's Nevada State Bank account ending in 8480.[12] There was no executed
9   bill of sale agreement entered between the Debtor and Tecumseh for the 1-I Receivables. [13]

10        On or about October 23, 2020, the Debtor generated a tenth Receivables Purchase Order
11  (the "**1-J Purchase Order**") identifying approximately 261 separate accounts receivable (the "**1-
12  J Accounts**") Tecumseh agreed to purchase from medical providers for a total price of
13  $136,063.26.[14] On October 26, 2020, Tecumseh wired the $136,063.26 purchase price for the 1-J
14  Accounts to Infinity's Nevada State Bank account ending in 8480.[15] There was no executed bill of
15  sale agreement entered between the Debtor and Tecumseh for the 1-I Receivables. [16]

16        2.   The Subset of 1-F Accounts Receivables, the 1-I Accounts Receivables, and the 1-
17             J Accounts Receivables at Issue

18

19  _____
    [9] See Infinity's September 30, 2020 Nevada State Bank account statement for account ending in
20  8420 submitted as Exhibit 17 to the March 22, 2022 HASelect Statement of Disputed Facts.
    [10] Meyer Decl. ¶ 4.

21  [11] The 1-I Purchase Order was filed in the chapter 7 case at Main ECF No. 201- 012 and designated
22  as "Exhibit D-9". A copy of the 1-I Purchase Order was also submitted as Exhibit 27 to the March
    22, 2022 HASelect Statement of Undisputed Facts and as HASelect Exhibit 4 to its Motion.

23  [12] See Infinity's October 30, 2020 Nevada State Bank account statement for account ending in
    8420 submitted as Exhibit 26 to the March 22, 2022 HASelect Statement of Disputed Facts.
24  [13] Meyer Decl. ¶ 9.

25  [14] The 1-J Purchase Order was filed in the chapter 7 case at Main ECF No. 201- 013 and designated
26  as "Exhibit D-10". A copy of the 1-J Purchase Order was also submitted as Exhibit 28 to the March
    22, 2022 HASelect Statement of Undisputed Facts, and as HASelect Exhibit 6 to its Motion.

27  [15] See Infinity's October 30, 2020 Nevada State Bank account statement for account ending in
    8420 submitted as Exhibit 26 to the March 22, 2022 HASelect Statement of Disputed Facts.
28  [16] Meyer Decl. ¶ 12.

**Garman Turner Gordon LLP**
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

While not particularly clear, HASelect's Motion seemingly pertains only to a subset of the 1-F Accounts, 1-I Accounts, and 1-J Accounts, identified in Exhibit 2, Exhibit 5, and Exhibit 7 to its Motion[17], and further detailed below:

| Accounts | Subset Purchase Price | Subset Receivables at Issue | Subset Face Value |
|---|---|---|---|
| 1-F Accounts | $315,166.54 | 239 out of 332 | $1,416,411.02 |
| 1-I Accounts | $170,795.83 | 755 out of 843 | $1,012,044.44 |
| 1-J Accounts | $54,823.26 | 127 out of 261 | $149,420.09 |

The evidence provided herewith and referenced in the corresponding Statement of Disputed Facts and Meyers Decl., both of which are incorporated herein by reference, establishes HASelect's analysis is fatally flawed, and as such the Court must deny HASelect's pending Motion seeking summary judgment as to all of the 1-F Accounts, 1-I Accounts, and 1-J Accounts as well as to the identified subset of those Accounts.

## III.  LEGAL ARGUMENT

### A.  LEGAL STANDARD

Rule 56, made applicable through Fed. R. Bankr. P. 7056, provides that "[the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. P. Elec. Contractors* Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The materiality of a fact is thus determined by the substantive law governing the claim or defense. *Id.*

---

[17] HASelect's argument and evidence establishes that Tecumseh paid for the remaining Accounts before even HASelect alleges they were acquired by the Debtor.

## B.     HASELECT HAS FAILED TO ESTABLISH ITS SECURED INTEREST IN THE 1-F, 1-I, AND 1-J ACCOUNTS.

HASelect bases the pending Motion on its flawed contention that it holds a security interest in *all* of the Debtor's assets. HASelect, however, has failed to establish it holds a first priority perfected secured interest in the 1-F, 1-I, and 1-J Accounts. As detailed in Tecumseh's pending *Motion to Set Aside Orders Approving Sales Procedures and Approving Sale*[18] and *Motion to Set Aside Order Abandoning Property of the Estate*[19] (the "Rule 60(b) Motions"), HASelect has (once again) failed to apprise the Court of the two inconsistent definitions of its collateral in the relevant loan documents. Unsurprisingly, HASelect's Motion is likewise based upon a misleading and incorrect interpretation of HASelect's collateral.

### 1.     The Note's Definition of the Collateral is Controlling

HASelect's Motion relies solely upon the broad definition of "Collateral" drawn from and limited to Section 4.1 of Loan Agreement. But, as Tecumseh has made clear in its pending Rule 60(b) Motions, Section 4.1 is not the only definition of "Collateral" in the lender/borrower relationship between HASelect and the Debtor; rather, paragraph 16 of the executed Note states a materially different and far narrower definition of "Collateral".

Under Illinois law, "[t]he primary goal in construing a contract is to give effect to the intent of the parties." *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002). "When the language of a contract is clear, a court must determine the intent of the parties solely from the plain language of the contract." *Id.* "The language of a contract must be given its plain and ordinary meaning." *Id*. Here, the Loan Documents are clear—the definition of "Collateral" in the Note is controlling. The Note was fully integrated into the Loan Agreement by virtue of Section 9.4 of the Loan Agreement. Section E of the Note provides, in pertinent part, "[t]his Note is being issued to Lender by Borrower pursuant, and otherwise subject, to the terms and conditions of the Loan Agreement. Capitalized terms used herein ***unless otherwise defined***, have the meanings given such

---

[18] Main Case, ECF No. 268.

[19] Main Case, ECF No. 271.

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

terms in the Loan Agreement." (emphasis added). Accordingly, the definition of "Collateral" in Paragraph 16 of the Note is the operative definition.

Section 16 of the Note defines "Collateral" narrowly—it does not include any assets beyond HASelect's "Receivables" and "Claims" as those terms are specifically defined in the Loan Agreement. The Note contains no reference to any collateral other than those Receivables and Claims, i.e., it does not grant a security interest in *all* assets notwithstanding HASelect's many attestations to the contrary. The Loan Agreement defines "Receivables" only as "receivables owing to medical providers for health care services or other service providers of the type approved by Lender, and acquired by Borrower, in each case secured by a Claim or some other collateral approved by Lender." Loan Agreement § 2. The Loan Agreement likewise defines "Claims" as "a claim by an Obligor for medical and other damages in connection with event or events for which Borrower has acquired the Receivable." Loan Agreement § 2.  HASelect's Motion and supporting Statement of Undisputed Facts fails to address whether the 1-F, 1-I, and 1-J Accounts are encompassed by these definitions of "Receivables" or "Claims" in any capacity. Summary judgment must therefore be denied as HASelect has failed to establish a secured interest in the 1-F Accounts, 1-A Accounts, and 1-J Accounts as a matter of law.

2.    At Most, The Separate Definitions of Collateral Create Ambiguity That Precludes Adoption of the Loan Agreement's Definition Without an Evidentiary Hearing.

The language of the Loan Documents permits only one of two conclusions: i) Section E of the Note unambiguously mandates the Note's definition of Collateral is controlling; or ii) the inconsistent definitions of Collateral in the Note and the Loan Agreement create an ambiguity that can only be resolved through an evidentiary hearing.

An ambiguity in an agreement exists when on the face of the agreement (intrinsic ambiguity) "key contract language is susceptible of more than one reasonable interpretation where the contract is read as a whole." *Alexian Bros. Health Providers Assn. v. Humana Health Plan, Inc*., 330 F. Supp. 2d 970, 974 (N.D. Ill. 2004), *citing Guerrant v. Roth*, 334 Ill.App.3d 259, 264, 777 N.E.2d 499, 503, 267 Ill. Dec. 696 (1st Dist. 2002).  "If … the contract's language is susceptible to more than one meaning, then an ambiguity is present. [T]hen may parol evidence

be admitted to aid the trier of fact in resolving the ambiguity." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462-3 (1999).

The purpose of admitting and considering parol or extrinsic evidence is to determine the intent of the parties at the time of the contract formation as to an ambiguous agreement. *Chicago Board of Options Exchange, Inc. v. Connecticut general Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir 1983); *Homeowners Choice, Inc. v. AON Benfield, Inc.*, 938 F. Supp. 2d 749. 756 (N.D. Ill. 2013), citing Illinois cases. And the finding of intent from the extrinsic evidence is for the trier of fact and **not for the court on summary judgment** or its equivalent. *Harman v. Gordon*, 712 F.3d 1044, 1050 (7th Cir. 2013), *citing Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288-89 (1990). The Court cannot and should not determine at this juncture HASelect's and the Debtor's intent regarding the nature of the Collateral in the face of the ambiguity as to the scope of HASelect's secured interest; summary judgment must, therefore, be denied.

In the alternative, Tecumseh requests the opportunity to conduct discovery pursuant to Rule 56(d) regarding HASelect's and the Debtor's intent regarding the scope of the "Collateral". *See* Fed. R. Civ. P. 56(d) (when a nonmoving party shows by affidavit or declaration that it is unable to marshal necessary facts to oppose summary judgment, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order).

C.     **HASELECT'S ANALYSIS OF THE 1-F ACCOUNTS, 1-I ACCOUNTS, AND 1-J ACCOUNTS FAILS**

1.     The "Date Paid Column" is not a Reliable Indicator of when the Debtor Paid for the Receivables at Issue.

HASelect's Motion relies on the flawed "Date Paid" column. For each receivable Tecumseh purchased, the Debtor provided a list containing the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price and an estimated total cost including the Debtor's fee. Belotz Decl. at ¶ 14. The lists also included a "Date Paid" column. The "Date Paid" column was quite often blank, sometimes contained dates that were months after the date of the list and sometimes contained dates prior to

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

the date of the list. *Id.* The "Date Paid" was taken from the Debtor's internal database of receivables and reflected the date that the Debtor reached an agreement with the provider as to the price of the receivable. Blank dates and November dates were placeholders. It did **not** reflect the date that the Debtor had paid for these particular receivables. *Id.*

Part of Belotz's duties were to reconcile the Debtor's records with Tecumseh's. As part of that process, Belotz noted the Debtor's data frequently changed and was often inconsistent. The "date paid" field was particularly problematic. The Debtor often left that field blank for months or, when populated, changed dates. Belotz Decl. at ¶ 22. As such, the "Date Paid" field is **not** a reliable indicator of when any receivables were purchased. *Id.* at ¶¶ 23-24.

HASelect relies on the problematic "Date Paid" column for its analysis. *See* Motion, Exhibits 2, 5, and 7. By its own admission, HASelect utilized the preexisting "Date Paid" column contained in the 1-F Purchase Order, 1-I Purchase Order, and the 1-J Purchase Order, to fill in its own data only when the "Date Paid" column remained blank. As further detailed below, there is insufficient evidence in the record to conclude the Debtor or HASelect's calculation of "Date Paid" conclusively establishes either: (i) the date that the Debtor actually paid the medical providers; or (ii) the date that legal title to the subset of 1-F, 1-I, and 1-J Accounts was transferred. HASelect's Motion must therefore be denied.

2.    HASelect Failed to Establish When Title to the Receivables Were Transferred.

HASelect's Motion fails to examine when the respective medical providers transferred title to the subset of 1-F Accounts, 1-I Accounts, and 1-J Accounts to the Debtor; instead, the Motion relies upon the mistaken assumption that Infinity's check date controls for purposes of establishing the date of transfer of title of the medical receivables from the medical providers.

First, the checks provided in Exhibit 3 to HASelect's Motion establish only that, at some date and time, the Debtor issued such checks. HASelect willfully omits any information pertaining to when the checks might have been transmitted to the medical providers, and, more to the point, when such checks were deposited and subsequently honored by Nevada State Bank.

Under the Bankruptcy Code, a transfer made by check is deemed to occur on date a check is honored. *Barnhill v. Johnson,* 503 U.S. 393 (1992); *see also In re Cresta Tech. Corp.*, 583 B.R.

224 (Bankr. App. 9th Cir. 2018) (a "transfer" occurs when an ordinary check is honored, not the date it was issued). In making this determination, the Supreme Court in *Barnhill* examined state law, namely the Uniform Commercial Code (the "U.C.C."), observing that under the U.C.C. a check is simply an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand. *Barnhill v. Johnson,* 503 U.S. at 398 (citing U.C.C. §§ 3-104(1)).  The Supreme Court continued, concluding that "[r]eceipt of a check does not, however, give the recipient a right against the bank. The recipient may present the check, but, if the drawee bank refuses to honor it, the recipient has no recourse against the drawee." *Id.* (citing § 3-409(1)).  It logically follows that for purposes of payment to the medical providers, the underlying transfer of funds was made only at such time as they were honored by Nevada State Bank.

Second, HASelect has failed to examine the underlying assets and respective purchase and sale agreements, a step necessary to determine when title to the 1-F Accounts, 1-I Accounts, and 1-J Accounts was actually transferred. After all, a purchase money resulting "trust must be coequal with the deed, and cannot arise from subsequent transactions, change of circumstances or intention. It arises at the time of making the purchase, or not at all." *Larisey v. Larisey*, 77 S.E. 129, 130 (S.C. 1913). In other words, "[f]or a resulting trust to arise, payment and intent *must coincide with a deed's execution, i.e. or the time of transfer*." *Larisey*, 77 S.E. at 130 (emphasis added). Absent an understanding of when title transferred—a predicate legal and factual issue—it is impossible to determine the timeliness, or lack thereof, of Tecumseh's funding. This alone must preclude the granting of summary judgment.

3.    The Motion Fails to Account for Instances of Tecumseh's Contemporaneous Payment.

HASelect has not conclusively established the record date of transfer of the receivables as discussed in Section C (2) above. Equally problematic are HASelect's limited examples pulled from the far-from-full analysis provided in HASelect's 1-F Accounts Spreadsheet, 1-I Accounts Spreadsheet, and 1-J Accounts Spreadsheet, as further addressed below. HASelect's Motion must be denied with respect to all Accounts at issue herein.

As reflected in the Statement of Disputed Facts and the Meyer Decl. (incorporated here), Tecumseh has prepared its own: (i) 1-F Tecumseh Accounts Spreadsheet (<u>Exhibit A</u>); (ii) 1-I Tecumseh Accounts Spreadsheet (<u>Exhibit B</u>); and (iii) 1-J Tecumseh Account Spreadsheet (<u>Exhibit C</u>) (collectively, the "<u>Tecumseh Account Spreadsheets</u>").[20] Rather than merely reflecting the date the Debtor issued respective checks, the Tecumseh Account Spreadsheets denote the date Nevada State Bank actually honored such payments—evidence far more indicative of when such transfers actually occurred. The Nevada State Bank account statements for the Debtor's 8480 Account corroborate this information (<u>Composite Exhibit D</u>). [21]

(i)     <u>The 1-F Purchase Order</u>

The 1-F Purchase Order identifies approximately 332 separate 1-F Accounts Tecumseh had agreed to purchase from medical providers for a total price of $481,023.10. [22] On September 25, 2020, Tecumseh wired the $481,023.10 purchase price for the 1-F Accounts to Infinity's 8480 Account. [23] There was no executed bill of sale agreement entered into by and between the Debtor and Tecumseh for the 1-F Receivables.[24]

As a threshold matter, given that HASelect has not conclusively established the record date of transfer of the receivables as discussed in Section C (2) above, HASelect's Motion must be denied with respect to the 1-F Accounts at issue herein. In its superficial discussion of the 1-F Accounts, HASelect highlights only: (i) one payment made via American Express by the Debtor; (ii) two wire transfers; and (iii) three check payments as somehow demonstrating that that Infinity funded the entirety of the 239 1-F accounts identified by HASelect in its 1-F Account Spreadsheets.

---

[20] The Tecumseh Account Spreadsheets are reorganized and simplified versions of the original "TIFDumpWithIncome-Final.xlsx" spreadsheet provided by Infinity to identify Tecumseh's receivables with certain information redacted (i.e. patient information) and irrelevant information (such as lawyer name) removed. Meyer Decl. ¶ 6.

[21] Meyer Decl. ¶¶ 4-14.

[22] Meyer Decl. ¶ 4.

[23] Meyer Decl. ¶ 4.

[24] Meyer Decl. ¶ 4.

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

Yet, as reflected in the 1-F Tecumseh Accounts Spreadsheet (Exhibit A) incorporated herein, there are 332 separate 1-F Accounts.[25] HASelect moved for summary judgement only as to 239 of the 1-F Accounts.[26] In other words, there are at least 93 of the 332 1-F Accounts that HASelect acknowledges Tecumseh funded. Of the remaining 239 1-F Accounts subject to HASelect's Motion, payment for at least 84 receivables were made by checks that were honored by the Nevada State Bank on or after September 25, 2020, the date of Tecumseh's wire.[27] Specifically, Check Nos. 7635, 7638, 7639, 7640, 7641, 7642, 7643, 7644, 7647, 7648, 7651, 7652, and 7663, were all honored on or after September 25, 2020.[28] Therefore, payment occurred for at least 170 of the total 332 1-F Accounts on or after Tecumseh's September 25, 2020 wire.[29]

In light of the forgoing and given that HASelect has not conclusively established the record date of transfer of the receivables as discussed in Section C (2) above, HASelect's Motion must be denied with respect to the 1-F Accounts at issue herein.

(ii)    The 1-I Purchase Order

The 1-I Purchase Orders – Batches 12 and 13– identifies approximately 843 1-I Accounts Tecumseh agreed to purchase from medical providers for a total price of $209,320.99.[30] On October 14, 2020, Tecumseh wired the $209,320.99 purchase price for the 1-I Accounts to Infinity's 8480 Account.[31] There was no executed bill of sale agreement entered into by and between the Debtor and Tecumseh for the 1-I Receivables.[32]

As a threshold matter, HASelect has not conclusively established the record date of transfer of the title of receivables under the terms of the respective purchase and sale agreements as

---

[25] Meyer Decl. ¶ 8.

[26] For ease of reference, the subset of accounts at issue in HASelect's Motion have been highlighted in light green on the 1-F Tecumseh Accounts Spreadsheet (Exhibit A).

[27] Meyer Decl. ¶ 8. These receivables are denoted on the 1-F Tecumseh Accounts Spreadsheet (Exhibit A) by red highlighting in the far left column.

[28] Meyer Decl. ¶ 8. ; see also Composite Exhibit D, Bates 15 and 19.

[29] Meyer Decl. ¶ 8.; see also Composite Exhibit D, Bates 15 and 19.

[30] Meyer Decl. ¶ 9.

[31] Meyer Decl. ¶ 9.

[32] Meyer Decl. ¶ 9.

discussed in Section C (2) above. Absent an understanding of when title transferred—a predicate legal and factual issue—it is impossible to determine the timeliness, or lack thereof, of Tecumseh's funding. This alone must preclude the granting of summary judgment.

Furthermore, as reflected in the 1-I Tecumseh Accounts Spreadsheet (Exhibit B) incorporated herein, there are 843 separate 1-I Accounts.[33] HASelect moved for summary judgement as to 755 of the 843 of 1-I Accounts.[34] In other words, there are at least 88 of the 843 1-I Accounts that HASelect acknowledges Tecumseh funded. Of the remaining 755 1-I Accounts subject to HASelect's Motion, payment for at least 29 receivables were made by wire from the Debtor's on or after the Debtor's October 14, 2020 receipt of Tecumseh's wire.[35] Therefore, payment occurred for at least 117 of the total 843 1-I Accounts on or after Tecumseh's October 14, 2020 wire.[36]

In light of the forgoing and given that HASelect has not conclusively established the record date of transfer of the receivables as discussed in Section C (2) above, HASelect's Motion must therefore be denied with respect to the 1-I Accounts at issue herein.

    (iii)   The 1-J Purchase Order

The 1-J Purchase Order identifies approximately 261 1-J Accounts Tecumseh agreed to purchase from medical providers for a total price of $136,063.26.[37] On October 26, 2020, Tecumseh wired the $136,063.26 purchase price for the 1-J Accounts to Infinity's 8480 Account.[38]

---

[33] Meyer Decl. at ¶ 11.

[34] For ease of reference, the subset of accounts at issue in HASelect's Motion have been highlighted in light green on the 1-I Tecumseh Accounts Spreadsheet (Exhibit B).

[35] Meyer Decl. at ¶ 11. These receivables are denoted the 1-I Tecumseh Accounts Spreadsheet (Exhibit B) by red highlighting in the far left column. *See also* Composite Exhibit D, Bates 19.

[36] *Id.*

[37] The 1-J Purchase Order was filed in the chapter 7 case at Main ECF No. 201- 013 and designated as "Exhibit D-10". A copy of the 1-J Purchase Order was also submitted as Exhibit 28 to the March 22, 2022 HASelect Statement of Undisputed Facts, and as HASelect Exhibit 6 to its Motion.

[38] See Infinity's October 30, 2020 Nevada State Bank account statement for account ending in 8420 submitted as Exhibit 26 to the March 22, 2022 HASelect Statement of Disputed Facts.

There was no executed bill of sale agreement entered into by and between the Debtor and Tecumseh for the 1-J Receivables.[39]

As reflected in the incorporated 1-J Tecumseh Accounts Spreadsheet (<u>Exhibit C</u>) , there are 261 separate 1-J Accounts.[40] HASelect moved for summary judgement as to 127 of them.[41] In other words, there are at least 134 of the 261 1-J Accounts that HASelect acknowledges Tecumseh funded. Of the remaining 127 1-J Accounts subject to HASelect's Motion, payment for at least 77 receivables were made by checks that were honored by the Nevada State Bank on or after the Debtor's October 26, 2020 receipt of Tecumseh's wire.[42] Specifically, Check Nos. 6701, 6728, 6729, 6730, 6731, 6733, 6734, 6735, 6736, 6737, 6738, 6739, 6740, 6741, 6742, 6743, 6744, 6745, and 6746 were all honored on or after October 26, 2020.[43] Therefore, payment occurred for at least 211 of the total 261 1-J Accounts on or after Tecumseh's October 26, 2020 wire.[44]

Of note, HASelect highlights Check No. 6740 (dated October 21, 2020) and Check No. 6741 (dated October 21, 2020), amongst others, as evidence indicative of the timing of payment for purposes of summary judgment. As detailed in the 1-J Tecumseh Accounts Spreadsheets, Check No. 6740 was honored by Nevada State Bank on November 17, 2020[45] and Check No. 6741 on November 10, 2020[46]—well after receipt of Tecumseh's October 26, 2020 wire. The delay seen elsewhere in the Tecumseh Account Spreadsheets evidences that the Debtor delayed delivering checks until it received funds from Tecumseh. that  In light of the forgoing and given that HASelect

---

[39] Meyer Decl. ¶ 12.

[40] Meyer Decl. at ¶ 12.

[41] For ease of reference, the subset of accounts at issue in HASelect's Motion have been highlighted in light green on the 1-J Tecumseh Accounts Spreadsheet (<u>Exhibit C</u>).

[42] Meyer Decl. at ¶ 14. These receivables are denoted on the 1-J Tecumseh Accounts Spreadsheet (<u>Exhibit C</u>) by red highlighting in the far left column. *See also* Composite Exhibit D, Bates No. 19, 23 and 27.

[43] Meyer Decl. at ¶ 14. ; *see also* Composite Exhibit D, Bates No. 19, 23, and 27.

[44] *Id.*

[45] See Composite Exhibit D, Bates No. 23.

[46] *Id.*

has not conclusively established the record date of transfer of the receivables as discussed in Section C (2) above, HASelect's Motion must be denied with respect to the 1-J Accounts at issue.

**D.    THE DEBTOR PURCHASED AND HELD THE RECEIVABLES FOR THE BENEFIT OF TECUMSEH.**

Where "a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid." Restatement (Third) of Trusts § 9 (2003); *see also Hayne Fed. Credit Union v. Bailey,* 489 S.E. 2d 472, 475 (S.C. 1997) ("Equity devised the theory of resulting trust to effectuate the intent of the parties in certain situations where one party pays for property, in whole or in part, that for a different reason is titled in the name of another."); *Cummings v. Tinkle*, 91 Nev. 548, 550, 539 P.2d 1213, 1214 (1975)("Where the consideration for the property is provided by one party, but title is taken by another, and the circumstances negate the possibility of the consideration being a gift, equity will intervene to protect the rights of the first party."). A resulting trust may likewise arise in personalty. *McDowell v. S.C. Dept. of Soc. Services*, 370 S.E.2d 878 (S.C. App. 1987) (food stamp applicant rebutted presumption that automobile, which was titled in both applicant's and son's name, but registered only in applicant's name, was gift to son, establishing that applicant was trustee of resulting trust that arose in favor of son, and thus, automobile was not applicant's asset for purpose of food stamp eligibility).

The determination of whether a resulting trust exists is thus intrinsically factual in nature. A "resulting trust for the payor of the purchase price is recognized only after any relevant circumstances, written and oral statements, associated agreements or understandings, and other admissible parol evidence have been considered in an effort to ascertain and give effect to any discernible, actual intentions of the payor or objectives of the parties." *Id.*; *see also In re Goldstein*, 135 B.R. 703, 705 (Bankr. S.D. Fla. 1992) (A "vital element [of a resulting trust] is the intention [of the parties] which will be presumed from the facts.")

The presumption of the resulting trust is, therefore, that the Debtor intended to hold the receivables for the benefit of the intended owner, Tecumseh. And while HASelect may rebut this presumption it has failed to do so. *See Hayne Fed. Credit Union v. Bailey*, 489 S.E.2d 472, 475

(S.C. 1997) ("The presumption [of the resulting trust]…may be rebutted and the actual intention shown by parol evidence.")

The Debtor holds the 1-F Accounts, 1-I Accounts, and 1-J Accounts subject to a purchase money resulting trust in favor of Tecumseh, as beneficiary. It is black-letter law that property which a debtor holds subject to a resulting trust never becomes part of bankruptcy estate. *See* 11 U.S.C. § 541(d); *see also In re Torrez*, 63 B.R. 751, 755 (B.A.P. 9th Cir. 1986), *aff'd,* 827 F.2d 1299 (9th Cir. 1987) (property held at all times in a resulting trust is not part of the estate); *In re Golden Triangle Capital, Inc.,* 171 B.R. 79 (Bankr. App. 9th Cir. 1994) (A "transaction that has failed to carry out the parties' intent becomes a resulting trust, and a resulting trust cannot be part of the debtor's estate."). Assets held in trust are not subject to the trustee's (here the Debtor's) creditors, whether they be secured or unsecured. *See In re Anchorage Nautical Tours, Inc.,* 102 B.R. 741 (9th Cir. BAP 1989) (in which prepetition oral assignment of insurance proceeds effective against subsequent lienholders and bankruptcy estate). Accordingly, the 1-F Accounts, 1-I Accounts, and 1-J Accounts are neither subject to HASelect's lien nor property of the estate which HASelect purchased pursuant to the *Order Granting in Part, and Denying in Part, the Trustee's Motion (I) Approve Sale of Certain Assets; (II) Set Sale/Auction Procedures: and (III) Set Auction Hearing Date* ("Procedural Order") [ECF No. 175] entered on January 21, 2022, and *Order Approving Sale* ("Sale Order") [ECF No. 184] entered February 11, 2022.[47]

Nor are they subject to the Trustee's strong-arm powers found in Section 543. As the Bankruptcy Appellate Panel in *In re Golden Triangle Capital*, explained:

> Determination of whether bankruptcy's policy of ratable distribution outweighs imposition of a trust depends on whether the trust arises out of intended ownership rights in the property [resulting trust] or whether it is to be imposed as a remedy to correct a wrong [constructive trust]. Analysis focuses on the legal relationship between the parties. If no debtor-creditor relationship exists, a trust will exclude property from the estate. If, on the other hand, the trust is imposed as a remedy for a claim, circumstances may warrant treating the claimant as any other creditor of the debtor, and thus subject to the policy of ratable distribution. This is the result

---

[47] The Procedural Order and Sale Order both specifically provided that "The sale of the Assets is free and clear of all liens, claims, and encumbrances of any third party other than HASelect and Tecumseh, The Assets are sold subject to whatever rights, title, interests, and encumbrances HASelect and Tecumseh may have in the Tecumseh Receivables."

in *In re Tleel,* 876 F.2d 769 (9th Cir. 1989) (inchoate trust remedy not superior to trustee's strong-arm power) . . .

*In re Golden Triangle Capital, Inc*., 171 B.R. at 82. Tecumseh and the Debtor had a contractual relationship whereby the Debtor was to act as a purchasing agent or broker for Tecumseh and to service the receivables that Tecumseh acquired. Belotz Decl. at ¶ 7. Tecumseh—unlike HASelect— is not a creditor of the Debtor.  Furthermore, allowing HASelect to utilize the strong arm powers of Section 543 will certainly not a effectuate a ratable distribution, as avoidance under these circumstances would serve to benefit only HASelect.

## IV.    CONCLUSION

HASelect is not entitled to summary judgment for several reasons. First, this Court should adjudicate the pending Rule 60(b) Motions before even considering this Motion. Second, HASelect has failed to establish that no issues of material fact exist as matter of law. As before, there remains insufficient evidence in the record to conclude that the date of Debtor's checks or HASelect's calculation of "Date Paid" conclusively establishes either: (i) the date that the Debtor

…

…

…

…

…

…

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

68766579;2

1    actually paid the medical providers; or (ii) the date that title to the subset of 1-F Accounts, 1-I

2    Accounts, and 1-J Accounts was transferred. HASelect's Motion is likewise flawed in that it fails

3    to account for more than 190 incidents of contemporaneous payment from Tecumseh to the Debtor.

4    The forgoing issues require that the Court deny the Motion.

5         Accordingly, Tecumseh respectfully requests that the Court deny the Motion in its entirety.

6         DATED this 23rd of February, 2023.

7                                    Respectfully submitted,

8                                    GARMAN TURNER GORDON LLP

9

10                                   By:  */s/ Jared M. Sechrist*
                                          GERALD M. GORDON, ESQ.
11                                        JARED M. SECHRIST, ESQ.
                                          7251 Amigo St., Suite 210
12                                        Las Vegas, Nevada 89119

13                                        and

14                                        MICHAEL D. NAPOLI, ESQ.
                                          *Pro hac vice*
15                                        AKERMAN LLP
                                          2001 Ross Avenue, Suite 3600
16                                        Dallas, Texas 75201
                                          Tel: (214) 720-4360 / Fax: (214) 720-8116
17
                                          ARIEL E. STERN, ESQ.
18                                        Nevada Bar No. 8276
                                          AKERMAN LLP
19                                        1635 Village Center Circle, Suite 200
                                          Las Vegas, Nevada 89134
20                                        Tel: (702) 634-5000 / Fax: (702) 380-8572
                                          Email: ariel.stern@akerman.com
21
                                          *Attorneys for Tecumseh–Infinity Medical*
22                                        *Receivable Fund, LP*

23

24

25

26

27

28