Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:   blarsen@shea.law
         kwyant@shea.law

*Attorneys for HASelect-Medical Receivables
Litigation Finance Fund International SP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br>**PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN 1-F, 1-I, AND 1-J ACCOUNTS** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP;<br><br>Counter-Defendants. | Hearing Date:  March 30, 2023<br>Hearing Time:  9:30 a.m. |

HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by and through counsel, respectfully submits this Reply in support of its *Motion for Partial Summary Judgment as to Certain 1-F, 1-I, and 1-J Accounts* [ECF No. 170] (the "Motion") and in response to Tecumseh's Opposition to the Motion [ECF No. 197].

This Reply is made pursuant to Fed. R. Civ. P. 56 and Federal Rules of Bankruptcy Procedure 7056 and Rule 7056 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Nevada,[1] and is made and based upon the following points and authorities, the statement of undisputed facts submitted herewith, the exhibits attached hereto as well as the pleadings and other documents on file in this Adversary Proceeding and the related chapter 7 bankruptcy case of Infinity, judicial notice of which is requested.[2]

### I. PRELIMINARY STATEMENT

While Tecumseh's Opposition is flawed in many respects, it is important to note that Tecumseh's Opposition does not dispute that Tecumseh did not provide contemporaneous or prior payment for a majority of the 1-F, 1-I, and 1-J Accounts[3] at issue in the Motion. Indeed, Tecumseh concedes that it did not provide prior or contemporaneous funding to Infinity for 162 1-F Accounts, 726 1-I Accounts, and 50 of the 1-J Accounts. As Tecumseh has conceded this lack of prior or contemporaneous funding and has also recognized that a resulting trust cannot be imposed for such subsequent funding, the summary judgment should, at a minimum, be granted in HASelect's favor with respect to these 938 accounts.

Moreover, it is clear that Tecumseh's claims regarding the check payment dates are flawed. While Tecumseh is generally correct as to the dates on which certain checks cleared Infinity's bank account, Tecumseh fails to acknowledge that its funds were not deposited in the same bank account

---

[1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

[2] Judicial notice of all materials appearing on the docket in the above-captioned Chapter 7 Bankruptcy Case and related adversary proceedings is proper. *See* FRE 201(b); *see also U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *Bank of Am., N.A. v. CD-04, Inc. (In re Owner Mgmt. Serv., LLC Trustee Corps.)*, 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case, and public records.") (cited by *In re Fikrou*, No. 19-13180-mkn, 2019 Bankr. LEXIS 2613, n. 2 (D. Nev. Bankr. Aug. 8, 2019)).

[3] All terms capitalized herein but not otherwise defined shall be given the meaning ascribed to them in the Motion.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

on the date that those checks cleared. As has been shown several times through this Adversary Proceeding, Tecumseh deposited funds in Infinity's Nevada State Bank Account ending in 8480 (the "8480 Account"); however, those funds were not immediately transferred over to Infinity's Nevada State Bank Account ending in 6375 (the "Operating Account"). Put differently, although Tecumseh claims it transferred funds into the 8480 Account, Infinity's payments to the pertinent medical providers were made from (and the checks cleared) Infinity's Operating Account prior to Tecumseh's funds being transferred to the Operating Account. As such, Tecumseh cannot credibly claim its funds were used to purchase the accounts at issue.

Tecumseh's absurd arguments regarding the definition of "Collateral" are entirely misplaced and are plainly intended only to detract from the proper analysis set forth in the Motion, which shows that HASelect is entitled to summary judgment on the disputed accounts identified therein. Similarly, Tecumseh's argument that it has not been established when Infinity acquired its interests in the disputed receivables is belied by the record before this Court.

Finally, Tecumseh cannot establish it is entitled to a resulting trust due to the unlawful nature of its supposed arrangement with Infinity. Tecumseh claims it engaged Infinity to "service and collect" accounts receivable acquired by Tecumseh.[4] However, any such arrangement would violate Nevada law, which requires that Infinity obtain a collection agency license to engage in such activities. *See* NRS Chapter 649. If Infinity unlawfully acted as an unlicensed collection agency as Tecumseh contends, it would render any claim for a resulting trust impossible.

Thus, based on Tecumseh's concessions in its Opposition that it did not provide prior or contemporaneous funding for many of the accounts at issue, its failure to meet its burden in opposing summary judgment, and the reasons stated more fully below, HASelect's Motion should be granted with respect to the 1-F, 1-I, and 1-J Accounts identified in the Motion.

## II.    LEGAL ARGUMENT

**A.    Tecumseh has failed to meet its burden in opposing summary judgment.**

In opposing summary judgment, Tecumseh was required to come forth with admissible

---

[4] *See* Opposition, 4:14-17.

evidence to establish a genuine issue of material fact as to the issue presented—i.e., that Tecumseh did not provide contemporaneous or prior payment for the accounts at issue. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (acknowledging that, in opposing summary judgment, the nonmoving party must tender evidence of specific facts and that such a burden is "not a light one" and must come forth with evidence that could render a verdict in the nonmoving party's favor). Further, conclusory statements, assertions, and metaphysical doubt as to the material facts will not defeat a properly supported and meritorious summary judgment motion. *Id.* at 586 – 87.

First, Tecumseh is simply wrong in arguing that the Motion relies in any way on the "Date Paid" column found in Tecumseh's purchase orders attached to the Motion as Exhibits 2, 5, and 7.[5] Rather, Tecumseh's Opposition conflates the "Date Paid" column reflected in Tecumseh's purchase orders with the "PaidDate" column from the list of Dispute Accounts included in ECF No. 201-1, which Tecumseh admits is based on the original "TIFDumpWithIncome-Final.xlsx" spreadsheet produced to the chapter 7 trustee by Infinity shortly after its chapter 7 filing.[6]

The Motion, in fact, relies on the "PaidDate" column from the "TIFDumpWithIncome-Final.xlsx" spreadsheet, which accurately reflects the date on which each Disputed Account was purchased by Infinity as confirmed through Oliver Hemmers Rule 2004 examination testimony.[7] There are obvious omissions and errors in the "Date Paid" column from Tecumseh's purchase orders. However, Tecumseh has offered no evidence whatsoever to refute Hemmers' testimony that the "PaidDate" column indicates the date on which Infinity acquired the Disputed Accounts nor any evidence indicating that the "PaidDate" entry for any particular Disputed Account is incorrect. In fact, Tecumseh's own inclusion of the "PaidDate" column in the list through which it identified to this Court the Disputed Accounts over which it claims ownership at ECF No. 201-1 (filed on March 22, 2022 – more than five months after the commencement of this Adversary Proceeding) should be

---

[5] *See* Opposition [ECF No. 197], 15:10-13.

[6] *See* ECF No. 200, ¶ 22.

[7] *See* Excerpts from Transcript of November 10, 2021 Rule 2004 Examination of Oliver Hemmers on file at ECF No. 57-3, pp. 38-39 (Q: "… the Paid Date shown here in column DV, does that represent the date on which Infinity acquired the receivable?" A: "Yeah, that's the date, yeah.").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

determinative on the issue of when the Disputed Accounts were acquired.

Tecumseh's Opposition likewise fails to offer any evidence with respect to when checks sent as payment for majority of the accounts at issue in the Motion were negotiated. In fact, Tecumseh put forth evidence with respect to only 84 of the 239 1-F Accounts at issue in the Motion,[8] 29 of the 755 1-I Accounts at issue in the Motion,[9] and 77 of the 127 1-J Accounts at issue in the Motion.[10] Because Tecumseh failed to put forth any evidence in its Opposition to rebut HASelect's properly supported Motion as to the remaining accounts, the Court must grant summary judgment as to the 155 1-F Accounts, 726 1-I Accounts, and 50 1-J Accounts for which Tecumseh concedes it did not provide contemporaneous or prior funding.

Furthermore, Tecumseh's own analysis in its Opposition and exhibits attached thereto is flawed as it fails to account for when Tecumseh's funds were actually transferred into the Operating Account from which Infinity made payment to medical providers. When the Court analyzes such facts, it is clear that Tecumseh's arguments are wanting. For example, Tecumseh claims that 84 receivables "were made by checks that were honored by the Nevada State Bank on or after September 25, 2020" with respect to the 1-F Accounts.[11] However, Tecumseh fails to acknowledge that Tecumseh's payment was not transferred to the Operating Account until October 8, 2020. Thus, Tecumseh's funds could not have been used to purchase the 1-F Accounts at issue.

As set forth in the Motion and as admitted by Tecumseh, Tecumseh did not send the payment corresponding to the 1-F Purchase Order and 1-F Accounts until September 25, 2020 when it wired $481,023.10 to the 8480 Account.[12] As further admitted by Tecumseh, the checks that paid for the 1-F Accounts were issued from and drawn on Infinity's Operating Account ending in 6375, and almost all such checks cleared the Operating Account prior to October 8, 2020.[13] However, Tecumseh's Exhibit D (the Operating Account bank statements) shows that Tecumseh's full

---

[8] *See* Opposition [ECF No. 197], 15:4-9.
[9] *Id.* at 16:7-9.
[10] *Id.* at 17:6-10.
[11] *Id.* at 15:4-9.
[12] *See* ECF No. 200, ¶ 25.
[13] *See* ECF No. 200, ¶ 28; Exhibit A to the Opposition.

$481,023.10 did not reach the Operating Account until October 8, 2020.[14]

Similar issues exist with respect to Tecumseh's arguments concerning the 1-I and 1-J Accounts. As to the 1-I Accounts, while Tecumseh wired $209,320.99 to Infinity's 8480 Account on October 14, 2020, such funds were not fully transferred to the Operating Account until November 5, 2020.[15] With respect to the 1-J Accounts, Tecumseh wired $136,063.26 to the 8480 Account on October 26, 2020, but those funds were not fully transferred to the Operating Account until until November 19, 2020.[16]

Additionally, Tecumseh has failed to carry its burden of producing evidence to establish that the commingled funds from the Operating Account that were used to purchase the 1-F, 1-J, and 1-I Accounts at issue were actually Tecumseh's funds. The funds in the Operating Account are presumptively property of Infinity. *See, e.g.*, *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir. 1988). The Ninth Circuit requires that the proponent seeking a trust "bears the burden of tracing the alleged trust property specifically and directly" and showing it is actually the property of the proponent. *Taylor Assocs. v. Diamont (In re Advent Mgmt. Corp.)*, 104 F.3d 293, 296 (9th Cir. 1997). Here, Tecumseh fails to perform any such analysis, and as such, failed to carry its burden in opposing the Motion with respect to the 1-F, 1-I, and 1-J Accounts at issue. As such, the Motion should be granted with respect to all the accounts at issue therein, or, at a minimum, with respect to the accounts where the funds cleared the Operating Account prior to full funding by Tecumseh.[17]

**B.    Infinity acquired the 1-F, 1-I, and 1-J Accounts at issue at the time of payment.**

Tecumseh's argument that HASelect has failed to establish when title passed to Infinity as to the 1-F, 1-I, and 1-J Accounts at issue is similarly misplaced. Tecumseh admits that Infinity

---

[14] *See* Exhibit D to the Opposition, Bates No. 013-017.
[15] *Id.* at Bates No. 21.
[16] *Id.*
[17] For clarity, this would include all 1-F Accounts highlighted in green on Tecumseh's Exhibit A wherein it was noted that the checks cleared on or before 10/8/2020, all 1-I Accounts highlighted in green on Tecumseh's Exhibit B and at issue in the Motion (because Tecumseh's funds could not have been used to purchase the 1-I Accounts at issue in the Motion prior to full transfer of the same on 10/19/2020), and all 1-J Accounts highlighted in green on Tecumseh's Exhibit C and at issue in the Motion (because Tecumseh's funds could not have been used to purchase the 1-J Accounts at issue in the Motion prior to full transfer of the same on 11/19/2020).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

acquired the 1-F, 1-I, and 1-J Accounts at issue pursuant to contracts Infinity entered into directly with medical providers.[18] But HASelect need not analyze each such contract to determine when Infinity acquired rights in the 1-F, 1-I, and 1-J Accounts at issue.

Sales of accounts[19] fall within scope of UCC Article 9. *See* NRS 104-9109(1) ("this Article applies to ...(3) [a] sale of accounts..."); *see also, Netbank, FSB v. Kipperman (In re Commercial Money Center, Inc.)*, 350 B.R. 465, 475 (9th Cir. BAP 2006) ("[T]he UCC uses lending terminology in provisions that are applicable to sales."). The term "security interest" includes the interest of an outright buyer of "accounts." *See* NRS 104.1201(ii);[20] s*ee also Dellamargio v. B-Line, LLC (In re Barker)*, 306 B.R. 339, 349 (Bankr. E.D. Cal. 2004) ("The scope of Revised Article 9 extends to: 'A sale of accounts....'"). Likewise, the term "collateral" is defined in NRS 104.9102(1)(l) to include "[a]ccounts ... that have been sold".

The question of when Infinity acquired its interests in the 1-F, 1-I, and 1-J Accounts at issue is resolved under NRS 104.9203, which governs attachment of security interests in collateral. As set forth therein, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment." NRS 104.9203 (1). A security interest becomes enforceable when three requirements are met: (1) value is given; (2) the debtor has rights in the collateral; and (3) the debtor has authenticated a security agreement[21] describing the collateral. *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F.Supp.2d 1013, 1020 (D. Nev. 2009) (citing *In re Schwalb*, 347 B.R. at 741; NRS 104.9203(2)(a)-(c)).

As set forth above, Tecumseh admits that Infinity acquired the 1-F, 1-I, and 1-J Accounts at issue pursuant to contracts (i.e., authenticated security agreements) Infinity entered into directly with

---

[18] *See* ECF No. 200, ¶ 7.

[19] For the reasons set forth in HASelect's opposition [ECF No. 122] to Tecumseh's motion for partial summary judgment, HASelect contends that transactions between Infinity and certain medical providers, including Cueva Diagnostics, LLC d/b/a Stat Diagnostics, Preva Advanced Surgicare – The Woodlands, LLC, and Viking Pain Management, were loans, not purchases. As such, no resulting trust could arise with respect to any Disputed Account funded with any such medical provider.

[20] "'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. 'Security interest' includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible or a promissory note …" NRS 104.1201(ii).

[21] "'Security agreement' means an agreement that creates or provides for a security interest." NRS 104.1201(uuu).

medical providers.[22]  Tecumseh has not suggested nor produce any evidence indicating (i) that any such contract included any understanding that attachment Infinity's security interest would be postponed or (ii) that any medical provider from whom the 1-F, 1-I, and 1-J Accounts at issue were acquired lacked rights in such accounts.  Accordingly, attachment is determined based on the time of payment, which has been established through the evidence presented by HASelect in support of the Motion.

C. **Tecumseh's arguments regarding the definition of Collateral are flawed and untimely.**

The Opposition's arguments regarding HASelect's alleged failure to establish its secured interest in the 1-F, 1-I, and 1-J Accounts not only flies in the face of this Court's previous findings, whereby the Court has determined on several occasions that HASelect has a perfected security interest in all of Infinity's personal property, it also fails to recognize that Tecumseh has already conceded this point in this litigation.[23]  Tecumseh's attempts to now walk back its previous admissions recognizing HASelect's perfected security interest, which have been on the record for the majority of this adversary proceeding, as well as the similar findings of this Court in Infinity's chapter 7 case.[24]

Tecumseh has filed two Motions (identified in the Opposition as the Rule 60(b) Motions) more than one year after the orders it seeks to set aside were entered by this Court.  Such a lengthy delay renders Tecumseh unable to move under either FRCP 60(b)(1) or (b)(2). *See, e.g., Nevitt v. United States*, 886 F.2d 1187, 1188 (9th Cir. 1989) (stating that a district court lacks jurisdiction to consider an untimely motion under Rule 60(b)(1) or (b)(2)).

Moreover, Tecumseh's inexcusable delay, which it asserts was based on its counsel failing to review applicable and wholly relevant loan documents, is not timely under Rule 60(b)(6). "A motion under Rule 60(b)(6) must be made within a reasonable time." *Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010). Rule 60(b)(6) should only be used "sparingly". *Id.* "To receive relief

---

[22] *See* ECF No. 200, ¶ 7.
[23] *See* ECF No. 75, ¶ 4, on file herein.
[24] HASelect responded in more detail to Tecumseh's newly concocted arguments regarding the definition of Collateral by way of its Opposition to Tecumseh's Motion to Set Aside Orders Approving Sales Procedures and Approving Sale [ECF No. 282] on file in the Bankruptcy Case, and HASelect incorporates its arguments set forth therein in full here.

under Rule 60(b)(6), a party **must demonstrate 'extraordinary circumstances which prevented or rendered him unable to prosecute [his case]."** *Id.* (emphasis supplied). An attorney's actions, unless grossly negligent, are chargeable to the client and "do not ordinarily constitute extraordinary circumstances warranting relief from judgment under Rule 60(b)(6)." Here, Tecumseh is bound by its attorneys' actions, and its extreme delay of more than a year to set aside orders in the bankruptcy case is entirely untimely. Further, Tecumseh seeks to use Rule 60(b) to assert arguments that could have been raised previously, which is expressly precluded by the Ninth Circuit. *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). For all these reasons, Tecumseh's Rule 60(b) Motions are untimely and any arguments relating thereto should not be considered by this Court in considering granting the current Motion relating to the 1-F, 1-I, and 1-J Accounts.

Further, Tecumseh is entirely incorrect that there are two competing definitions between the Note and the MLA, as the only definition for Collateral is contained in the MLA. Under applicable law, the MLA and the Note constitute one contract as they were executed simultaneously, the Note was attached as an Exhibit to the MLA, and both documents expressly reference one another. *See, e.g.*, *Roche v. Travelers Prop. Cas. Ins. Co.*, No. 07-cv-302, 2008 U.S. Dist. LEXIS 57418, *14 (S.D. Ill. July 24, 2008) ("Under Illinois law, different instruments executed by the same parties, at the same time, for the same purpose, and in the course of the same transaction, are regarded as one instrument and will be read and construed together."); *Lincoln Welding Works v. Ramirez*, 98 Nev. 342, 345, 647 P.2d 381, 383 (1982) ("Writings which are made a part of the contract by annexation or reference will be so construed…."). Thus, logically, there can be only one definition of Collateral in this single contract, which is the one contained in the primary body of the contract, the MLA.

Tecumseh's entire argument relies on the impermissible notion that a section heading entitled "Collateral" in the Note is somehow a capitalized define term, despite being capitalized and defined earlier in the contract at § 4.1 of the MLA. Collateral is used in the Note at ¶ 16 solely as a section heading, like "Remedies", "Events of Default", "Prepayment", and "Business Day"—the very paragraph headings preceding it. However, Remedies is not a defined term, despite being

Page 9 of 17

capitalized.[25] Indeed, "Remedies" is used to connote ¶ 15, but when the Court reads ¶ 15 in its entirety, it is apparent that "remedies" is used in its noncapitalized form, despite being a "capitalized" paragraph heading. "Prepayment" is another example of a paragraph heading that is not subsequently capitalized in the same paragraph because it is not considered a defined term.[26] As such, because remedies and prepayment are not considered a capitalized defined term simply based on its capitalization and use as a paragraph heading, the same logic applies to "Collateral" as a paragraph heading and shows that it is not considered a capitalized defined term.

This logical conclusion is only bolstered when the Court looks at ¶ 14 of the Note entitled "Events of Default". "Events of Default" is a capitalized paragraph heading, but it cannot be considered a defined term solely based on its use as a capitalized paragraph heading because it is subsequently defined in **bold** typeface without underline later in the same paragraph.[27] Had the paragraph heading been sufficient to define such a term, it would not have been re-defined later on. Moreover, it is clear that when a term is defined in the Note that may not be already defined in the MLA, it is delineated as such through **bold** typeface without underline. For example, the Note at § A defines the MLA as the "**Loan Agreement**", which is defined in the MLA as the "**Agreement**". The parties to the MLA and the Note routinely used **bold** typeface without underlining to define terms, and "Collateral" as used in the Note is simply not delineated in such a manner. In fact, the only place where "**Collateral**" (in **bold** typeface with no underline) appears is in the MLA. As such, the only logical conclusion is that Collateral is only defined in the MLA and not the Note as Tecumseh now suggests.

Further, the Note routinely states that, unless otherwise stated, the MLA is the governing document when there is a conflict between the MLA and the Note.[28] The Note, at ¶ 16 entitled Collateral even states that the Note shall be secured by a security interest "as set forth in the [MLA]." All documents defer to the MLA and its provisions, and as such, those provisions are the operative and controlling ones that have been used during the entirety of the Bankruptcy Case and related

---

[25] *See* Note, ¶ 15 at [Claim No. 8-2] on file in the above-captioned bankruptcy matter.
[26] *Id.* at ¶ 13.
[27] *Id.* at ¶ 14.
[28] *See* Note, § E at [Claim No. 8-2] on file in the above-captioned bankruptcy matter.

Adversary Proceeding. The Court should not now, based on Tecumseh's newly concocted argument more than a year later, reverse all the progress made in the Bankruptcy Case and related proceedings on such a flawed argument when the documents themselves expressly disprove Tecumseh's arguments and Tecumseh has admitted that § 4.1 of the MLA and the definition of Collateral therein controls.[29]

Moreover, the Court should not read the MLA and Note in such a way to render § 4.1 superfluous. *See, e.g.*, *Bayview Hunters Point Cmty. Advocates v. Metro Transp. Comm'n*, 366 F.3d 692, 700 (9th Cir. 2004); *see also United States ex rel. R Excavating v. PK Constrs.*, No. 96-35765, 1997 U.S. App. LEXIS 34870, *6 (9th Cir. Dec. 4, 1997) (unpublished). Reading the MLA and Note as Tecumseh would suggest would entirely render § 4.1 of the MLA superfluous. Indeed, the Court cannot adopt Tecumseh's interpretation of reading the Note to define "Collateral" without rendering the security interest and Collateral definition in MLA nugatory, thereby violating the applicable contractual construction principles. Further, Tecumseh's Motion attempts to create a conflict between the MLA and the Note, thereby violating the principle of contractual construction that requires provisions to be read in a nonconflicting manner unless no other reasonable interpretation is possible. Here, there is a reasonable interpretation that does not require conflict—the MLA governs the definition of Collateral and the scope of HASelect's security interest, and the Note simply reaffirms the same.

Lastly, the only two parties to the MLA—Infinity and HASelect—have both admitted that the definition of Collateral in § 4.1 of the MLA is the operative one. Infinity has admitted, via its principals in Oliver Hemmers and Anne Pantelas, that "HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "<u>Collateral</u>")."[30] This is considered a judicial admission, and is binding on Infinity. *See, e.g.*, *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

As such and as previously found by this Court several times over, HASelect has a perfected

---

[29] *See* [ECF No. 75], ¶ 4, on file herein.

[30] *Compare Adversary Complaint* filed by HASelect against Anne Pantelas, Oliver Hemmers, and Infinity Health Solutions [ECF No. 1], at ¶ 11, in Case No. 22-01109 *with Defendants' Answer to the Adversary Complaint* [ECF No. 21], at ¶ 11, in Case No. 22-01109.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

security interest in all of Infinity's personal property, which includes, but is not limited to, the 1-F, 1-I, and 1-J Accounts at issue in the Motion.

### D. Tecumseh is not entitled to the equitable remedy of a resulting trust.

Tecumseh's final argument in its Opposition is one that the Court has heard numerous times before and has found wanting. Indeed, Tecumseh again claims it is entitled to a resulting trust over the 1-F, 1-I, and 1-J Accounts identified in the Motion despite this Court refusing to impose such a rarely granted and extreme remedy on either HASelect's Prior Motion or Tecumseh's own motion for partial summary judgment.[31] Tecumseh cannot meet the extreme burden to obtain such a remedy. *See, e.g.*, *Anderson v. Monroe (In re Hester)*, No. 18-03903, 2019 Bankr. LEXIS 2371, *8 (D.S.C. Bankr. July 26, 2019); *see also Glover v. Glover*, 234 S.E.2d 477 (S.C. 1977) ("In order to establish a resulting trust [under South Carolina law], it was necessary that respondent show by ***definite, clear, unequivocal, and convincing evidence*** that she paid…the purchase money at the time of the transaction.") (emphasis supplied); Restatement (Third) of Trusts, § 9, Comment f (1) ("[T]he party alleging the purchase-money resulting trust has the burden of proving by clear and convincing evidence that the claimant…paid or furnished the purchase price…thereof."). "If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails." *In re Peregrine Fin. Grp., Inc.*, 2014 Bankr. LEXIS 2328 at *9.

As set forth previously, Tecumseh has failed to establish that its funds were actually used to purchase anything. Tecumseh has not engaged in any tracing exercise to date. *See Old Republic Nat'l title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) ("[A] party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust."); *Hatoff v. Lemons & Assocs., Inc.*, 67 B.R. 198, 213 (Bankr. D. Nev. 1986) ("A party who wishes to exempt trust property from the estate must not only prove the existence of a trust relationship but must also specifically identify the trust property in either its original or substituted form."). Tecumseh has not and cannot meet this burden, and the commingling of funds weighs heavily against Tecumseh's claims for a resulting trust. *See Obuchowski v. Entis (In re Robert)*, No.

---

[31] *See* [ECF No. 90].

05-12461, 2007 Bankr. LEXIS 2852, *33 (Vt. Bankr. Aug. 17, 2007) (finding that as a matter of law, there was no intent to create a resulting trust when the operative agreement contained no provision that the funds provided to debtor would be held in trust or kept separate from debtor's assets).

Additionally, Tecumseh has admitted through the amended declaration of Chad Meyer filed in Infinity's chapter 7 case on March 22, 2022 that it purchased the 1-F, 1-I, and 1-J Accounts at issue from Infinity.[32] Tecumseh cannot now perform an about face when it made these representations under oath and under penalty of perjury. Furthermore, and as this Court has noted, Infinity's bankruptcy schedules make no reference of any kind to any accounts receivable held in trust for Tecumseh.[33]

Lastly, the unclean hands doctrine bars such a claim for a resulting trust in Tecumseh's favor as a matter of law. In addition to Tecumseh's pervasive misconduct in seeking to interfere in HASelect's relationship with Infinity and misappropriate HASelect's Collateral as described in other filings[34], Tecumseh's Opposition obtusely claims that Infinity was to "service and collect" accounts receivable acquired by Tecumseh.[35] In other words, Tecumseh claims that it engaged Infinity to act as its collection agent. This claim alone precludes the imposition of a resulting trust due to the unlawful nature of the claimed relationship between Tecumseh and Infinity. Under Nevada law, it would plainly be unlawful for Infinity to "service and collect" any account receivable owned by Tecumseh without holding a valid license to act as a collection agency. Specifically, NRS 649.075 states:

> Except as otherwise provided in this section, a person shall not conduct within this State a collection agency or engage within this State in the business of collecting claims for others, or of soliciting the right to collect or receive payment for another of any claim, or advertise, or solicit, either in print, by letter, in person or otherwise, the right to collect or receive payment for another of any claim, or seek to make collection or obtain payment of any claim on behalf of another without having first applied for and obtained a license from the Commissioner.

---

[32] *See* Bankruptcy Case No. 21-14486-abl, ECF Nos. 200, 201-13, and 201-14 ("[Tecumseh] purchased the remaining Tecumseh Receivables from the Debtor. Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of Tecumseh Receivables from the Debtor.").
[33] *See* Bankruptcy Case No. 21-14486-abl, ECF No. 112.
[34] *See* ECF Nos. 122, 123, and 124.
[35] *See* Opposition, 4:14-17.

NRS 649.075 (1).

The term "collection agency" means all persons engaging, directly or indirectly, and as a primary or a secondary object, business or pursuit, in the collection of or in soliciting or obtaining in any manner the payment of a claim owed or due or asserted to be owed or due to another.  NRS 649.020 (1).  Infinity was undoubtedly doing business in Nevada prior to its chapter 7 filing but held no license to act as a collection agency.[36]   Further, NRS 649.435 states that it is unlawful for any person to violate NRS Chapter 649's provisions, which require licensing for any person who is "in the business of collecting claims for others." *See* NRS 649.075.

It is well established law that illegal conduct bars equitable remedies, including, but not limited to, resulting trusts. *See, e.g.*, *Ferreira v. Mafnas*, 1 F.3d 960, 962-63 (9th Cir. 1993) (stating that even if intended, a resulting trust will not be created to accomplish or further an illegal purpose); *Radbill v. Radbill (In re Radbill)*, No. 10-49932, 2013 Bankr. LEXIS 2883, *19 (D.N.J. Bankr. July 16, 2013) (recognizing that illegality bars the imposition of a resulting trust). Therefore, even if Tecumseh could establish through clear and convincing evidence the tracing of its funds, the intent of the parties, and somehow undo its already sworn statements under oath (all of which, it cannot), Tecumseh still would not be entitled to a resulting trust because of its unclean hands, which includes, but is not limited to, the illegal nature of its asserted relationship with Infinity.

### III.  CONCLUSION

Based on the foregoing, HASelect respectfully requests that this Court enter an order (i) granting partial summary judgment in its favor, (ii) determining that HASelect's perfected security interest in the 1-F Accounts, 1-I Accounts, and 1-J Accounts at issue herein is superior to any interest held by Tecumseh in the same accounts, (iii) determining that HASelect's position as a "lien creditor" under 11 U.S.C. § 544(a) is superior to any interest held by Tecumseh in the 1-F Accounts, 1-I Accounts, and 1-J Accounts at issue herein, (iv) determining that any interest held by Tecumseh in the 1-F Accounts, 1-I Accounts, and 1-J Accounts at issue herein is avoided pursuant to 11 U.S.C. § 544(a), (v) determining that HASelect is entitled to immediate ownership and possession of the 1-

---

[36] *See* Case No. 21-14486-abl, ECF No. 112, Part 10.

F Accounts, 1-I Accounts, and 1-J Accounts at issue herein as well as all proceeds thereof, and (vi) compelling Tecumseh to immediately surrender and turn over to HASelect all of the 1-F Accounts, 1-I Accounts, and 1-J Accounts at issue herein as well as all proceeds thereof pursuant to 11 U.S.C. § 550(a).

Dated this 9th day of March 2023.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
BART K. LARSEN, ESQ.
Nevada Bar No. 8538
KYLE M. WYANT, ESQ.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables Litigation Finance Fund International SP*

# CERTIFICATE OF SERVICE

1. On March 9, 2023, I served the following document(s): **PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN 1-F, 1-I, AND 1-J ACCOUNTS**

2. I served the above document(s) by the following means to the persons as listed below:

   ☒ a. ECF System:

   CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
   clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

   GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
   ggordon@gtg.legal, bknotices@gtg.legal

   MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
   michael.napoli@akerman.com,
   cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

   ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
   ariel.stern@akerman.com, akermanlas@akerman.com

   ☐ b. United States mail, postage fully prepaid:

   ☐ c. Personal Service:

   I personally delivered the document(s) to the persons at these addresses:

   ☐ For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

   ☐ For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

   ☐ d. By direct email (as opposed to through the ECF System):
   Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

   ☐ e. By fax transmission:

   Based upon the written agreement of the parties to accept service by fax transmission or a

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐     f.     By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 9, 2023.

By: /s/ *Bart K. Larsen, Esq,*