GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
JARED M. SECHRIST
Nevada Bar No. 10439
E-mail: jsechrist@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

*Attorneys for Tecumseh–Infinity Medical
Receivable Fund, LP*

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 21-14486-abl |
| INFINITY CAPITAL MANAGEMENT, INC. | Chapter 7 |
| Debtor. | |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, | Adversary Case No. 21-01167-abl |
| Plaintiff, | **TRIAL DECLARATION OF CHAD MEYER** |
| v. | |
| TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, | |
| Defendant. | Trial Date: August 24, 25, 28, 29, 31, 2023 Time: 9:30 a.m. |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, *et al.*, | |
| Counter-Claimant | |
| v. | |
| TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, *et al.*, | |
| Counter-Defendants. | |

72197982;4

I, CHAD MEYER, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Chad Meyer. I am over the age of twenty-one years, of sound mind, and fully competent to testify in this cause.

2.     I submit this declaration as my direct testimony in the trial of this case.

3.     I am a principal of Tecumseh Alternatives, LLC, the advisor to the Tecumseh-Infinity Medical Receivables Fund, LP, the defendant, counter-claimant and counter-defendant in this case ("**Tecumseh**"). In that capacity, I have personal knowledge of the facts stated herein, all of which are true and correct. If called upon to testify regarding the contents of this Declaration, I could and would do so.

4.     Tecumseh is a private equity fund. It has no employees. Instead, it is managed and operated by Tecumseh Alternatives, its investment advisor. Tecumseh Alternatives, as the investment advisor, makes all decisions on behalf of the Tecumseh including decisions as to what investments to purchase and hold. An investment advisor is a fiduciary of the fund. Often, investment advisors will retain sub-advisors who have particular expertise that the advisor lacks. The sub-advisor will share some of the advisor's duties including making decisions as to what investments to purchase and hold. Because Tecumseh Alternatives lacked expertise in medical receivables, it retained Infinity Capital Management, Inc., the debtor in this case ("Infinity"), which had that expertise, as a sub-advisor for the Tecumseh fund.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

72197982;4

## I.    My Background

5.    I graduated from Cornell University with a BA in Economics in 1989. I then graduated from the University of Pennsylvania law school in 1992. Instead of practicing law after graduating from law school, I purchased and ran a construction company in Atlanta, Georgia. After several years, I went back to school. I received an MBA from the University of Chicago in or around 2000. After obtaining my MBA, I founded BridgePortfolio.com, which was an industry-leader in providing outsourced back-office services. Utilizing proprietary technology, BridgePortfolio.com greatly improves the efficiency and transparency of hundreds of registered investment advisors, across several billion dollars in managed assets. I sold BridgePortfolio to a larger financial services company in Chicago in 2011.

6.    I joined Griffin Asset Management ("**GAM**") in late 2012, early 2013. GAM is the advisor for the HASelect-Medical Receivables Litigation Finance Fund International SP, the plaintiff, counter-defendant and counter-claimant in this case ("**HASelect**").

7.    I was not actually employed by GAM and was not paid a regular salary. Instead, Michael Griffin, the head of GAM, promised that he would give me a 40% equity interest in GAM in exchange for my services. I believe that Mr. Griffin provided the equity to me; he denies that he did. Our dispute over the terms of an operating agreement for GAM led him to fire me in May 2019. Mr. Griffin and I are engaged in litigation in state court in Chicago over my equity in GAM.

8.    While I was working with GAM, I had the title of President. I was generally responsible for sales, operations, overseeing technology, human resources and legal.

9.    I had only a slight involvement in HASelect's loan to Infinity. GAM was introduced to Bill Dalzell and Endre Dobozy of FTM in 2018 by John Seem, who was an investor in some of GAM's funds. That introduction lead to a dinner involving me, Simon Clark and Mr. Griffin of GAM; Mr. Dalzell and Mr. Dobozy of FTM; and Anne Pantelas and Oliver Hemmers of Infinity. I had no specific involvement in the negotiation of the loan, although I was generally apprised of the negotiations.

10.    HASelect entered into a lending agreement with Infinity and a sub-advisor agreement with FTM related to the loan in or about February 2019. As with the negotiations with

Infinity, I was not in charge of the negotiations with FTM and did not have any specific involvement but was kept generally apprised.

11.    Between the execution of the loan documents in February 2019 and the end of my termination in May of 2019, I had no role in the management of the loan. I also had no contact with Mr. Dalzell, Mr. Dobozy, Mr. Hemmers or Ms. Pantelas during that time period.

12.    In August of 2019, Michael Belotz and I formed Tecumseh Alternatives, LLC. Tecumseh Alternatives is in the business of creating and advising investment funds that invest in a variety of assets. In addition to Tecumseh, Tecumseh Alternatives advises five other funds which invest in law firm finance, life settlements and patent portfolios. Simon Clark joined Tecumseh Alternatives in January 2021.

**II.    Negotiations with Infinity**

13.    In January 2020, I received a LinkedIn message from Mr. Dobozy. That message led to a call in February 2020. Following that call, Mr. Dobozy, Mr. Dalzell, Mr. Belotz and I began discussing a potential business relationship between Infinity and Tecumseh. Shortly thereafter, the discussions expanded to directly include Ms. Pantelas and Mr. Hemmers. My understanding was that Mr. Dobozy and Mr. Dalzell were assisting Infinity in the negotiation of a potential business relationship between Infinity and Tecumseh. I definitely viewed them as sitting on Infinity's side of the negotiating table.

14.    We discussed a number of potential business ideas including potentially paying off the HASelect loan. While we discussed a number of potential ideas, our discussions were guided by three principles: any deal had to be fair to Infinity, any deal had to be fair to Tecumseh and any deal could not interfere with HASelect's lending relationship with Infinity. We ultimately settled on the concept of Infinity acting as an advisor and agent for Tecumseh. It would assist Tecumseh in acquiring receivables in Tecumseh's name and would service those receivables in exchange for fees.

15.    An e-mail dated March 20, 2020 from me to Mr. Dobozy copying Mr. Belotz (Trial Exhibit F-128 at TIF_0000529) is an example of the early back and forth between Mike Belotz and myself and Endre Dobozy of FTM about a potential deal with Infinity. FTM appears in

numerous places in connection with Infinity. It was a lender to Infinity, a sub-advisor to HASelect, an unofficial advisor to Infinity and a sub-advisor to Tecumseh. As I understood it in March 2020, FTM was assisting Infinity in locating additional sources of revenue. Thus, Mr. Dobozy approached me.

16. In this e-mail (Trial Exhibit F-128), I proposed a structure similar to what was ultimately agreed to. Infinity would manage receivables for Tecumseh in its normal manner except that all of the receivables would be purchased in Tecumseh's name instead of Infinity. As you can see from the subsequent e-mails in this string, there was a great deal of back and forth on how our fund would be structured, what the investment would look like and what Infinity would receive. Most of these were just potential ideas and structures. For example, although Infinity through FTM asked for residual rights in the receivables to be purchased, we did not agree to do so.

17. On March 25, 2020, I again proposed that Infinity would manage and assist Tecumseh in acquiring receivables to be purchased and held by Tecumseh directly. In an e-mail dated that day (Trial Exh. E-101 at 2), I wrote that "Infinity, Bill [Dalzell] and Endre [Dobozy] would conduct all transactions within confines of the fund, rather than as a third party as is currently done." I was referring to Infinity acting as an agent for Tecumseh and Tecumseh holding the receivables in contrast to the situation with the HASelect Loan where Infinity held the receivables as a third party to HASelect.

18. The concept of residual rights for Infinity was repeatedly raised by Mr. Dobozy and others on the Infinity side of the table; Mr. Belotz and I repeatedly refused to agree to do so. For example, we told Infinity that we would be unwilling to allow Infinity to retain a residual issue in an e-mail from Mr. Belotz (copying me) to Mr. Dobozy, dated April 17,2020 (Trial Exh. F-131). We ultimately negotiated a different method of incentivizing Infinity's collection efforts. We did, however, agree to pay a 20% fee on acquisition.

19. One issue that came up regularly was Infinity's desire to refinance the HASelect loan. Ms. Pantelas, Mr. Hemmers, Mr. Dalzell and Mr. Dobozy expressed this desire on a number of occasions throughout our negotiations and later.

72197982;4

5

20.    As part of our discussions, Infinity provided Mr. Belotz and me with a copy of the HASelect loan agreement for us to review. We reviewed it to determine whether a fee-for-services arrangement with Infinity would violate its terms. As the loan agreement provides only that Infinity is not allowed to take on additional debt, we concluded that paying Infinity to assist Tecumseh in purchasing receivables and to service those receivables would not violate the loan's terms.

21.    As part of our due diligence, Mr. Belotz and I wanted to review the historical performance of the receivables that Infinity had purchased over time. We wanted to understand whether or not Infinity had a successful track record and whether the receivables that Infinity would locate and service for Tecumseh would be profitable for Tecumseh and its investors. We also wanted performance information from Infinity to show potential investors. Before providing us with information regarding its receivables and their performance, Infinity asked Tecumseh Alternatives, Mr. Belotz and me to execute a non-disclosure agreement.

22.    An April 2020 e-mail conversation involving me, Mr. Belotz, Mr. Dobozy and Mr. Dalzell (Exhibit F-129) is an example of the back and forth between Tecumseh, FTM and Infinity over the data that Infinity would provide. Infinity and FTM proposed providing a very limited set of data related to receivables it purchased through the HASelect loan in 2019. We asked for a much broader data set showing Infinity's historical returns. Infinity refused but did agree initially to provide a smaller set of data.

23.    Eventually, Infinity provided us with information regarding the performance of the receivables that it had purchased using the HASelect loan. Mr. Belotz analyzed that data to determine whether investing in similar receivables would make sense for our fund. Infinity provided us with additional data covering more of its receivables later. Ultimately, Infinity allowed us to use its data as part of our marketing of Tecumseh to investors.

24.    Throughout the negotiations with Infinity, it was our intent and goal to create a business relationship wherein Infinity would utilize its business acumen, experience and existing relationships to assist Tecumseh to acquire receivables for Tecumseh's account and to service those receivables on Tecumseh's behalf. I always intended for Tecumseh to directly own the receivables, to hold all economic rights in them, and to make the profit or suffer the loss on them.

Infinity was never to hold any sort of interest in the receivables and would not make the profit or loss on the receivable. It would identify receivables for purchase, perform due diligence on them and negotiate a purchase price so that Tecumseh could complete a purchase. Infinity was not to buy and resell receivables to Tecumseh. Instead, Infinity would be limited to the fees it would earn under our agreement.

25.     Throughout these negotiations and indeed throughout our business relationship, Ms. Pantelas and Mr. Hemmers repeatedly assured me that Infinity would act as Tecumseh's agent, that it would assist Tecumseh to purchase receivables, that Infinity would not have an interest in the receivables but would service them on Tecumseh's behalf.

**III.     The Sub-Advisory Agreement**

26.     After extensive negotiations, Tecumseh and Infinity entered into a sub-advisory agreement entered on June 18, 2020, as modified by Addendum A on or about January 5, 2021 (the "**Sub-Advisory Agreement**") which is Trial Exh. A-3. The Sub-Advisory Agreement served two purposes: (1) facilitate the sale of receivables from medical providers to Tecumseh and (2) to provide for servicing of the receivables by Infinity. Under the Sub-Advisory Agreement, Infinity was not supposed to, and did not, acquire a beneficial ownership interest in the receivables purchased on Tecumseh's behalf. Infinity exclusively served as an intermediary and servicer for Tecumseh.

27.     At Exhibit A, the Sub-Advisory Agreement provided that Infinity would (i) assist Tecumseh in acquiring medical receivables [Trial Exh. A-3, ¶ 1(a)]; (ii) identify receivables for purchase by Tecumseh [*Id.*, ¶ 3(a)]; (iii) negotiate the purchase [*Id.*, ¶ 1(b), ¶ 3(b)]; (iii) arrange for Tecumseh to secure a lien or equivalent security against plaintiff's recovery [*Id.*, ¶ 1(c)]; and (iv) arrange for documentation to "evidence the sale of the Receivable to the Company by the Medical Service Provider." [*Id.*, ¶ 3(d)]. It also provided that Infinity was to arrange a purchase by Tecumseh "directly from the Medical Service Provider." [*Id.*, ¶ 3(b)].

28.     Under the Sub-Advisory Agreement, Tecumseh agreed to pay Infinity a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and

servicing the receivables. Tecumseh did not enter into a purchase and sale agreement with Infinity with respect to the receivables remaining at issue in this case.

29.     Tecumseh paid Infinity a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables as set forth in the Sub-Advisory Agreement. These provisions of the Sub-Advisory Agreement were intended to incentivize Infinity to identify and to aggressively service good quality, high yielding receivables for Tecumseh's benefit. Because Infinity was acting as an agent and advisor to Tecumseh, we wanted to tie Infinity's fees to Tecumseh's overall performance at least in part.

30.     The payment provisions of the Sub-Advisory Agreement provides (at Addendum A) that:

   a.   "Infinity will continue to earn, and be paid immediately, an acquisition fee (the 'Acquisition Fee') equal to twenty percent (20%) of the Purchase Price of each Receivable purchased by the Company when new investor cash is being used." Trial Exh. C at Addendum A at ¶ (a)

   b.   Infinity will continue to earn 15% of the Receivable Spread on any Receivable purchased by the Company and it will all be paid according to the contingency schedule below ('Contingency Payments')." *Id*. at ¶ (b).

The contingency schedule was based on Tecumseh's internal rate of return calculated at the end of Tecumseh's life. The higher Tecumseh's internal rate of return the more of the Contingency Payments that Infinity would earn according to a schedule set forth in Addendum A.

31.     We  also entered into an agreement with Forget The Market, Ltd., ("**FTM**"), an entity affiliated with Mr. Dobozy and Mr. Dalzell.  The agreement between Tecumseh and FTM is Trial Exh. E-110. FTM was to supervise Infinity's work, perform due diligence on the receivables recommended for purchase, and account for the purchase and sale of the receivables.

## IV.    The purchase of receivables

32.     While Mr. Belotz had more day-to-day involvement in the flow of funds and accounting for the Infinity relationship, I remained actively involved. From June of 2020 through Infinity's bankruptcy in September 2021, I was in regular communication with Ms. Pantelas and

8

Mr. Hemmers of Infinity both by e-mail and telephone. I also regularly communicated with Mr. Dalzell and Mr. Dobozy of FTM. In addition, I regularly reviewed the reports and accountings generated during the course of Tecumseh's relationship with Infinity.

33.    To aid in the purchase of receivables, Tecumseh created a bank account (whose account number ends in 8995) at Bank of America (the "**BofA Account**") in July 2020. I personally opened the BofA Account and made the initial $350 opening deposit at a local branch in South Carolina where I reside. The account is in the name of "Tecumseh-Infinity Medical Receivables Fund, LP" which is Tecumseh's full legal name. The only funds deposited into the BofA Account are funds transferred from our main investment account at Northbrook Bank & Trust and the proceeds of receivables that Tecumseh purchased. Tecumseh's corporate resolution authorizing the BofA Account is at pages 4-6 of Trial Exh. A-22. The signature card for the BofA Account is at pages 7-8 of Trial Exh. A-22.

34.    The authorized signatories on the account were originally myself, Mr. Belotz, Ms. Pantelas and Mr. Hemmers. We later added Mr. Dalzell of FTM as an authorized signatory on Tecumseh's behalf. We set the account up so that two signatures – one from Infinity and one on behalf of Tecumseh – were required to release funds. While Infinity had limited signatory rights on the account, it was allowed to use the funds in the account only to purchase receivables for Tecumseh. While Tecumseh did pay Infinity's fee out of the account, funds for the fee could not be released to Infinity without Mr. Belotz's authorization.

35.    Early on, Infinity informed Mr. Belotz and me that it planned to utilize its existing documentation and agreements with medical providers. Mr. Hemmers and Ms. Pantelas explained that it did not want to change its agreements with medical providers to reflect Tecumseh's name as that would impact the pricing and that using Infinity's existing documentation with Infinity's name on it would make servicing and collecting the receivables easier. All of the funds were to come from our BofA Account using checks bearing our name so that the medical providers would know that Tecumseh had purchased the receivables. She also assured me that cancelled checks from our account would be sufficient for Tecumseh to enforce its rights in the receivables that Tecumseh would purchase with Infinity's assistance. As I understood it, Infinity was purchasing

1    receivables for Tecumseh as our agent using Infinity's name. I personally relied on Ms. Pantela's

2    and Mr. Hemmers' representations in this regard.

3           36.    To that end, Infinity allowed us to use "Infinity Health Connections" as an assumed

4    name. In October 2020, we registered "Infinity Health Connections" as Tecumseh's d/b/a in

5    Delaware where Tecumseh was formed with Infinity's permission. Page 2 of Trial Exh. A-21 is

6    the registration of the assumed name by Tecumseh. Tecumseh also associated the "Infinity Health

7    Connections" assumed name with the BofA Account and the assumed name was shown as a d/b/a

8    on checks written on the BofA Account. *Id.* at 1. Copies of checks written on the BofA Account

9    are Trial Exh D-80 and Trial Exh. D-81.

10          37.    In allowing Infinity to use its existing documentation (bearing its name) it was our

11   understanding and intent that Tecumseh would be the direct purchaser of the Disputed Receivables

12   from the medical providers. Tecumseh was paying the medical providers. Infinity was using its

13   documents and its name merely as a convenience for our benefit. The Disputed Receivables

14   belonged to Tecumseh. Infinity never acquired an interest in the Receivables. It was not buying

15   and reselling to us. Infinity would not have a profit or loss on the Receivables. Instead, Infinity

16   would earn a fee on the services it provided.

17          38.    Infinity always acknowledged that the receivables that Tecumseh purchased were

18   Tecumseh's. I saw that in Infinity's Case Manager system, Tecumseh's receivables were identified

19   as belonging to Tecumseh. Infinity deposited the proceeds of the Disputed Receivables into

20   Tecumseh's BofA account. At no point did Ms. Pantelas, Mr. Hemmers or anyone else at Infinity

21   ever suggest that Infinity had any interest in or ownership of the Disputed Receivables. Instead,

22   Mr. Hemmers and Ms. Pantelas stressed many times to me that the "Tecumseh receivables" were

23   completely isolated from all other Infinity receivables, for our benefit, in their paper and electronic

24   records and in all accounting.

25          39.    For its part, Tecumseh expected and intended to be owner of the Disputed

26   Receivables. Tecumseh has held itself out as the beneficial owner of the Disputed Receivables.

27   Tecumseh provided information about the receivables it purchased to its fund administrator, NAV,

28   on a regular basis so that NAV could include the receivables in Tecumseh's financial records.  In

                                          10

72197982;4

addition, Tecumseh made ownership information available to its investors on a regular basis, posting publicly available fund reports detailing, among other things, the "date of purchase" together with the "purchase cost" of each Disputed Receivable denoted by its "BillID." Two of these reports are Trial Exh. B-30 and Trial Exh. B-31.

40.    Tecumseh also reported its ownership interest and any resulting capital gains and losses to the Internal Revenue Service for tax purposes.

**V.    The Disputed Receivables**

41.    Shortly after it filed for bankruptcy, Infinity provided to Tecumseh an export of the data in its Case Manager system relating to Tecumseh's receivables in the form of two spreadsheets -- "TIFDumpWithIncome-Final.xlsx" and "ESD Verified HASOverlapDumpWith Income-Final.xlsx." "ESD Verified HASOverlapDumpWith Income-Final.xlsx" appears to contain a subset of the receivables listed on "TIFDumpWithIncome-Final.xlsx." Modified versions of these spreadsheets are Trial Exhs. A-1 and A-2. We removed the patient's name for privacy purposes as well as a great deal of information not needed to identify the receivables. During the course of this case, the parties have often referred to the receivables listed on Trial Exh. A-1 as the "Tecumseh Receivables" or the "Disputed Receivables."

42.    The "ESD Verified HASOverlapDumpWith Income-Final.xlsx" (Trial Exh. A-2) identifies a set of receivables that Infinity referred to as "Overlaps." What this meant was that Infinity purchased certain receivables related to a given patient for its own account using the HASelect loan and Tecumseh purchased other receivables related to that same patient. Each receivable relates to a different medical procedure so that they don't truly overlap.

43.    While Tecumseh opened the BofA Account in July 2020, we were unable to use it meaningfully until October of 2020 because of difficulties encountered in setting up an account with multiple authorized signatories and because of the almost insurmountable challenge of locating an open Bank of America branch accessible to each signatory in the midst of the COVID-19 pandemic, and setting up simultaneous in-person appointments at each branch so that each signatory could be in the presence of a Bank of America banker executing the necessary paperwork at the same time. Trial Exh. A-22 is e-mail correspondence between me and Mr. Hemmers and

72197982;4

Ms. Pantelas, dated October 28, 2020, asking them to walk documents related to the BofA account into their local branch. Trial Exh. A-21 is further correspondence between Ms. Pantelas and a Bank of America banker, dated in early-November 2020 and copied to me, seeking assistance in finalizing the account.

44.    Therefore, from approximately July through October 2020, Tecumseh transferred funds to Infinity to purchase the receivables on Tecumseh's behalf. Of the approximately 8,670 receivables purchased, only 2,833 with a face value of approximately $6.1 million involved a transfer of funds to Infinity. These 2,833 receivables are referred to herein as the "Series 1 Receivables."

45.    I understand that the Court has entered a summary judgment in HASelect's favor with respect to the Series 1, A through E Receivables, the Series 1, G and the Series 1, H Receivables. Of the Series 1 Receivables, that leaves the Series 1, F and the Series 1, I through K Receivables in dispute.

46.    For the first several of the Series 1 lists, Infinity asked that Tecumseh sign a bill of sale. By the time of Series 1-E, I stopped executing the bills of sale. At that point, I recognized that the bills of sale misrepresented the nature of the transaction. We were not buying receivables from Infinity. Note that the bills of sale for Series 1-G (Trial Exh. D-89) and Series 1-H (Trial Exh. D-90) are not signed by me or anyone else on behalf of Tecumseh.  I also did not sign bills of sale for Series 1-E, Series 1-F, Series 1-I, Series 1-J, Series 1-J2 or Batch P Receivables.

**A.    The 1-F Receivables**

47.    The 1-F Purchase Order (Trial Exh. H-193) identifies approximately 332 separate 1-F Receivables that Tecumseh had agreed to purchase from medical providers for a total price of $481,023.10. On September 25, 2020, Tecumseh wired the $481,023.10 purchase price for the 1-F Receivables to Infinity's 8480 Account. Trial Exh. C-60 at 1. There was no executed bill of sale agreement entered into by and between Infinity and Tecumseh for the 1-F Receivables.

48.    I and people working under my supervision prepared the Tecumseh Account Spreadsheets which are the 1-F Tecumseh Accounts Spreadsheet Trial Exh. A-5, the 1-I Tecumseh

72197982;4

Accounts Spreadsheet, Trial Exh. A-6, and the 1-J Tecumseh Accounts Spreadsheet Trial Exh. A-7.

49.     The 1-F Tecumseh Accounts Spreadsheet is a reorganized and simplified version of the original "TIFDumpWithIncome-Final.xlsx" spreadsheet provided by Infinity to identify Tecumseh's receivables with certain information redacted (i.e. patient information) and irrelevant information (such as lawyer name) removed and with our analysis added.

50.     The Tecumseh Account Spreadsheets are sorted by the "cleared in bank" column. The "cleared in bank" information was compiled by myself and people working under my supervision from a comprehensive review of Nevada State Bank account statements for Infinity's 8480 Account, true and correct copies of which are Trial Exh. A-8.

51.     As reflected in the 1-F Tecumseh Accounts Spreadsheet (Trial Exh. A-5), there are 332 separate 1-F Receivables. Of these, 93 have "dates paid" after September 25, 2020. The remaining 239 have "dates paid" before September 25, 2020. For ease of reference, this subset has been highlighted in light green on the 1-F Tecumseh Accounts Spreadsheet.   Of these 239 1-F Accounts, payment for at least 84 receivables were made by checks that were honored by the Nevada State Bank on or after September 25, 2020, the date of Tecumseh's wire. These receivables are denoted on the 1-F Tecumseh Accounts Spreadsheet by red highlighting in the far left column. Specifically, Check Nos. 7635, 7638, 7639, 7640, 7641, 7642, 7643, 7644, 7647, 7648, 7651, 7652, and 7663, were all honored on or after September 25, 2020. Trial Exh. A-8 at 15, 19. Therefore payment occurred for at least 177 of the total 332 1-F Accounts on or after Tecumseh's September 25, 2020 wire.

**B.     The 1-I Receivables**

52.     The 1-I Purchase Order– Trial Exh. H-194 – identifies approximately 843 1-I Accounts Tecumseh agreed to purchase from medical providers for a total price of $209,320.99. On October 14, 2020, Tecumseh wired the $209,320.99 purchase price for the 1-I Accounts to Infinity's 8480 Account. *See* Infinity's October 30, 2020 Nevada State Bank account statement for account ending in 8420 (Trial Exh. C-61 at 1).  There was no executed bill of sale agreement entered into by and between Infinity and Tecumseh for the 1-I Receivables.

13

72197982;4

53.     The 1-I Tecumseh Accounts Spreadsheet (Trial Exh. A-6) is a reorganized and simplified version of the original "TIFDumpWithIncome-Final.xlsx" spreadsheet provided by Infinity to identify Tecumseh's receivables with certain information redacted (i.e. patient information) and irrelevant information (such as lawyer name) removed and with our analysis added.

54.     As reflected in the 1-I Tecumseh Accounts Spreadsheet, there are 843 separate 1-I Accounts. Of these, 88 have "PaidDates" after October 14, 2020. The remaining 755 1-F Accounts have "PaidDates" before October 14, 2020. For ease of reference, this subset of accounts have been highlighted in light green on the 1-I Tecumseh Accounts Spreadsheet. Of these 755 1-I Accounts, payment for at least 29  receivables were made by wire from Infinity's on or after Infinity's October 14, 2020 receipt of Tecumseh's wire. These receivables are denoted on 1-I Tecumseh Accounts Spreadsheet. by red highlighting in the far left column. Therefore, payment occurred for at least 117 of the total 843 1-F Accounts on or after Tecumseh's October 14, 2020 wire.

C.     **The 1-J Receivables**

55.     On or about October 23, 2020, a tenth Receivables Purchase Order (Trial Exh. H-195)  was generated by Infinity (the "**1-J Purchase Order**") identifying approximately 261 separate accounts receivable (the "**1-J Receivables**") that Tecumseh agreed to purchase from medical providers for a total price of $136,063.26. On October 26, 2020, Tecumseh wired the $136,063.26 purchase price for the 1-J Accounts to Infinity's Nevada State Bank account ending in 8480. See Infinity's October 30, 2020 Nevada State Bank account statement for account ending in 8420 (Trial Exh. C-61) at 10. There was no executed bill of sale agreement entered into by and between Infinity and Tecumseh for the 1-J Receivables.

56.     The 1-J Tecumseh Accounts Spreadsheet is a reorganized and simplified version of the original "TIFDumpWithIncome-Final.xlsx" spreadsheet provided by Infinity to identify Tecumseh's receivables with certain information redacted (i.e. patient information) and irrelevant information (such as lawyer name) removed and with our analysis added.

14

72197982;4

57.     As reflected in the 1-J Tecumseh Accounts Spreadsheet (Trial Exh. A-7), there are 261 separate 1-J Accounts. For 134 of the 261 1-J Accounts the "PaidDate" is after October 26, 2020. For 127 of the 261 1-J Accounts, the "PaidDate" suggests that the receivables were paid for before October 26, 2020. For ease of reference, this subset of accounts on have been highlighted in light green on the 1-J Tecumseh Accounts Spreadsheet. For these 127 1-J Accounts, payment for at least 77 receivables were made by checks that were honored by the Nevada State Bank on or after Infinity's October 26, 2020 receipt of Tecumseh's wire. These receivables are denoted on the 1-F Tecumseh Accounts Spreadsheet by red highlighting in the far left column. Specifically, Check Nos. 6701, 6728, 6729, 6730, 6731, 6733, 6734, 6735, 6736, 6737, 6738, 6739, 6740, 6741, 6742, 6743, 6744, 6745, and 6746 were all honored on or after October 26, 2020. Trial Exh. A-8, Bates No. 19, 23, and 27. Therefore, payment occurred for at least 211 of the total 261 1-J Accounts on or after Tecumseh's October 26, 2020 wire.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 21, 2023

Chad Meyer

72197982;4