1

2

3

4

5

6

7

8

9

GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
JARED M. SECHRIST
Nevada Bar No. 10439
E-mail: jsechrist@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

*Attorneys for Tecumseh–Infinity Medical
Receivable Fund, LP*

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

10

11

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.,<br><br>       Debtor. | Case No. 21-14486-abl<br><br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>       Plaintiff,<br><br>v.<br><br>TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>       Defendant. | Adversary Case No. 21-01167-abl<br><br>**TRIAL DECLARATION OF MICHAEL BELOTZ**<br><br>Trial Date: August 24, 25, 28, 29, 31 2023<br>Time: 9:30 a.m. |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, *et al.*,<br><br>       Counter-Claimant<br><br>v.<br><br>TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, *et al.*,<br><br>       Counter-Defendants. | |

72173407;3

1

I, MICHAEL BELOTZ, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    My name is Michael Belotz. I am over the age of twenty one years, of sound mind, and fully competent to testify in this cause.

2.    I submit this declaration as my direct testimony in the trial of this case.

3.    I am a principal of Tecumseh Alternatives, LLC, the advisor to the Tecumseh-Infinity Medical Receivables Fund, LP, the Defendant, Counter-Claimant and Counter-Defendant in this case ("**Tecumseh**"). In that capacity, I have personal knowledge of the facts stated herein, all of which are true and correct. If called upon to testify regarding the contents of this Declaration, I could and would do so.

4.    In my role as a principal of Tecumseh's advisor, I am responsible for all aspects of Tecumseh's investments in medical receivables. Part of my duties require that I ensure the proper accounting and reporting of funds flowing to and from Tecumseh. In order to do so, I review and manage Tecumseh's banking records, financial records, contracts, and investments.

5.    As it relates to Tecumseh, I was personally involved in the business between Infinity Capital Management, Inc. ("**Infinity**"), and Tecumseh, particularly as it relates to the purchase of receivables pursuant to a sub-advisory agreement entered with Infinity on June 18, 2020, as modified by Addendum A on or about January 5, 2021 (the "**Sub-Advisory Agreement**"). (Trial Exh. A-3). I personally participated in the negotiations with Infinity leading to the Sub-Advisory Agreement.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

72173407;3

## I.        My Background

6.        I have twenty-one years of hedge fund portfolio management and research experience covering all investment sectors. This follows a long career on the sell side in both trading and marketing in the derivatives of equities and commodities, including three years as a floor trader in equity options on the American Stock Exchange, where I traded a diverse book of derivatives on individual equities. Later, I specialized in commodity derivatives as both a marketer and structurer for firms such as Chase, Societe Generale and Kidder Peabody. In these roles, I devised derivative structures in crude oil, products and natural gas as well as put together financing packages for energy production and transportation projects. I also spent time as a risk management expert during the initial deregulation of the U.S. electricity market for a major utility.

7.        I was Head of U.S. and Chief Risk Officer for DNA Partners Management Company AG ("DNA Partners"), where I was responsible for sourcing and due diligence of U.S. based hedge funds. Just prior to this role, I was the Head of Research and Risk Management at Lanx Management, a Fund of Hedge Funds. Prior to that, I was Head of Portfolio Management in the U.S. for the Fund of Hedge Funds Group at Credit Suisse where I ran $6 Billion in portfolios. I started my hedge fund career at TAG Associates, a multi-client family office, as the portfolio manager for their relative value and diversified strategy fund of funds.

8.        I have my MBA from The Wharton School and a BS in business from the University of California, Berkeley.

9.        DNA Partners was potential business partner of  Griffin Asset Management ("**GAM**"), the advisor for the HASelect-Medical Receivables Litigation Finance Fund International SP, the plaintiff, counter-defendant and counter-claimant in this case ("**HASelect**"). We did some consulting for GAM but were not paid. I was never employed by or held an office in GAM. The DNA Partners consulting work for GAM ended in or about 2015. I had no involvement in the HASelect fund.

10.        In August of 2019, Chad Meyer and I formed Tecumseh Alternatives, LLC. Tecumseh Alternatives is in the business of creating and advising investment funds that invest in a variety of assets. In addition to Tecumseh, Tecumseh Alternatives advises five other funds which

invest in law firm finance, life settlements and patent portfolios. Simon Clark joined Tecumseh Alternatives in January 2021.

## II.    Negotiations with Infinity

11.    In or about February 2020, Chad Meyer informed me that he had been contacted by Endre Dobozy about a potential investment opportunity involving Infinity. At that time and throughout our negotiations with Infinity, I understood that Mr. Dobozy and his partner, Bill Dalzell, were acting as go-betweens for Infinity. Along with Mr. Meyer, I participated in discussions with Anne Pantelas and Oliver Hemmers of Infinity. These discussions also included Mr. Dalzell and Mr. Dobozy.

12.    While Mr. Meyer and I were interested in forming a fund to invest in medical receivables with the assistance of Infinity, we were initially unsure how to structure the fund or its potential investment and whether an investment in medical receivables would interest potential investors. To determine whether an investment in medical receivables would make sense, we asked that Infinity provide us with historical data regarding the performance of the receivables it owned. Prior to providing us with information regarding its receivables, Infinity asked that Tecumseh execute a non-disclosure agreement, which we did.

13.    An e-mail string between and among myself, Mr. Meyer, Mr. Dobozy and Mr. Dalzell (Trial Exhibit F-129) in April 2020 sets out the back and forth sets out the back and forth between Tecumseh, FTM and Infinity over the data that Infinity would provide. After executing the non-disclosure agreement requested by Infinity, we asked Infinity for data regarding its performance. *Id.* at 4. Infinity and FTM proposed providing a very limited set of data related to receivables it purchased through the HASelect loan in 2019. *Id.* at 3. We asked for a much broader data set showing Infinity's historical returns. *Id.*  Infinity pushed back. *Id.* at 2.

14.    Eventually, Infinity provided us with information regarding the performance of the receivables that it had purchased in connection with the HASelect loan. I analyzed that data to determine whether investing in similar receivables would make sense for our fund. The first set of data that Infinity provided to us was related to receivables it had purchased using its first draw on the HASelect loan. I didn't find it tremendously useful as it was too small a set and included only

receivables that had paid. We needed to see receivables that had gone through their entire life cycle. Eventually, Infinity provided us with data regarding receivables purchased before the HASelect loan.  This data related to older MRI receivables that were fully closed, i.e., they had either paid or had been written off.  This MRI data allowed us to model the proposed investment.

15.    Ultimately, Infinity allowed us to use its data as part of our marketing of Tecumseh to investors.

16.    The discussions with Ms. Pantelas, Mr. Hemmers, Mr. Dalzell and Mr. Dobozy over the next couple of months (from March through May 2020) were wide-ranging and included a number of potential investment structures. We were generally aware, based on statements by Ms. Pantelas, Mr. Hemmers, Mr. Dalzell and Mr. Dobozy, that HASelect had made a loan to Infinity and that its loan was secured by the receivables that Infinity purchased using its proceeds. Ms. Pantelas, Mr. Hemmers, Mr. Dalzell and Mr. Dobozy also repeatedly stated that Infinity was dissatisfied with the HASelect Loan and wanted to refinance it.

17.    As part of our due diligence, we wanted to make sure that whatever deal we did with Infinity would not violate Infinity's obligations to HASelect under the HASelect Loan. To that end, I requested a copy of the HASelect Loan documents from Infinity and reviewed them to see what, if any, restrictions it placed on Infinity. Based on my review, I determined that Infinity could not borrow money without HASelect's permission. Thus, we concluded that we could not loan money to Infinity but that other potential investment structures were available.   I memorialized my conclusion in an e-mail from me to Mr. Meyer, dated March 1, 2020 (Trial Exh. [D-99]) in which I wrote: "There is no exclusive of any kind nor anything that I think would even remotely affect us starting a fund with Infinity."

18.    Most of the investment structures were pitched by Mr. Dobozy. He suggested among other things that Tecumseh refinance the HASelect Loan, that Tecumseh grant Infinity some sort of a residual interest in receivables that Tecumseh would purchase and that Tecumseh make a loan to Infinity after it had paid off the HASelect Loan.

19.    We did not expect that Tecumseh would be able to raise enough money to payoff or refinance the HASelect Loan in the near term. Moreover, we (Mr. Meyer and I) were not

72173407;3

particularly interested in being a lender. First, neither of us really had the expertise to manage a lending relationship. Second, we did not want to compete with HASelect. We wanted to do something different. In an effort to keep negotiations moving forward, we did agree to "consider" a lending relationship with Infinity if and when they paid off the HASelect Loan.

20.    Ultimately, we settled on the idea that Tecumseh would own medical receivables that it would purchase directly from medical providers. Tecumseh would hire Infinity to identify receivables, negotiate with medical providers for purchase, prepare the necessary documents and service the receivables that Tecumseh would acquire. The plan was for Tecumseh to hold the receivables in its own name and hire Infinity to manage them. We also planned to retain an affiliate of Mr. Dobozy and Mr. Dalzell to manage Infinity and to do all of the necessary accounting.

21.    We also refused to grant Infinity some sort of residual interest in the receivables that Tecumseh would purchase. Granting that sort of a residual interest would have limited the amount that our investors could earn. We did, however, recognize the need to motivate Infinity to identify quality receivables and to service them properly. Thus, we ultimately agreed to pay Infinity a bonus based on the overall performance of Tecumseh.

22.    Throughout the negotiations with Infinity, it was our intent and goal to create a business relationship wherein Infinity would utilize its business acumen, experience and existing relationships to assist Tecumseh to acquire receivables for Tecumseh's account and to service those receivables on Tecumseh's behalf. I always intended for Tecumseh to directly own the receivables, to hold all economic rights in them, and to make the profit or loss on them. Infinity was never to hold any sort of interest in the receivables and would not make the profit or loss on the receivable. Instead, Infinity would be limited to the fees it would earn under our agreement.

23.    We intended for Infinity's role to be akin to that of a real estate agent. It would identify receivables for purchase, perform due diligence on them and negotiate a purchase price so that Tecumseh could complete a purchase. Infinity was not to buy and resell receivables to Tecumseh. It was not to acquire an economic or beneficial interest in the receivables. Infinity would not share in the profit or loss generated by any of the receivables. Nor was it to buy at a lower price and resell the receivable to Tecumseh for a profit.

6

72173407;3

24.     Throughout these negotiations and indeed throughout our business relationship, Ms. Pantelas and Mr. Hemmers repeatedly assured me that Infinity would act as Tecumseh's agent, that it would assist Tecumseh to purchase receivables, that Infinity would not have an interest in the receivables but would service them on Tecumseh's behalf.

**III.    The Sub-Advisory Agreement**

25.     Tecumseh and Infinity entered into the Sub-Advisory Agreement on June 18, 2020, and modified it with Addendum A on or about January 5, 2021. (Trial Exh. A-3).  The Sub-Advisory Agreement served two purposes: (1) facilitate the sale of receivables from medical providers to Tecumseh and (2) to provide for servicing of the receivables by Infinity. Under the Sub-Advisory Agreement, Infinity was not supposed to, and did not, acquire a beneficial ownership interest in the receivables purchased on Tecumseh's behalf. Infinity exclusively served as an intermediary and servicer for Tecumseh.

26.     At Exhibit A, the Sub-Advisory Agreement provided that Infinity would (i) assist Tecumseh in acquiring medical receivables [Trial Exh. A-3, ¶ 1(a)]; (ii) identify receivables for purchase by Tecumseh [*Id.*, ¶ 3(a)]; (iii) negotiate the purchase [*Id.*, ¶ 1(b), ¶ 3(b)]; (iii) arrange for Tecumseh to secure a lien or equivalent security against plaintiff's recovery [*Id.*, ¶ 1(c)]; and (iv) arrange for documentation to "evidence the sale of the Receivable to the Company by the Medical Service Provider." [*Id.*, ¶ 3(d)]. It also provided that Infinity was to arrange a purchase by Tecumseh "directly from the Medical Service Provider." [*Id.*, ¶ 3(b)].

27.     In my view, the Sub-Advisory Agreement gave rise to a fiduciary duty on the part of Infinity. It was acting as a sub-advisor to an investment fund, which based on my experience with hedge funds and private equity funds, is a fiduciary relationship. A sub-advisor generally takes on certain of the investment advisor's duties. Among other things, a sub-advisor manages all or a portion of a fund's investments, including determining what investments to buy or sell. Sub-advisors typically identify, research, negotiate and operate some or all of the fund's investments under the supervision of the fund advisor. In short, the things that Infinity was to do under the Sub-Advisory Agreement.

7

72173407;3

28.     At all times, my understanding and expectation was that Infinity was to act with Tecumseh's best interests in mind.

29.     Under the Sub-Advisory Agreement, Tecumseh agreed to pay Infinity a fee as compensation for identifying receivables, negotiating a purchase price, processing the sale, and servicing the receivables. Tecumseh did not enter into a purchase and sale agreement with Infinity with respect to the receivables remaining at issue in this case.

30.     The payment provisions of the Sub-Advisory Agreement provide (at Addendum A) that:

    a.  "Infinity will continue to earn, and be paid immediately, an acquisition fee (the 'Acquisition Fee') equal to twenty percent (20%) of the Purchase Price of each Receivable purchased by the Company when new investor cash is being used." Trial Exh. A-3, Addendum A at ¶ (a)

    b.  Infinity will continue to earn 15% of the Receivable Spread on any Receivable purchased by the Company and it will all be paid according to the contingency schedule below ('Contingency Payments')." *Id*. at ¶ (b).

The contingency schedule was based on Tecumseh's internal rate of return calculated at the end of Tecumseh's life. The higher Tecumseh's internal rate of return the more of the Contingency Payments that Infinity would earn according to a schedule set forth in Addendum A.

31.     Around the time that Tecumseh and Infinity executed the Sub-Advisory Agreement, HASelect sued Tecumseh seeking to enjoin Tecumseh and Infinity from working together. As part of that litigation, HASelect took extensive discovery and learned that Tecumseh was purchasing receivables with the assistance of Infinity. At no point in that litigation, however, did HASelect assert a claim that it held a lien on the receivables that Tecumseh was acquiring with Infinity's assistance. Had it done so, Tecumseh would have stopped buying receivables until the issue could have been resolved. Instead, Tecumseh spent more than $3 million acquiring receivables with Infinity's assistance.

1    **IV.    The purchase of receivables**

2        32.    As part of my work coordinating with Infinity, I had access to Infinity's internal

3    database, called Case Manager, that stored all receivables Infinity managed on behalf of

4    Tecumseh. I regularly reviewed the database in the course of my duties. I also had extensive

5    contact with various employees of Infinity, including Mr. Hemmers and less frequently with Ms.

6    Pantelas. I also spoke regularly, multiple times per week, with Mr. Dalzell and Mr. Dobozy who

7    were representatives of Forget The Market, Ltd. ("**FTM**"), Tecumseh's co-manager, and with

8    Infinity's employees about the receivables that Tecumseh owned. We also had frequent e-mail

9    exchanges. Generally, I would contact FTM before reaching out to Infinity because contractually

10   FTM managed accounting on all of the receivables that Tecumseh purchased.

11       33.    It is my understanding that each receivable represented a three-way transaction

12   between Tecumseh, a medical provider, and a personal injury plaintiff. Tecumseh agreed to pay

13   the medical provider a certain sum of money in exchange for the provider's medical services to the

14   plaintiff. The plaintiff, in turn, agreed to pay Tecumseh a larger amount of money (represented by

15   the face amount of the receivable) secured by an interest in the plaintiff's claim.

16       34.    The process for purchasing a receivable began with Infinity identifying a

17   receivable, negotiating with the medical provider, and presenting the receivable to Tecumseh.

18   FTM would then verify the receivable on behalf of Tecumseh, after which Tecumseh would

19   approve the purchase. Tecumseh then paid the price agreed to by the medical provider along with

20   the fee to Infinity required by the Sub-Advisory Agreement. Thereafter, each receivable  received

21   its own unique BillID number, and Infinity would identify the receivable as owned by Tecumseh

22   in its records. It would also maintain evidence of Tecumseh's contemporaneous payment.

23       35.    Fairly early on, Infinity informed Mr. Meyer and me that it planned to utilize its

24   existing documentation and agreements with medical providers. Mr. Hemmers and Ms. Pantelas

25   explained that Infinity did not want to change its agreements with medical providers to reflect

26   Tecumseh's name as that would impact the pricing and that using Infinity's existing documentation

27   with Infinity's name on it would make servicing and collecting the receivables easier. They

28   explained that using Tecumseh's name would create servicing difficulties and confusion. As I

72173407;3

understood it, Infinity was purchasing receivables for Tecumseh as our agent using Infinity's name. I trusted Mr. Hemmers and Ms. Pantelas in this regard.

36.    Because Infinity was allowing us to use its name to purchase receivables, Infinity allowed us to use "Infinity Health Connections" as an assumed name. We registered "Infinity Health Connections" as Tecumseh's d/b/a with Infinity's permission in Delaware where Tecumseh was formed. Page 2 of Trial Exhibit A-21 is a copy of the assumed name certificate that we filed in Delaware.

37.    In allowing Infinity to use its existing documentation (bearing its name) it was our understanding and intent that Tecumseh would be the direct purchaser of the Disputed Receivables from the medical providers. Tecumseh was paying the medical providers. Infinity was using its documents and its name merely as a convenience for our benefit. The Disputed Receivables belonged to Tecumseh. Infinity never acquired an interest in the Receivables. It was not buying and reselling to us. Infinity would not have a profit or loss on the Receivables. Instead, Infinity would earn a fee on the services it provided.

38.    Infinity always acknowledged that the receivables that Tecumseh purchased were Tecumseh's. I saw that in Infinity's Case Manager system, Tecumseh's receivables were identified as belonging to Tecumseh. Infinity deposited the proceeds of the Disputed Receivables into Tecumseh's BofA account. At no point did Ms. Pantelas, Mr. Hemmers or anyone else at Infinity ever suggest that Infinity had any interest in or ownership of the Disputed Receivables.

39.    Tecumseh expected and intended to be owner of the Receivables it purchased. Tecumseh has, at all times relevant hereto, held itself out as the beneficial owner of the Disputed Receivables. Tecumseh relayed to its fund administrator, NAV, the Bill ID, cost of the receivable, the overhead charge, the total cost, date paid and the type of receivables on a regular basis. We did so in order for NAV to maintain accurate accounting records on Tecumseh's behalf.

40.    Tecumseh made ownership information available to its investors on a regular basis, posting publicly available fund reports detailing, among other things, the "date of purchase" together with the "purchase cost" of each Disputed Receivable denoted by its "BillID." Exhibits

72173407;3

B-30 and B-31 are examples of these reports. Tecumseh also reported its ownership interest and any resulting capital gains and losses to the Internal Revenue Service.

41.     Prior to the bankruptcy, Tecumseh acquired a total of about 8,670 receivables with a face value of $28,045,874 from medical providers with Infinity's assistance. These receivables are listed on Trial Exh. A-1. During the course of this case, the parties have often referred to the receivables listed on Trial Exh. A-1 as the "Tecumseh Receivables" or the "Disputed Receivables."

42.     The Disputed Receivables can be divided into two categories based on the manner in which Tecumseh paid for them. The payments were made in two primary ways: (1) payments for the Series 1 Receivables (defined below) were made through Infinity to fund the purchases of receivables on Tecumseh's behalf; and (2) payments for the Direct Purchase Receivables (defined below) were made directly from Tecumseh's account at Bank of America to the medical providers. Both are discussed more fully below.

A.     **Tecumseh provided the purchase money for the Series 1 Receivables**

43.     To aid in payment for the receivables that it intended to purchase, Tecumseh opened a bank account (whose account number ends in 8995) at Bank of America (the "**BofA Account**") in July 2020. The BofA Account and all funds in it belong to Tecumseh. The account bears the title "Tecumseh-Infinity Medical Receivables Fund, LP," which is Tecumseh's legal name. That title is referenced on all of the bank statements and checks issued on the account. Tecumseh funded the BofA Account with money from its investors. It granted signing authority to Hemmers and Pantelas along with myself and another Tecumseh principal, Chad Meyer, and later Bill Dalzell of FTM. Tecumseh opened the account with a $350 counter deposit on July 16, 2020. Tecumseh associated the "Infinity Health Connections" assumed name with the BofA Account and the assumed name was shown as a d/b/a on checks written on the BofA Account. In this manner, Infinity was able to deposit checks for the proceeds of the receivables that Tecumseh purchased directly into Tecumseh's BofA Account.

44.     Although the BofA Account was opened in July 2020, we were unable to use it meaningfully until October of 2020 because of difficulties encountered in setting up an account with multiple authorized signatories and because of the almost insurmountable challenge of

11

72173407;3

locating an open Bank of America branch accessible to each signatory in the midst of the COVID-19 pandemic, and setting up simultaneous in-person appointments at each branch so that each signatory could be in the presence of a Bank of America banker executing the necessary paperwork at the same time.

45.    Therefore, from approximately July through October 2020, Tecumseh transferred funds to Infinity to purchase the receivables on Tecumseh's behalf. Of the approximately 8,670 receivables purchased, only 2,833 with a face value of approximately $6.1 million involved a transfer of funds to Infinity. These 2,833 receivables are referred to herein as the "Series 1 Receivables."

46.    With respect to the Series 1 Receivables, Infinity periodically (approximately every two weeks) provided Tecumseh with a list of receivables from various medical providers that Infinity recommended Tecumseh purchase. From June 19, 2020 through October 29, 2020, Infinity provided the following receivable lists:

| Receivable Lists | Date |
|---|---|
| Series 1, Intake A | June 19, 2020 |
| Series 1, Intake B | July 13, 2020 |
| Series 1, Intake C | July 27, 2020 |
| Series 1, Intake D | August 30, 2020 |
| Series 1, Intake E | September 15, 2020 |
| Series 1, Intake F | September 22, 2020 |
| Series 1, Intake F, version 2 | September 25, 2020 |
| Series 1, Intake G | September 30, 2020 |
| Series 1, Intake H (Batch 10) | October 4, 2020 |
| Series 1, Intake H (Batch 11) | October 4, 2020 |
| Series 1, Intake I (Batch 12) | October 12, 2020 |
| Series 1, Intake J (Batch 13) | October 12, 2020 |
| Series 1, Intake J (Batch 14-A) | October 23, 2020 |
| Series 1, Intake J (Batch 14-B) | October 23, 2020 |
| Series 1, Intake J (Batch 14-C) | October 23, 2020 |
| Series 1, Intake K | October 29, 2020 |

I understand that the Court has entered a summary judgment in HASelect's favor with respect to the Series 1, A through E Receivables, the Series 1, G and the Series 1, H Receivables.

12

72173407;3

47.    The Series 1, K Receivables were the first set of receivables purchased using the BofA Account.

48.    Using the list for the Series 1, B Receivables (Trial Exh. A-4) as an example, we can see how Infinity identified receivables that it recommended that Tecumseh purchase. For each receivable, Infinity provided the patient's name, the patient's lawyer's name, the provider, a unique Bill ID number, the face amount, the estimated purchase price, and an estimated total cost that included Infinity's fee. The lists also included a "Date Paid" column. The "Date Paid" column was often blank, sometimes contained dates that were months after the date of the list, and sometimes contained dates prior to the date of the list. Based on my contemporaneous review and usage of Infinity's Case Manager system, the "Date Paid" column on these lists is the same as the PaidDate field on Case Manager.

49.    Part of my duties for Tecumseh included attempting to reconcile our records with Infinity's records. To that end, I regularly reviewed Infinity's internal database of receivables. During the course of my review, I noted that data related to the receivables purchased by Tecumseh changed frequently. Frequently, the "Date Paid" field remained blank for months at a time. Even after the field was populated, the date often changed. The "Date Paid" field typically did not match the actual purchase dates for the receivables listed on the Series 1 lists provided by Infinity.

50.    Using Series 1, B (Trial Exh. A-4) as an example, the "Date Paid" column has 25 blanks and 34 dates ranging from June to November 2020. When I asked Mr. Hemmers about the dates, he told me that the "Date Paid" was taken from Infinity's internal database of receivables and did not reflect the date that Infinity had paid for these particular receivables. Hemmers said that past dates reflected the date that Infinity reached an agreement with the provider as to the price of the receivable, and blank dates and November dates were placeholders.

51.    Chad Meyer along with other employees of Tecumseh Alternatives analyzed Infinity's bank records related to the Series 1, Intake F Receivables, Series 1, Intake I Receivables, and the Series, I, Intake J Receivables. I have reviewed their analysis and believe it to be correct.

52.    Once Tecumseh approved a list of receivables for purchase, Bill Dalzell generated a purchase order, which Tecumseh paid. Infinity then used the funds to purchase the receivables

13

on Tecumseh's behalf. Tecumseh stopped accepting the purchase order form as of October 29, 2020 when the BofA Account began to be used.

53.    On occasion, Infinity underestimated how much the receivables would cost. When that happened, Infinity requested and Tecumseh provided additional funds that allowed Infinity to complete the acquisition of the listed receivables on Tecumseh's behalf. Typically, Mr. Hemmers would contact me by telephone to request additional funds when he underestimated the cost of receivables Tecumseh was purchasing. On occasion, however, he would contact me by e-mail. Trial Exh. A-23 is a true and correct copy of an e-mail from Mr. Hemmers to me, dated June 25, 2020, noting that he needed additional funds because the receivables he planned to acquire cost more than he had anticipated. Only upon receipt of an updated PO and list of receivables, however, would Tecumseh provide such additional funds.

54.    It was always our understanding and expectation that Tecumseh's funds were being used to pay the medical providers for the receivables we were purchasing and that we were purchasing new receivables. Having decided not to purchase HASelect's collateral in a refinancing of the HASelect loan, we wanted to avoid any overlap with the receivables securing HASelect's loan.

55.    It was also our understanding that Infinity was not paying the medical providers until it had the money from Tecumseh to do so. HASelect had declared Infinity in default in May 2020 cutting off any further funding from HASelect. Hemmers repeatedly, often, and routinely complained to me that Infinity had no money and that it could not purchase receivables without money from Tecumseh. I often told Hemmers that Tecumseh only wanted to purchase new receivables unrelated to HASelect.

    **B.**      **Tecumseh provided the purchase money for the Direct Purchase Receivables.**

56.    The receivables purchased by Tecumseh from and after October 29, 2020—4,190 receivables at a face amount of approximately $19,846,621.37—were paid for with transfers of purchase money directly from Tecumseh's BofA Account to the respective medical providers. These receivables are referred to herein as the "Direct Purchase Receivables." Except for the Series 1, K Receivables, we did not use the purchase orders that were used for the Series 1 Receivables

14

72173407;3

for the Direct Purchase Receivables. The Series 1, K Receivables were the first of the Direct Purchase Receivables. Trial Exh. H-192 is a complete list of the Direct Purchase Receivables.

57.    Tecumseh paid for the Direct Purchase Receivables directly from its BofA Account to the medical provider. Further, rather than purchasing groups of receivables every two weeks or so, Tecumseh purchased receivables throughout the month, and Tecumseh paid Infinity its servicing fee for its work in locating and servicing the Disputed Receivables (including the Direct Purchase Receivables) periodically from the BofA Account.

58.    As required by the Sub-Advisory Agreement, Infinity maintained a log of the Tecumseh Receivables along with any collections on them.  Infinity made these records available to Tecumseh on a regular basis through an application known as "Case Manager".  In addition, Tecumseh maintained its own records related to the Disputed Receivables.  Accordingly, Tecumseh prepared its own reconciliation evidencing the payment and detailed purchase history of the Direct Purchase Receivables in reliance on both its and Infinity's records. A true and correct copy of the Reconciliation is Trial Exh. A-17.

59.    I and people working under my supervision traced payments made by Tecumseh to medical service providers. To do so, we began with the two spreadsheets provided by Infinity -- TIFDumpWithIncomeFinal.xlsx        and        ESDVerifiedHASOverlapDumpWithIncome.xlsx (collectively "Infinity's spreadsheets") – and compared the data entered by Infinity in the Provider's name, the BillID, the PaidCheckNo. and the Bill Cost columns to the BofA Account Statements and cancelled checks.

60.    Infinity did not record the actual amount that Tecumseh paid the providers for receivables. For the Bill Cost data, Infinity combined the actual amount that Tecumseh paid to the provider with an allocation of the fee that Tecumseh paid to Infinity for its services. After backing out Infinity's fee, we were able to tie cancelled checks and wire transfer confirmations in the account statements to individual receivables. We were also able to largely reconcile our bank records to the fees paid to Infinity for its services.

61.    An example of this reconciliation is the purchase of four receivables from South Atlanta MUA Center on or about October 29, 2020 shown on Trial Exh. A-17 at page 2.  According

72173407;3

to Infinity's Spreadsheets, Tecumseh purchased four receivables (BillID Nos. 27183, 27278, 27292, 27293) with a total face amount of $115,108.00 from South Atlanta MUA Center. Infinity recorded a BillCost for the four receivables of $34,532.40. As discussed the BillCost is comprised of the amount that Tecumseh paid South Atlanta MUA Center and the fee paid to Infinity. We reduced the BillCost by the 20% fee ($5,755.40) to obtain the actual amount that Tecumseh paid to South Atlanta MUA Center ($28,777.00). We then identified a wire transfer (No. 301693158) paid in that amount on October 29, 2020 to South Atlanta MUA Center in the BofA Account Statements.

62.    We used the same reconciliation process for all 4,190 receivables totaling $19,846,621.37 in face value.

63.    The chart below represents a reconciled accounting of the Direct Purchase Receivables:

| Month/Year | Number of Receivables | Face Value | Total Purchase Price | Infinity Fee |
|---|---|---|---|---|
| October 2020 | 92 total | $828,614.88 | $142,862.63 | $28,572.52 |
| November 2020 | 266 total | $501,921.54 | $170,027.05 | $30,142.28 |
| December 2020 | 441 total | $1,305,197.62 | $283,162.07 | $56,692.44 |
| January 2021 | 430 total | $1,500,807.25 | $284,325.87 | $56,865.78 |
| February 2021 | 323 total | $1,248,675.56 | $321,377.94 | $64,588.45 |
| March 2021 | 412 total | $2,081,787.17 | $285,862.33 | $46,100.85 |
| April 2021 | 425 total | $1,278,990.10 | $308,721.70 | $33,371.64 |
| May 2021 | 582 total | $2,647,439.26 | $349,515.96 | $69,903.19 |
| June 2021 | 533 total | $4,233,654.73 | $539,763.82 | $98,999.89 |
| July 2021 | 245 total | $2,154,768.92 | $197,192.40 | $29,861.69 |
| August 2021 | 394 total | $1,751,688.53 | $199,942.76 | $31,348.54 |
| September 2021 | 47 total | $313075.81 | $102,827.82 | - |

A copy of Tecumseh's monthly account statement for the BofA Account for each month reflected

16

72173407;3

in the chart above is at Trial Exh. A-18.

64.    Our accounting shows that each of the 4,190 Direct Purchase Receivables was purchased from funds that came directly from the BofA Account and that were paid on the date that Tecumseh acquired each receivable. Each check used to pay for a receivable bears Tecumseh's name.

65.    Tecumseh opened the account with a $350 counter deposit on July 16, 2020. Following July 2020, Tecumseh made deposits into the BofA Account from its bank account (account number ending in 1991) at Wintrust Funds Group/Northbrook Bank & Trust (the "**Northbrook Account**"). The Northbrook Account is the account that Tecumseh uses to receive and hold investments from investors. The funds in the Northbrook Account are almost exclusively from investors. None of the funds in that account were the proceeds of any receivable acquired with the assistance of Infinity, including both the Series 1 Receivables and the Direct Purchase Receivables (both as defined above).

66.    As part of the process by which Tecumseh purchased receivables and paid for them using the BofA account, Infinity informed us in advance of the general quantity of receivables it had identified for Tecumseh to purchase over the next several weeks. Based on that estimate, Tecumseh would deposit funds as needed to pay for the receivables. From October 2020 through September 2021, Tecumseh deposited an average of $308,950 per month. For that same period, we paid an average of $290,385 to medical providers to purchase receivables.

67.    I and people working under my supervision traced all of the deposits and withdrawals in the BofA Account. Our Tracing Analysis is Trial Exh. A-20.

68.    To determine the source of the deposits in the BofA Account, we reviewed all of the account statements for that account through September 2021. Deposits by Tecumseh are identified on the account statements with the following language: "ORIG:TECUMSEH INFINITY MEDICAL ID:8704901991 SND BK:NORTHBROOK BANK & TRUST COMPA." We determined that Tecumseh deposited $3,707,401.26 in investor funds into the BofA account. Copies of the BofA Account statements showing all withdrawals and deposits are at Trial Exh. A-18. They are identified on the Tracing Analysis as "Tecumseh Deposits."

17

69.     To confirm that these deposits reflected investor funds, we reviewed the Northbrook Account. I reviewed all of the statements for the Northbrook Account from June 2020 through September 2021. For each month in which in which Tecumseh deposited funds into the BofA Account from the Northbrook Account, I confirmed that there were sufficient investor deposits in the Northbrook Account to cover the deposit to the BofA Account. Copies of the Northbrook Account statements are at Trial Exh. A-19.

70.     We identified $696,747.31 of deposits that relate to payments received for receivables purchased by Tecumseh. To insure that we did not understate the funds related to payments received on receivables, we credited all deposits that we could not positively identify as either a deposit by Tecumseh or a returned item or the like as a receivable deposit. These are shown on the Tracing Analysis as "Receivables." Note that for August 2021, $80,564.35 was deposited but $32,380.80 was reversed by the bank for a net of $48,183.55. The $32,380.80 item was deposited on August 26, 2021 and charged back by the bank on August 27, 2021.

71.     We also identified $139,403.56 as "Other Deposits." These are a $60 wire transfer fee refund on December 14, 2020, a $59,047.97 return of posted check 1691 on March 4, 2021, a $78,000 returned wire from Stat Diagnostics on March 24, 2021 and a $2,295.59 returned item in June 2021.

72.     The withdrawals for payments to medical service providers to purchase receivables are set out in the Reconciliation that is Trial Exh. A-17.  The Reconciliation shows that Tecumseh paid $3,185,582.35 directly to medical service providers from the BofA Account. Our separate review of the bank statements confirms that at least that much was distributed from the BofA Account to medical providers. These payments are identified as "Provider Payments" in the Tracing Analysis. The monthly totals in the Reconciliation and the Tracing Analysis do not correspond because the Reconciliation is based on the date checks were written and the Tracing Analysis is based on the date checks cleared. In addition, the total amount in the Tracing Analysis is higher ($3,484,619.03) due to returned items such as the two items totaling $137,047.97 in March 2021 discussed above and because Tecumseh bought receivables not brokered by Infinity in September 2021 following the petition date using the BofA Account.

72173407;3

73.    Tecumseh also paid Infinity's fee out of the BofA Account. It paid $723,072.79 to Infinity in fees and expense reimbursements. The payments are identified as "Infinity Fees" in the Tracing Analysis. In addition, Tecumseh distributed $55,580.80 to Infinity in October 2020 (Check 1001, dated 9/30/2020 cleared 10/1/2020) to enable Infinity to purchase the Batch 1-G receivables, which are part of the Disputed Receivables, on Tecumseh's behalf.

74.    The total Tecumseh Deposits into the BofA Account ($3,707,401.26) exceed the amount that Tecumseh paid for the Direct Purchase Receivables ($3,185,582.35) by more than $521,000. The flow of funds from Tecumseh Deposits and Provider Payments shows that the Tecumseh Deposits were used to pay the Provider Payments. On October 1, 2020, the BofA account had a balance of $56,175.06. On that day, check 1001 in the amount of $55,580.80 for Batch 1-G of the Series 1 cleared leaving a balance of less than $1,000. On October 29, 2020, Tecumseh deposited $200,000 and wired $142,862.63 to medical providers South Atlanta MUA, Stat Diagnostics and Preva. The only possible source of payment for these receivables was Tecumseh's $200,000 deposit. From then on Tecumseh Deposits exceeded Provider Payments by a wide margin. From July 2020 through September 2021, cumulative Tecumseh Deposits were higher than cumulative Provider Payments in each month as shown below.

|  | Cumulative Tecumseh Deposits | Cumulative Provider Payments | Difference |
|---|---|---|---|
| Jul-20 | $ 350.00 | $ - | $ 350.00 |
| Aug-20 | $ 350.00 | $ - | $ 350.00 |
| Sep-20 | $ 350.00 | $ - | $ 350.00 |
| Oct-20 | $ 400,350.00 | $ 143,269.01 | $ 257,080.99 |
| Nov-20 | $ 400,350.00 | $ 271,866.95 | $ 128,483.05 |
| Dec-20 | $ 800,350.00 | $ 529,150.63 | $ 271,199.37 |
| Jan-21 | $ 1,300,350.00 | $ 830,245.60 | $ 470,104.40 |
| Feb-21 | $ 1,300,350.00 | $ 1,067,187.31 | $ 233,162.69 |
| Mar-21 | $ 1,592,653.50 | $ 1,506,191.97 | $ 86,461.53 |
| Apr-21 | $ 1,962,785.20 | $ 1,855,632.65 | $ 107,152.55 |
| May-21 | $ 2,447,365.18 | $ 2,214,705.14 | $ 232,660.04 |
| Jun-21 | $ 2,860,043.95 | $ 2,767,335.39 | $ 92,708.56 |
| Jul-21 | $ 3,191,470.48 | $ 2,979,537.16 | $ 211,933.32 |
| Aug-21 | $ 3,417,561.32 | $ 3,204,879.42 | $ 212,681.90 |
| Sep-21 | $ 3,707,401.26 | $ 3,484,619.03 | $ 222,782.23 |

72173407;3

75. Also, the total payments related to Receivables ($696,747.31) was less than the amount paid to Infinity for fees ($723,072.79). The margin is even greater when the $55,580.80 for the Batch 1-G receivables is included.

76. Beginning in late-2020 and continuing through the first quarter of 2021, I attempted to reconcile Tecumseh's records against Infinity's records and the records that FTM was supposed to be maintaining. I had numerous calls and e-mails with Bill Dalzell of FTM and Oliver Hemmers of Infinity which provided only incomplete information and excuses from both of them. It quickly became apparent that Infinity had not spent all the money that we provided to it prior to the end of October 2020 in order to buy receivables for Tecumseh. By January 2021, I recognized that there was at least $80,000 that we had provided to Infinity that had not been used for receivables or to pay fees earned by Infinity.

77. At the time, it seemed to make the most sense for Infinity to use the money that it had already received from us for the purpose of purchasing receivables to purchase new receivables for Tecumseh. Infinity agreed to do so. Mr. Dalzell informed me that Infinity had purchased the Batch P-A and Batch P-B receivables using Tecumseh's money that it had on hand. In an e-mail to me dated January 22, 2021 (Trial Exh. H-196), Mr. Dalzell sent me lists of the Batch P Receivables purchased with funds previously supplied by Tecumseh. The lists were two Excel files called "Dec TIF Receivables Batch P(A) Verified Redacted – 17 DEC 2020.xlsx" and "Dec TI Rec (Batch P-B) Verified Redacted - Dec 2020.xlsx." The cost (including Infinity's fee) of the Batch P-A receivables was $54,626.71 and of the Batch P-B receivables was $22,585.20 for a total of $77,211.91. In this e-mail, Mr. Dalzell told me that he "did not believe any funds need to be transferred" which I understood to mean that Infinity had used the funds that we had already paid them.

78. I understand that HASelect has alleged that a $73,644.86 wire from the BofA Account to Infinity on December 11, 2020 was payment for the Batch P-A and Batch P-B receivables. It was not. That wire was a payment of Infinity's fee for prior months.

72173407;3

79.    Mr. Dalzell's e-mail (Trial Exh. H-196) also contained a third Excel file, "Dec TIF Receivables Batch P (DP) Verified Redacted- 20 Dec 2020.xlsx," that identifies receivables included within the Direct Purchase Receivables as well as two purchase orders. I ignored the purchase orders as I had previously asked Mr. Dalzell to stop sending them.

80.    The accounting and reconciliation did not immediately improve. By early-February 2021, I had learned that Infinity owed us even more money than I initially thought. The $77,212 spent on the Batch P receivables was not the full extent of the issue. By late February, I had complained to Mr. Dobozy about Mr. Dalzell's failure to complete the 2020 reconciliation and questioned the value that FTM was bringing to Tecumseh. Trial Exh. F-137 (E-mail correspondence between me and Mr. Dobozy, dated February 25, 2021). By March and April of 2021, the accounting issues began to get resolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated August 17, 2023.

_____

MICHAEL BELOTZ

72173407;3

21